FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ JUN 17 2011 ★

BROOKLYN OFFICE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

NANCY KOWALSKI, on behalf of herself and all other
similarly situated,

                        Plaintiff,

         v.

APPLE REIT TEN, INC., APPLE REIT NINE, INC,
DAVID LERNER ASSOCIATES, INC., DAVID
LERNER, GLADE M. KNIGHT, BRYAN PEERY,
KENT W. COLTON, GLENN W. BUNTING, R.
GARNETT HALL, JR., RONALD A. ROSENFELD,
ANTHONY FRANCIS "CHIP" KEATING, III, LISA B.
KERN, BRUCE H. MATSON, MICHAEL S. WATERS,
AND ROBERT M. WILY

                        Defendants,

CIVIL ACTION
NO:

**CV 11 - 2919**

CLASS ACTION
COMPLAINT

JURY TRIAL DEMANDED

**MATSUMOTO, J.**

**J. ORENSTEIN, M.J.**

Plaintiff Nancy Kowalski ( "Plaintiff"), individually and on behalf of all other persons

similarly situated, by her undersigned attorneys, alleges the following for her Class Action

Complaint against defendants, based upon personal knowledge as to herself and her own acts,

and based upon information and belief as to all other matters from, *inter alia*, the investigation of

Counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings of Apple REIT Six, Inc. ("REIT Six"), Apple REIT Seven, Inc. ("REIT Seven"),

Apple REIT Eight, Inc. ("REIT Eight"),  Apple REIT Nine, Inc. ("REIT Nine"), and Apple

REIT Ten, Inc. ("REIT Ten"), the complaint in a Disciplinary Hearing intiated against David

Lerner Associates, Inc. by the Financial Industry Regulatory Authority ("FINRA") on May 27,

2011, other regulatory filings and reports, press releases and other public statements, reference to

authoritative accounting literature and consultations with forensic accounting experts.

## I.    **INTRODUCTION**

1.    This class action lawsuit asserts claims under Sections 11, 12, and 15 of the
Securities Act of 1933 ("Securities Act") on behalf of all persons or entities who purchased
shares of REIT Nine and REIT Ten pursuant to Offering Documents issued by the REITs and
pursuant to solicitations by the sole distributor of shares, David Lerner Associates, Inc. ("DLA"),
that contained materially false and misleading statements and omitted to state facts necessary to
make the statements made therein not materially misleading.

2.    The false and misleading statements and omissions alleged herein fall into three
general categories, summarized here:

a.    First, REIT Nine's and REIT Ten's registration statements and
prospectuses ("Offering Documents," defined below) failed to disclose material information
concerning the valuation of shares of REITs Six through Nine that was highly material to
investors' decisions to invest and, further, failed to disclose that the valuation of shares of those
REITs did not adhere to rules adopted by FINRA pertaining to such valuations.  Specifically,
when defendants were selling shares of REIT Nine for $11 per share from April 25, 2008 to
December 2010, and when defendants were selling shares of REIT Ten for $11 per share from
January 2011 to present, defendants never disclosed that the true value of shares of REITs Six,
Seven, and Eight, (and eventually REIT Nine) had been significantly eroded as a result market
fluctuations, performance declines, increased leverage, and excessive return of capital. REITs
Six through Ten all invest primarily in properties of the same two hotel chains, they are managed
by the same individual and are closely interrelated, and they all offer shares to the public at the
same price of $11 per share.   Thus, the significant decline in the value of prior REIT shares was
highly material to investors and should have been disclosed in the Offering Documents pursuant

2

to SEC regulations.  Indeed, the Offering Documents contained several charts concerning the
financial results of the prior REITs, yet, the fact that the value of the prior REITs' shares had
been significantly eroded by, *inter alia*, paying distributions by returning capital and borrowings
was never disclosed to investors.  Moreover, the failure to restate the market value of the prior
REIT shares violated FINRA rules, which require share value estimates for Real Estate
Investment Trusts to be based on information that is not more than 18 months old.  By failing to
disclose that the value of shares of REITs Six, Seven, Eight, and, eventually, REIT Nine, had
declined significantly, and by not disclosing the failure to adhere to FINRA rules, investors in
REIT Nine and REIT Ten were presented a materially misleading picture of the success (or lack
thereof) of the related REITs.  That information was highly material to the decision to invest in
REITs Nine and Ten.

    b.  Second, one of the primary reasons why distributions were being funded
by investors' capital and borrowing, and therefore one of the primary reasons that the values of
REITs Six through Nine have collapsed, is that the Apple REIT operations model was
guaranteed to lose the investors' capital.  This occurred because the model entailed the
acquisition of hotel properties that would yield revenues and profits that could not support the
level of distributions that defendants were paying.  In many instances, the Apple REITs acquired
existing properties that simply did not generate enough cash to support the 8% distributions the
REITs were paying.  In other instances, the REITs purchased recently completed or to-be-built
properties without any of the types of cash flow guarantees that were industry standards to
protect the REIT.  Thus, the operational shortfalls were virtually guaranteed. Whether the
acquisitions were motivated by sweetheart deals between the sponsors and the hotel developers
(e.g., a single developer, LBAM Management Group LLC, developed, built and sold more than

50 hotels to Apple REITs) or by a desire to maximize for certain defendants the commissions

and fees that were paid to them based on acquisition prices, or for some other reasons (such as

business naiveté) is less important than the end result. The end result was that the hotel

properties acquired by the Apple REITs were guaranteed not to generate anywhere near the level

of revenues and profits necessary to meet distribution levels, with the result that investor capital

(and, as a consequence, share value) was certain to be depleted. None of these facts were

disclosed in the Offering Documents

        **c.**     Third, DLA, the sole distributor of shares, solicited purchases of REITs

Nine and Ten by means of false and misleading statements concerning the distributions paid by

REITs Six through Nine.   In soliciting the purchase of shares, DLA provided summary

information to prospective purchasers that was false and misleading with respect to the

distributions paid by REITs Six through Nine because it failed to disclose that such distributions

(1) had declined over time and (2) were funded by, *inter alia*, returning investor capital and by

borrowing on lines of credit.   Further, DLA failed to disclose that it had not engaged in adequate

due diligence sufficient to be able to recommend purchases of shares based, in part, on the fact

that it failed to recognize or take into account the fact that the market value of the prior REITs

had declined precipitously.  DLA should not have recommended purchases at all, but at a

minimum it should have provided truthful summaries of the prior REITs' performance and

should have warned investors that, even though they were still being represented as being valued

at $11 per share, the market value of shares of the prior REITs had declined significantly below

the $11 per share for which they were originally sold.  On May 27, 2001, FINRA initiated a

Disciplinary Hearing against DLA based on allegations substantially similar to those herein.

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1331.

4.     Venue is proper in this Court pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391, because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and certain of the defendants have their principal places of business within this District. Specifically, DLA, which is the sole distributor of the shares that are at issue in this lawsuit, is a New York corporation headquartered in this District. Thus, the solicitations at issue originated in this District and many of the specific statements at issue in this lawsuit emanated from this District.

5.     In connection with the acts, conduct and other wrongs complained of herein, defendants used the means and instrumentalities of interstate commerce.

## III.     PARTIES

### Plaintiff

6.     Plaintiff Nancy Kowalski, a resident of Palm Beach County, Florida, purchased 1,818.1 shares of REIT Nine as set forth on the attached certification.

### Defendants

7.     **Defendant REIT Ten** is a Virginia corporation formed by Glade M. Knight on August 11, 2010. REIT Ten's office address is 814 East Main Street, Richmond, Virginia 23219.

8.     REIT Ten was formed to acquire and own hotels and other income-producing real estate. REIT Ten operates for federal income tax purposes as a real estate investment trust. A real estate investment trust is an entity which combines the capital of many investors to own and,

in most cases, operate income-producing real estate. As a real estate investment trust, REIT Ten

is not treated for federal income tax purposes as a corporation, and thus, is not taxed at the

corporate level on its "real estate investment trust taxable income" that is distributed to

shareholders. In order to qualify as a real estate investment trust, REIT Ten must comply with a

number of requirements and provisions within the Internal Revenue Code, including that it must:

      (a)     pay at least 90 percent of its otherwise taxable income to shareholders;

      (b)     derive most of its income from real estate held for the long term;

      (c)     operate or manage its assets through a subsidiary which can be wholly owned by the REIT; and

      (d)     be widely held.

9.     REIT Ten is not traded on any securities exchange.  Rather, shares are sold to the

public by REIT Ten's sole distributor, DLA.  Because shares do not trade on any exchange, there

is no market by which share value is determined.  Instead, purchases are highly dependent on the

financial statements and other reports from the REIT and Defendants are able to sell shares to the

public at a fixed price of $11 per share.  Since REIT Ten's securities are unlisted and relatively

illiquid, securities analysts do not typically report on REIT Ten.  Therefore, the type of in depth

analysis that analysts generate about listed securities is absent from the body of information

available about REIT Ten stock, heightening the importance of complete and accurate

disclosures to investors.

10.     From its formation through May 19, 2011, REIT Ten has raised over $307

million from the investing public, who have purchased over 28 million shares at a price of $11

per share (or $10.50 per share for the first 9,523,810 shares sold).

11.     REIT Ten does not have any employees. Rather, it contracts with affiliates of Glade M. Knight to provide services to it. Defendant Apple Ten Advisors, Inc. ("Apple Ten Advisors") provides day-to-day management of REIT Ten. Apple Ten Advisors receives an asset management fee based on the ratio of modified funds from operations to the amount raised in the offering, plus reimbursement of expenses. Apple Suites Realty Group, Inc. ("Apple Suites Realty") provides property acquisition and disposition services and receives 2% of the gross price of all properties purchased or sold by REIT Ten, plus reimbursement of expenses. Apple Ten Advisors and Apple Suites Realty, however, also do not have any employees. Rather, they use the services of certain officers and employees of Apple Fund Management, LLC (a subsidiary of Apple REIT Six, Inc. and indirectly controlled by Glade M. Knight) to perform the functions for which they have contracted. Glade M. Knight owns all of the outstanding capital stock of Apple Ten Advisors and Apple Suites Realty.

12.     **Defendant REIT Nine** is a Virginia corporation formed by Glade M. Knight on November 8, 2007. REIT Nine's office address is 814 East Main Street, Richmond, Virginia 23219.

13.     REIT Nine was formed to acquire and own hotels and other income-producing real estate. REIT Nine operates for federal income tax purposes as a real estate investment trust.

14.     REIT Nine is not traded on any securities exchange. Rather, shares are sold to the public by REIT Nine's sole distributor, DLA. Because shares do not trade on any exchange, there is no market by which share value is determined. Instead, purchases are highly dependent on the financial statements and other reports from the REIT and Defendants are able to sell shares to the public at a fixed price of $11 per share. Since REIT Nine's securities are unlisted and relatively illiquid, securities analysts do not typically report on REIT Nine. Therefore, the

type of in depth analysis that analysts generate about market traded securities is absent from the body of information available about REIT Nine stock, heightening the importance of complete and accurate disclosures to investors.

15.    From its formation through May 19, 2011, Apple REIT Nine has collected nearly $2 billion from the investing public, who have purchased nearly 200 million shares at a price of $11 per share (or $10.50 per share for the first 9,523,810 shares sold).

16.    REIT Nine does not have any employees. Rather, it contracts with affiliates of Glade M. Knight to provide services to it. Defendant Apple Nine Advisors, Inc. ("Apple Nine Advisors") provides day-to-day management of REIT Nine. Apple Nine Advisors receives an asset management fee based on the ratio of modified funds from operations to the amount raised in the offering, plus reimbursement of expenses. Apple Suites Realty provides property acquisition and disposition services and receives 2% of the gross price of all properties purchased or sold by REIT Nine, plus reimbursement of expenses. Apple Nine Advisors and Apple Suites Realty, however, also do not have any employees. Rather, they use the services of certain officers and employees of Apple Fund Management, LLC (a subsidiary of Apple REIT Six, Inc. and indirectly controlled by Glade M. Knight) to perform the functions for which they have contracted. Glade M. Knight owns all of the outstanding capital stock of Apple Nine Advisors and Apple Suites Realty.

17.    **Defendant Apple Ten Advisors** is wholly owned by Defendant Knight and contracts to provide day-to-day management of REIT Ten.

18.    **Defendant Apple Nine Advisors** is wholly owned by Defendant Knight and contracts to provide day-to-day management of REIT Nine.

19.    **Defendant DLA** was and is the sole distributor and managing dealer for sales of

shares of REIT Nine and REIT Ten to the public.  DLA is a New York corporation with its office

address at 477 Jericho Turnpike, P.O. Box 9006 Syosset, New York 11791-9006.  DLA is a

registered broker-dealer with the Securities and Exchange Commission ("SEC") and is a member

of FINRA, formerly known as the National Association of Securities Dealers, Inc.

20.    DLA primarily conducts business with retail customers at branch offices on the

east coast of the United States of America. DLA's voting shares are wholly owned by an

individual, David Lerner, and its' non-voting shares are held by individuals and trusts established

by David Lerner.

21.    Since 1992, DLA has served as best efforts underwriter and sole distributor of a

series of ten REITs formed by Glade M. Knight and his affiliates that have issued nearly $6.8

billion in securities to date.  The last seven REITs, the so-called "Apple REITs," have invested

almost exclusively in the same sector: extended stay hotels of only two national chains.

Revenues generated by DLA's sale and distribution of certain real estate investment trust REIT

units represent approximately 70% of its total revenues.

22.    DLA collects commissions of 7.5% of all Apple REIT shares it sells, plus a 2.5%

marketing expense allowance, for a total of 10% of all shares it sells.  DLA also receives a fee

for account management services of $5 per new customer account and $10 per year for each

active customer account.

23.    DLA has sold nearly $6.8 billion of Apple REIT securities into approximately

122,600 customer accounts in its role as sole distributor (managing dealer) of the offerings. It has

collected nearly $600 million from Apple REIT sales, which has accounted for 60–70 percent of

DLA's business annually since 1996.  DLA has earned over $30 million in commissions and marketing allowances related to sales of Apple REIT Ten shares alone.

24.     DLA, in its capacity as best efforts underwriter and sole distributor, continues to solicit numerous customers to purchase Apple REIT Ten without performing adequate due diligence to determine that there is a reasonable basis to recommend the security to any customer. DLA has sold the Apple REITs and continues to sell REIT Ten targeting unsophisticated and elderly customers to buy the illiquid Apple REIT securities.

25.     **Defendant David Lerner ("Lerner")** is the president, founder, and the sole owner of the voting shares of DLA and also owns a majority of DLA's non-voting shares.

The REIT's Officers and Directors

26.     The following are officers and directors of REIT Nine and REIT Ten and are referred to collectively herein as the "**REIT Officers and Directors**":

27.     **Defendant Glade M. Knight** ("Knight") is the founder, chairman, and chief executive officer of REITs Six, Seven, Eight, Nine, and Ten. Mr. Knight is also the chief executive officer and sole shareholder of Apple Ten Advisors, Apple Nine Advisors, and Apple Suites Realty.  Knight signed all of the relevant Offering Documents on behalf of REITs Nine and Ten.

28.     **Defendant Bryan Peery** ("Peery") is the Executive Vice President and Chief Financial Officer of REITs Six, Seven, Eight, Nine, and Ten. Peery signed all of the relevant Offering Documents on behalf of REITs Nine and Ten.

29.     **Defendant Kent W. Colton** ("Colton") has been a director of REIT Ten from August 2008 to present and signed all of the relevant Offering Documents on behalf of REIT Ten.

30.     **Defendant Glenn W. Bunting** ("Bunting") has been a director of REIT Ten from August 2008 to present and signed all of the relevant Offering Documents on behalf of REIT Ten.

31.     **Defendant R. Garnett Hall, Jr.** ("Hall") has been a director of REIT Ten from August 2008 to present and signed all of the relevant Offering Documents on behalf of REIT Ten.

32.     **Defendant Ronald A. Rosenfeld** ("Rosenfeld") has been a director of REIT Ten from August 2008 to present and signed all of the relevant Offering Documents on behalf of REIT Ten.

33.     **Defendant Anthony Francis "Chip" Keating, III** ("Keating") has been a director of REIT Ten from August 2008 to present and signed all of the relevant Offering Documents on behalf of REIT Ten.

34.     Defendants Knight, Peery, Colton, Bunting, Hall, Rosenfeld, and Keating are sometimes referred to herein as the "**REIT Ten Officers and Directors**."

35.     **Defendant Lisa B. Kern** ("Kern") has been a director of REIT Nine from 2007 to present and signed all of the relevant Offering Documents on behalf of REIT Nine. Ms. Kern is also a director of REIT Six and REIT Seven.

36.     **Defendant Bruce H. Matson** ("Matson") has been a director of REIT Nine from 2007 to present and signed all of the relevant Offering Documents on behalf of REIT Nine.  Mr. Matson is also a director of REIT Six and REIT Seven.

37.     **Defendant Michael S. Waters** ("Waters") has been a director of REIT Nine from 2007 to present and signed all of the relevant Offering Documents on behalf of REIT Nine.  Mr. Waters is also a director of REIT Six and REIT Eight.

38.     **Defendant Robert M. Wily** ("Wily") has been a director of REIT Nine from 2007 to present and signed all of the relevant Offering Documents on behalf of REIT Nine. Mr. Wily is also a director of REIT Six and REIT Eight.

39.     Other than Defendant Knight, none of the REIT Officers and Directors has ever purchased a single share of Apple REITs Six through Ten. In fact, even though the non-employee directors of the REITs receive options to purchase shares as part of their compensation, not a single one has ever exercised one of their options.

## IV.    CLASS ACTION ALLEGATIONS

40.     This is a class action pursuant to Rule 23(a), (b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of all persons who purchased or otherwise acquired REIT Nine and REIT Ten securities pursuant to the Offering Documents and/or through DLA between June 16, 2008 and present, inclusive (the "Class Period"), who suffered damages as a result of the actions complained of herein (the "Class").

41.     Excluded from the Class are the Defendants named herein, officers and directors of Defendants at all relevant times, members of each Defendant's immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

42.     Because REIT Ten has sold over 28 million shares during the Class Period, and REIT Nine has sold nearly 200 million shares during the Class period, members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined through appropriate discovery, Class members number at least in the tens of thousands and they are geographically dispersed.

43.     Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct.

44.     Plaintiff will fairly and adequately protect the interests of all Class members and has retained counsel experienced and competent in class and securities litigation. Plaintiff has no interest contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent. Because Plaintiff alleges identical conduct on the part of defendants with respect to marketing and selling of shares of REITs Nine and Ten, the sales of which were solicited by the same defendants based on Offering Documents that contained identical or nearly identical false and misleading statements or omitted the same material information, she is similarly situated to all Class members, there are no conflicts, and she will fairly and adequately protect the interests of all Class members, including purchasers of both REIT Nine and REIT Ten.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

        (a)     Whether defendants violated Sections 11, 12, and/or 15 of the Securities Act;

(b)     Whether REIT Nine and REIT Ten's registration statements and prospectuses contained materially false and misleading statements and failed to disclose material facts necessary to make the statements therein not materially false and misleading;

(c)     Whether DLA solicited purchases through materially false and misleading statements and failed to disclose material facts necessary to make the statements therein not materially false and misleading; and

(d)     Whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

## V.     **WRONGFUL CONDUCT**

### **Background**

47.     One of the primary objectives of REITs generally is the regular distribution of the REIT's income in the form of dividends at a consistent level, typically 6-8% annually. To be sustainable, these distributions *should be* funded by cash flows from the REIT's operating activities.

48.     While it is not uncommon in the initial stages for distributions to be funded, in part, by the proceeds of the sale of REIT shares -- *i.e.*, returning invested capital -- a successful REIT must eventually start earning enough revenue to support its distributions without using invested capital to pay dividends.

49.     Apple REITs Six through Ten have never become profitable enough to consistently fund the 8% distributions that they were paying. Instead, the distributions were funded through, *inter alia*, returning investor capital (*e.g.,* paying distributions to earlier investors with newly invested capital in the manner of a Ponzi scheme) and through borrowing on lines of credit. Of course, funding distributions in that manner seriously impaired the value of

those REITs, since the REITs incurred debt and depleted capital that could have been used to invest in properties. Further, market and economic declines beginning in 2008 and continuing into 2010 compounded the loss of value of the REITs shares. By 2008, the market value of shares of REITs Six through Eight had fallen well below the $11 for which they had been sold. However, when REIT Nine began selling shares in 2008, and when REIT Ten subsequently began selling shares in 2010, investors were never informed about the dismal financial performance of and significant loss of value of shares of the prior REITs.

50.     To make matters worse, DLA, the sole distributor of those shares, employed misleading promotional materials that obscured the fact that the profitability of the prior REITs had been plummeting and that their distributions were substantially derived from investor capital and borrowings.

51.     REIT Nine sold shares to the public from April 25, 2008 to December 2010. REIT Ten has sold shares to the public from January 20, 2011 to the present. Both REITs were formed by Defendant Knight and his affiliates for the purpose of acquiring and owning hotels and other income-producing real estate. Both REITs sold shares to the public for $11 per share.[1] Between April 25, 2008 and December 2010, REIT Nine sold nearly 200 million shares to the public for gross proceeds of nearly $2 billion. As of April 30, 2011, REIT Ten had sold approximately 28,342,685 shares for gross proceeds of over $307 million.

52.     There is no public market for REIT Six through Ten's common shares. Since their securities are unlisted and relatively illiquid, securities analysts do not typically report on the Apple REITs. Therefore, the type of in depth analysis that analysts generate about market traded

---

[1]     As an incentive to purchase at the early stages of the offering, the first 5% of shares (9,523,810 shares) in both offerings were sold for $10.50 per share.

securities is absent from the body of information available about the stock of REITs Six through Ten, heightening the importance of complete and accurate disclosures to investors.

53. Exhibit A, attached hereto and incorporated by reference herein, lists the registration statements, and prospectuses and other documents incorporated therein, that comprise the Offering Documents for the REIT Ten public offering ("REIT Ten Offering Documents").

54. Exhibit B, attached hereto and incorporated by reference herein, lists the registration statements, and prospectuses and other documents incorporated therein, that comprise the Offering Documents for the REIT Nine public offering ("REIT Nine Offering Documents").

55. The REIT Nine Offering Documents and the REIT Ten Offering Documents are referred to collectively herein as the "Offering Documents."

56. REIT Nine and REIT Ten were not the first REITs formed by Knight to invest in hospitality properties. Rather, they were merely the latest in a string REITs formed by Knight beginning at least as early as 2000, and including REIT Six (which sold shares from April 23, 2004 to March 2006), REIT Seven (which sold shares from March 15, 2006 to July 2007), and REIT Eight (which sold shares from July 19, 2007 to April 2008), all of which invested in in the same real estate subsector as REITs Nine and Ten, nationally branded extended stay hotels, and all of which offered shares for $11 per share, just like REITs Nine and Ten.

57. In fact, REITs Six through Ten all invested primarily in properties of the same two hotel chains (Marriott International, Inc. or Hilton Worldwide). They are managed by the same individual and are closely interrelated.

58.     Thus, the performance and history of prior Apple REITs was highly relevant and material to investors considering an investment in REIT Nine and REIT Ten.  Indeed, the registration statement and prospectus for REITs Nine and Ten included several descriptions of the "prior programs" intended "to provide prospective investors with information concerning the past performance of entities formed by Glade M. Knight."

59.     For example, the Prospectus for REIT Ten filed January 20, 2011 included a narrative summary of the "Prior Performance of Programs Sponsored by Glade M. Knight," which stated:

> In general, the investment objectives of the six real estate investment trusts previously organized by Glade M. Knight over the past ten years (Apple Hospitality Two, Apple Hospitality Five, Apple REIT Six, Apple REIT Seven, Apple REIT Eight and Apple REIT Nine), were similar to our investment objectives of achieving long-term growth in cash distributions, together with possible capital appreciation, through the acquisition, ownership and ultimate disposition of real properties.

(*Id.* at pp. 76-79).  That portion of the prospectus listed various information about the prior REITs, including, *inter alia*, the fact that they were all formed by Defendant Knight to acquire hotels, the dollar amount of shares sold, and the purchase price of the hotels each REIT acquired.

60.     Completely absent, however, is any disclosure that the value of the prior REITs had collapsed.  To the contrary, by stating that the prior REITs had sold a certain dollar amount of shares (e.g., "REIT Seven has sold approximately $1 billion in Units in a best-efforts offering") the prospectus implied that the value of those shares had not changed.  *Id.*  The Prospectuses for REIT Nine contained nearly identical disclosures concerning the prior REITs, which also failed to disclose that the value of the prior REITs had collapsed. *See e.g.*, REIT Nine Prospectus filed April 28, 2008, at pp. 80-83.

17

61.     In addition, the Prospectuses included numerous tables of financial data for the prior REITs, including the dollar amounts raised, operating results, and other information concerning the prior REITs. *See e.g.*, REIT Ten Prospectus filed January 20, 2011, at 119-127; REIT Nine Prospectus filed April 28, 2008, at pp. 125-132. Nevertheless, the financial disclosures omitted to state that the value of the prior REIT shares had declined dramatically.

### The Offering Documents Were Materially False and Misleading Because They Failed to Disclose That The Value of Prior Apple REITs Had Plummeted

62.     Just like REITs Nine and Ten, REITs Six through Eight sold shares to the investing public for $11 per share, with DLA serving as the underwriter and sole distributor. However, by at least 2008, when REIT Nine began selling shares, and continuing through January 2010, when REIT Ten began selling shares, the value of the shares of the prior REITs had significantly declined from their $11 selling price because their operations had fallen dramatically and, further, was damaged by the REIT's practice of returning original investment capital and DRIP proceeds. In addition, the economic downturn for commercial real estate (and the hotel and hospitality industry in particular) and net income declines compounded the loss of value of the prior REIT shares.

63.     FINRA Rule 2340 requires REITs to bring valuations of shares current within 18 months of closing a public offering. Virtually all other participants in the non- traded REIT industry performed revaluations of their own shares during the 2008-2010 period.

64.     Nevertheless, REITs Six through Nine never changed the $11 per share value in reports and statements provided to shareholders, which between 2008 and 2010 grew more and more inaccurate. REITs Six through Nine all issued shares at $11 per share and never changed that valuation since REIT Six commenced its offering in April 2004. The REITs based their

unchanging valuations solely upon the fact that they were currently selling shares at $11 to existing shareholders under Dividend Reinvestment Plans (DRIP) and redeeming shares at $11 under the redemption program. DLA accepted this justification and has always recorded the Apple REITs at $11 per share on customer account statements. That basis was and is wholly unsound because it adopted a defendant-controlled arbitrary value over a market value as required by FINRA Rule 2340 and the Securities Act.

65.     Because 10% of the proceeds from the sale of REIT shares is paid to DLA in the form of commissions and marketing allowances, the inherent value of the REIT shares does not even start at $11.

66.     In addition, by 2008, the prior REITs had an established pattern of acquiring properties that were virtually guaranteed not to be profitable enough to support 8% distributions. overpaying for properties, which further reduced the value of shares and made it impossible to fund the distributions that the REITs were paying from operating cash alone.  (See paragraphs 83-92, below)

67.     The overpayment for properties, plus the exorbitant commissions, acquisition fees, and offering expenses paid off the top, seriously impaired REITs Six through Nine's ability to fund distributions right from the start. In fact, REITs Six through Ten have *never* been profitable enough to fund their distributions to investors, which were 8 percent at the outset and reduced to 7 or 7.2 percent in May 2010.

68.     Instead, the REITs employed a variety of tactics to fund distributions that substantially eroded share value over time. Since the results of their operations were insufficient to fund the 7-8% distributions they were paying, the REITs borrowed on lines of credit to fund the distributions and, to the extent a shortfall remained after borrowing funds, they made up the

19

difference by including a return of capital to investors, which was derived from new investors' investments and/or DRIP investments. In other words, to maintain an artificially high return *on* investment, the Apple REITs made a return *of* investment with the dividend.

69.     Returning capital to investors and taking on debt (which must be serviced out of future income and new investor proceeds) reduces the value of the REITs' shares and limits the ability to acquire income producing assets to generate future income for distribution to investors. Increasing leverage in this manner may have allowed the REIT to fund distributions in the short term but it decreased the REIT's ability to generate income to fund distributions in the future and reduced share value.

70.     On top of paying exorbitant commissions, returning capital, and borrowing to fund distributions, general market conditions also seriously impaired the value of REITs Six through Nine. The economic downturn for commercial real estate (and the hotel and hospitality industry in particular), as well as net income declines, has compounded the loss of value of the shares of REITs Six through Nine. The general economy and the sector in which Apple REITs invest, extended stay hotels, suffered a significant, material downturn in 2008 and 2009 due to the overall economic crisis.

71.     Nevertheless, REITs Six through Nine have steadfastly maintained that their illiquid shares are worth the same $11 per share price at which they were issued. By failing to timely and properly account for the negative impact of the foregoing on the stock values of REITs Six through Nine, in violation of FINRA Rule 2340 and the Securities Act, Defendants failed to disclose material information o members of the Class that an ordinary investor would have wanted to know before investing in REITs Nine or Ten.

72.     Unlike most other market participants, the Apple REITs did not adjust their valuations, even while the REITs suffered substantial performance declines in 2008 and 2009, which did not fully recover in 2010. For example, in 10-K filings with the SEC, REIT Six disclosed substantial declines in all material financial metrics from 2008 to 2009:

a.     Cash flows from operations declined from $88,747,000 in 2008 to $66,029,000 to 2009.

b.     Total revenues declined from $258,913,000 in 2008 to $216,323,000 in 2009.

c.     Net income declined from $58,502,000 in 2008 to $33,379,000 in 2009.

d.     Funds from Operations in 2009 was down 27 percent from 2008.

e.     Revenue per room in 2009 declined 15.7 percent from 2008.

73.     Likewise, REIT Seven suffered substantial declines in all material financial metrics from 2008 to 2009:

a.     Cash flows from operations declined from $69,025,000 in 2008 to $55,460,000 to 2009.

b.     Total revenues declined from $214,291,000 in 2008 to $191,715,000 in 2009.

c.     Net Income declined from $38,063,000 in 2008 to $20,713,000 in 2009.

d.     Funds from Operations in 2009 was down 20 percent from 2008.

e.     Revenue per room in 2009 declined 14 percent from 2008.

74.     REIT Eight recently announced that it expects to default on five loans totaling $36.7 million and record an impairment loss of $7–11 million.

75.     A third party recently submitted tender offers to purchase shares of REIT Seven and REIT Eight on June 1, 2011 for $3 per share and estimated that the liquidation value of REIT Seven was approximately $4.15 per share and REIT Eight was approximately $4.10 per share. Nevertheless, REIT Eight's ostensible $11 per share valuation remains unchanged.

76.     When REIT Nine began selling shares in April 2008, and particularly when it was continuing to sell shares in 2009, the defendants should have informed prospective investors that the then current values of shares in REITs Six through Eight were significantly less than the $11 per share at which they were sold.

77.     Similarly when REIT Ten began selling shares in January 2010, the defendants should have informed prospective investors that then current values of shares in REITs Six through Nine were significantly less than the $11 per share at which they were sold.

78.     The unsupported $11 valuations concerned the core financial condition of those REITs. That information was highly material to investors who were being solicited to purchase shares in a later REIT with an identical investment strategy, run by the same management, at the same $11 per share price.

79.     SEC regulations articulated in Industry Guide 5 required disclosure in the Offering Documents concerning the sponsor's prior experience. Among other things, REITs are required to provide financial charts concerning prior REITs and a narrative summary of the prior programs. The narrative summary is required to "include a discussion of those major adverse business developments or conditions experienced by any prior program, either public or nonpublic, that would be material to investors in this program." Further, with respect to financial information disclosed, the Offering Documents must make all disclosures "necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

80.     In the case of the Apple REITs, the Offering Documents were materially misleading because they did not include a discussion of the substantial declines in share values that resulted from funding distributions through returning capital and borrowings, which were "major adverse business developments or conditions." Moreover, by including certain financial disclosures concerning the prior programs but ignoring the critical impaired value of shares, the Offering Documents omitted material information "necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

81.     Moreover, defendants should have disclosed that they were not in compliance with FINRA rules or industry standards requiring revaluation of the shares of REITs Six through Nine, which would have served as a red flag to investors concerning management and performance. FINRA rules required valuations to be performed based on current information within 18 months of the date that the REITs closed to new investors. Nevertheless, defendants have never provided updated market value information for REITs Six through Nine.

82.     Instead, REIT Nine's and REIT Ten's Offering Documents omitted any disclosure about the decline in value in REITs Six through Nine, or the fact that those REITs were non-compliant with industry standards and FINRA rules requiring revaluation, even while pointing to those prior REITs "to provide prospective investors with information concerning the past performance of entities formed by Glade M. Knight."

**The Offering Documents Were Materially False and Misleading Because They Failed to Disclose That The Apple REIT Acquisition Model Was Guaranteed to Fail**

83.     One of the primary reasons that the prior REITs were forced to fund distributions by returning capital and borrowing on lines of credit, and therefore one of the reasons behind the substantial decline in values of REITs Six through Nine, was that the Apple REIT property

acquisition model was virtually guaranteed to generate insufficient cash to fund the 8% distributions that the REITs were paying. By 2008, that failed model was well-established and should have been disclosed in the Offering Documents, when REITs Nine and Ten were embarking on the exact same course.

84.     As discussed above, for every dollar invested in the REITs, the first $.10 is paid to DLA as a commission and marketing expense. Right from the start 10% of the investable capital is gone. Then, for any property acquired, Apple Suites Realty collects a 2% commission, leaving only $.88 of every dollar available to invest in income-generating properties. As a matter of simple arithmetic, in order to fund distributions at 8%, each dollar invested would need to earn at least 9.14% annually, which does not even include management and other fees paid by the REITs.

85.     That model might work if the acquired properties earn more than 9.14%, but the properties acquired by the Apple REITs did not.

86.     Many of the properties acquired by the Apple REITs were established properties that were not generating nearly enough cash to support the 8% distributions that the REITs were paying. One example is a transaction for the purchase of six properties consummated during 2008 by REIT Eight. At the time of the acquisition, REIT Eight was paying shareholders a distribution of 8%. The six properties were purchased for a gross purchase price of $65.8 million. The 2007 audited financial statements of the combined operations of these properties show that cash flow from their operations, after deducting $780,000 for capital improvement reserves, was $4.4 million, a 6.7% return on investment. The hotels had been built between 2000 and 2006, so the operating information as presented in the financial statements should have been

representative of the stabilized operations of the properties. There was quite simply no reasonable basis to suppose that those properties could support 8% distributions.

87.    Another explanation for the dismal results of the prior REITs was the pattern of purchasing or committing to purchase recently completed or to-be-built properties, which was necessitated by the furious pace of capital raising by DLA. Hotels of the type invested in by the Apple REITs normally require a period of time to "stabilize" their operations, *i.e.*, to establish a market with repeat customers, corporate relationships and advance bookings. This period is usually about three years. The purchase price of newer properties and to-be-built properties is usually based on pro-forma financial statements and is accompanied by cash flow guarantees by the seller in order to compensate the purchaser for the risk inherent in purchasing a property that has not undergone a reasonable stabilization period. Of the approximately 250 hotels owned by Apple REITs Six through Nine, about 100 were new or to-be built properties, yet there is no indication that there were any guarantees provided by the sellers. Such risky acquisition practices could not support 8% distributions.

88.    As an example, from 2005 through 2006, LBAM Management Group LLC ("LBAM") was involved in the development, sale and management of more than 50 of the hotels owned by the REITs. At least one-half of these were developed and sold to the Apple REITs prior to operating a single day, substantially enriching LBAM in what was essentially a no risk arrangement whereby LBAM built hotels and sold them at full price without the risk of operating them for a single day. Adding insult to injury LBAM then stayed on to manage many of the properties under lucrative management agreements.

89.    Another example is two properties purchased by REIT Eight in July 2008 for a total of $22.5 million, which had recently been completed in 2007. As shown on the following

Table, the purchase price paid by REIT Eight represented a cost per room of $128,866 and $138,889, respectively, with Net Operating Income ("NOI") $4,386 and $5,551, which meant that the properties were earning a return on investment of 3.4% and 4%, far below what was sufficient to support an 8% distribution from REIT Eight.

| | Rooms | Cost | Cost Per Room | Annualized REVPAR 6/30/2008 | NOI /Room | ROI /Room |
|---|---|---|---|---|---|---|
| Courtyard | 97 | $12,500,000 | $128,866 | $ 24,096 | $ 4,386 | 3.40% |
| TownPlace Suites | 72 | $10,000,000 | $138,889 | $ 17,031 | $ 5,551 | 4.00% |

90.    By 2008, it should have been apparent to defendants that the disastrous acquisition model pursued by Apple REITs Six through Eight could not succeed.  A detailed financial analysis shows that over time REITs Six, Seven, and Eight were paying more and more in terms of cost per available room while Revenue Per Available Room ("RevPAR") for those acquisitions stayed roughly the same or fell.  By the time REIT Nine began acquiring properties, it was paying substantially more than REIT Six in terms of cost per available room, yet the RevPAR it could earn on those properties was substantially less.  In short, the strategy employed by REITs Six through Eight, and then REITs Nine and Ten, was never successful and, as time went on, the acquisitions became more expensive and less profitable.

91.    Yet, when REIT Nine and REIT Ten began selling shares, the failure of the model was never disclosed.  The failure of the model was a "major adverse business development[] or condition[] experienced by any prior program" that was highly material and should have been disclosed pursuant to SEC Industry Guide 5.   Further, disclosure was "necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

92.    Whether the acquisitions were motivated by sweetheart deals between the sponsors and the hotel developers (e.g., LBAM) or by a desire to maximize for certain

Defendants the commissions and fees that were paid to them based on acquisition prices, or for some other reasons is less important than the end result, which was that prior Apple REITs materially overpaid for hotel properties that were guaranteed not to generate anywhere near the level of revenues and profits necessary to meet distribution levels, with the result that investor capital (and, as a consequence, net asset value) was certain to be depleted. None of these facts were disclosed in the prospectuses.

### DLA Made False and Misleading Statements Concerning Distributions In Soliciting Sales

93.     Although there is no formal affiliation between DLA and the Apple REITs, DLA has sold nearly $6.8 billion of Apple REIT securities into approximately 122,600 customer accounts in its role as sole distributor (managing dealer) of the offerings.  Further, although all of the Apple REITs are illiquid and concentrated in one subsector, extended stay hotels, a substantial number of DLA's customers own two or more of the Apple REITs. Many of DLA's customers are senior citizens and/or unsophisticated, and DLA solicits customers by general means such as the internet, radio, cold calling, mailings, and open invitation seminars at senior centers.

94.     DLA collects 10 percent of the gross proceeds of all offerings of Apple REIT securities, composed of 7.5 percent in commissions and 2.5 percent in selling fees. The firm also collects additional fees for account maintenance services. The nearly $600 million generated from Apple REIT sales has accounted for a very large percent of DLA's business annually since 1996.

95.     In addition to soliciting purchases through the Offering Documents of REIT Nine and REIT Ten, DLA also solicited the purchase of shares through its website and other written materials.  Those solicitations were false and misleading in several respects.

96.     First, DLA failed to disclose that it had not performed adequate due diligence. As the sole distributor, DLA cannot merely accept the valuation and other material disclosures in the public filings of the Apple REITs but, rather, must conduct its own due diligence regarding the offerings. When it began to sell REIT Nine and REIT Ten, DLA's due diligence was inadequate because it had not identified the significant decline in share values in REITs Six through Eight (and with respect REIT Ten, Six through Nine), even though such declines were well-known in the industry. If it had conducted adequate due diligence, it could not have recommended purchases in REIT Nine and REIT Ten. Thus, DLA should have disclosed its failure to conduct sufficient due diligence to recommend purchases and, therefore, its entire selling effort was materially false and misleading.

97.     Second, DLA made materially false and misleading statements concerning previous distributions paid by REITs Six through Nine. REITs Six through Nine have distributed 7–8 percent returns to investors since the inception of the REITs. DLA used this prior performance to sell shares of REIT Nine and REIT Ten.

98.     Similar to other non-traded REITs, the Apple REITs use Funds from Operations ("FFO"), a non-GAAP measurement, in their public financial documents as a means to calculate income generated by properties that support distributions. However, since 2008, Apple REITs Six through Nine did not achieve anywhere near the cash from operations necessary to cover the 8 percent distributions they had been paying out to investors.

99.     REITs Six through Nine were able to make distributions — 8 percent at the outset, reduced to 7 or 7.2 percent in May 2010 — that well exceeded cash from operations in two ways. First, the Apple REITs borrowed funds and used the loan proceeds to fund the distributions. Second, to the extent a shortfall remained after borrowing funds, the REITs Six

through Nine made up the difference by including a return of capital to investors, which was derived from new investments and the DRIP program. In other words, to maintain an artificially high return *on* investment, the Apple REITs made a return *of* investment with the monthly dividend.

100.   Returning capital to investors and taking on debt (which must be paid out of future income and new investor proceeds) reduces the REIT's ability to preserve capital and generate future income for distribution to investors. Increasing leverage in this manner decreased the REIT's ability to preserve capital, maintain distribution levels in the future, and reduced the ability to generate income.

101.   DLA's website, through which it solicited purchases of REIT Nine and REIT Ten, provided information about the prior REITs' distributions in a materially misleading manner.

### *Misleading Use of Averages*

102.   First, the summary information provided on DLA's website was misleading when DLA began selling REIT Ten shares because it failed to note that REIT's Six through Nine had cut their distributions in May 2010.  DLA's recitation of "REIT History" included year-by-year "annual yields" for the earliest REITs, but it only provided a single figure, "average annualized distribution" since inception, for Apple REITs Six through Nine. Describing the performance of Apple REITs Six through Eight using average distribution since inception was misleading, because it masked that distribution rates for those REITs were cut in May 2010, which was more recent and more relevant:

a.  DLA's website represented that Apple REIT Six has achieved average annualized distribution of "7.9% through 3/31/11," but its distribution was reduced from 8.0 percent at inception to 7.2 percent in May 2010.

b.  DLA's website represented that Apple REIT Seven has achieved average annualized distribution of "7.62% through 3/31/11," but its distribution was reduced from 8.0 percent at inception to 7.0 percent in May 2010.

c.  DLA's website represented that Apple REIT Eight has achieved average annualized distribution of "7.48% through 3/31/11," but its distribution was reduced from 8.0 percent at inception to 7.0 percent in May 2010.

### *Misleading Omissions Concerning the Source of Distributions*

103.   Second, when DLA was selling shares of REIT Nine and REIT Ten, its website was materially misleading in that it failed to disclose that distributions had been funded by returning investor capital and borrowings.

104.   DLA's presentation of returns for REITs Six through Nine was misleading because it did not disclose that cash from operations was insufficient to support the 7–8 percent returns the REITs sought to pay.  DLA's website merely provided the percent paid as a distribution, but failed to note that those distributions were funded in large part by returning invested capital.

105.   DLA's presentation of returns also failed to disclose that those REITs made distributions that were partially funded by debt that further leveraged the REITs.

106.   Further, DLA's presentation misleadingly and inaccurately characterized the source of the distributions as "net income and a return of capital, primarily in the form of depreciation" when in fact the return of capital was not primarily from depreciation.

107.    By including misleading return figures of previous Apple REITs and failing to disclose significant caveats thereto, and masking the declining returns, DLA's website omitted material information and was misleading.  FINRA's Advertising Regulation Department twice warned DLA not to promote Apple REIT Ten using the returns of prior Apple REITs, yet DLA has persisted in making the same claims on its website to date.

108.    Thus, in addition to soliciting shares through a false and misleading registration statement that failed to disclose the material declines in value in REITs Six through Nine, DLA also solicited shares through its website by means of false and misleading statements concerning the makeup of the distributions paid by REITs Six through Nine and failed to disclose that it had not performed adequate due diligence to be able to recommend purchases.

## COUNT I

### For Violations of Section 11 of the Securities Act Against REIT Ten, DLA, and the REIT Ten Officers and Directors on Behalf of Purchasers of REIT Ten Shares

109.    Plaintiff incorporates by reference each and every allegation contained above as if set forth fully herein.

110.    This Count is asserted under Section 11 of the Securities Act, 15 U.S.C. §§ 77k, against REIT Ten, DLA, and the REIT Ten Officers and Directors, on behalf of the Members of the Class who acquired REIT Ten securities pursuant to the Offering Documents.  Each member of the Class who acquired shares of REIT Ten did so pursuant to or traceable to the Offering Documents.

111.    The Offering Documents were materially false and misleading by containing untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading, as set forth above.

112.    Pursuant to Section 11 of the Securities Act, the Class is entitled to recover its damages jointly and severally from REIT Ten as the registrant for the Offering Documents, and from the REIT Ten Officers and Directors, as persons who signed the Offering Documents, and from DLA who served as Underwriter.

113.    Defendants owed the Class the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that said statements were correct and that there was no omission of material fact required in order for the statements contained therein not to be misleading.

114.    In fact, through Defendants' negligence, the Offering Documents contained untrue statements of material fact and omitted material facts as set forth above.

115.    Defendants owed the Class an absolute duty to ensure that the statements contained therein were true and that there were no omissions of material facts.

116.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose, inter alia, the facts set forth above.

117.    As a direct and proximate result of their conduct, the price of REIT Ten stock was artificially inflated and the Class consequently suffered substantial damages in connection with their acquisition of shares.

118.    At the times they obtained their shares of REIT Ten, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements alleged herein.

119.    Plaintiff commenced this action within three years from the date of the Registration Statement for REIT Ten. Under Item 512(a)(2) of Regulation S-K, 17 C.F.R. §

229.512(a)(2), this action is commenced within three years of the bona fide public offering of the REIT Ten shares and is also commenced within one year of the time any member of the Class could have learned of the wrongs alleged herein.

120.    By reason of the above, Defendants have violated Section 11 of the Securities Act and are liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of the violation.

## COUNT II

### For Violations of Section 12 of the Securities Act
### Against REIT Nine, REIT Ten, and DLA

121.    Plaintiff incorporates by reference each and every allegation contained above as if set forth fully herein.

122.    This Count is asserted under Section 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77o, against REIT Nine, REIT Ten, and DLA on behalf of the Members of the Class who acquired REIT Nine or REIT Ten securities.

123.    REIT Nine, REIT Ten, and DLA offered, sold, solicited or were a substantial factor in the sale of REIT Nine and REIT Ten stock offered pursuant to the Offering Documents.

124.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

125.    Further, the information provided by DLA on its website constitutes a prospectus as that term is used in Section 12(a)(2) of the Securities Act, which also contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

126. REIT Nine, REIT Ten, and DLA owed to the members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the prospectuses at the time they became effective to ensure that said statements were true and that there was no omission of material fact required to be disclosed in order for the statements contained therein not to be misleading. REIT Nine, REIT Ten, and DLA knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the materials as set forth above.

127. Plaintiff and other members of the Class purchased or otherwise acquired REIT Nine and REIT Ten securities pursuant to and/or traceable to the defective prospectuses.

128. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

129. By reason of the above, the REIT Nine, REIT Ten, and DLA violated Section 12(2) of the Securities Act and are liable to Plaintiff and the Class, each of whom has been damaged by reason of the violation.

130. Plaintiff and the members of the Class still owning REIT Nine and REIT Ten stock hereby tender their stock upon return of the consideration paid, plus interest, and those members of the Class who sold their stock hereby tender the consideration they received upon the return of the consideration they paid, plus interest.

## COUNT III

### For Control Person Liability Under Section 15 of the Securities Act
### Against the REIT Directors and Officers,
### Apple Nine Advisor, Apple Ten Advisor, and Lerner

131.    Plaintiff incorporates by reference each and every allegation contained above as if set forth fully herein.

132.    Section 15 of the Securities Act, 15 U.S.C. § 77o, provides that "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...."

133.    The REIT Directors and Officers, Apple Nine Advisor, Apple Ten Advisor, and Lerner, by reason of their directorial and/or management positions, are controlling persons of REIT Nine, REIT Ten, and DLA within the meaning of Section 15 of the Securities Act and also are liable for the violations of Sections 11 and 12 of the Securities Act alleged herein.

134.    Based on the allegations made herein, the REIT Officers and Directors, Apple Nine Advisor, Apple Ten Advisor, and Lerner had the power, influence and authority to cause or prevent the wrongful conduct described herein.

135.    By reason of the above, the REIT Officers and Directors, Apple Nine Advisor, Apple Ten Advisor, and Lerner have caused violations Sections 11 and 12 of the Securities Act and are liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of the violation.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Certifying the Class as set forth herein and designating Plaintiff as the representative thereof;

B.    Declaring the conduct of the Defendants to be in violation of law as set forth herein;

C.    Awarding Plaintiff and members of the Class compensation for the damages which they have sustained as a result of the Defendants' unlawful conduct;

D.    Ordering rescission of share purchases;

E.    Enjoining Defendants from further violations of law as alleged herein;

F.    Awarding Plaintiff's reasonable attorneys' fees, experts' fees, interest and cost of suit; and

G.    Awarding such other and further relief as this Court may deem just.

### PLAINTIFF DEMANDS A JURY TRIAL

Dated: June 16, 2011

LABATON SUCHAROW LLP

By: *Michael Woolley*

Lawrence A. Sucharow
Joseph Sternberg
Michael Woolley
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

CHIMICLES & TIKELLIS LLP
Nicholas E. Chimicles
Kimberly M. Donaldson
Timothy N. Mathews
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

ECCLESTON LAW OFFICES, P.C.
James J. Eccleston
One North Franklin Street
Suite 2620
Chicago, IL  60606-4425

STOLTMANN LAW OFFICES
Andrew Stoltmann, Esquire
10 S. LaSalle, 35th Floor
Chicago, IL 60603

*Counsel for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Nancy Kowalski, hereby certifies as follows:

1.       I am fully authorized to enter into and execute this Certification concerning legal claims to be asserted involving Apple REIT Nine, Inc. alleging violations of the federal securities laws. I have reviewed a draft of the Complaint to be filed and have authorized counsel to file the Complaint on my behalf naming me as a named plaintiff and proposed class representative.

2.       I did not purchase or otherwise acquire any security that is the subject of this action at the direction of counsel or in order to participate in this private action or other litigation arising under the federal securities laws.

3.       I am willing to serve as a named plaintiff and class representative in this matter.  I understand that a named class plaintiff is a representative party who acts on behalf of other class members in directing the litigation and whose duties may include providing testimony at deposition and trial, if necessary.

4.       I purchased 1,818.1 shares of Apple REIT Nine, Inc. on or around April 2010 for $11 per share.

5.       During the three years prior to the date of this certification, I have not sought to serve as a lead plaintiff in any federal securities class action. I am not currently serving as a lead plaintiff in any securities class action.

6.       I will not accept any payment for serving as a lead plaintiff or representative party on behalf of the class beyond my pro rata share of any recovery, except reimbursement of reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7Th

day of June, 2011.

Nancy Kowalski

2

| Filings | Description | Filed/Effective |
|---------|-------------|-----------------|
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-06-16 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-06-16 |
| 8-K | Current report, item 5.02 | 2011-06-14 |
| 8-K | Current report, items 2.01 and 9.01 | 2011-06-13 |
| 8-K | Current report, items 2.02 and 9.01 | 2011-06-07 |
| 8-K | Current report, items 2.01 and 9.01 | 2011-06-07 |
| 8-K | Current report, item 1.01 | 2011-06-02 |
| EFFECT | Notice of Effectiveness | 2011-05-31 |
| POS AM | Post-Effective amendments for registration statement | 2011-05-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-05-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-05-19 |
| 8-K/A | [Amend]Current report, item 9.01 | 2011-05-17 |
| 8-K/A | [Amend]Current report, item 9.01 | 2011-05-17 |
| 8-K/A | [Amend]Current report, item 9.01 | 2011-05-17 |
| 8-K | Current report, items 8.01 and 9.01 | 2011-05-13 |

| | | |
|---|---|---|
| 10-Q | Quarterly report [Sections 13 or 15(d)] | 2011-05-06 |
| 8-K | Current report, item 1.01 | 2011-05-06 |
| 8-K | Current report, item 1.02 | 2011-05-05 |
| 8-K | Current report, item 1.01 | 2011-04-15 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-04-14 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-04-14 |
| 8-K | Current report, item 1.01 | 2011-04-07 |
| 8-K | Current report, items 2.01 and 9.01 | 2011-03-29 |
| 8-K | Current report, items 2.01 and 9.01 | 2011-03-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-03-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-03-17 |
| 8-K | Current report, items 2.01 and 9.01 | 2011-03-08 |
| 8-K | Current report, item 1.01 | 2011-03-04 |
| 8-K | Current report, items 1.01 and 1.02 | 2011-03-01 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-02-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-02-17 |
| 8-K | Current report, item 1.01 | 2011-02-14 |
| 8-K | Current report, item 1.01 | 2011-02-09 |

| 8-K | Current report, item 1.01 | 2011-02-03 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-01-27 |
| 8-K | Current report, item 5.02 | 2011-01-27 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2011-01-20 |
| EFFECT | Notice of Effectiveness | 2011-01-19 17:30:00 |

| Filings | Description | Filed/Effective |
|---|---|---|
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-12-02 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-12-02 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-11-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-11-18 |
| EFFECT | Notice of Effectiveness | 2010-10-27 |
| POS AM | Post-Effective amendments for registration statement | 2010-10-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-10-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-10-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-09-16 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-09-16 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-08-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-08-19 |
| EFFECT | Notice of Effectiveness | 2010-08-04 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-07-21 |
| POS AM | Post-Effective amendments for registration statement | 2010-07-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-07-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-06-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-06-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-05-20 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-05-20 |
| EFFECT | Notice of Effectiveness | 2010-04-30 |

| POS AM | Post-Effective amendments for registration statement | 2010-04-21 |
|---|---|---|
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-04-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-04-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-03-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-03-18 |
| EFFECT | Notice of Effectiveness | 2010-03-12 |
| POS AM | Post-Effective amendments for registration statement | 2010-02-26 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-02-26 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-02-26 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-02-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-02-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-01-21 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2010-01-21 |
| EFFECT | Notice of Effectiveness | 2009-12-16 |
| POS AM | Post-Effective amendments for registration statement | 2009-12-04 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-12-04 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-12-04 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-11-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-11-18 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-10-22 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-10-22 |
| 424B3 | Prospectus [Rule 424(b)(3)] MB | 2009-09-24 |
| EFFECT | Notice of Effectiveness | 2009-09-21 |

| POS AM | Post-Effective amendments for registration statement | 2009-09-04 |
|--------|------------------------------------------------------|------------|
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-08-20 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-08-20 |
| EFFECT | Notice of Effectiveness                              | 2009-07-28 |
| POS AM | Post-Effective amendments for registration statement | 2009-07-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-07-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-07-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-06-18 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-06-18 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-05-19 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-05-19 |
| EFFECT | Notice of Effectiveness                              | 2009-04-30 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-04-30 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-04-30 |
| POS AM | [Cover]Post-Effective amendments for registration statement | 2009-04-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-04-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-04-17 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-03-19 |
| 424B3  | Prospectus [Rule 424(b)(3)]                          | 2009-03-19 |
| 8-K    | Current report, item 2.01                           | 2009-03-16 |
| 8-K    | Current report, items 2.01 and 9.01                 | 2009-03-10 |
| 10-K   | Annual report [Section 13 and 15(d), not S-K Item 405] | 2009-03-04 |

| | | |
|---|---|---|
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-02-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-02-19 |
| 8-K | Current report, item 5.02 | 2009-02-17 |
| EFFECT | Notice of Effectiveness | 2009-02-11 |
| 8-K | Current report, item 1.02 | 2009-02-06 |
| 8-K | Current report, item 1.02 | 2009-02-03 |
| 8-K/A | [Amend]Current report, item 9.01 | 2009-01-27 |
| 8-K/A | [Amend]Current report, item 9.01 | 2009-01-27 |
| 8-K/A | [Amend]Current report, item 9.01 | 2009-01-27 |
| POS AM | Post-Effective amendments for registration statement | 2009-01-23 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-01-23 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2009-01-23 |
| 8-K | Current report, item 1.01 | 2009-01-22 |
| 8-K/A | [Amend]Current report, item 9.01 | 2009-01-12 |

| | | |
|---|---|---|
| 8-K/A | [Amend]Current report, item 9.01 | 2009-01-12 |
| 8-K | Current report, item 1.01 | 2009-01-08 |
| 8-K | Current report, item 1.01 | 2009-01-07 |
| 8-K | Current report, items 2.01 and 9.01 | 2009-01-02 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-12-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-12-17 |
| 8-K | Current report, items 1.01, 2.01, and 9.01 | 2008-12-17 |
| 8-K | Current report, item 2.01 | 2008-12-16 |
| 8-K | Current report, items 2.01 and 9.01 | 2008-12-05 |

| 8-K | Current report, items 2.02 and 9.01 | 2008-11-20 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-11-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-11-19 |
| EFFECT | Notice of Effectiveness | 2008-11-18 |
| 8-K | Current report, item 1.01 | 2008-11-17 |
| 8-K | Current report, item 1.01 | 2008-11-14 |
| 8-K | Current report, items 2.01 and 9.01 | 2008-11-12 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] | 2008-11-04 |
| 8-K | Current report, items 1.01, 2.01, and 9.01 | 2008-11-03 |
| 8-K/A | **[Amend]**Current report, item 9.01 | 2008-10-24 |
| 8-K/A | **[Amend]**Current report, item 9.01 | 2008-10-24 |
| POS AM | **[Cover]**Post-Effective amendments for registration statement | 2008-10-23 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-10-23 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-10-23 |
| 8-K | Current report, items 1.01, 2.01, and 9.01 | 2008-10-22 |
| 8-K | Current report, item 1.01 | 2008-10-14 |
| 8-K/A | **[Amend]**Current report, item 9.01 | 2008-10-10 |
| 8-K | Current report, items 1.01, 2.01, and 9.01 | 2008-10-08 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-09-26 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-09-26 |
| 8-K | Current report, items 2.01 and 9.01 | 2008-09-26 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-09-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-09-17 |
| 8-K | Current report, item 1.01 | 2008-09-15 |

| | | |
|---|---|---|
| 8-K | Current report, item 1.02 | 2008-09-11 |
| 8-K | Current report, items 2.02 and 9.01 | 2008-09-04 |
| 8-K | Current report, item 1.01 | 2008-09-03 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-08-19 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-08-19 |
| 8-K | Current report, item 1.01 | 2008-08-14 |
| 8-K | Current report, item 1.01 | 2008-08-11 |
| 8-K | Current report, item 1.01 | 2008-08-06 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] | 2008-08-04 |
| 8-K | Current report, items 2.01 and 9.01 | 2008-08-04 |
| 8-K | Current report, item 1.01 | 2008-07-28 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-07-14 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-06-17 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-06-17 |
| 8-K | Current report, item 1.01 | 2008-06-06 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-05-15 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-05-15 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] | 2008-05-08 |
| 8-K | Current report, item 5.02 | 2008-05-01 |
| 424B3 | Prospectus [Rule 424(b)(3)] | 2008-04-28 |
| EFFECT | Notice of Effectiveness | 2008-04-25 14:00:00 |