**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLE REITs LITIGATION | Civil Action No. 1:11-cv-02919-KAM-JO<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL REQUESTED |

Plaintiffs Stanley and Debra Kronberg, Marvin Bendavid, Laura Berger, Barbara Shefsky and William Murray, by and through their attorneys, file this consolidated class action complaint against defendants David Lerner Associates, Inc., David Lerner, Apple REIT Six, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc., Apple REIT Nine, Inc., Apple REIT Ten, Inc., Apple Suites Realty Group Inc., Apple Eight Advisors, Inc., Apple Nine Advisors, Inc., Apple Ten Advisors, Inc., Apple Fund Management, LLC, Bryan Peery, Glenn W. Bunting, Kent W. Colton, Michael S. Waters, Robert M. Wiley, Lisa B. Kern, Bruce H. Matson, Garnett Hall, Jr., Anthony Francis "Chip" Keating, Ronald A. Rosenfeld, David J. Adams, and Glade M. Knight (collectively, "Defendants") on behalf of themselves and other similarly situated individuals and allege as follows:

**SUMMARY OF THE CASE**

1.      Following the September 2001 terrorist attacks on the United States and the resulting shock to the United States economy, the Federal Reserve Board initiated a monetary policy designed to decrease interest rates in an effort to stimulate the United States economy. That policy and resulting increase in the availability of inexpensive credit resulted in an historic boom in real estate values that peaked in late 2005 and 2006.  Beginning in late 2006 and early 2007, the United States economy began to contract, and by 2008, virtually all sectors of the

economy were experiencing decreased or negative growth.  Commercial real estate and the travel

industry were no exception, with market analysts forecasting the largest occupancy declines

since 1999 (excluding 2001) and lower average daily room rates.

2.      With the contraction of the United States economy, the Federal Reserve Board

has continued to pursue a policy of historically low interest rates.  Beginning in June 2006, the

Board cut interest rates ten times, and between 2006 and 2011, interbank lending rates have

declined from 5.25% to a range of 0 - 0.25%.   The current rates of interest available to savers

are the lowest in the history of the United States.  Passive investors seeking reasonable risk

adjusted returns have few attractive options.  Individual savers, in particular, have been hard hit

because safe investments traditionally available to "Mom and Pop" savers such as certificates of

deposit, money market funds, and highly rated corporate bonds offer almost no return on

investment.  These developments have left retirees and other retail investors vulnerable to

investment promoters who promise attractive rates of return.

3.      Defendants are in the business of selling investments in real estate investment

trusts, or "REITs."   Most REIT shares are registered for trading on a national securities

exchange.  Publicly traded REIT shares are widely followed by securities analysts.  Their share

prices fluctuate with changes in the REIT's portfolio and economic conditions.  Other REITs,

such as those sponsored by Defendants, are referred to as "non-traded REITs," as their shares are

not registered for trading on any exchange.  Investors in non-traded REITs generally expect to

hold their shares for a five to seven year term, with the understanding that the sponsor will seek

to list the shares on a national securities exchange.  Investors depend on the sale of properties or

listing for the return of their principal.  Investors in non-traded REITs who seek to sell their

shares before the term of the investment must either resell their shares to the sponsor or sell in an

inefficient secondary market, usually at severe discounts.  Because non-traded REIT shares do

not trade in an open market and are rarely the subject of analyst reports, investors depend on the

disclosures made by the sponsor for information about the value of the REIT's shares.

4.     The plaintiffs in this case are individuals who invested in REIT offerings

sponsored by Defendants.  These offerings were titled Apple REIT Six, Apple REIT Seven,

Apple REIT Eight, Apple REIT Nine and Apple REIT Ten.  Stanley and Debra Kronberg live in

Mahwah, New Jersey.  They invested $744,694.  Marvin Bendavid lives in New York, New

York.  He invested $500,000.  Barbara Shefsky lives in New York, New York.  She invested

$828,748.  Laura Berger lives in Bethel, Connecticut.  She invested $1,834,131.  William

Murray lives in Palm Beach Gardens, Florida.  He invested $387,690.

5.     Each plaintiff invested in the Apple REITs through solicitations made by a local

DLA representative.  DLA was the exclusive sales agent for the Apple REITs.  The Apple REITs

are controlled by Defendant Glade M. Knight.  Defendant Knight also owns the entities that

provide property management, acquisition, advisory, operational and managerial services to the

Apple REITs.

6.     Each plaintiff invested with the understanding that the money he or she invested

with Defendants would be used to pursue the stated investment objectives of the Apple REITs:

"to maximize shareholder value by achieving long-term growth in cash distributions to our

shareholders" by acquiring income-producing real estate and seeking to "maximize current and

long-term net income and the value of our assets."  The offerings in which Plaintiffs invested

were structured as "blind pool" offerings, in which Plaintiffs committed their money before

knowing what properties the REITs would purchase with the net offering proceeds.  Plaintiffs

necessarily depended on the accuracy of Defendants' disclosures about their investment objectives and policies to assess the risks associated with investment.

7.     Plaintiffs were told the Apple REITs were safe, conservative investments that would protect their savings from the volatility of the stock market.  Plaintiffs were told that previous Apple REITs had a track record of paying dividends at a rate of return in the range of 7% to 8%.  Plaintiffs were told that they could expect a favorable result from investing in the REITs through an eventual sale of the properties or other transaction at the term of their investment.

8.     Plaintiffs were sold interests in the Apple REITs at a fixed price of $11 per share (following an initial sale of 5% of the shares for $10.50).  Plaintiffs received regular distributions on their investments equal to approximately 7% to 8% of their principal investment, on an annualized basis.  Until May 2011 or thereafter, Plaintiffs believed that the Apple REITs, including the REITs in which they invested or reinvested, were performing sufficiently well to justify payment of dividends of 7% to 8%, and that Plaintiffs enjoyed a reasonable prospect of recovering their principal at the term of their investments.

9.     In May 2011, DLA was sued by its primary securities regulator, the Financial Industry Regulatory Authority (FINRA).  FINRA alleges that in marketing the Apple REIT Ten shares, DLA misled customers by providing misleading performance figures for all of the Apple REITs on its website and implying that future investments could be expected to achieve similar results.  FINRA also alleges that DLA failed to investigate the Apple REITs adequately and had no basis for recommending and selling them as suitable investments for its customers. Following press reports of the FINRA suit, Plaintiffs independently retained counsel to investigate the circumstances surrounding their investments in the Apple REITs.

10.     As a result of the investigation performed by their counsel, which has included consultation with experts in real estate finance, the hotel industry, and the REIT market; analysis of regulatory filings and related information; review of industry publications; review of filings by the Apple REITs with the SEC; interviews with Apple REIT investors; interviews with securities analysts; investigation of the sales practices and materials used by DLA; and review of other public and private source materials, Plaintiffs have determined that Defendants misrepresented the investment objectives of the Apple REITs, the dividend payment policy of the Apple REITs, and the value of their Apple REIT investments.  Plaintiffs have determined that at no relevant time could the investment objectives of the Apple REITs be fairly described, as claimed, as seeking "to maximize shareholder value by achieving long-term growth in cash distributions to our shareholders," and that the Apple REITs were not, at any relevant time, operated in such a manner as to "maximize current and long-term net income and the value of our assets."  The failure of the Apple REITs to follow their stated investment objectives was not the result of mismanagement or changes in investment objectives that occurred after Defendants had solicited Plaintiffs' investments.  Instead, at all relevant times the Apple REITs operated in a manner inconsistent with their stated investment objectives.

11.     Specifically, and contrary to the Apple REITs' stated investment objectives, the Apple REITs, at all relevant times, pursued a policy of maintaining a steady 7% to 8% rate of distributions, without regard to the ability of the REIT to fund the distributions from operating income.  The Apple REIT's distribution policy was dictated by Defendants' interest in carrying on continuous sales of the REITs and the need for new capital to fund distributions to maintain the appearance that the REITs were operating profitably.  The Apple REITs set distribution rates to be competitive with other non-traded REITs and paid distributions without regard to

profitability, even as they acquired properties at prices they knew could not conceivably justify the level of distributions they were paying. Defendants nevertheless continued to solicit new investments from Plaintiffs and other investors using offering materials that contained false and misleading statements about the Apple REITs' investment objectives and coy references to the possibility they might return capital in the form of distributions for some limited period of time.

12. The Apple REITs' disclosures did not fairly apprise Plaintiffs of the investment objectives and policies implemented in operating earlier Apple REITs and continued in the Apple REITs in which Plaintiffs were being solicited to invest. These objectives and policies included acquiring properties at prices that ensured Apple REIT investors would lose a substantial portion of their principal unless the properties appreciated greatly in value; depleting the capital raised from investors to pay distributions at rates that far exceeded the operating income generated by the properties; and depleting capital to repurchase at inflated values the shares tendered by earlier investors who wished to liquidate their interests, in order to prevent the development of a secondary market in which Apple REIT shares traded for less than their stated value.

13. Defendants engaged in acts and practices that compounded the misleading impression created by the written disclosures Defendants circulated to investors in the Apple REITs. DLA's marketing and sales presentations emphasized that investors could repose trust and confidence in David Lerner and his sales operatives; that David Lerner had developed a desirable "middle ground" investment strategy that permitted investors to achieve reasonable rates of return without assuming undue risks; that no investor had ever lost a penny investing in Apple REITs; that the Apple REITs paid attractive rates of return in comparison to other alternatives available to retail investors; that investments in the Apple REITs were desirable

because they were shielded from fluctuations in the stock market; that Apple REIT investments would prove profitable because the REITs were acquiring highly desirable properties at attractive prices without incurring debt; and that the Apple REITs were appropriate investments for conservative, income oriented investors.  DLA also mailed monthly statements to every investor valuing shares in the Apple REITs at $11 per share, even though the shares were worth significantly less than $11.  After the FINRA action was filed in May 2011, DLA removed the $11 value from its customer account statements, and now describes the Apple REIT shares as "not priced."

14.     By encouraging Plaintiffs to repose trust and confidence in Defendants and soliciting their investments in the Apple REITs, Defendants assumed a duty to deal fairly and forthrightly with Plaintiffs, and to refrain from engaging in the acts, practices and courses of conduct described in this complaint.  Defendants misled Plaintiffs and caused financial and other injury to them.  By engaging in the actions described in the complaint, Defendants breached and continue to breach their duties to Plaintiffs and other Apple REIT investors.  Plaintiffs bring this action on behalf of all persons and entities that purchased, subscribed and paid for, or otherwise acquired shares in Apple REIT Six, Apple REIT Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten from DLA to recover losses and damages suffered as the result of Defendants' violations of law.

## PARTIES

### Court-Appointed Lead Plaintiffs

15.     Plaintiffs Stanley and Debra Kronberg reside in Mahwah, New Jersey and invested in Apple REITs as customers of DLA.  The Kronbergs purchased Apple REIT Six shares between January 2004 and March 2006, Apple REIT Seven shares between March 2006 and July 2007, Apple REIT Eight shares between July 2007 and April 2008, and Apple REIT

Nine shares in May and June 2008, in March through December of 2009, and in February, July and September of 2010 from Lewis Orenstein, a representative of DLA.  They also purchased Apple REIT Ten shares in March 2011 from Mr. Orenstein.  In the aggregate, the Kronbergs have acquired 6,909.091 shares of Apple REIT Six purchased for $76,000; 21,480.61 Apple REIT Seven shares purchased for $236,286.70; 12,429.182 shares of Apple REIT Eight purchased for $136,721; 25,927.17 shares of Apple REIT Nine purchased for $285,198.87; and 953.364 shares of Apple REIT Ten purchased for $10,487.  The shares the Kronbergs hold include their original purchases and additional shares purchased through DLA's dividend reinvestment program.

16.     Plaintiff Marvin Bendavid resides in New York, New York and invested in Apple REITs as a customer of DLA.  Mr. Bendavid purchased Apple REIT Nine shares in May 2008 and Apple REIT Ten shares in January 2011 from Brenda Yellin, a representative of DLA.  In the aggregate, Mr. Bendavid has acquired 23,809.524 shares of Apple REIT Nine purchased for $250,000, and 23,809.524 shares of Apple REIT Ten purchased for $250,000.

17.     Plaintiff Laura Berger resides in Bethel, Connecticut and invested in Apple REITs as a customer of DLA.  Ms. Berger purchased Apple REIT Eight shares in March and April 2008, and Apple REIT Nine shares in July and August 2008 and in June, July and December 2009 from Anthony Faustini, a representative of DLA.  In the aggregate, Ms. Berger has acquired 81,248.706 shares of Apple REIT Eight with a value of $893,735.77, assuming $11 per share, and 85,490.505 shares of Apple REIT Nine with a value of $940,395.62, assuming $11 per share.  The shares Ms. Berger holds include her original purchases and additional shares purchased through DLA's dividend reinvestment program.

18.     Plaintiff Barbara Shefsky resides in New York, New York and invested in Apple REITs as a customer of DLA.  Ms. Shefsky purchased Apple REIT Eight shares in March 2008, and Apple REIT Nine shares in June and October 2009 and in April through November 2010 from Martin Walcoe, a representative of DLA.  In the aggregate, Ms. Shefsky has acquired 47,880.676 shares of Apple REIT Eight purchased for $526,687.43 and 27,460.054 shares of Apple REIT Nine purchased for $302,060.59.  The shares Ms. Shefsky holds include her original purchases and additional shares purchased through DLA's dividend reinvestment program.

**Additional Plaintiff**

19.     Plaintiff William Murray resides in Palm Beach Gardens, Florida and invested in Apple REITs as a customer of DLA.  Mr. Murray purchased Apple REIT Eight shares in October 2007 from John Callahan, a representative of DLA, and purchased Apple REIT Nine shares in August and November 2010 from Lee Ravodowitz, another representative of DLA.  In the aggregate, Mr. Murray has acquired 27,272.727 shares of Apple REIT Eight purchased for $300,000.00, and 7,971.1818 shares of Apple REIT Nine purchased for $87,690.00.

**The DLA Defendants**

20.     Defendant David Lerner Associates, Inc. (DLA) is a brokerage firm founded by defendant David Lerner in 1975 that purports to specialize in fixed income, government bonds, municipal bonds, and conservative investments for individual investors and retirees.  DLA is a privately-held broker dealer that operates a total of six branches and has approximately 370 employees.  DLA is headquartered in Syosset, New York, and maintains offices in White Plains, New York, Princeton and Teaneck, New Jersey, Westport, Connecticut, and Boca Raton, Florida.  DLA is registered with the United States Securities and Exchange Commission and is a member of FINRA.

21.     Pursuant to agency agreements between DLA and the Apple REITs, DLA is the sole and exclusive selling agent for shares of the Apple REITs.

22.     DLA has a lengthy disciplinary and complaint history.  DLA is currently being investigated by FINRA for, among other things, charging customers excessive markups on municipal bonds and high-grade mortgage-backed securities.

23.     DLA has also been the subject of over a dozen regulatory actions by both the SEC and NASD (the predecessor to FINRA), which have led to censures, suspensions, and fines.  In 2006, for example, DLA was censured, suspended from conducting new business in variable annuities and variable life insurance for 30 days, and fined $400,000 for violations of New York state law and NASD regulations.  In 2005, DLA was censured and fined $115,000 for disseminating numerous statements and claims that were misleading, exaggerated or unwarranted through various media, including radio advertisements, investment seminars and other communications.

24.     At least five times in 2011, FINRA's Advertising Regulation Department specifically warned DLA about its sales practices.  In response to DLA's proposal to promote Apple REIT Ten using the returns of prior Apple REITs, FINRA's Advertising Regulation Department issued a review letter on March 11, 2011 advising DLA not to use a sales presentation DLA submitted for review, in part because it "contains and discusses returns of REIT programs that are no longer available."  As FINRA explained, "the presentation is misleading, as it promotes investment in a new real estate program based on historical results of closed programs, contrary to Rule 2210(d)(1)."  When DLA submitted a revised version of these materials, along with the prospectus that would be provided during the presentation, FINRA noted in an April 13, 2011 letter that "the performance of prior REIT programs are not

substantiated contrary to Rule 2210(d)(1)(A) and must be deleted ….'' FINRA's Advertising Regulation Department reviewed DLA's revised seminar materials three more times in 2011, each time notifying DLA that it could not use the materials because they highlighted the performance of closed REITs.

25.   DLA has also been subject to dozens of customer complaints alleging damages of several million dollars in total, resulting in awards of hundreds of thousands of dollars against DLA.  The misconduct leading to these penalties included failure to supervise, breach of contract, breach of fiduciary duty, manipulation, misrepresentation, negligence, suitability violations, unauthorized trading, and omission of facts.

26.   Defendant David Lerner is the President and controlling owner of DLA. He has been censured at least four times and fined by the NASD.  Two of these censures related to misrepresentations in connection with the sale of securities.  David Lerner is the "public face" of the company and has appeared in many promotional videos and on the radio, and frequently conducts seminars for current and potential investors.

27.   Together, Defendant DLA and Defendant David Lerner are referred to as the "DLA Defendants."  David Lerner is individually sued as a participant, as an agent, as a conspirator, and as an aider and abettor in the improper acts, plans, schemes and transactions that are the subject of this lawsuit.  David Lerner participated in the improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this complaint, and have performed acts and made statements in furtherance of the violations.

**The Apple REIT Defendants**

28.     Defendant Apple REIT Six, Inc. was formed by Glade Knight in April 2004 and is focused on the ownership and operation of extended stay and limited service hotels.  Apple REIT Six raised $1 billion by March 2006, when it was closed to new investors.  Apple REIT Six is a Virginia corporation headquartered in Richmond, Virginia.

29.     Defendant Apple REIT Seven, Inc. was formed by Glade Knight in March 2006 and is focused on the ownership and operation of extended stay and limited service hotels.  Apple REIT Seven raised $1 billion by July 2007, when it was closed to new investors.  Apple REIT Seven is a Virginia corporation headquartered in Richmond, Virginia

30.     Defendant Apple REIT Eight, Inc. was formed by Glade Knight in January 2007 and is focused on the ownership and operation of extended stay and limited service hotels.  Through the sale of 91.1 million shares starting on July 19, 2007, Apple REIT Eight raised $1 billion by April 2008, when it was closed to new investors.  From 2007 through 2010, Apple REIT Eight made distributions of $238.2 million, even though it generated cash flow from operations of only $82 million, after deductions for recurring capital expenditures and other cash items.  Apple REIT Eight is a Virginia corporation headquartered in Richmond, Virginia.

31.      Defendant Apple REIT Nine, Inc. was formed by defendant Knight in November 2007 and is focused on the ownership and operation of extended stay and limited service hotels and other income producing real estate.  Apple REIT Nine raised $2 billion between April 25, 2008 and December 2010, when it was closed to new investors.  From 2008 through 2010, Apple REIT Nine made distributions of $188.4 million but generated cash flow from operations of only $42 million, after deductions for recurring capital expenditures and other cash items.  Apple REIT Nine is a Virginia corporation headquartered in Richmond, Virginia. Apple REIT Nine

12

does not have any employees and is dependent on Apple Nine Advisors, Apple Suites Realty and Apple Fund Management to manage its day-to-day operations and provide brokerage services.

32.     Defendant Apple REIT Ten, Inc., which is also focused on acquiring and owning extended stay and limited service hotels and other income producing real estate, was formed by defendant Knight in August 2010 with the stated goal of raising a total of $2 billion through the sale of shares.  Apple REIT Ten has sold shares to the public since January 2011, and had raised $473.7 million as of December 31, 2011.  Apple REIT Ten is a Virginia corporation headquartered in Richmond, Virginia.  Apple REIT Ten is a Virginia corporation headquartered in Richmond, Virginia. Apple REIT Ten does not have any employees and is dependent on Apple Ten Advisors, Apple Suites Realty and Apple Fund Management to manage its day-to-day operations and provide brokerage services.

33.     Defendant Glade M. Knight is the Chairman and Chief Executive Officer of each of the Apple REITs.  He is also the direct or indirect owner of all of the related entities that provide property management, acquisition, advisory, operational and managerial services to the Apple REITs.  As the direct or indirect owner of the related Apple REIT entities, Knight has the power to terminate the agreements between the Apple REITs and the related Apple entities without or without cause.  Knight built a business around real estate tax shelters in the 1970s, but when Congress ended those tax-shelter benefits in the mid-1980s, Knight entered the REIT industry.  Knight signed the registration statements for Apple REIT Eight, Apple REIT Nine and Apple REIT Ten.  He also signed Apple REIT Nine's 2008 10-K, First Quarter 2009 Form 10-Q, Second Quarter 2009 Form 10-Q, 2009 Form 10-K, First Quarter 2010 Form 10-Q, and Second Quarter 2010 Form 10-Q.

34.     Defendant Apple Suites Realty Group Inc. is wholly owned by defendant Knight and provides brokerage services to the Apple REITs.  It is a Virginia corporation headquartered in Richmond, Virginia.

35.     Defendant Apple Eight Advisors, Inc. is wholly owned by defendant Knight and provides day-to-day management of Apple REIT Eight.  It is a Virginia corporation headquartered in Richmond, Virginia.

36.     Defendant Apple Nine Advisors, Inc. is wholly owned by defendant Knight and provides day-to-day management of Apple REIT Nine. It is a Virginia corporation headquartered in Richmond, Virginia.

37.     Defendant Apple Ten Advisors, Inc. is wholly owned by defendant Knight and provides day-to-day management of Apple REIT Ten.  It is a Virginia corporation headquartered in Richmond, Virginia.

38.     Defendant Apple Fund Management, LLC is a subsidiary of Apple REIT Six, Inc. and is indirectly owned by defendant Knight.  It is a Virginia limited liability company headquartered in Richmond, Virginia.  Apple Fund Management supplies officers and employees to the other Apple entities, which have no employees.

39.     Defendant Bryan Peery is the Executive Vice President and Chief Financial Officer of all of the REITs.  Peery also served as Senior Vice President, Chief Financial Officer and Treasurer, for Apple Hospitality Two and Apple Hospitality Five.  Peery signed the registration statements for Apple REIT Eight, Apple REIT Nine and Apple REIT Ten.  He also signed Apple REIT Nine's 2008 10-K, First Quarter 2009 Form 10-Q, Second Quarter 2009 Form 10-Q; 2009 Form 10-K, First Quarter 2010 Form 10-Q, Second Quarter 2010 Form 10-Q.

40.     Defendant Glenn W. Bunting has been a director of Apple REIT Eight from 2007 to present.  Bunting serves on Apple REIT Eight's Audit Committee, Compensation Committee and Executive Committee.  Bunting also served as a director of prior Knight ventures Cornerstone Realty Income Trust and Apple Hospitality Five, and currently serves on the Apple REIT Seven board of directors.  At the time the registration statement for Apple REIT Eight was filed, Bunting was nominated as a prospective director and consented to being named in the registration statement.  Once appointed as a director, Bunting signed all of the post-effective amendments to the registration statement.

41.     Defendant Kent W. Colton has been a director of Apple REIT Eight from 2007 to present and a director of Apple REIT Ten from 2011 to present.  Colton is a member of Apple REIT Eight's Audit Committee and Compensation Committee.  For Apple REIT Ten, he serves as Chairperson of the Audit Committees and is a member of the Compensation Committee and the Executive Committee.  Colton was also a director for prior Knight ventures Cornerstone Realty Income Trust and Apple Hospitality Five, and currently serves as a director of Apple REIT Seven.  At the time the registration statements for Apple REIT Eight and Apple REIT Ten were filed, Colton was nominated as a prospective director and consented to being named in the each of the registration statements.  Once appointed as a director, Colton signed all of the post-effective amendments to the registration statement for Apple REIT Eight and Apple REIT Ten.

42.     Defendant Michael S. Waters has been a director of Apple REIT Eight from 2007 to present and Apple REIT Nine from 2008 to present.  Waters is a member of Apple REIT Eight and Apple REIT Nine's Audit Committees.  Waters also served as a director of Apple Hospitality Five and is currently a director of Apple REIT Six.  At the time the registration statement for Apple REIT Eight and Amendment No. 4 to the registration statement for Apple

REIT Nine were filed, Waters was nominated as a prospective director for both REITs and consented to being named in the registration statement.  Once appointed as a director, Waters signed all of the post-effective amendments to the registration statements for Apple REIT Eight and Apple REIT Nine.

43.     Defendant Robert M. Wily has been a director of Apple REIT Eight from 2007 to present and Apple REIT Nine from 2008 to present.  Wily is a member of Apple REIT Eight and Nine's Audit, Compensation and Executive Committees.  Wily also served as a director of Apple Hospitality Five and is a director of Apple REIT Six.  At the time the registration statement for Apple REIT Eight and Amendment No. 4 to the registration statement for Apple REIT Nine were filed, Wily was nominated as a prospective director for both REITs and consented to being named in the registration statement.  Once appointed as director, Wily signed all of the post-effective amendments to the registration statement for Apple REIT Eight and Apple REIT Nine.

44.     Defendant Lisa B. Kern has been a director of Apple REIT Nine from 2008 to present.  Kern serves as Chairperson of Apple REIT Nine's Audit Committee.  Kern is also a director of Apple REIT Six and Apple REIT Seven, and previously served as a director of Apple Hospitality Two and Apple Hospitality Five.  At the time Amendment No. 4 to the registration statement for Apple REIT Nine was filed, Kern was nominated as a prospective director and consented to being named in the registration statement.  Once appointed as a director, Kern signed all of the post-effective amendments to the registration statement.

45.     Defendant Bruce H. Matson has been a director of Apple REIT Nine from 2008 to present.  Matson serves as Chairperson of Apple REIT Nine's Compensation Committee and is a member of Apple REIT Nine's Executive Committee.  Matson is also a director of Apple REIT Six and Apple REIT Seven, and previously served as a director of Apple Hospitality Two and

Apple Hospitality Five.  At the time Amendment No. 4 to the registration statement for Apple REIT Nine was filed, Matson was nominated as a prospective director and consented to being named in the registration statement.  Once appointed as a director, Matson signed all the post-effective amendments to the registration statement.

46.     Defendant Garnett Hall, Jr. has been a director of Apple REIT Ten from January 2011 to present.  Hall also serves as a member of Apple REIT Ten's Audit Committee. At the time the registration statement for Apple REIT Ten was filed, Hall was nominated as a prospective director and consented to being named in the registration statement.  Once appointed as a director, Hall signed all the post-effective amendments to the registration statement.

47.     Defendant Anthony Francis "Chip" Keating has been a director of Apple REIT Ten from January 2011 to present.  Keating is a member of Apple REIT Ten's Audit Committee and serves as the Chairperson of the Compensation Committee.  At the time the registration statement for Apple REIT Ten was filed, Keating was nominated as a prospective director and consented to being named in the registration statement.  Once appointed as a director, Keating signed all the post-effective amendments to the registration statement.

48.     Defendant Ronald A. Rosenfeld was a director of Apple REIT Ten from January 2011 to June 2011.  Rosenfeld also served on Apple REIT Ten's Executive Committee.  At the time the registration statement for Apple REIT Ten was filed, Rosenfeld was nominated as a prospective director and consented to being named in the registration statement.  During his time as a director, Rosenfeld signed Post-Effective Amendment No. 1 to the registration statement.

49.     Defendant David J. Adams has been a director of Apple REIT Ten from July 2011 to the present.  Adams joined the Board shortly after Rosenfeld's departure.  Adams signed Post-Effective Amendments No. 2 and 3 to the registration statement.

50.     Defendants Glade Knight, Bryan Peery, Glenn W. Bunting, Kent W. Colton, Michael S. Waters, Robert M. Wiley, Lisa B. Kern, Bruce H. Matson, Garnett Hall, Jr., Anthony Francis "Chip" Keating, Ronald A. Rosenfeld, and David J. Adams are collectively referred to as the "Individual Apple REIT Defendants."  The Individual Apple REIT Defendants signed or consented to being named in relevant SEC filings during their tenures.

51.     The Apple REITs' boards of directors have "full, exclusive, and absolute power, control and authority over [the REITs'] property and business."   The offering documents state that "the powers of our company will be exercised by or under the authority of, and the business affairs of our company, will be controlled by, the board of directors."  Distributions are at the discretion of the board members.  They also approve transactions with affiliates and related parties, determine the amount of the REIT's aggregate debt, and may reject any request for redemption, change the purchase price for redemptions, or suspend or terminate the redemption program.  The boards may recommend a merger or sale of the company, or a listing, liquidation or other transaction.

52.     Apple REIT Six, Apple REIT Seven, Apple REIT Eight, Apple REIT Nine, Apple REIT Ten, Apple Suites Realty Group, Apple Eight Advisors, Apple Nine Advisors, Apple Ten Advisors and Apple Fund Management are referred to as the "Apple REIT Entity Defendants."

53.     Collectively, the Individual Apple REIT Defendants and the Apple REIT Entity Defendants are referred to as the "Apple REIT Defendants."

54.     The Individual Apple REIT Defendants are the directors, senior officers, executives and principals of the Apple REIT Entity Defendants.  Because of their positions of control and authority of the Apple REIT Entity Defendants, the Individual Apple REIT Defendants were able to and did control the Apple REIT Entities' management and policies and

18

their public statements about the Apple REITs.  The Individual Apple REIT Defendants are

individually sued as participants, as agents, as conspirators, and as aiders and abettors in the

improper acts, plans, schemes and transactions that are the subject of this lawsuit.  The

Individual Apple REIT Defendants participated in the improper acts or acted with or in

furtherance of them, or aided or assisted in carrying out their purposes as alleged in this

complaint, and have performed acts and made statements in furtherance of the violations.

## JURISDICTION AND VENUE

55.     This Court has subject matter jurisdiction pursuant to section 22 of the Securities

Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331 and § 1337.  The Court has subject matter

jurisdiction of the state law claims under 28 U.S.C. § 1332(d) because the aggregate amount in

controversy exceeds $5,000,000 and at least one class member is a citizen of a state different

from a defendant.

56.     Venue is proper under section 22 of the Securities Act (15 U.S.C. § 77v) and 28

U.S.C. §§ 1391(a) and (b) because a substantial part of the acts and omissions giving rise to the

claims in this action occurred in this District and certain of the defendants have their principal

place of business within this District.  DLA, the underwriter and sole distributor of the Apple

REIT shares, is a New York corporation headquartered in this District.  All defendants transacted

business in this District at times material to this action.

57.     In connection with the acts, conduct and other wrongs complained of, defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce and the U.S.

mails.

## CLASS ALLEGATIONS

58.     This action is brought by Plaintiffs, for themselves and on behalf of all others

similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).  Plaintiffs seek

to represent the following proposed class:

> All persons and entities that purchased, subscribed and paid for, or
> otherwise acquired shares in Apple REIT Six, Apple REIT Seven,
> Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten that
> were offered and sold to them by David Lerner Associates, Inc., or
> its affiliates.

59.     Plaintiffs Stanley and Debra Kronberg also seek to represent a proposed New

Jersey subclass defined as:

> All residents of New Jersey that purchased, subscribed and paid
> for, or otherwise acquired shares in Apple REIT Six, Apple REIT
> Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten
> that were offered and sold to them by David Lerner Associates,
> Inc., or its affiliates.

60.     Plaintiffs Marvin Bendavid and Barbara Shefsky also seek to represent a

proposed New York subclass defined as:

> All residents of New York that purchased, subscribed and paid for,
> or otherwise acquired shares in Apple REIT Six, Apple REIT
> Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten
> that were offered and sold to them by David Lerner Associates,
> Inc., or its affiliates.

61.     Plaintiff Laura Berger also seeks to represent a proposed Connecticut subclass

defined as:

> All residents of Connecticut that purchased, subscribed and paid
> for, or otherwise acquired shares in Apple REIT Six, Apple REIT
> Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten
> that were offered and sold to them by David Lerner Associates,
> Inc., or its affiliates.

62.     Plaintiff William Murray also seeks to represent a proposed Florida subclass

defined as:

>All residents of Florida that purchased, subscribed and paid for, or otherwise acquired shares in Apple REIT Six, Apple REIT Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten that were offered and sold to them by David Lerner Associates, Inc., or its affiliates.

63.     Excluded from the class and subclasses are: Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of Defendants.

64.     <u>Numerosity</u>.  The members of the class are so numerous and dispersed that it would be impracticable to join them individually.  There are approximately 19,600 investors in Apple REIT Eight, according to its 2010 10-K.  There are approximately 38,500 investors in Apple REIT Nine, according to its 2010 10-K.  Apple REIT Ten had sold 45,502,263 shares as of December 31, 2011, according to its January 19, 2012 prospectus supplement.  In addition, the members of each subclass are so numerous that their individual joinder is impracticable.  DLA has offices in New York, New Jersey, Connecticut and Florida, and most of its sales of the Apple REIT shares were to residents of those states.  Defendants have said that approximately 24% of investors who hold Apple REIT shares distributed by DLA are New Jersey residents, and that approximately 54% are New York residents.  While Plaintiffs do not know the exact number of members of the class and subclasses at this time, Plaintiffs believe there are, at a minimum, hundreds of members of each proposed subclass, and tens of thousands of members of the class.  DLA's records contain sufficient information to determine the exact number of persons in the class and in each proposed subclass.

65.     <u>Existence and Predominance of Common Questions</u>.  Common questions of law and fact exist as to all class and subclass members and predominate over questions affecting only individual subclass members.  These common questions include the following:

a.     Whether the DLA Defendants breached fiduciary duties to Plaintiffs and class members;

b.      Whether the Apple REIT Defendants aided and abetted the DLA Defendants' breach of fiduciary duty;

c.      Whether Defendants were unjustly enriched at the expense of Plaintiffs and class members;

d.      Whether Defendants owed a duty of care to Plaintiffs and class members;

e.      Whether Defendants breached the duty of care they owed to Plaintiffs and class members;

f.      Whether Defendants violated the Connecticut Uniform Securities Act;

g.      Whether Defendants violated the Florida Securities Investor Protection Act;

h.      Whether Defendants violated sections 11, 12(a)(2) and 15 of the Securities Act;

i.      Whether the Apple REITs' registration statements contained materially false and misleading statements and failed to disclose facts necessary to make statements in the documents not materially false and misleading;

j.      What remedies are appropriate compensation for the damages caused to Plaintiffs and class members; and

k.      Whether the Plaintiffs and class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

66.    Typicality.  Plaintiffs' claims are typical of the claims of the members of the class and of the subclasses they represent because they all invested in the Apple REITs through DLA.

67. <u>Adequacy of Representation</u>. Plaintiffs will adequately represent and protect the interests of the class and subclasses and have no interests that conflict with or are antagonistic to the interests of class members. Plaintiffs have retained attorneys who are experienced and capable of prosecuting complex litigation. Plaintiffs' attorneys will actively conduct and be responsible for the prosecution of this litigation, and have adequate resources, experience and commitment to litigate this matter.

68. <u>Superiority</u>. A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual class members to bring a separate action. Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

69. Class certification is also appropriate because there is a readily identifiable class, and readily identifiable subclasses, on whose behalf this action can be prosecuted. Class members are readily ascertainable from Defendants' records. A notice of pendency or resolution of this class action can be provided to class members by direct mail, email, publication notice, or other similar means.

70. In the alternative, the class and subclasses may be certified under Rule 23(b)(1), 23(b)(2) or 23(c)(4) because:

a. The prosecution of separate actions by the individual members of the class or Subclasses would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

b.      The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

c.      Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole; and

d.      The claims of class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

### The Apple REITs

71.     A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors.  REITs pool the capital of numerous investors to purchase a portfolio of properties the typical investor might not be able to buy individually.  To qualify as a REIT, a company must have most of its assets and income tied to a real estate investment and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends.  To be sustainable, a REIT's dividends should be funded by cash flows from the income-producing properties.

72.     Since 1993, David Lerner and Glade Knight have teamed up to sell a series of REITs.  Knight is the founder and CEO of the REITs and David Lerner's company has served as best efforts underwriter and exclusive selling agent of the REITs' shares.

73.     The last five of Knight's REITs are referred to as the "Apple REITs," and are numbered Six through Ten.  As each REIT closed to new investors, Knight opened the next one.

The offer and sale of securities of each Apple REIT entity was registered with the SEC and each Apple REIT entity is a reporting, non-traded public company.  The Apple REIT shares do not trade on any securities exchange and are illiquid.  Apple REIT Six, Apple REIT Seven, Apple REIT Eight and Apple REIT Nine continue to operate but are closed to new investors.  Apple REIT Ten opened in January 2011 and is still open to new investors.

74.     This chart shows the opening and closing dates for each of the Apple REIT offerings (closing dates are in bold):

**Offering Opening and Closing Dates**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|
| **Apple REIT Six** | April | | **March** | | | | | |
| **Apple REIT Seven** | | | March | **July** | | | | |
| **Apple REIT  Eight** | | | | July | **April** | | | |
| **Apple REIT Nine** | | | | | April | | **Dec** | |
| **Apple REIT Ten** | | | | | | | | Jan |

75.     The Apple REITs all invest primarily in Marriott and Hilton extended stay and limited service hotels.  (One exception was Apple REIT Nine's acquisition in 2009 of approximately 417 acres of land in the Fort Worth, Texas area that includes 113 sites leased to a third party for the production of natural gas.)  They have raised over $5.7 billion as of December 2011.

**Key Features of the Apple REITs**

76.     <u>Investment objective.</u>  All of the Apple REITs have the same stated investment objective:

> Our primary business objective is to maximize shareholder value by achieving long-term growth in cash distributions to our shareholders. We intend to pursue this objective by acquiring hotels, residential apartment communities and other income-producing real estate in metropolitan areas throughout the United States for long-term ownership. We generally intend

to acquire fee ownership of our properties. We seek to maximize current and long-term net income and the value of our assets. Our policy is to acquire assets where we believe opportunities exist for acceptable investment returns. We expect to pursue our objectives primarily through the direct ownership of hotels, residential apartment communities and other income-producing real estate assets in metropolitan areas throughout the United States.

77.    Sale price.  All of the Apple REIT shares sold for $11 per share (after the first 5% was sold for $10.50).  This per share price never changed.

78.    Value of the shares.  Until May 2011, DLA's monthly customer account statements showed an $11 market price and market value for each of the Apple REITs.  The statements said that the share prices were calculated using several factors, including the then-current value of the assets in each Apple REIT:  "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets."  Beginning in May 2011, the statements have described the shares as "not priced."

79.    Dividends.  Until recently, Apple REITs Six, Seven, Eight, Nine and Ten consistently paid monthly distributions of 7-8% to investors.  The Apple REITs paid these distributions for marketing purposes and without regard for profits or cash flow.  The DLA Defendants portray these regular distributions as reflective of the successful operation of the Apple REITs, and the distributions were one of the main selling points of the Apple REITs for investors who wanted a safe investment with steady returns.

80.    Dividend reinvestment.  Investors in the Apple REITs were encouraged to reinvest their dividends to acquire more Apple REIT shares at $11 per share through a "Dividend Reinvestment Plan" ("DRIP").  Investors may reinvest as much as they want through the DRIP

and many of DLA's customers reinvested their distributions.  This chart shows the amount of capital raised for each of the Apple REITs, both through DLA's sales and through the DRIPs:

**Sources of Capital**

|  | Capital raised by DLA | Capital raised through DRIP (through Dec 2010) | Total capital raised |
|---|---|---|---|
| **Apple REIT Six** | $1,000,000,000 | $ 134,412,000 | $ 1,134,412,000 |
| **Apple REIT Seven** | $ 1,000,000,000 | $ 86,900,000 | $ 1,086,900,000 |
| **Apple REIT Eight** | $ 1,000,000,000 | $ 68,900,000 | $ 1,068,900,000 |
| **Apple REIT Nine** | $ 2,000,000,000 |  | $ 2,000,000,000 |
| **Apple REIT Ten** | $ 473,762,983[1] |  | $ 473,762,983 |
| **Total** | $ 5,473,762,983 | $ 290,212,000 | $ 5,763,974,983 |

81.    Redemption.  Investors had limited redemption rights.  After three years from the date of their initial investment, investors were in theory free to redeem their shares for the full $11 paid to acquire them.  If they redeemed earlier, investors would receive only 92% of their principal investment.  But even after the three-year waiting period, redemptions were limited to 3% to 5% of the weighted average number of shares outstanding during the 12-month period immediately prior to the date of redemption.  Thus, if a substantial number of Apple REITs were to seek redemption at or about the same time, only a small fraction would be eligible.  Apple REITs Six, Seven and Eight recently announced plans to reduce their redemptions to 2% later this year.

82.    Offering documents.  The registration statement for each offering incorporates by reference subsequent prospectuses and prospectus supplements.  Apple REIT Nine's prospectuses in turn incorporate by reference additional documents that were filed with the SEC throughout the offering period, including Form 10-Q, 10-K and 8-K filings. The registration

---

[1] Apple REIT Ten is still open to investors and this amount is as of December 31, 2011, per Apple REIT Ten prospectus supplement no. 13, dated January 19, 2012.

statements, prospectuses, and other incorporated documents are referred to collectively as that REIT's "offering documents" and are listed in Appendix A (Apple REIT Six), B (Apple REIT Seven), C (Apple REIT Eight), D (Apple REIT Nine) and E (Apple REIT Ten).  Appendix F is a chart of false or misleading statements that cites the location of each statement in the complaint and in the offering documents.  The appendices are incorporated into and form part of this complaint.

### Defendants' Sales of the Apple REIT Shares

83.     DLA has been the exclusive seller of the Apple REITs.  Therefore, all of the money raised by the Apple REITs through the sale of shares has come through the efforts of the DLA Defendants, acting in their capacity as agents for defendant Knight and the Apple REIT Defendants.

84.     DLA markets itself as a different kind of financial advisory firm, saying "We do not run with the herd."  DLA's motto is that "You don't gamble with your rent and grocery money."   David Lerner has said that the "stock market should not be a matter of financial life and death," and investing in the stock market—which could cause an entire lifetime of work to "go down"—is an "act of insanity."  Instead, people should target a "sensible middle ground" that is shielded from the fluctuations of the stock market.

85.     DLA sold the Apple REITs through the internet, radio, cold calls, mailings, and open invitation seminars at senior centers, retirement communities, and membership clubs. David Lerner identifies himself as "Poppy" in commercials that pitch seminars about the Apple REITs.  The seminars offer door prizes like umbrellas and flat-screen TVs.  DLA financial advisors also often make personal visits to customers' homes.  DLA's customers are individual

retail investors, typically retirees, and all, or nearly all, of DLA's sales of the Apple REITs were "solicited," meaning that a DLA representative persuaded a DLA customer to buy the shares.

86.     Defendants marketed and sold the Apple REITs as conservative, safe and low-risk investments.  DLA typically recommends the Apple REITs as part of its "sensible middle ground of investing" strategy, which DLA describes as promoting investments that avoid the volatility of the stock market and instead deliver steady dividends.  DLA states on its website, "We believe we have an obligation to guide our investors in directions we feel will help them achieve their financial objectives. We believe investors should not be chasing financial rainbows."

87.     DLA encourages its clients to reinvest their distributions through the DRIP program, and to invest in multiple REITs.

88.     The websites for Apple REITs Six, Seven, Eight, and Nine have pages captioned "CONTACT US" that identify DLA as a contact for inquiries about Apple REIT shares.  Since Apple REITs Six, Seven, Eight and Nine are each closed to new investors and information about those entities can be obtained directly from REITs themselves, the only apparent purpose of the link to DLA is to direct potential investors to DLA to solicit purchases of shares in the Apple REIT that is open to new investors (currently, Apple REIT Ten).

89.     DLA's website includes a page titled "REIT History at David Lerner Associates." The website provides information about each of the previous REITs, touting the successful sale of the first REITs, Apple Hospitality Two and Apple Hospitality Five, both at a profit to investors.  The recitation of "REIT History" includes year-by-year "annual yields" for these earliest REITs.  The website currently provides very little information about Apple REITs Six through Nine, stating only the number of hotels the REIT owns, the total amount invested, and that the REIT is no longer open to investors. Until recently, however, DLA's website provided

only a single figure, "average annualized distribution" since inception, for Apple REITs Six

through Nine.  FINRA asserts that describing the performance of Apple REITs Six through Nine

using average distribution since inception was misleading, because it masked that distribution

rates for REITs Seven and Eight were previously reduced, did not disclose that income from

operations was insufficient to support the 7-8% distributions, and failed to disclose that the

distributions made were partially funded by debt that further leveraged the REITs.

  90. From late 2007 to early 2008, while selling shares of Apple REIT Eight, the DLA

Defendants made the following statements on the Apple REIT page of the DLA website:

- Investing in the Apple REITs "provides reliable and significant dividends typically higher than other stocks" and "offers an attractive risk/reward trade-off."

- Because "REITs must pay out almost all of their taxable income to shareholders, investors can look to REITs for reliable and significant dividends (typically four times higher than those of other stocks, on average)."

- The "REITs may boost return and/or reduce risk when added to a diversified portfolio."

- "Any investor can build greater long-term wealth by combining homeownership and REIT stocks as a part of a diversified portfolio."

  91. In 2008 through early 2011, as the DLA Defendants were selling Apple REIT

Nine and Apple REIT Ten shares, the DLA website continued to state that investing in the Apple

REITs "provides reliable and significant dividends typically higher than other stocks" and

because "REITs must pay out almost all of their taxable income to shareholders, investors can

look to REITs for reliable and significant dividends (typically four times higher than those of

other stocks, on average)."

  92. Investors say that DLA sold Apple REITs Eight, Nine and Ten by pointing to the

stability of the earlier Apple REITs sponsored by Knight and Lerner, including the consistent

payment of 7-8% distributions to investors, the unwavering share value of $11, and the

redemption programs that allow investors to recover their principal after three years.  Because

the Apple REITs were structured as "blind pool" offerings, the performance and history of the

other Apple REITs were highly material to investors.

93.     In June 2011 David Lerner sent a form letter to approximately 50,000 DLA

customers to address the media attention that FINRA's complaint brought to DLA's sales

practices and the Apple REITs.  The letter was addressed to "Mr. John Smith, 123 Main Street,

Anytown, NY 11234," and said, "There is nothing more important to us than you, our clients."

In the letter, Lerner stated (with emphasis in the original):

- *"None of the allegations have any impact on your investments purchased at DLA, including Apple REITs, municipal bonds, mutual funds, or any other investments."*

- "Apple REIT programs (and prior programs) sold by DLA have a proven track record going back to 1993, and *given today's market, all the Apple programs are performing as expected."*

- "The current, fully-subscribed Apple REIT programs (Apple Six, Apple Seven, Apple Eight and Apple Nine) have, historically, been consistently profitable and have paid distributions even during recessionary periods."

- "Apple REIT programs and DLA fully comply with regulatory requirements for displaying the estimated value on monthly statements."

- "And most importantly, *NO ONE HAS EVER LOST MONEY IN ANY OF THE APPLE REIT HOTEL PROGRAMS!"*

94.     FINRA's Advertising Regulation Department notified DLA that "several of the

bullet points included in the letter raise serious regulatory concerns" and directed DLA to "cease

the use of the letter immediately as it fails to comply with applicable standards."

95.     DLA collects a commission of 7.5% of each share it sells, plus a 2.5% marketing

expense allowance, for a total of 10% of each share.  The DLA Defendants received $300

million in commissions and expenses from their sale of Apple REIT Eight and Apple REIT Nine

shares, and as of December 31, 2011, have received more than $47.3 million from their sale of Apple REIT Ten shares.  The sale of Apple REIT shares has accounted for 60 to 70% of DLA's business annually since 1996.  DLA also collects account management fees of $4 per new account and $10 per year for each active customer account.

96.     Defendant Knight has earned more than $100 million through ongoing management and transactional fees paid by the Apple REITs to the various entities he controls. He is the sole owner of Apple Suites Realty Group, which provides brokerage services to all of the Apple REITs and receives 2% of the total purchase price of all acquisitions.  He is also the sole owner of the Apple advisory companies (Apple Eight Advisors, Apple Nine Advisors and Apple Ten Advisors), which evaluate and recommend property, serve as property investment advisors and supervise day-to-day operations.  The advisory fees range from .1% to .25% of investors' capital annually.   Knight also indirectly owns Apple Fund Management, which provides staffing to the other Apple entities.

### The Apple REITs Have Consistently Paid Distributions in Excess of Their Operating Income to Induce Sales and Compete With the Distribution Rates of Other Non-Traded REITs

97.     Because all the Apple REITs have the same investment objective, are managed by Knight, and have the same key features (the $11 price, 7-8% distribution payments, reinvestment program and redemption plan), the performance and history of prior Apple REITs was highly relevant and material to investors considering an investment in Apple REIT Six, Seven, Eight Nine and Ten.

98.     The offering documents for Apple REIT Six, Seven, Eight, Nine and Ten have lengthy descriptions of the "past performance of programs sponsored by Glade M. Knight." While they include the typical disclaimer that "past performance of prior programs is not

necessarily indicative of our future results," this innocuous warning is outweighed by the paragraphs that follow.  The next paragraph emphasizes the similarity of the past REITs to the current REIT:  "In general, the investment objectives of the eight real estate investment trusts previously organized by Mr. Knight …were similar to our investment objectives of achieving long-term growth in cash distributions, together with possible capital appreciation, through the acquisition, ownership and ultimate disposition of properties."   Several paragraphs describing the prior REITs follow.  The descriptions of REITs Six through Nine are virtually identical, with variations only in dates and number of hotels acquired, and for Apple REIT Nine, a note of its purchase of land in Ft. Worth, Texas.

99.     Shares in Apple REITs Six and Seven were sold from 2004 to mid-2007, some of the hotel industry's best years in recent history.  In June 2005, PFK Consulting's Hospitality Investment Survey reported that "[w]ith few exceptions, it's all good news in U.S. hotel markets" and "investors and lenders remain optimistic for 2005 that hotel real estate will continue to produce favorable cash flows and property values will remain firm."  In its April 2006 Hospitality Investment Survey, PFK Consulting extolled "Life Near the Peak" and reported that "[m]ost of the U.S. hotel markets seem to be flourishing near the peak."  In the March 2007 Hospitality Investment Survey, PFK Consulting remarked on "another exceptional year of financial performance in 2006" and said that "the U.S. hotel industry rests at the highest peak since the late 1990s."

100.     But even as the market peaked in 2007, Apple REITs Six and Seven were not generating sufficient income to consistently pay 7% to 8% dividends to investors from operating cash.  The REITs continued paying the distributions in full, however, to promote sales of the Apple REIT Eight shares.  In 2007, Apple REIT Six paid nearly $79 million in distributions,

95% of which was made from operating income.  The "shortfall" of $3.8 million was made up through funds invested in the DRIP.  Apple REIT Seven paid approximately $60 million in distributions, $17 million of which was paid by returning capital, including reinvested funds.

101.     In fact, none of the Apple REITs has ever been able to pay distributions from operating income and all have resorted to returning capital or borrowing.  Returning capital to investors and taking on debt that must be serviced out of future income and new investor proceeds limited the REITs' ability to acquire income-producing assets, and thus to generate future income for distribution to investors, and reduced the value of the shares.

102.     These charts shows the amount of distributions each Apple REIT paid annually and the percentage of the distribution that was paid from cash from operations:









| | Distributions Paid | Distributions Paid from Cash from Operations | % of Distributions Paid from Cash from Operations |
|---|---|---|---|
| **Apple REIT Six** | | | |
| 2007 | $78,834,000 | $74,980,000 | 95% |
| 2008 | $81,746,000 | $74,471,000 | 91% |
| 2009 | $82,215,000 | $55,162,000 | 67% |
| 2010 | $72,301,000 | $57,420,000 | 79% |
| **Totals:** | **$315,096,000** | **$262,033,000** | |
| **Apple REIT Seven** | | | |
| 2007 | $60,234,000 | $43,126,000 | 72% |
| 2008 | $81,440,000 | $41,644,000 | 51% |
| 2009 | $75,380,000 | $39,086,000 | 52% |
| 2010 | $71,340,000 | $56,873,000 | 80% |
| **Totals:** | **$288,394,000** | **$ 180,729,000** | |
| **Apple REIT Eight** | | | |
| 2007 | $14,464,000 | $5,751,000 | 40% |
| 2008 | $76,378,000 | $27,344,000 | 36% |
| 2009 | $74,924,000 | $8,733,000 | 12% |
| 2010 | $72,465,000 | $40,483,000 | 56% |
| **Totals:** | **$ 238,231,000** | **$82,311,000** | |
| **Apple REIT Nine** | | | |
| 2008 | $13,012,000 | $4,371,000 | 34% |
| 2009 | $57,330,000 | $15,810,000 | 28% |
| 2010 | $118,126,000 | $22,028,000 | 19% |
| **Totals:** | **$188,468,000** | **$42,209,000** | |

103.    The Apple REIT websites describe the distributions as "dividends," even though the term dividend typically refers to distributions from earnings or profits, not a return of capital or borrowed funds.  DLA's customer account statements described the distributions as "yield" on the value of the investments.

104.    The offering documents say that "[d]istributions will be at the discretion of our board" and "will depend on factors including: gross revenue we receive from our properties, our operating expenses, our interest expenses incurred in borrowing, capital expenditures, and our need for cash reserves."

105.    In fact, the boards set distribution rates at a level that would promote further sales of Apple REIT shares and be competitive with other non-traded REITs.  This chart shows the distribution rates of a representative sample of the Apple REITs and other non-traded REITs, including both closed REITs (which are no longer open to new investors) and open REITs (which are still issuing shares to new investors).  A chart that includes all non-traded REITs is attached as Appendix G.

| | 2007 | 2008 | 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Apple REIT 6 | 8.00 | 8.20 | 8.20 | 7.80 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT 7 | 8.00 | 8.00 | 7.40 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT 8 | 8.00 | 8.00 | 7.40 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT 9 | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| Apple REIT 10 | | | | | | | | 7.50 | 7.50 |
| **Closed REITs** | | | | | | | | | |
| CNL Lifestyle Properties | 6.00 | 6.15 | 6.58 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 |
| Corporate Property Associates 15 | 6.70 | 7.00 | 7.20 | 7.29 | 7.30 | 7.31 | 7.32 | 7.33 | 7.34 |
| Healthcare Trust of America | 7.00 | 7.30 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Hines REIT | 6.25 | 6.40 | 6.20 | 6.00 | 6.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| KBS REIT | 7.00 | 7.00 | 6.10 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 |
| **Open REITs** | | | | | | | | | |
| Cole Credit Property Trust III | | | 6.69 | 6.75 | 7.00 | 7.00 | 7.00 | 6.50 | 6.50 |
| Griffin Capital Net Lease REIT | | | | 6.75 | 6.75 | 6.75 | 6.75 | 6.75 | 6.75 |
| Lightstone Value Plus REIT | 7.00 | 7.00 | 7.00 | 7.00 | 8.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Moody National REIT I | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| Paladin Realty Income Properties | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |

106.     The Apple REIT Six, Seven, Eight, Nine and Ten offering documents do not fairly apprise potential investors that the Apple REITs would follow a policy of paying distributions at a 7% to 8% annualized rate without regard to the ability of the REIT to cover those distributions from operating income, making it a certainty that distributions would always be sourced by funds other than operating income.  Instead, the offering documents portray the payment of dividends from sources other than operating income as a contingency that would only occur in "certain circumstances" and "from time to time," when the actual policy of the REIT was to prioritize the payment of regular distributions at the 7% to 8% annualized rate over the long term economic interest of the REIT in achieving its investment objective of "maximizing shareholder value by achieving long term growth in cash distributions" and "maximizing current and long-term net income and the value of our assets."  In fact, the Apple REITs have never paid the distributions solely from operating income.

107.     Among other things, the offering documents stated:[2]

- The REITs "**may** need to utilize debt, offering proceeds and cash for operations" to pay consistent distributions.

- "While we will seek generally to make distributions from our operating revenues, we **might** make distributions (although there is no obligation to do so) **in certain circumstances** in part from financing proceeds or other sources, such as proceeds from our offering of Units."

- "In addition, we **may from time to time** distribute funds that include a return of capital and we **may from time to time** need to borrow to make distributions."

- "While the Company continues to seek generally to make distributions from its operating revenues, distributions **may** be made (although there is no obligation to do so) **in certain circumstances** in part from financing proceeds or other sources, such as proceeds from the offering of Units."

- "Our distributions **may** include a return of capital."

---

[2] All emphasis is added.

108.    The board of directors "evaluates the distribution rate on an ongoing basis and may make changes at any time if the Company feels the rate is not appropriate based on available cash resources."  But the boards of directors of Apple REIT Six, Seven, Eight, Nine and Ten consistently approved distributions that exceeded the amount of income the REITs could expect to generate from operations.  As a result, the disclosures provided to investors concerning the dividend payment policies followed by Apple REIT Six, Seven, Eight, Nine and Ten misrepresented the basis upon which each REIT's board declared and paid dividends.  As each REIT continued to raise money, that money was invested into new properties that were not generating sufficient income to sustain the rate at which the REIT continued to pay distributions.

### To Promote Sales and Compete With Other Non-Traded REITs, the Apple REITs Maintained an $11 Share Price Throughout and After the Offerings

109.    Each Apple REIT's board of directors determines the price of the shares and may, "in its sole discretion," determine the value of the shares.  Although the offering materials state that "[t]he per-Unit offering prices have been established arbitrarily by us and may not reflect the true value of the Units," in fact, the Apple REITs' boards of directors set the share price based on the prices charged by other non-traded REITs.  This chart shows that the share price of other non-traded REITs during their offering periods was $10:[3]

---

[3] Two high outliers were excluded.



110.    During the offering period, the estimated value is usually reported as the value at which the shares are being offered to the public, known as "par value."  NASD Rule 2340(c)(2), however, prohibits firms from using a per-share estimated value that has been developed from data generated more than 18 months prior to the date of the customer's account statement. FINRA has said that "[t]he 18-month requirement was designed to ensure that investors are provided with reasonably current valuations of these illiquid securities. In addition, by providing firms with an 18-month window in which to rely on the data, the rule ensures that either they or the sponsors have adequate time to appraise the program's assets and operations and calculate an estimated value."  For Apple REIT Six the 18-month window expired in September 2007, and for Apple REIT Seven the window expired in January 2008.  Defendants did not revalue the Apple REIT Six and Seven shares in 2008.

111.    The Apple REITs have maintained that the value of each Apple REIT's shares is $11 based on the fact that they sell the shares at $11 through the DRIP and redeem the shares at $11.  They did not change the value of their shares from $11 despite market fluctuations,

including significant declines in the hotel industry, net income declines, increased leverage

through borrowing, and return of capital to investors through distributions.

112.    When a publicly-traded REIT invests in an asset with earnings that are dilutive to

shareholders' equity, the price of the REIT's shares is impacted as the market assimilates the

anticipated impact of the acquisition on the REIT's performance.  The Apple REITs are not

traded on any exchange, and they are therefore not subject to the scrutiny of the market or

analysts.  Through December 31, 2010, the Apple REITs granted 100% of investors' redemption

requests to avoid creating a secondary market that would have undermined the $11 per share

price of the Apple REITs.  This chart shows the percentage of redemption requests the Apple

REITs honored and the total units redeemed from the inception of each program through

September  30, 2011:

**Percentage of Redemption Requests Honored**

|  | 2007 | 2008 | 2009 | 2010 | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 | Units redeemed through 9/30/11 |
|---|---|---|---|---|---|---|---|---|---|
| Apple REIT 6 | 100% | 100% | 100% | 100% | 100% | 100% | 17% | 7% | 15,900,000 |
| Apple REIT 7 | 100% | 100% | 100% | 100% | 63% | 56% | 13% | 6% | 9,200,000 |
| Apple REIT 8 |  | 100% | 100% | 100% | 61% | 48% | 9% | 4% | 5,000,000 |
| Apple REIT 9 |  |  | 100% | 100% | 100% | 100% | 41% | 18% | 3,200,000 |

113.    By avoiding the creation of a secondary market for their shares, the Apple REITs

have perpetuated the illusion that their shares are worth $11.  This chart shows the price of Apple

REIT shares (at a steady $11) compared to the prices of similar publicly-traded REITs from 2007

to January 2012:



114.    The Apple REIT offering documents state, "If we listed our Units on a national securities exchange, the Unit price **might** drop below our shareholder's original investment." (emphasis added)  But it was a certainty that the value of the Apple REIT shares would decline steadily as a result of the substantial commissions and fees paid at the outset, declines in the value of the properties and their reduced income due to the economic downturn, borrowings and returns of capital to investors.

**July 2007 to April 2008:**
**Defendants Sell $1 Billion of Apple REIT Eight Shares**

115.    Defendants commenced selling Apple REIT Eight shares in July 2007.  The hotel industry was still prospering, but the pace of improvement was moving steadily downward.  In August 2007, PricewaterhouseCoopers (PwC) reported in Hospitality Directions, a publication focused on the lodging sector, that "the U.S. economy slowed considerably in the first quarter of 2007" and "[t]he U.S. lodging industry's RevPAR growth will decelerate in 2007 and 2008 as

ADR gains subside and supply additions accelerate."  "RevPAR," or revenue per available room, is a performance metric commonly used in the hotel industry to measure how well a hotel performs compared to its competitors, or to its own prior performance.  It is calculated by multiplying the property's average daily rate (ADR) over a given time period (typically annually) by the percentage of occupancy.

116.    Despite these industry warnings, Defendants launched the Apple REIT Eight offering in July 2007, making no changes to the investment objective, the $11 price, or the policy of making distributions by returning capital that had failed to make investment in Apple REITs Six and Seven profitable.  The Apple REIT Eight offering materials used the same descriptions of its investment objectives and dividend policy that appeared in the offering materials for the earlier REITs.

117.    By February 2008, PwC reported in Hospitality Directions that "[t]he U.S. economy's growth decelerated significantly in the fourth quarter of 2007. … The forecast calls for the largest occupancy decline since 1999 (excluding 2001), and slower ADR and RevPAR growth in 2008. … [S]ubstantial downside risks remain to the performance of the U.S. lodging industry."  PwC forecasted that RevPAR growth would slow to 4.5% in 2008 and 4.2% in 2009—down from 5.7% in 2007.

118.    In April 2008, Apple REIT Eight reached its $1 billion goal and closed to new investors.  That same month, PKF Consulting said "The Party's Over" for the hospitality industry and reported that "as we now enter 2008, it is evident that liquidity in the market has been drastically reduced, RevPAR expectations have been revised downward, and transactions have slowed considerably."

119.    As the extended stay and limited service hotel sector began to suffer due to the real estate market crash and subsequent credit crunch, Defendants chose to remain silent about the economy's impact on Apple REIT Eight.  Only after the offering was closed to new investors did the Apple REITs address the economic conditions.  Beginning in September 2008, shareholders began receiving reassurances from Glade Knight addressing the "potential concerns" investors might have "regarding what effect the state of our nation's economy will have, if any, on the status of [shareholders'] investment in Apple REIT Eight."  Knight reassured shareholders by saying "we continue to find confidence in our capital structure, the strength in operations at our hotels" and "we anticipate our year-end results will be reflective of relatively stable hotel operations."  These reassurances continued throughout 2009.  Almost every quarterly statement included a statement regarding the strength of Apple REIT Eight, its "strong foundation," and that it remained well positioned to endure the recession, be "highly competitive," and be "able to resourcefully manage the challenging economic environment."

### Apple REIT Eight Acquired Properties That Generate Insufficient Cash to Pay Distributions

120.    Apple REIT Eight did not implement its stated investment objective to "maximize shareholder value by achieving long-term growth in cash distributions to our shareholders" by acquiring income-producing real estate and seeking to "maximize current and long-term net income and the value of our assets."  Instead, Apple REIT Eight acquired properties that generated insufficient income to pay 7% to 8% distributions without depleting investor capital or borrowing funds.

121.    For every dollar invested in Apple REIT Eight, the first $.10 is paid to DLA as a commission and marketing expense, leaving $.90 available for investment in income producing properties.  For every property purchased, Knight (through Apple Suites Realty) collects a 2%

commission.  An additional 0.5% percent is set aside for cash reserves.  To fund distributions of

8%, then, without adjustments for return of capital, each dollar invested must earn approximately

9.1% annually:

| | | |
|---|---|---|
| **Investment in Apple REIT Eight** | | **$01.000** |
| Less: | | |
| DLA commissions and costs: | $ 0.100 | $ (0.100) |
| REIT Capitalization: | | $ 0.900 |
| | | |
| Less: | | |
| Reserves: | $ 0.005 | |
| Glade Knight acquisition fees: | $ 0.020 | |
| Subtotal for reserves and fees: | | $ (0.025) |
| | | |
| Capital available for investment in hotels: | | $ 0.875 |
| | | |
| Cash required to pay 8% distributions: | | $ 0.080 |
| | | |
| **Required return on investor capital:** | | **approx. 9.1%** |

122.    The required return on investor capital for a particular property is calculated by

dividing the hotel's net operating income (NOI) by the total amount of invested capital

(including commissions and fees).  As a group and individually, the hotels purchased by Apple

REIT Eight did not offer a return on investor capital of 9.1% or more.

123.    For example, Apple REIT Eight purchased the Burbank Residence Inn for

$50,500,000 in March 2008.  With DLA's commission ($6,733,333) and the 2% acquisition fee

to Mr. Knight ($1,010,000), the total capital invested was $57,233,333.  The net operating

income was $3,015,179.  The return on investor capital was 5.27%.

124.    Another representative example of Apple REIT Eight's acquisitions was the Port

Wentworth, Georgia Hampton Inn for $10,780,000 in December 2007.  Adding DLA's

commission ($1,437,333) and the 2% acquisition fee ($215,600), the total capital invested was

$12,217,333.  The net operating income at the time of acquisition was $844,704.  The return on

investor capital was 6.91%.

125.    While Apple REIT Eight was purchasing hotel after hotel that would not generate sufficient income to pay the 8% distributions, the REIT assured investors in letters, quarterly reports, and annual reports of Apple REIT Eight's commitment to enhancing shareholder value.

- In a November 2007 letter to shareholders, Glade Knight said: "We are steadfastly committed to our core goals of providing you with strong returns and increasing the value of your investment over time, through the ownership of high-quality, income-producing real estate" and "[a]s part of our strategy to protect and grow your investment, our acquisition team carefully hand-picks attractive properties in well performing and growing metropolitan areas."

- Apple REIT Eight's 2007 and 2008 10-Ks said: "The Company's primary objective is to enhance shareholder value by increasing funds from operations and cash available for distributions through acquisitions and internal growth…."

- In a March 2008 letter to shareholders included with the 2008 first quarterly report Glade Knight said "With the goal of developing a well-performing diversified portfolio of lodging real estate that will grow in value and provide you with strong returns, we have hand-selected 21 properties since the beginning of the year."

126.    In addition to generating insufficient returns on investor capital to pay the distributions, the capitalization rates associated with Apple REIT Eight's acquisitions were lower than market capitalization rates.  Appraisers and real estate investors use capitalization rates— referred to as "cap rates"—as benchmarks for determining a hotel property's value.  The Dictionary of Real Estate Appraisal defines capitalization rate as "[a]n income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value; used to convert net operating income into an indication of overall property value."  Put more simply, the cap rate is the projected return for one year if the property was bought with all cash.

127.    A cap rate is calculated by dividing the net operating income (NOI) of the hotel by the price paid for the hotel.  For example, a hotel with an annual NOI of $1 million that sold

for $10 million sold at a cap rate of 10% ($1,000,000 divided by $10,000,000).  Generally speaking, an investor prefers a higher cap rate, meaning that he paid less for a property with a given income than he would for a property with similar income but a lower cap rate.  In a typical transaction, the seller of the hotel is trying to get the highest price for the property or sell at the lowest cap rate possible.  The buyer is trying to purchase the property at the lowest price possible, which translates into a higher cap rate.  From an investor's or buyer's perspective, the higher the cap rate the better.

128.    Market capitalization rates are derived from the most recent transactions occurring in a property sector or locale, so they represent the average rate that hotel purchasers are obtaining in the market.  Benchmarks are reported in publications commonly used by hotel investors, such as PwC's Korpacz Real Estate Investor Survey and PFK Consulting's Hospitality Investment Survey.  This chart summarizes information about the range of average annual capitalization rates from those reports:

**Average Market Capitalization Rates for Hotels**

|       | Minimum | Maximum | Average |
|-------|---------|---------|---------|
| 2007  | 9.13%   | 9.67%   | 9.46%   |
| 2008  | 9.36%   | 9.83%   | 9.59%   |
| 2009  | 10.75%  | 10.85%  | 10.80%  |
| 2010  | 10.20%  | 10.83%  | 10.57%  |

129.    To have a reasonable prospect of supporting 8% dividend payments to investors, the Apple REITs' hotel acquisitions would have had to fall within the range of the typical market capitalization rates at the time.  While the REIT could have purchased some assets below the required capitalization rate, those purchases would have had to be balanced by other purchases above the required rate.  For example, if the required capitalization rate is 10% and an asset is

acquired at a 3% capitalization rate, another asset would have had to be acquired at a 17% capitalization rate.

130.    The approximate capitalization rates for Apple REIT Eight's acquisitions based upon twelve months trailing earnings are consistently lower than the average market rate, the rate at which Apple REIT Eight's competitors were purchasing property.  This chart shows that the capitalization rates for nearly all of Apple REIT Eight's property acquisitions were below (and many were well below) the average market capitalization rates for 2007 and 2008:



131.    For example, Apple REIT Eight purchased a Homewood Suites property in Chattanooga, Tennessee for $8,600,000 in December 2007 at a capitalization rate of 6.53%. Similar properties were trading at a capitalization rate of 9.67%, which would indicate a market value of $6,005,000.  Because the actual market value of the hotel was $2,595,000 lower than the price paid by Apple REIT Eight, the property would have to appreciate 43% in order to be sold without incurring a loss.

132.    To more accurately determine the required appreciation rate, however, the calculation must take into account all of the capital invested, not just the purchase price of the property.  Adding the acquisition costs, related party fees and brokerage commissions to the purchase price of the Chattanooga Homewood Suites increases the total invested capital to approximately $9,747,000, and the required appreciation rate to 62%.  An extended stay hotel in Chattanooga, TN was unlikely to increase in value by 62% within any time period relevant to the fortunes of an Apple REIT Eight investor.

133.    Another way of analyzing Apple REIT Eight's portfolio is to compare the cash flow of a property with the earnings necessary to pay dividends from the hotel's earnings.  The Chattanooga Homewood Suites had a net operating income of $580,780 at the time it was purchased.  To pay an 8% dividend on the purchase price of $8,600,000, cash flow would have to increase to $688,000, an 18% increase over the hotel's net operating income of $580,780 at the time it was purchased.  Adding in the costs, related party fees and brokerage commissions, the existing earnings would have to increase 34% to cover the dividend payments.  Industry expectations of earnings growth for the next year were well below 10% at the time.

134.    This chart shows the appreciation rate required to preserve investor capital and the income growth necessary to fund dividend payments and return investors' capital for a representative selection of other Apple REIT Eight hotels (considered on an unleveraged basis to facilitate comparison with industry benchmarks):

| Hotel | Asset appreciation necessary to preserve investor capital | Income growth necessary to fund dividend payments |
|---|---|---|
| Virginia Beach Courtyard 2002 | 53% | 20% |
| Sanford, FL Springhill Suites | 118% | 80% |
| Winston Salem, NC Courtyard | 62% | 27% |
| Hilton Head, SC Hilton Garden Inn | 157% | 101% |
| Somerset, NJ Courtyard | 54% | 27% |
| Bowling Green, KY Hampton Inn | 52% | 25% |
| Savannah, GA Hilton Garden Inn | 23% | 1% |

135.    The New York Renaissance is the largest asset Apple REIT Eight acquired and it was purchased at a capitalization rate so low that it virtually guaranteed the REIT would not be able to pay its dividend at Apple REIT Eight's historic rate from operating cash flow.  Apple REIT Eight acquired the New York Renaissance in December 2007 for $111.9 million, which represented more than 11% of the total capital raised by Apple REIT Eight.  An additional $21 million was required for renovations to complete the conversion to a Renaissance hotel, bringing the total investment to $132.9 million.  Apple REIT Eight paid $664,500 per room for the leasehold estate (Apple REIT Eight did not acquire fee title to the land).  The hotel's net operating income at the time of acquisition was $2.5 million, indicating a 2% capitalization rate. This rate is far below the rate realized for similar hotel acquisitions.

136.    This chart shows the sale price, capitalization rate and related information for hotels purchased in New York City in the same time frame as the New York Renaissance:

**New York City Hotel Acquisitions (Fall 2007 – Spring 2008)**

| Hotel | Sale Date | Rooms | Price | Price/Room | Cap Rate |
|---|---|---|---|---|---|
| Holiday Inn | Sep 2007 | 227 | $128,600,000 | $566,520 | 6.8% |
| Crowne Plaza Tudor | Sep 2007 | 300 | $109,000,000 | $363,333 | 8.2% |
| Hampton Inn and Hilton & Garden Inn Times Square | Nov 2007 | 669 | $474,990,000 | $710,000 | 6.0% |
| Comfort Inn | Jan 2008 | 56 | $25,000,000 | $446,429 | 6.9% |
| Hotel QT | Apr 2008 | 139 | $82,000,000 | $589,928 | 7.0% |

137.    If a hotel's cash flow at the time of acquisition is insufficient to meet the REIT's dividend needs, the REIT must make up for the shortfall in existing earnings with above-average gains in appreciation.  But Apple REIT Eight could not reasonably expect above-average gains in appreciation in the midst of an economic downturn that was adversely affecting the hotel industry.  Even PwC's February 2008 forecast—of increases of 4.5% in 2008 and 4.2% in 2009—would not yield the level of improved financial performance required to pay 8% dividends from operating earnings.

138.    When Apple REIT Eight acquired the Renaissance in December 2007, the New York City hotel market was facing an unprecedented increase in new hotels—the largest percentage increase of any major metropolitan area in the United States.  Many of the thousands of new hotel rooms were in direct competition with the Renaissance, limiting the hotel's prospects for future earnings appreciation.

139.    The Renaissance is the only property for which Apple REIT Eight reports post-acquisition financial data.  This charts shows that the income generated by the hotel has been consistently inadequate to pay dividends:

**New York Renaissance Cash Flow**

|  | Cash flow necessary to pay 8% dividend on $122 million acquisition price | Actual cash flow (estimated from company filings) | Percentage of dividend payments supported by actual cash flow |
|---|---|---|---|
| **2008** | $9.76 million | $2.2 million | 23% |
| **2009** | $9.76 million | $5.2 million | 59% |
| **2010** | $9.76 million | $4.3 million | 44% |

140.    The financial data can be used to calculate an internal rate of return (IRR) to show the appreciation required for the Renaissance's income to provide investors with an 8% return on their investment and no loss of principal upon disposition of the property.  The hotel would have to appreciate approximately 200% to achieve the REIT's investment objectives—an extraordinary rate, particularly since there is scant evidence that hotels in New York have appreciated in any material way since 2008.

**April 2008 to December 2010:**
**Defendants Sell $2 Billion of Apple REIT Nine Shares**

141.    Defendants launched Apple REIT Nine in April 2008, their largest venture yet, with a goal of raising $2 billion—twice as much as the earlier Apple REITs.  In soliciting investments in Apple REIT Nine, Defendants pointed to the purported success of the earlier Apple REITs, with their consistent dividend payments and a constant $11 share price.  These were strong selling points for retail investors seeking refuge from the volatility of the stock market.

142.    But in 2008, Apple REITs Six and Seven were still unable to pay distributions with cash from operations.  Apple REIT Six paid $81,746,000 in dividends, approximately $7.2 million of which came from proceeds of its dividend reinvestment program.  Apple REIT Seven paid $81,440,000 in dividends, using $20.5 million in proceeds from its dividend reinvestment program and $19.2 million in returned capital.  Neither REIT reduced the amount of their

distributions or adjusted the value of their shares.  These charts show the sources of the

distributions for 2008:



143.    Apple REIT Eight was paying 8% distributions in 2008 as well, and covered a

nearly $50 million shortfall in its $76 million in distributions by returning investor capital of

almost $24 million, $14 million in proceeds from dividend reinvestments, and $10 million drawn

from a credit line.  This chart shows the sources of Apple REIT Eight's distributions in 2008:



144.    By March 2009, PKF Consulting's Hospitality Investment Survey reported on the

bleak prospects for the industry, stating, "As we now contemplate the worsening economic

recession and its impact on lodging revenues and expenses, it has become evident that investors anticipate a significant decline in operating incomes and resultant loss in property values unlike anything we have seen in past recessions."  In fact, "[t]he decrease in RevPAR forecast is the largest annual decline observed by PKF Hospitality Research (PKF-HR) since 1932. When revenue contraction is heavily influenced by declines in ADR, the downward impact on profit is amplified."

145.    Nonetheless, Apple REITs Six and Seven continued to pay 7% to 8% distributions to investors in 2009, although they had inadequate cash flow and borrowed to pay the shortfalls.  Apple REIT Six had a shortfall of approximately $27 million that it paid by borrowing $25.9 million and returning $1.1 million in capital.  Despite cutting its distribution to 7% in May 2009, Apple REIT Seven had a shortfall of approximately $36.3 million, which it paid with $23.8 million in returned capital, $1 million from the DRIP, and $11.5 million drawn from a credit line.

146.    Apple REIT Eight also decreased its distribution to 7% in May 2009, but still had a shortfall of approximately $66 million.  It closed the gap with $4.4 million in returned capital, $13.6 million from the DRIP, and borrowing $48 million.







147.    Although the Apple REITs made minor changes to the distribution rates, those changes were not correlated to cash flow in any discernible manner.  This chart shows the changes in the Apple REITs' distribution rates from 2007 through 2011:

**Changes in Distribution Rates**

|  | **2007** | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|---|
| **Apple REIT 6** | 8% | Feb: 8.2% | 8.2% | March: 7% | July: 7.2% |
| **Apple REIT 7** | 8% | 8% | May: 7% | 7% | 7% |
| **Apple REIT 8** | Nov: 8% | 8% | May: 7% | 7% | July: 5% |
| **Apple REIT 9** |  | Dec: 8% | 8% | 8% | 8% |
| **Apple REIT 10** |  |  |  |  | Jan: 7.5% |

148.   Until very recently, the Apple REITs maintained a distribution rate at 7% or above to compete with other non-traded REITs.  The Apple REITs' rates have been at the high end of those rates.  Appendix G to this complaint is a chart that shows the distribution rates of the Apple REITs and other non-traded REITs, both open and closed, from 2007 to June 2011.

149.   Unlike the Apple REITs, similar publicly-traded REITs significantly adjusted their dividend payments during this time in response to the dramatic changes in the market.  This chart shows the dividends paid by comparable publicly-traded REITs:



**Apple REIT Nine Acquired Properties That Generate
Insufficient Cash to Pay Distributions**

150.     Apple REIT Nine was acquiring property throughout some of the worst times for

the hotel industry in many decades.  But it did not amend the disclosures in its prospectus to

address the market conditions.  Apple REIT Nine supplemented its prospectus on dozens of

occasions, but none of the supplemental filings included any disclosures about the impact of the

credit crunch and recession on the REIT's investments or the ability of REIT Nine to achieve its

investment objectives.

151.     In June 2008, in a letter accompanying Apple REIT Nine's 2008 second quarterly

report, Glade Knight reassured shareholders that Apple REIT Nine's hotels were not impacted by

the real estate market crash, stating that "[d]espite current market volatility, operations at [Apple

REIT Nine's] hotels have remained stable."

152.     And yet, to pay 8% distributions through 2010, Apple REIT Nine returned a total

of $156 million in capital to investors.  As this substantial return of investor capital decreased the

available capital to acquire new income-producing properties, the investment return threshold

that was required for Apple REIT Nine to sustain its 8% distribution rate increased.  This chart

shows the rate of return the investments would have to achieve—approximately 10.04%—

adjusted for Apple REIT Nine's returns of capital:

| | | |
|---|---|---|
| **Investment in Apple REIT Nine** | | **$ 1.000** |
| Less: | | |
| DLA commissions and costs: | $ 0.100 | |
| REIT Capitalization: | | $ 0.900 |
| | | |
| Less: | | |
| Reserves: | $ 0.005 | |
| Glade Knight acquisition fees: | $ 0.020 | |
| Return of investor capital as distributions: | $ 0.078 | |
| Subtotal for reserves, return of investor capital and fees: | | $ (0.103) |
| | | |
| Capital available for investment in hotels: | | $ 0.797 |
| | | |
| Cash required to pay 8% distributions: | | $ 0.080 |
| **Required return on investor capital:** | | **approx. 10.04%** |

153.    Determining the return on investor capital for the hotels that Apple REIT Nine acquired is difficult because a large percentage of the hotels were purchased as part of a portfolio and the REIT has not disclosed financial data for the individual hotels.

154.    Compounding the problem is the substantial number of new and to-be-built properties that Apple REIT Nine acquired (many of which were also part of a portfolio). Of 76 acquired hotels, 43 had been in operation for less than two years or were brand new. New hotels are typically priced as if they were fully operational, based upon current market rate and occupancy data, but the usual practice is for the developer to provide some form of cash flow guarantee for the first years of operation in return for a fully priced contract. Apple REIT Nine paid the fully-operational prices for new hotels but did not secure any cash flow guarantees, and did not disclose this deviation from industry practice to investors.

155.    This chart summarizes information derived from thousands of pages of SEC filings (over a nearly two year span) to show the number of new and unseasoned hotels purchased by Apple REIT Nine and the percentage of investor capital that was used to acquire each type of property:

|  | No. of Properties | Contract Price | Acquisition Fees | Offering Costs | Total Investor Capital | % of Investor Capital |
|---|---|---|---|---|---|---|
| Stabilized | 32 | $491,020,000 | $9,820,000 | $55,649,000 | $556,489,000 | 37.6% |
| Under Two Years | 18 | $356,550,000 | $7,131,000 | $40,409,000 | $404,090,000 | 27.3% |
| New Properties | 25 | $449,000,000 | $8,980,000 | $50,887,000 | $508,867,000 | 34.4% |
| No rental information | 1 | $10,250,000 | $205,000 | $1,162,000 | $11,617,000 | 0.8% |
| Total | 76 | $1,306,820,000 | $26,136,000 | $148,107,000 | $1,481,063,000 | |

156.    The new hotels do not have past net operating income data to calculate the required return on investment, but there is other relevant information available.  To comply with the tax code, REITs may not own income-producing property directly but may create a taxable subsidiary to hold and manage the properties acquired by the REIT.  The subsidiary remits rent payments to the REIT, and those rent payments are qualifying REIT income.  The rent set in the lease customarily approximates an amount almost equal to the entirety of the net operating income (NOI) of the hotel.

157.    The rents are therefore a reasonable approximation of Apple REIT Nine's projection of the NOI that will be generated by the property (before or after real estate taxes and insurance depending on the terms of the lease).  The required return on investor capital for a property may be calculated by dividing the rent (as a proxy for the hotel's NOI) by the total amount of invested capital (including commissions and fees).  Thus, the percentage of investor capital that the rents represent is a valid indicator of the maximum return that Apple REIT Nine expects to receive.

158.   This chart shows that Apple REIT Nine's projection of net operating income for its hotels—its best case scenario—was far below the 10.04% required to sustain the 8% distributions from operating income:

| | Percentage of Properties | Total Investor Capital | Rent per SEC Filings | **Return on Investor Capital** |
|---|---|---|---|---|
| Stabilized | 32% | $556,489,000 | $38,190,000 | **6.9%** |
| Under Two Years | 18% | $404,090,000 | $20,380,000 | **5.0%** |
| New Properties | 25% | $509,027,000 | $ 31,900,000 | **6.3%** |
| Total | | $1,469,606,000 | $90,470,000 | **6.2%** |

159.   The average rate of return on investor capital for all of the hotels was only 6.2%, well below the 10.04% necessary to fund 8% distributions.  Nonetheless, in August 2010, the Apple REIT Nine offering documents represented that the Apple REIT team "continues to aggressively seek new real estate acquisitions that we believe will grow the value of your investment over time."

160.   For example, one of the new properties Apple REIT Nine purchased is the Houston Marriott—in fact, Apple REIT Nine purchased it on the very day it opened for business, January 8, 2010.  Per the financial information included in Supplement No. 4 to the January 21, 2009 prospectus, the purchase price for the property was $50,750,000.  The rent was $2,367,460 and, using the rent as a proxy for the NOI, the rate of return on investor capital was 4.1%.  With the commission and fees, the total investor capital committed to purchase the Houston Marriott was $50,750,000 million.  The rent was $2,367,460 and, using the rent as a proxy for the NOI, the rate of return on investor capital was 4.1%.

**January 2011 to Present:**
**Defendants' Sale of Apple REIT Ten**

161.    Defendants started selling Apple REIT Ten in January 2011, despite the deepening losses experienced by investors in earlier Apple REITs, the increasing portions of distributions these REITs were paying from returned capital and borrowing rather than operating income, and the increasingly desperate measures needed to cover those distributions.

162.    In 2010, Apple REIT Six dropped its distributions to 7% and paid a shortfall of approximately $14.8 million with $13.6 million drawn from a line of credit, $1.8 million return of capital and $85,000 in proceeds from its DRIP program.  Apple REIT Seven paid an approximately $14.5 million shortfall entirely with borrowed funds—and borrowed more to pay redemptions.  Apple REIT Eight had a shortfall of approximately $32 million, which it paid by borrowing $16.6 million, returning $4 million in capital and using $11.3 million from its DRIP program.  Apple REIT Nine's shortfall was $96 million, paid entirely by returning almost 5% of the originally invested capital, funds that should have been used to purchase properties.   These charts show the sources of the Apple REITs' distribution payments in 2010:









163.    The Apple REIT Ten shares were priced at $11, and Defendants continued to point to the earlier Apple REITs as examples of investments that maintained their value and paid regular distributions during a severe economic crisis.  Defendants did not disclose that the value of the shares had been steadily eroded by the ongoing payment of distributions with returns of capital and borrowed funds, the impact of the economy on the hotel industry, and increased leverage.

164.    Available information about Apple REIT Ten's acquisitions is limited because, like Apple REIT Nine, most of the acquisitions have been portfolios of several hotels, and many are newly or recently built so they have little or no operating history.  Some information is available from the forms 8-K, 8-KA and 424(b)(3).

165.    One of Apple REIT Ten's acquisitions of a seasoned property is the Denver Hilton Garden Inn.  The purchase closed in March 2011 for $58,500,000.  The seller's financial statements as of December 31, 2010 show a net operating income, after a 5% allowance for capital improvements, of $3,972,301.  Capitalizing the NOI at 9.75% (the market average for limited service hotels at the time) indicates a market value of about $39 million—$19.5 million less than Apple REIT Ten paid.  The 2011 rent, set by Apple REIT Ten, was $3,995,126 before

payment of real estate taxes of $380,000 for an anticipated 2011 NOI of approximately $3.6 million (before reserves for capital improvement). This amount represents a 6.2% return on investment and a return on investor capital of only 5.45%. These returns are much lower than necessary to sustain the 8% dividend payments or justify the $11 price of the shares.

166.    Apple REIT Ten contracted with an unidentified seller to purchase the "CN Portfolio" of four properties in Winston Salem, North Carolina; Columbia, South Carolina; Wytheville, Virginia; and Jacksonville, North Carolina. The Wytheville hotel was dropped, but a property in Matthews, North Carolina was added. Three of the four properties are in operation. The contract cost for those three hotels was $31.5 million. The rent for the three properties totals $2,238,348, which represents a 6.27% rate of return on investor capital.

167.    In a March 2011 letter to shareholders included with the 2011 first quarterly report, Glade Knight said, "Our team at Apple REIT Ten is committed to maximizing the value of your investment though a conservative approach to the ownership of income producing real estate." And in a June 2011 letter to shareholders included with the 2011 Second Quarterly Report, "Apple REIT Ten is focused on the protection of shareholder principal and the distribution of attractive returns…."

168.    But Apple REIT Ten has been in trouble since the start. During the first six months of 2011, Apple REIT Ten experienced a net loss of $2.4 million and distributed $7.6 million to shareholders—resulting in a $10 million, 2.5% return of capital in less than six months of operation.[4]

---

[4] The calculated net loss is based on the Consolidated Statement of Cash Flows in Apple REIT Ten's Second Quarter 2011 10-Q and includes depreciation and stock option expenses.

169.    Sales of Apple REIT Ten are ongoing, although the rate of sales has steadily decreased since June 2011.  Defendants had sold $473.7 million of Apple REIT Ten shares as of December 31, 2011.

**May 2011 to Present:**
**FINRA's Complaint Against DLA and Defendants' Response**

170.    On May 27, 2011, DLA was sued by FINRA, its primary securities regulator. FINRA alleges that DLA misled consumers by providing misleading performance figures for all of the Apple REITs on its website and implying that future investments (like the ongoing Apple REIT Ten offering) could be expected to achieve similar results.  FINRA also contends that the performance figures on DLA's website were misleading because they did not say that the income from the Apple REITs was insufficient to support the 7–8 % returns paid by the REITs, and that the REITs had funded the distributions through borrowings.  Similar representations were made for the earlier Apple REIT offerings.  FINRA also asserts that DLA failed to investigate the Apple REITs adequately and had no basis for recommending and selling them as suitable investments for its customers.

171.    FINRA's complaint brought Defendants' practices to the public's—and investors'—attention.  The New York Times, the Wall Street Journal, Bloomberg and other publications have reported on FINRA's suit against DLA.  Redemption requests for all of the Apple REITs increased significantly, and the Apple REITs are no longer granting 100% of the requests.  This chart shows the number of shares investors sought to redeem in 2011:

**Approximate Number of Redemption Requests Received in Units**

|  | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| Apple REIT 6 | 600,000 | 680,000 | 4,300,000 | 9,900,000 |
| Apple REIT 7 | 1,100,000 | 1,300,000 | 5,600,000 | 11,300,000 |
| Apple REIT 8 | 1,170,000 | 1,530,000 | 8,200,000 | 17,900,000 |
| Apple REIT 9 | 320,000 | 380,000 | 3,600,000 | 8,400,000 |

172.    Despite the significant increase in the number of requests, in October 2011 Apple

REITs Six, Seven, and Eight announced plans to further limit the number of redemption requests

that will be granted, dropping the current 3% to 5% limit down to 2% of the weighted average of

outstanding units during the 12-month period immediately prior to the date of redemption.  This

chart shows the percentage of redemption requests the REITs granted:



Percentage of Granted Redemption Requests

**Percentage of Redemptions Granted in 2011**

|  | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| Apple REIT 6 | 100% | 100% | 17% | 7% |
| Apple REIT 7 | 63% | 56% | 13% | 6% |
| Apple REIT 8 | 61% | 48% | 9% | 4% |
| Apple REIT 9 | 100% | 100% | 41% | 18% |

173.    Starting in May 2011, DLA changed the estimated market price and estimated

market value for Apple REIT shares on its customer account statements from $11 to "not

priced."  DLA deleted the explanation of how the share value was calculated from the statements, and gave no explanation for the change to "not priced."

174.     In a June 2, 2011 New York Times article about DLA and the Apple REITs entitled "Statements Skip Over REIT's Woes," Knight was quoted as saying, "Who knows what the value is? I would not be comfortable in saying it was $4, $5, or $6.  If I said I could sell it for $12, I would be sued."

175.     On June 29, 2011, the Wall Street Journal reported that the SEC is inquiring into the operations and disclosures of non-traded REITs.  The paper quoted Michael McTiernan, a lawyer in the SEC's corporation-finance division, as saying, "We believe investors would benefit from more information about how [nontraded REITs] reach their valuations. … We told the industry we would be reviewing the annual reports for this disclosure, and if it doesn't appear, they should expect to hear from us."

176.     Also in June 2011, Mackenzie, Patterson, Fuller, LP ("MPF"), a company engaged in trading discounted and distressed real estate securities, offered to purchase Apple REIT Seven and Eight shares for $3 per share and estimated that the liquation value of Apple REIT Seven was approximately $4.15 per share and Apple REIT Eight was approximately $4.10 per share.  The REITs recommended rejection of the tender offer and stated that, as of March 31, 2011, the Apple REIT Seven shares had a per unit "book value" of $7.83 and the Apple REIT Eight shares had a per unit "book value" of $7.57.

177.     In July 2011, DLA posted an article on its website entitled "Understanding the Difference Between Book Value Per Share and Market Value."  Noting that "[i]t can be a source of alarm to an investor if they are informed of the book value per share of an investment they own, and this price differs from a market value of which they had previously been informed,"

DLA said that "[i]n the case of a non-traded REIT, the market value per share is may be [sic] above the book value."  DLA provided an example:  "[I]n an SEC filing a non-traded Real Estate Investment Trust (REIT) might have a stated book value per share of $7.00. If information about market value was not taken into account or omitted, this price might cause some concern with investors, especially if they had been consistently informed that that their price per share was substantially higher. In such a case, the higher price, if reflecting market value, may well be entirely accurate and in fact revelatory of the full value of the investment."

178.    On August 19, 2011, Apple REITs Six, Seven, Eight and Nine announced that their boards of directors had authorized the evaluation of a possible consolidation transaction in which the Apple REITs would be combined, possibly with a listing of the stock of the combined enterprise for trading on a national exchange.

179.    Consolidation or listing on an exchange would be incredibly profitable for Knight, who is issued "Series B" shares at a price of $0.10 per share at the formation of each REIT.  He can convert each Series B share into 24.17104 common shares in the event the REIT engages in a transaction like a liquidation, roll up or consolidation, or if the REIT's shares are listed on an exchange.  The following chart shows the gain in value Knight would receive if the shares are valued at $11:

|  | Number of shares | Price paid for shares | Common shares received upon conversion | Value of common shares upon conversion (at $11) | Gain in value from conversion |
|---|---|---|---|---|---|
| Apple REIT 6 | 240,000 | $24,000 | 5,801,049.60 | $63,811,545.60 | $63,787,545.60 |
| Apple REIT 7 | 240,000 | $24,000 | 5,801,049.60 | $63,811,545.60 | $63,787,545.60 |
| Apple REIT 8 | 240,000 | $24,000 | 5,801,049.60 | $63,811,545.60 | $63,787,545.60 |
| Apple REIT 9 | 480,000 | $48,000 | 11,602,099.20 | $127,623,091.20 | $127,575,091.20 |
| **TOTAL** | 1,200,000 | $120,000 | 29,005,248 | $319,057,728.00 | **$318,937,728.00** |

180.    In September 2011, MPF made a new tender offer of $5 per share for Apple REIT

Six and $4 per share for Apple REIT Seven and Apple REIT Eight, estimating that the

liquidation value for Apple REIT Six was approximately $6.98 per share, Apple REIT Seven

was approximately $4.88 per share, and Apple REIT Eight was approximately $4.26 per share.

Defendants again recommended rejection of the offer and stated that as of June 30, 2011, the per

unit book value of Apple REIT Six shares was $7.73, Apple REIT Seven shares was $7.71, and

Apple REIT Eight shares was $7.42.  They added: "The Board notes that book value may not

necessarily be representative of the liquidation value of the Company.  The per Unit book value

per share is the total of the Company's assets (reduced by depreciation) less liabilities as

reflected in its financial statements divided by the total outstanding shares. Assets and liabilities

are recorded in the financial statements in accordance with generally accepted accounting

principles and do not necessarily reflect fair value."

181.    In October 2011, FINRA issued an investor alert about public non-traded REITs,

urging investors to "perform a careful review before investing."  The alert states that "FINRA is

issuing this alert to inform investors of the features and risks of publicly registered non-exchange

traded REITs.  If you are considering a publicly registered non-exchange traded REIT, be

prepared to ask questions about the benefits, risks, features and fees."  With a footnote

referencing FINRA's disciplinary complaint against DLA for failing to conduct a reasonable

investigation and providing misleading information on its website, FINRA advises investors to

"[b]e wary of pitches or sales literature offering simplistic reasons to buy a REIT investment.

Sales pitches might play up high yields and stability while glossing over the product's lack of

liquidity, fees and other risks."

182.    FINRA recently filed an amended complaint, adding David Lerner as a defendant

and detailing the misleading statements Lerner has used in its seminar presentations to existing

and prospective Apple REIT investors.  Among the statements that FINRA describes as "untrue,

false, exaggerated, unwarranted and misleading" are:

- $100,000 invested in Apple REIT Six would be worth $171,901 today (June 16, 2011).

- $100,000 invested in Apple REIT Seven would be worth $148,000 today.

- $100,000 invested in Apple REIT Eight would be worth $148,000 today.

- $100,000 invested in Apple REIT Nine would be worth $125,486 today.

- Apple REIT Six and Apple REIT Eight are making money "hand over fist" and Apple REIT Eight is "making all kinds of money."

- Lerner "wouldn't be surprised" if shares in the combined REIT (the proposed consolidation of Apple REITs Six, Seven, Eight and Nine and listing on an exchange) were worth "$20" a share.

- Characterizing the Apple REITs as "moderately conservative."

- Describing the Apple REITs as a "cash cow."

- "We are the Rolls Royce of this business.  It doesn't get any better.  These are the facts. … So if you have any of these Apple programs, this is it.  You're the Rolls Royce of the business.  You have the best that there is in the entire industry."

- "There is limited liquidity—no one, ever, in the history of these two programs, has ever not gotten back their money or has ever lost money—ever, in the history of these programs.  All right, I hope everyone understands this. This is a fact."

**The DLA Defendants Failed to Conduct Adequate Due Diligence**

183.    The DLA Defendants knew or should have with adequate due diligence known

that market conditions and the Apple REIT Defendants' investment strategies were affecting the

value of the Apple REITs.  As a seller of the Apple REITs, the DLA Defendants were required to

conduct proper due diligence in connection with the offerings.  The failure of Apple REITs Six, Seven, Eight, Nine and Ten to adjust their uniform $11 valuation or their consistent 7-8% distributions notwithstanding changes in market conditions and each REIT's financial condition and results of operations was a red flag requiring the DLA Defendants to conduct a reasonable investigation.  Instead, the DLA Defendants continue to sell Apple REIT shares without having conducted adequate due diligence to properly advise their customers of the risks associated with investing in Apple REIT shares.

184.   In DLA's role as sole selling agent of the Apple REIT shares, the DLA Defendants were uniquely empowered to investigate and identify the risks associated with the investment.  For example, pursuant to an agency agreement with each of the Apple REITs, DLA can request certain non-public information concerning the "business and financial condition" of the Apple REITs.

185.   Under FINRA regulations, the DLA Defendants must have reasonable grounds to believe that all material facts are adequately and accurately disclosed and provide a basis for evaluating the REIT program.  They are required to obtain information on material facts relating to, among other things, the program's risk factors, and inquire into the amount or composition of the REIT's dividend distributions.  As part of that inquiry, the DLA Defendants must evaluate the sources of distributions, including the portion comprised of investor capital or borrowed money, and considered whether there are impairments to the REIT's assets or other material events that would affect the distributions and whether disclosures about dividend distributions needed to be updated to reflect those developments.

186.   Had the DLA Defendants conducted a sufficient and meaningful due diligence investigation with the goal of adequately advising their customers about the risks of investing in

the Apple REITs, they would have concluded that the Apple REITs were not safe and conservative investments, that the shares were not accurately priced, and that the distributions were not sustainable.

### The Apple REIT Defendants Are Responsible for the DLA Defendants' Actions and Omissions

187.   Since Apple REIT Six commenced sales in April 2004, DLA has served as the sole selling agent for the Apple REITs.  For each offering, DLA and the Apple REITs entered into an "Agency Agreement."  In those agreements the Apple REITs engaged DLA to solicit purchasers for shares in the Apple REITs.

188.   The financial fortunes of the Apple REIT Defendants and the DLA Defendants are intertwined.   The DLA Defendants have sold more than $6.8 billion of Apple REIT securities to approximately 122,600 customer accounts in DLA's role as exclusive selling agent of the offerings.  DLA's brokerage customers represent a captive sales market for the Apple REIT Defendants.

189.   The Apple REIT Defendants have relied on the DLA Defendants as the sole selling agent for their shares.  Therefore, the Apple REIT Defendants have been, and continue to be, wholly dependent on the DLA Defendants for their funding.

190.   The DLA Defendants made repeated multi-year representations to their customers and potential customers on behalf of the Apple REIT Defendants.  The Apple REIT Defendants knew or should have known about the DLA Defendants' representations and omissions about the Apple REITs, their operations and financial condition, the value of their shares, and their dividend policy.  The Apple REIT Defendants took no actions to correct these misrepresentations and omissions.

191.     The Apple REITs and DLA have integrated their presentations to the public.  The separate websites for Apple REITs Six, Seven, Eight and Nine have pages captioned "CONTACT US" that identify DLA as a contact for inquiries about Apple REIT shares.  The website for the Apple REIT companies (applereitcompanies.com) has a page captioned "CONTACT US" that identifies DLA as a contact for inquiries about Apple REIT shares.  A visitor to the Apple REIT companies' website who clicks on the contact information for DLA will be taken directly to a DLA website page touting the Apple REITs (www.davidlerner.com/Real-Estate-Investment-Trusts.aspx).

192.     The DLA website prominently displays information about the Apple REIT companies and suggests that the Apple REITs have been and will continue to be safe investments.  Consistent with the Apple REIT website providing a link to the DLA website, the DLA website states, "Visit the Apple REIT Companies website," and provides a link to the home page for the Apple REIT companies.

193.     The websites for the Apple REIT companies and for each of the Apple REITs identify no other sources of information about shares in the Apple REITs other than DLA.

194.     Through the agency agreements and the close relationship evidenced by the volume of business and the interlinked web pages, and the role of DLA as the exclusive seller of Apple REIT investments, DLA has assumed the role of the agent of the Apple REITs regarding the sale of shares in the Apple REITs.  The Apple REIT Defendants are responsible for the DLA Defendants' actions because (1) the Apple REITs expressly make DLA their agent regarding the sale of shares in the REITs and (2) the Apple REITs have through their words, conduct, and other manifestations held the DLA Defendants out and ratified the actions of the DLA Defendants as their agent.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

195.    Plaintiffs, on behalf of the class and subclasses, did not discover the facts

constituting Defendants' violations until after FINRA filed its original complaint on May 27,

2011, alleging that DLA misled customers in marketing the Apple REIT Ten shares.  Plaintiffs

learned about Defendants' practices through the extensive media coverage of FINRA's

complaint and the Apple REITs, which included articles in the New York Times and the Wall

Street Journal and numerous blog postings.  Plaintiffs then identified and retained counsel.

196.    Plaintiffs and class members could not reasonably have discovered the facts

constituting Defendants' violations until after the FINRA complaint was filed.  Until then, DLA

had sent monthly customer statements to plaintiffs and class members that showed a market price

and market value of $11.  And the Apple REITs consistently paid dividends of 7% to 8% and

granted 100% of investors' redemption requests.  Knight and the Apple REITs sent and filed

with the SEC letters, quarterly reports, and annual reports assuring investors of the REITs'

commitment to enhancing shareholder value and emphasizing the REITs' stability.

197.    Because plaintiffs and class members could not have reasonably discovered the

facts constituting Defendants' violations until FINRA's May 27, 2011 complaint, their claims

accrued on that date and any applicable statutes of limitations were tolled until that date.

## COUNT ONE

### (for violations of section 11 of the Securities Act against Apple REIT Ten, DLA, and the Individual Apple REIT Defendants)

198.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth

fully herein.

199.    This count is asserted under section 11 of the Securities Act, 15 U.S.C. § 77k,

against Apple REIT Ten, DLA and certain of the Individual Apple REIT Defendants (those who

serve on Apple REIT Ten's board of directors), on behalf of the members of the class who acquired Apple REIT Ten shares pursuant to the registration statement and documents incorporated by reference in the registration statement, and were damaged.

200.    Plaintiffs purchased their Apple REIT Ten shares directly from DLA.

201.    The registration statement and incorporated prospectuses and other documents were false and misleading, contained untrue statements of material fact, omitted to state material facts necessary to make the statements not misleading, and omitted material facts required to be stated therein.

202.    Pursuant to section 11 of the Securities Act, the class is entitled to recover its damages jointly and severally from Apple REIT Ten as the registrant for the offering documents, from the Individual Apple REIT Defendants as persons who signed or consented to be named in the offering documents, and from DLA as the underwriter.

203.    Each Defendant is strictly liable under section 11 for the materially untrue statements and omissions in the offering documents.

204.    DLA and the Individual Apple REIT Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the offering documents.  They did not make a reasonable investigation or possess reasonable grounds to believe that the statements were true and that there were no omissions of material fact.  Accordingly, DLA and the Individual Apple REIT Defendants acted negligently and are therefore liable to Plaintiffs and class members.

205.    Plaintiffs and the class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material fact in the offering documents when they purchased their shares.

206.    Less than one year elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the offering documents. Less than three years elapsed between the time that the shares were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of the offering documents.

207.    Apple REIT Ten, DLA and the Individual Apple REIT Defendants violated Section 11 of the Securities Act and are liable to Plaintiff and the class, who have been damaged by this violation.

## COUNT TWO

### (for violations of section 12(a)(2) of the Securities Act against Apple REIT Nine, Apple REIT Ten, and DLA)

208.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

209.    This count is asserted under section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Apple REIT Nine, Apple REIT Ten, DLA, and David Lerner on behalf of the members of the class who acquired Apple REIT Nine or Apple REIT Ten shares.

210.    Apple REIT Nine, Apple REIT Ten, DLA, and David Lerner were sellers, offerors and/or solicitors of sales of Apple REIT Nine and Apple REIT Ten shares pursuant to the offering documents.

211.    The prospectuses contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements not misleading.

212.    DLA and its officers, employees, representatives and agents, including David Lerner, made oral representations to Plaintiffs and class members that were untrue statements of

74

material fact and omitted to state material facts required to be stated or necessary to make the statements not misleading. These representations were part of a uniform, scripted sales presentation.

213.    Apple REIT Nine, Apple REIT Ten, DLA and David Lerner directly solicited the purchase of the shares by Plaintiffs and class members by means of the prospectuses and oral representations, motivated at least in part by the desire to serve their own financial interests.

214.    Apple REIT Nine, Apple REIT Ten, DLA and David Lerner used means and instrumentalities of interstate commerce and the U.S. mails.

215.    Plaintiffs and class members purchased Apple REIT Nine and Apple REIT Ten shares pursuant to the materially untrue and misleading prospectuses and oral representations, and did not know, and in the exercise of reasonable care could not have known, of the untruths and omissions contained therein.

216.    Less than one year elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the offering documents. Less than three years elapsed between the time that the shares were sold and the time that the first complaint was filed asserting claims arising out of the falsity of the offering documents.

217.    Apple REIT Nine, Apple REIT Ten, DLA and David Lerner owed the class the duty to make a reasonable and diligent investigation of the statements contained in the prospectuses and in oral representations at the time they became effective to ensure that the statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  Apple REIT Nine, Apple REIT Ten, DLA and

David Lerner knew, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the prospectuses and oral representations.

218.    Apple REIT Nine, Apple REIT Ten, DLA and David Lerner violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and the class, who have been damaged by this violation.

219.    Plaintiff and class members who still hold Apple REIT Nine and Apple REIT Ten shares hereby tender their shares upon return of the consideration paid, plus interest, and those members of the class who sold their shares hereby tender the consideration they received upon the return of the consideration they paid, plus interest.

## COUNT THREE

### (for control person liability under section 15 of the Securities Act against Apple Nine Advisors, Apple Suites Realty, Apple Fund Management, Knight, Peery, Waters, Wily, Kern, and Matson)

220.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

221.    Section 15 of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise … controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable …."

222.    Apple Nine Advisors, Apple Suites Realty, Apple Fund Management, Knight, Peery, Waters, Wily, Kern and Matson are controlling persons of Apple REIT Nine because of their directorial and/or management positions and are also liable for the violations of the Securities Act alleged in this complaint.  They had the power, influence and authority to cause or prevent the wrongful conduct alleged in this complaint.

223.    Apple Nine Advisors, Apple Suites Realty, Apple Fund Management, Knight, Peery, Waters, Wily, Kern and Matson violated Section 15 of the Securities Act and are liable to Plaintiff and the class, who have been damaged by this violation.

## COUNT FOUR

**(for control person liability under section 15 of the Securities Act against Apple Ten Advisors, Apple Suites Realty, Apple Fund Management, Knight, Colton, Hall, Keating, Rosenfeld and Adams)**

224.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

225.    Section 15 of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise … controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable …."

226.    Apple Ten Advisors, Apple Suites Realty, Apple Fund Management, Knight, Peery, Colton, Hall, Keating, Rosenfeld and Adams are controlling persons of Apple REIT Nine because of their directorial and/or management positions and are also liable for the violations of the Securities Act alleged in this complaint.  They had the power, influence and authority to cause or prevent the wrongful conduct alleged in this complaint.

227.    Apple Ten Advisors, Apple Suites Realty, Apple Fund Management, Knight, Peery, Waters, Wily, Kern and Matson violated Section 15 of the Securities Act and are liable to Plaintiff and the class, who have been damaged by this violation.

## COUNT FIVE

### (for control person liability under section 15 of the Securities Act against David Lerner)

228.     Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

229.     Section 15 of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise … controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable …."

230.     David Lerner is a controlling person of DLA because of his management position and is also liable for the violations of the Securities Act alleged in this complaint.  David Lerner had the power, influence and authority to cause or prevent the wrongful conduct alleged in this complaint.

231.     David Lerner violated Section 15 of the Securities Act and is liable to Plaintiff and the class, who have been damaged by this violation.

## COUNT SIX

### (by Plaintiffs against the DLA Defendants for breach of fiduciary duty and aiding and abetting breach of fiduciary duty)

232.     Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

233.     The DLA Defendants owed Plaintiffs and the proposed class members a duty of ordinary and reasonable care and good faith which arose from the relationships between DLA and its customers and DLA's position and status as the underwriter and sole selling agent of the Apple REIT securities, as a financial and investment advisor to DLA's customers, and as a

registered broker-dealer.  The DLA Defendants owed duties of ordinary and reasonable care applicable to any similar financial advisory firm or securities broker-dealer and FINRA member.

234.    The DLA Defendants had a fiduciary duty to deal fairly with Plaintiffs and class members and to communicate promptly to them all material facts they knew or should have known about the true nature of the investments in the Apple REITs.

235.    The DLA Defendants breached the duties and obligations of ordinary care by, among other things, offering investments in Apple REITs Six, Seven, Eight, Nine and Ten to DLA's customers without having conducted a reasonable due diligence investigation to understand the potential risks and rewards associated with investment in the Apple REITs; failing to conduct further inquiry when red flags were present; failing to ensure the Apple REITs were suitable investments; failing to disclose material information about the prior Apple REITs, including the source of their distributions and the value of their shares; not providing a full and fair disclosure of the risks and rewards associated with an investment in the Apple REITs; negligently making numerous false and misleading misrepresentations about the Apple REITs to Plaintiffs and class members about the $11 per share valuation, the expected distributions, the safety and conservative nature of the Apple REITs as an investment, and their true economic performance.

236.    The DLA Defendants advanced their own interests in continuing the sale of Apple REIT shares and the commissions those sales generated to the detriment of Plaintiffs and class members.

237.    The DLA Defendants also aided and abetted the Individual Apple REIT Defendants' breach of fiduciary duties to Plaintiffs and class members, in that they knew about and substantially assisted in or encouraged the breach

238.    As a result of Defendants' breaches of their fiduciary duties and/or aiding and abetting breaches of fiduciary duty, Plaintiffs and the class have suffered and continue to suffer economic losses in an amount to be determined according to proof at trial.

## COUNT SEVEN

### (by Plaintiffs against the Apple REIT Defendants for breach of fiduciary duty and aiding and abetting breach of fiduciary duty)

239.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

240.    The Individual Apple REIT Defendants owe a fiduciary to shareholders as set forth in the Apple REIT's bylaws and as required by the North American Securities Administrators Association's Policy Regarding Real Estate Investment Trusts.  The Individual Apple REIT Defendants breached this duty by, among other things, failing to disclose material information about the prior Apple REITs, including the source of their distributions and the value of their shares, and negligently making numerous false and misleading misrepresentations about the Apple REITs to Plaintiffs and class members about the $11 per share valuation, the expected distributions, and the REITs' true economic performance.

241.    The Individual Apple REIT Defendants advanced their own interests in continuing the sale of Apple REIT shares and the fees those sales generated to the detriment of Plaintiffs and class members.

242.    The Apple REIT Entity Defendants aided and abetted the Individual Apple REIT Defendants' breach of fiduciary duties to Plaintiffs and class members, in that they knew about and substantially assisted in or encouraged the breach.

243.    The Apple REIT Defendants also aided and abetted the DLA Defendants' breach of their fiduciary duties to Plaintiffs and class members, in that they knew about and substantially assisted in or encouraged the breach.

244.    As a result of Defendants' breaches of their fiduciary duties and/or aiding and abetting breaches of fiduciary duty, Plaintiffs and the class have suffered and continue to suffer economic losses in an amount to be determined according to proof at trial.

## COUNT EIGHT

### (by Plaintiffs against Defendants for unjust enrichment)

245.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

246.    By their wrongful acts and omissions alleged above, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs and the class.

247.    As a result of Defendants' wrongful conduct as alleged herein, Plaintiffs and the class have acquired shares in the Apple REITs that are not worth the value reported and are contrary to the descriptions and understanding of the investments as sold to them.

248.    Defendants' knowing acceptance and retention of this non-gratuitous benefit conferred by Plaintiffs and Class members under these circumstances is unjust and inequitable.

249.    No other remedy at law can adequately compensate Plaintiffs and class members for the economic damages resulting to them from Defendants' wrongful actions as alleged herein.

250.    Plaintiffs and the class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Defendants from their wrongful conduct.

## COUNT NINE

### (by Plaintiffs against Defendants for negligence)

251.    Plaintiffs re-allege and incorporate all of the foregoing paragraphs as if set forth fully herein.

252.    The DLA Defendants owed a duty of care to Plaintiffs and class members through their roles as financial and investment advisor, registered broker-dealer, underwriter and sole selling agent of the Apple REITs.

253.    The DLA Defendants had a duty to exercise due care when offering and selling the Apple REIT shares to Plaintiffs and class members.  The DLA Defendants' duty to exercise due care included the following duties:

- To perform a reasonable review and due diligence investigation of the Apple REITs;

- To conduct further inquiry if any red flags are present;

- To ensure that the Apple REITs were suitable investments;

- To ensure that all material facts about and risks of investing in the Apple REITs were disclosed;

- To provide full and fair disclosure of the risks and rewards associated with an investment in the Apple REITs;

- To ensure that investors were not misled by the practices of the Apple REIT board of directors of declaring dividends that were not derived from operating income, of maintaining a fixed price of $11 per share in each Apple REIT regardless of the value of the assets acquired or the performance of the properties or overall market, and redeeming shares at a price that exceeded the market value of the shares; and

- To comply with federal and state law, and applicable industry rules, regulations and regulatory notices issued by FINRA or its predecessor, NASD, including FINRA Rules 2010, 2020, 2710 and NASD Rules 2210 and 2310.

254.    The DLA Defendants' breach of their duty of care, failure to comply with federal and state laws and industry rules and regulations, and failure to exercise due care are the proximate and factual causes of the losses suffered by Plaintiffs and class members.

255.    The Apple REIT Defendants are jointly and severally liable for the DLA Defendants' negligence because the DLA Defendants were agents of and acting in the scope of their agency with the Apple REIT Defendants when they offered and sold the Apple REITs to Plaintiffs and Class members.

## <u>COUNT TEN</u>

**(by Plaintiff Laura Berger and the Connecticut Subclass against DLA, David Lerner, Apple REIT Eight, Apple REIT Nine, Apple REIT Ten, and Knight for violation of § 36b-4 of the Connecticut Uniform Securities Act)**

256.    Plaintiff Laura Berger re-alleges and incorporates all of the foregoing paragraphs as if set forth fully herein.

257.    As alleged herein, in connection with the offer and sale of the Apple REITs, Defendants directly or indirectly made untrue statements of material fact about the value of the Apple REIT shares, or omitted to state material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

258.    Plaintiff Berger and the Connecticut subclass members did not know of the untruth or omission.

259.    Defendants engaged in dishonest or unethical acts or practices in connection with the offer and sale of the Apple REITs to Plaintiff Berger and Connecticut subclass members, as alleged herein.

260.    As a result of the Defendants' wrongful conduct, Plaintiff Berger and the Connecticut subclass members suffered damages.

<u>**COUNT ELEVEN**</u>

**(by Plaintiff Laura Berger and the Connecticut Subclass against Apple REIT
Eight, Apple REIT Nine, Apple REIT Ten, the Individual Apple REIT
Defendants, DLA, and David Lerner for violation of § 36b-5 of the
Connecticut Uniform Securities Act)**

261.    Plaintiff Laura Berger re-alleges and incorporates all of the foregoing paragraphs as if set forth fully herein.

262.    The Defendants directly or indirectly received compensation or other remuneration for advising Plaintiff Berger and Connecticut subclass members as to the value of the Apple REIT shares and their sale.

263.    As alleged herein, the Defendants made untrue statements of fact about the value of the Apple REIT shares, or omitted to state material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, in offering and selling the Apple REITs to Plaintiff Berger and Connecticut subclass members.

264.    The Defendants engaged in dishonest or unethical practices in connection with advising Plaintiff Berger and Connecticut subclass members about the value of the Apple REIT shares.

265.    As a result of the Defendants' wrongful conduct, Plaintiff Berger and the Connecticut subclass members suffered damages.

266.    Under § 36b-29(c) of the Connecticut Uniform Securities Act, David Lerner, as an officer of DLA, is jointly or severally liable to Plaintiff Berger and the Connecticut subclass members.

267.    Under § 36b-29(c), the Individual Apple REIT Defendants, as directors and officers of the REITs, are jointly or severally liable to Plaintiff Berger and the Connecticut subclass members.

## COUNT TWELVE

**(by Plaintiff Laura Berger and the Connecticut Subclass against Apple REIT Eight, Apple REIT Nine, Apple REIT Ten, Knight, DLA, and David Lerner for violation of § 36b-29(a) of the Connecticut Uniform Securities Act)**

268.    Plaintiff Laura Berger re-alleges and incorporates all of the foregoing paragraphs as if set forth fully herein.

269.    Defendants were offerors and sellers, or materially assisted offerors and sellers, of the Apple REIT investments within the meaning of the Connecticut Uniform Securities Act.

270.    As alleged herein, Defendants offered and sold the Apple REITs by means of untrue statements of material fact and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading.

271.    Defendants knew or in the exercise of reasonable care should have known of the untruth or omission.

272.    Plaintiff Berger and the Connecticut subclass did not know of the untruth or omission.

273.    As a result of the Defendants' wrongful conduct, Plaintiff Berger and the Connecticut subclass members were damaged.

274.    Under § 36b-29(c) of the Connecticut Uniform Securities Act, the Individual Apple REIT Defendants, as directors and officers of the Apple REIT Entity Defendants, are jointly or severally liable to Plaintiff Berger and the Connecticut subclass members.

275.    Under § 36b-29(c) of the Connecticut Uniform Securities Act, David Lerner, as a director and officer of DLA, is jointly or severally liable to Plaintiff Berger and the Connecticut subclass members.

## COUNT THIRTEEN

**(by Plaintiff William Murray and the Florida Subclass against Apple REIT Eight, Apple REIT Nine, Apple REIT Ten, Knight, DLA, and David Lerner for violation of § 517.301 of the Florida Securities Investor Protection Act)**

276.     Plaintiff William Murray re-alleges and incorporates all of the foregoing paragraphs as if set forth fully herein.

277.     As alleged herein, in connection with rendering investment advice about the Apple REITs, the DLA Defendants obtained money from Plaintiff Murray and the Florida subclass members by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.  The DLA Defendants knew or should have known of the untruth or omission.

278.     As alleged herein, in connection with the offer and sale of the Apple REITs, Defendants obtained money from Plaintiff Murray and the Florida subclass members by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.  Defendants knew or should have known of the untruth or omission.

279.     Plaintiff Murray and the Florida subclass members justifiably relied on the advice or untruth or omission, and suffered damages as a result.

280.     As a directors and officers who participated in or aided in selling the Apple REITs, the Individual Apple REIT Defendants are jointly and severally liable to Plaintiff Murray and the Florida subclass.

281.     As a director and officer who participated in or aided in selling the Apple REITs, David Lerner is jointly and severally liable to Plaintiff Murray and the Florida subclass.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and class members pray for a judgment in their favor:

(1)     for an order certifying the class, appointing Plaintiffs as representatives of the

class, and appointing Plaintiffs' counsel as class counsel;

(2)     for an order certifying the subclasses, appointing Plaintiffs as representatives of

the subclasses, and appointing Plaintiffs' counsel as class counsel;

(2)     for compensatory, special and general damages according to proof;

(3)     for pre-judgment and post-judgment interest;

(4)     for rescission or other appropriate equitable relief;

(5)     for reasonable attorneys' fees and costs of investigation and litigation; and

(6)     for such other and further relief as the interests of law or equity may require.

## PLAINTIFFS DEMAND A JURY TRIAL

Plaintiffs hereby demand trial by a jury as to all issues so triable.

Dated: February 17, 2012              GIRARD GIBBS LLP

By:    /s/*Amanda M. Steiner*

Daniel C. Girard
Christina C. Sharp
Janice S. Yi
601 California Street, 14th Floor
San Francisco, CA 94611
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

ZAMANSKY & ASSOCIATES LLC
Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Plaintiffs' Counsel*

MEYER WILSON CO., LPA
David P. Meyer
Matthew R. Wilson
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

*Additional Counsel for Plaintiffs*

**APPENDIX A:**
**Apple REIT Six Offering Documents**

|     | Date       | Document                                                        |
| --- | ---------- | --------------------------------------------------------------- |
| 1   | 4/20/2004  | Amendment No. 3 to Form S-11 Registration Statement             |
| 2   | 4/23/2004  | Prospectus                                                      |
| 3   | 4/29/2004  | Post-Effective Amendment No. 1 to Form S-11 Registration Statement |
| 4   | 6/15/2004  | Prospectus Supplement No. 2                                     |
| 5   | 7/19/2004  | Prospectus Supplement No. 3                                     |
| 6   | 7/29/2004  | Post-Effective Amendment No. 2 to Form S-11 Registration Statement |
| 7   | 7/29/2004  | Prospectus Supplement No. 4                                     |
| 8   | 8/16/2004  | Prospectus Supplement No. 5                                     |
| 9   | 9/17/2004  | Prospectus Supplement No. 6                                     |
| 10  | 10/28/2004 | Prospectus Supplement No. 7                                     |
| 11  | 10/29/2004 | Post-Effective Amendment No. 3 to Form S-11 Registration Statement |
| 12  | 11/12/2004 | Prospectus Supplement No. 8                                     |
| 13  | 3/31/2005  | Prospectus Supplement No. 9                                     |
| 14  | 5/18/2005  | Prospectus Supplement No. 10                                    |
| 15  | 6/13/2005  | Prospectus Supplement No. 11                                    |
| 16  | 6/14/2005  | Post-Effective Amendment No. 4 to Form S-11 Registration Statement |
| 17  | 7/19/2005  | Prospectus Supplement No. 12                                    |
| 18  | 8/16/2005  | Prospectus Supplement No. 13                                    |
| 19  | 9/13/2005  | Prospectus Supplement No. 14                                    |
| 20  | 9/14/2005  | Post-Effective Amendment No. 5 to Form S-11 Registration Statement |
| 21  | 10/17/2005 | Prospectus Supplement No. 15                                    |
| 22  | 11/14/2005 | Prospectus Supplement No. 16                                    |
| 23  | 12/14/2005 | Post-Effective Amendment No. 6 to Form S-11 Registration Statement |
| 24  | 12/14/2005 | Prospectus Supplement No. 17                                    |
| 25  | 1/12/2006  | Prospectus Supplement No. 18                                    |
| 26  | 2/14/2006  | Prospectus Supplement No. 19                                    |

**APPENDIX B:**
**Apple REIT Seven Offering Documents**

|    | Date       | Document                                            |
|----|------------|-----------------------------------------------------|
| 1  | 2/16/2006  | Amendment No. 4 to Form S-11 Registration Statement |
| 2  | 3/3/2006   | Prospectus                                          |
| 3  | 3/16/2006  | Prospectus Supplement No. 1                         |
| 4  | 4/18/2006  | Prospectus Supplement No. 2                         |
| 5  | 5/16/2006  | Prospectus Supplement No. 3                         |
| 6  | 6/20/2006  | Prospectus Supplement No. 4                         |
| 7  | 7/17/2006  | Prospectus Supplement No. 5                         |
| 8  | 7/25/2006  | Prospectus Supplement No. 6                         |
| 9  | 7/26/2006  | Post-Effective Amendment No. 1                      |
| 10 | 8/18/2006  | Prospectus Supplement No. 7                         |
| 11 | 9/18/2006  | Prospectus Supplement No. 8                         |
| 12 | 10/18/2006 | Prospectus Supplement No. 9                         |
| 13 | 10/26/2006 | Prospectus Supplement No. 10                        |
| 14 | 10/26/2006 | Post-Effective Amendment No. 2                      |
| 15 | 11/15/2006 | Prospectus Supplement No. 11                        |
| 16 | 12/18/2006 | Prospectus Supplement No. 12                        |
| 17 | 1/17/2007  | Prospectus Supplement No. 13                        |
| 18 | 1/26/2007  | Prospectus Supplement No. 14                        |
| 19 | 1/26/2007  | Post-Effective Amendment No. 3                      |
| 20 | 3/19/2007  | Prospectus Supplement No. 15                        |
| 21 | 4/17/2007  | Prospectus Supplement No. 16                        |
| 22 | 4/26/2007  | Prospectus Supplement No. 17                        |
| 23 | 4/26/2007  | Post-Effective Amendment No. 4                      |
| 24 | 5/16/2007  | Prospectus Supplement No. 18                        |
| 25 | 6/5/2007   | Prospectus Supplement No. 19                        |
| 26 | 6/19/2007  | Prospectus Supplement No. 20                        |
| 27 | 7/13/2007  | Prospectus Supplement No. 21                        |

**APPENDIX C:**
**Apple REIT Eight Offering Documents**

|     | Date       | Document                                                          |
| --- | ---------- | ---------------------------------------------------------------- |
| 1   | 7/2/2007   | Amendment No. 3 to Form S-11 Registration Statement              |
| 2   | 7/19/2007  | Prospectus                                                        |
| 3   | 7/27/2007  | Prospectus Supplement No. 1                                       |
| 4   | 8/21/2007  | Prospectus Supplement No. 2                                       |
| 5   | 9/18/2007  | Prospectus Supplement No. 3                                       |
| 6   | 10/10/2007 | Prospectus Supplement No. 4                                       |
| 7   | 11/19/2007 | Prospectus Supplement No. 5                                       |
| 8   | 12/18/2007 | Prospectus Supplement No. 6                                       |
| 9   | 12/27/2007 | Prospectus Supplement No. 7                                       |
| 10  | 12/27/2007 | Post-Effective Amendment No. 1 to Form S-11 Registration Statement |
| 11  | 1/16/2008  | Prospectus Supplement No. 8                                       |
| 12  | 2/19/2008  | Prospectus Supplement No. 9                                       |
| 13  | 3/18/2008  | Prospectus Supplement No. 10                                      |
| 14  | 3/27/2008  | Prospectus Supplement No. 11                                      |
| 15  | 3/27/2008  | Post-Effective Amendment No. 2 to Form S-11 Registration Statement |
| 16  | 4/15/2008  | Prospectus Supplement No. 12                                      |

**APPENDIX D:**
**Apple REIT Nine Offering Documents**

|    | Date       | Document                                                        |
|----|------------|-----------------------------------------------------------------|
| 1  | 4/23/2008  | Amendment No. 4 to Form S-11 Registration Statement             |
| 2  | 4/25/2008  | Prospectus                                                      |
| 3  | 5/15/2008  | Supplement No. 1 to Prospectus dated April 25, 2008             |
| 4  | 6/17/2008  | Supplement No. 2 to Prospectus dated April 25, 2008             |
| 5  | 8/19/2008  | Supplement No. 3 to Prospectus dated April 25, 2008             |
| 6  | 9/17/2008  | Supplement No. 4 to Prospectus dated April 25, 2008             |
| 7  | 9/26/2008  | Supplement No. 5 to Prospectus dated April 25, 2008             |
| 8  | 10/10/2008 | Form 8-K/A                                                      |
| 9  | 10/22/2008 | Form 8-K                                                        |
| 10 | 10/22/2008 | Form 8-K                                                        |
| 11 | 10/23/2008 | Supplement No. 6 to Prospectus dated April 25, 2008             |
| 12 | 10/23/2008 | Post-Effective Amendment No. 1 to Form S-11 Registration Statement |
| 13 | 10/24/2008 | Form 8-K/A                                                      |
| 14 | 10/24/2008 | Form 8-K/A                                                      |
| 15 | 10/24/2008 | Form 8-K/A                                                      |
| 16 | 10/24/2008 | Form 8-K/A                                                      |
| 17 | 11/19/2008 | Supplement No. 7 to Prospectus dated April 25, 2008             |
| 18 | 12/17/2008 | Supplement No. 8 to Prospectus dated April 25, 2008             |
| 19 | 1/2/2009   | Form 8-K                                                        |
| 20 | 1/7/2009   | Form 8-K                                                        |
| 21 | 1/8/2009   | Form 8-K                                                        |
| 22 | 1/12/2009  | Form 8-K/A                                                      |
| 23 | 1/12/2009  | Form 8-K/A                                                      |
| 24 | 1/12/2009  | Form 8-K/A                                                      |
| 25 | 1/12/2009  | Form 8-K/A                                                      |
| 26 | 1/22/2009  | Form 8-K                                                        |
| 27 | 1/23/2009  | Supplement No. 9 to Prospectus dated April 25, 2008             |

|    | Date      | Document                                                                 |
|----|-----------|--------------------------------------------------------------------------|
| 28 | 1/23/2009 | Post-Effective Amendment No. 2 to Form S-11 Registration Statement        |
| 29 | 1/27/2009 | Form 8-K/A                                                                |
| 30 | 1/27/2009 | Form 8-K/A                                                                |
| 31 | 1/27/2009 | Form 8-K/A                                                                |
| 32 | 1/27/2009 | Form 8-K/A                                                                |
| 33 | 2/3/2009  | Form 8-K                                                                  |
| 34 | 2/6/2009  | Form 8-K                                                                  |
| 35 | 2/17/2009 | Form 8-K                                                                  |
| 36 | 2/19/2009 | Supplement No. 10 to Prospectus dated April 25, 2008                     |
| 37 | 3/4/2009  | Form 10-K for the fiscal year ended December 31, 2008                     |
| 38 | 3/10/2009 | Form 8-K                                                                  |
| 39 | 3/16/2009 | Form 8-K                                                                  |
| 40 | 3/19/2009 | Supplement No. 11 to Prospectus dated April 25, 2008                     |
| 41 | 3/27/2009 | Form 8-A                                                                  |
| 42 | 4/9/2009  | Definitive Proxy Statement filed on Schedule 14A                         |
| 43 | 4/10/2009 | Form 8-K                                                                  |
| 44 | 4/15/2009 | Form 8-K/A                                                                |
| 45 | 4/15/2009 | Form 8-K/A                                                                |
| 46 | 4/17/2009 | Supplement No. 12 to Prospectus dated April 25, 2008                     |
| 47 | 4/17/2009 | Post-Effective Amendment No. 3 to Form S-11 Registration Statement        |
| 48 | 4/30/2009 | Amended and Restated Supplement No. 12 to Prospectus dated April 25, 2008 |
| 49 | 5/5/2009  | Form 10-Q for quarter ended March 31, 2009                               |
| 50 | 5/21/2009 | Supplement No. 13 to Prospectus dated April 25, 2008                     |
| 51 | 5/26/2009 | Form 8-K                                                                  |
| 52 | 6/3/2009  | Form 8-K                                                                  |
| 53 | 6/18/2009 | Form 8-K                                                                  |
| 54 | 6/18/2009 | Supplement No. 14 to Prospectus dated April 25, 2008                     |
| 55 | 6/30/2009 | Form 10-Q for quarter ended June 30, 2009                                |

|    | Date | Document |
|----|------|----------|
| 56 | 7/2/2009 | Form 8-K |
| 57 | 7/17/2009 | Supplement No. 15 to Prospectus dated April 25, 2008 |
| 58 | 7/17/2009 | Post-Effective Amendment No. 4 to Form S-11 Registration Statement |
| 59 | 8/20/2009 | Supplement No. 16 to Prospectus dated April 25, 2008 |
| 60 | 8/21/2009 | Form 8-K |
| 61 | 9/1/2009 | Form 8-K/A |
| 62 | 9/4/2009 | Post-Effective Amendment No. 5 to Form S-11 Registration Statement |
| 63 | 9/21/2009 | Prospectus |
| 64 | 9/28/2009 | Form 8-K |
| 65 | 10/22/2009 | Supplement No. 1 to Prospectus dated September 21, 2009 |
| 66 | 11/18/2009 | Supplement No. 2 to Prospectus dated September 21, 2009 |
| 67 | 11/20/2009 | Form 8-K |
| 68 | 12/4/2009 | Supplement No. 3 to Prospectus dated September 21, 2009 |
| 69 | 12/4/2009 | Post-Effective Amendment No. 6 to Form S-11 Registration Statement |
| 70 | 1/12/2010 | Form 8-K |
| 71 | 1/20/2010 | Form 8-K |
| 72 | 1/21/2010 | Supplement No. 4 to Prospectus dated September 21, 2009 |
| 73 | 2/18/2010 | Supplement No. 5 to Prospectus dated September 21, 2009 |
| 74 | 2/26/2010 | Supplement No. 6 to Prospectus dated September 21, 2009 |
| 75 | 2/26/2010 | Post-Effective Amendment No. 7 to Form S-11 Registration Statement |
| 76 | 3/5/2010 | Form 10-K for the fiscal year ended December 31, 2009 |
| 77 | 3/18/2010 | Supplement No. 7 to Prospectus dated September 21, 2009 |
| 78 | 3/19/2010 | Form 8-K |
| 79 | 3/22/2010 | Form 8-K/A |
| 80 | 4/2/2010 | Definitive Proxy Statement filed on Schedule 14A |
| 81 | 4/16/2010 | Form 8-K |
| 82 | 4/21/2010 | Supplement No. 8 to Prospectus dated September 21, 2009 |
| 83 | 4/21/2010 | Post-Effective Amendment No. 8 to Form S-11 Registration Statement |

|  | **Date** | **Document** |
|---|---|---|
| 84 | 5/4/2010 | Form 8-K |
| 85 | 5/5/2010 | Form 10-Q for quarter ended March 31, 2010 |
| 86 | 5/10/2010 | Form 8-K |
| 87 | 5/20/2010 | Supplement No. 9 to Prospectus dated September 21, 2009 |
| 88 | 5/28/2010 | Form 8-K |
| 89 | 6/3/2010 | Form 8-K |
| 90 | 6/17/2010 | Supplement No. 10 to Prospectus dated September 21, 2009 |
| 91 | 6/29/2010 | Form 8-K/A |
| 92 | 6/29/2010 | Form 8-K/A |
| 93 | 7/21/2010 | Supplement No. 11 to Prospectus dated September 21, 2009 |
| 94 | 7/21/2010 | Post-Effective Amendment No. 9 to Form S-11 Registration Statement |
| 95 | 8/4/2010 | Form 10-Q for quarter ended June 30, 2009 |
| 96 | 8/4/2010 | Form 8-K |
| 97 | 8/10/2010 | Form 8-K |
| 98 | 8/19/2010 | Supplement No. 12 to Prospectus dated September 21, 2009 |
| 99 | 8/20/2010 | Form 8-K |
| 100 | 9/3/2010 | Form 8-K |
| 101 | 9/15/2010 | Form 8-K |
| 102 | 9/16/2010 | Supplement No. 13 to Prospectus dated September 21, 2009 |
| 103 | 10/8/2010 | Form 8-K/A |
| 104 | 10/21/2010 | Supplement No. 14 to Prospectus dated September 21, 2009 |
| 105 | 10/21/2010 | Post-Effective Amendment No. 10 to Form S-11 Registration Statement |
| 106 | 11/18/2010 | Supplement No. 15 to Prospectus dated September 21, 2009 |
| 107 | 12/2/2010 | Supplement No. 16 to Prospectus dated September 21, 2009 |

**APPENDIX E:**
**Apple REIT Ten Offering Documents**

|    | Date       | Document                                                           |
|----|------------|--------------------------------------------------------------------|
| 1  | 1/7/2011   | Amendment No. 4 to Form S-11 Registration Statement                |
| 2  | 1/19/2011  | Prospectus                                                         |
| 3  | 1/27/2011  | Prospectus Supplement No. 1                                        |
| 4  | 2/17/2011  | Prospectus Supplement No. 2                                        |
| 5  | 3/17/2011  | Prospectus Supplement No. 3                                        |
| 6  | 4/14/2011  | Prospectus Supplement No. 4                                        |
| 7  | 5/9/2011   | Post-Effective Amendment No. 1 to Form S-11 Registration Statement |
| 8  | 5/19/2011  | Prospectus Supplement No. 5                                        |
| 9  | 6/16/2011  | Prospectus Supplement No. 6                                        |
| 10 | 7/21/2011  | Prospectus Supplement No. 7                                        |
| 11 | 8/19/2011  | Prospectus Supplement No. 8                                        |
| 12 | 8/19/2011  | Post-Effective Amendment No. 2 to Form S-11 Registration Statement |
| 13 | 9/22/2011  | Prospectus Supplement No. 9                                        |
| 14 | 10/20/2011 | Prospectus Supplement No. 10                                       |
| 15 | 11/18/2011 | Prospectus Supplement No. 11                                       |
| 16 | 11/18/2011 | Post-Effective Amendment No. 3 to Form S-11 Registration Statement |
| 17 | 12/22/2011 | Prospectus Supplement No. 12                                       |

**APPENDIX F:**
**False or Misleading Statements in the Offering Documents**

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| **Statements about the investment objective** | | | | | |
| "Our primary business objective is to maximize shareholder value by maintaining long-term growth in cash distributions to our shareholders." | ¶ 6<br>¶ 81<br>¶ 125 | Amendments to registration statements:<br>7/2/07 at 49 & 55*<br>7/19/07 at 49<br>12/27/07 at 49 & 55<br>3/27/08 at 49*<br><br>Prospectuses and supplements:<br>7/19/07 at 55<br><br><br><br>*says "achieving" instead of "maintaining" | Amendments to registration statements:<br>4/23/08 at 56 & 62<br>10/23/08 at 56 & 62<br>1/23/09 at 56 & 62<br>4/17/09 at 56 & 62<br>7/17/09 at 56 & 62<br>9/4/09 at 55 & 73<br>12/4/09 at 55 & 73<br>2/26/10 at 55 & 73<br>4/21/10 at 55 & 73<br>7/21/10 at 55 & 73<br>10/21/10 at 55 & 73<br><br>Prospectuses and supplements:<br>4/25/08 at 56 & 62<br>9/21/09 at 55 & 73 | Amendments to registration statements:<br>1/7/11 at 53 & 58<br>5/9/11 at 53 & 58<br>8/19/11 at 53 & 58<br>11/18/11 at 53 & 58<br><br>Prospectuses and supplements:<br>1/19/11 at 53 & 58 | The REITs acquired properties that did not generate sufficient income to pay the distributions with cash. Instead distributions were funded through other sources, including the return of investor capital. Distributions funded by other sources meant there would be less cash to invest in additional properties and ultimately decreased shareholder value.<br><br>*See* Complaint ¶¶ 125; 127-129; 138-145; 147-151; 155-165; 167-171; 173 |
| "We seek to maximize current and long-term net income and the value of our assets." | ¶ 6<br>¶ 81<br>¶ 125 | Amendments to registration statements:<br>7/2/07 at 49 | Amendments to registration statements:<br>4/23/08 at 56 | Amendments to registration statements:<br>1/7/11 at 53 | The REITs acquired properties that did not maximize net income or the value of the REITs' |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| | | 12/27/07 at 49<br>3/27/08 at 49<br><br>Prospectuses and supplements:<br>7/19/07 at 49 | 10/23/08 at 56<br>1/23/09 at 56<br>4/17/09 at 56<br>7/17/09 at 56<br>9/4/09 at 55<br>12/4/09 at 55<br>2/26/10 at 55<br>4/21/10 at 55<br>7/21/10 at 55<br>10/21/10 at 55<br><br>Prospectuses and supplements:<br>4/25/08 at 56<br>9/21/09 at 55. | 5/9/11 at 53<br>8/19/11 at 53<br>11/18/11 at 53<br><br>Prospectuses and supplements:<br>1/19/11 at 53 | assets.<br><br>*See* Complaint ¶¶ 125, 127-129, 131-145, 155-165, 170-171 |
| "Our policy is to acquire assets where we believe opportunities exist for acceptable investment returns." | ¶ 81 | Amendments to registration statements:<br>7/2/07 at 49<br>12/27/07 at 49<br>3/27/08 at 49<br><br>Prospectuses and supplements:<br>7/19/07 at 49 | Amendments and to registration statements:<br>4/23/08 at 56<br>10/23/08 at 56<br>1/23/09 at 56<br>4/17/09 at 56<br>7/17/09 at 56<br>9/4/09 at 55<br>12/4/09 at 55<br>2/26/10 at 55<br>4/21/10 at 55<br>7/21/10 at 55<br>10/21/10 at 55 | Amendments statements:<br><br>1/7/11 at 53<br>5/9/11 at 53<br>8/19/11 at 53<br>11/18/11 at 53<br><br>Prospectuses and supplements:<br>1/19/11 at 53 | The REITs acquired properties that did not generate sufficient investment returns to pay the 7-8% distributions to investors.<br><br>*See* Complaint ¶¶ 125-129, 131-145, 147-151, 155-165, 167-171, 173 |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| | | | Prospectuses and supplements: 4/25/08 at 56 9/21/09 at 55 | | |
| "With our all-cash purchasing strategy, our team continues to aggressively seek new real estate acquisitions that we believe will grow the value of your investment over time." | ¶ 164 | | 8/20/10 8-K at 2 | | The average rate of return for hotels acquired by Apple REIT Nine was below the percentage necessary to fund 7-8% distributions.<br><br>*See* Complaint ¶¶ 155-165 |
| **Statements about distributions** | | | | | |
| "Distributions will be at the discretion of our board of directors and will depend on factors including: the gross revenues we receive from our properties, our operating expenses, our interest expenses incurred in borrowing, capital expenditures, and our need for cash reserves." | ¶ 109 | Amendments to registration statements: 7/2/07 at 54 12/27/07 at 54 3/27/08 at 54<br><br>Prospectuses and supplements: 7/19/07 at 54 | Amendments to registration statements: 4/23/08 at 61 10/23/08 at 61 1/23/09 at 61 4/17/09 at 61 7/17/09 at 61 9/4/09 at 60 12/4/09 at 60 2/26/10 at 60 4/21/10 at 60 7/21/10 at 60 10/21/10 at 60<br><br>Prospectuses and | Amendments to registration statements: 1/7/11 at 9, 58 5/9/11 at 9, 58 8/19/11 at 9, 58 11/18/11 at 9, 58<br><br>Prospectuses and supplements: 1/19/11 at 9, 58 | The boards of directors consistently approved distributions that exceeded the amount of income the REITs could expect to generate from operations and set rates to promote further sales and to compete with other non-traded REITs and without regard to the ability of the REIT to pay the distributions from operating income.<br><br>*See* Complaint ¶¶ 105- |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| | | | supplements: 4/25/08 at 61 9/21/09 at 60 | | 108, 110; 147-148, 151-152, 167 |
| "Our objective in setting a distribution rate is to project a rate that will provide consistency over the life of the program, taking into account acquisitions and capital improvements, ramp up of new properties and varying economic cycles. We anticipate that we may need to utilize debt, offering proceeds and cash for operations to meet this objective." | ¶ 112 | | Amendments registration statements: 9/4/09 at 7 12/4/09 at 7 2/26/10 at 7 4/21/10 at 7 7/21/10 at 7 10/21/10 at 7  Prospectuses and supplements: 9/21/09 at 7 | | It was a certainty that the REITs would have to use debt and offering proceeds to fund consistent distributions of 7% to 8%.  *See* Complaint ¶¶ 105-107, 147-148, 151, 167 |
| "While we will seek generally to make distributions from our operating revenues, we might make distributions (although there is no obligation to do so) in certain circumstances in part | ¶ 112 | Amendments to registration statements: 7/2/07 at 9, 24, 54 12/27/07 at 9, 24, 54 3/27/08 at 9, 24, 54  Prospectuses and supplements: | Amendments to registration statements: 4/23/08 at 12, 28, 61 10/23/08 at 12, 28, 61 1/23/09 at 12, 28, 61 4/17/09 at 12, 28, 61 7/17/09 at 12, 28, 61 9/4/09 at 11, 28, 60 | Amendments to registration statements:  1/7/11 at 9, 58 5/9/11 at 9, 58 8/19/11 at 9, 58 11/18/11 at 9, 58 Prospectuses and | Distributions were never paid solely from operating revenues. Every distribution was partially sourced by debt or offering proceeds.  *See* Complaint ¶¶ 105-107, 147-148, 151, 167 |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| from financing proceeds or other sources, such as proceeds from our offering of Units." | | 7/19/07 at 9, 24, 54 | 12/4/09 at 11, 28, 60 2/26/10 at 11, 28, 60 4/21/10 at 11, 28, 60 7/21/10 at 11, 28, 60 10/21/10 at 11, 28, 60  Prospectuses and supplements: 4/25/08 at 12, 28, 61 9/21/09 at 11, 28, 60  With slightly different wording: 3/3/09 10-K at 11 3/5/10 10-K at 12 | supplements: 1/19/11 at 9, 58 | |
| "In addition, we may from time to time distribute funds that include a return of capital and we may from time to time need to borrow to make distributions." | ¶ 112 | Amendments to registration statements: 7/2/07 at 54 12/27/07 at 54 3/27/08 at 54  Prospectuses and supplements: 7/19/07 at 54 | Amendments to registration statements: 4/23/08 at 61 10/23/08 at 61 1/23/09 at 61 4/17/09 at 61 7/17/09 at 61 9/4/09 at 60 12/4/09 at 60 2/26/10 at 60 4/21/10 at 60 7/21/10 at 60 10/21/10 at 60 Prospectuses and | | The REITs consistently paid distributions that included a return of capital or borrowed funds.  *See* Complaint ¶¶ 105-107, 147-148, 151, 167 |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| | | | supplements:<br>4/25/08 at 61<br>9/21/09 at 60 | | |
| "Our distributions may include a return of capital." | ¶ 112 | Amendments to registration statements:<br>7/2/07 at 5<br>12/27/07 at 5<br>3/27/08 at 5<br><br>Prospectuses and supplements:<br>7/19/07 at 5 | Amendments to registration statements:<br>4/23/08 at 7<br>10/23/08 at 7<br>1/23/09 at 7<br>4/17/09 at 7<br>7/17/09 at 7<br>9/4/09 at 6<br>12/4/09 at 6<br>2/26/10 at 6<br>4/21/10 at 6<br>7/21/10 at 6<br>10/21/10 at 6<br><br>Prospectuses and supplements:<br>4/25/08 at 7<br>9/21/09 at 6 | Amendments to registration statements:<br><br>1/7/11 at 5<br>5/9/11 at 5<br>8/19/11 at 5<br>11/18/11 at 5<br><br>Prospectuses and supplements:<br>1/19/11 at 5 | Almost all of the distributions included a return of capital.<br><br>*See* Complaint ¶¶ 147-148, 151, 167 |
| "The Company evaluates the distribution rate on an ongoing basis and may make changes at any time if the Company feels the rate is not | ¶ 113 | | 3/5/10 10-K at 12 | | The boards of directors consistently approved distributions that exceeded the REITs' cash resources and were not appropriate based on the REITs' cash resources. |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| appropriate based on available cash resources." | | | | | *See* Complaint ¶¶ 105-108, 110; 147-148, 151-152, 167 |
| **Statements about the price or value of the shares** | | | | | |
| "The per-Unit offering prices have been established arbitrarily by us and may not reflect the true value of the Units." | ¶ 114 | Amendments to registration statements: 7/2/07 at 24 12/27/07 at 24 3/27/08 at 24  Prospectuses and supplements: 7/19/07 at 24 | Amendments to registration statements: 4/23/08 at 28 10/23/08 at 28 1/23/09 at 28 4/17/09 at 28 7/17/09 at 28 9/4/09 at 27 12/4/09 at 27 2/26/10 at 27 4/21/10 at 27 7/21/10 at 27 10/21/10 at 27  Prospectuses and supplements: 4/25/08 at 28 9/21/09 at 27 | Amendments to registration statements: 1/7/11 at 26 5/9/11 at 26 8/19/11 at 26 11/18/11 at 26  Prospectuses and supplements: 1/19/11 at 26 | The prices were not established arbitrarily. They were kept at a consistent $11 for all of the REITs for marketing purposes, to compete with other non-traded REITs, and to maintain the illusion that the value of the shares was $11.  *See* Complaint at ¶¶ 83, 110, 114-119 |
| "If we listed our Units on a national securities exchange, the Unit price might drop below our shareholder's original | ¶ 119 | Amendments to registration statements: 7/2/07 at 24 12/27/07 at 24 3/27/08 at 24 | Amendments to registration statements: 4/23/08 at 28 10/23/08 at 28 1/23/09 at 28 | Amendments to registration statements: 1/7/11 at 26 5/9/11 at 26 | It was a certainty that the value of the shares would decline steadily because of the substantial commissions and fees, the economic downturn, the |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| investment." | | Prospectuses and supplements: 7/19/07 at 24 | 4/17/09 at 28 7/17/09 at 28 9/4/09 at 27 12/4/09 at 27 2/26/10 at 27 4/21/10 at 27 7/21/10 at 27 10/21/10 at 27<br><br>Prospectuses and supplements: 4/25/08 at 28 9/21/09 at 27 | 8/19/11 at 26 11/18/11 at 26<br><br>Prospectuses and supplements: 1/19/11 at 26 | types of properties the REITs acquired, and the borrowings and returns of capital to investors.<br><br>*See* Complaint ¶¶ 100-101, 120-145; 147-151; 155-165; 167-171; 173, 179-181, 185 |
| **Statements about prior REITs** | | | | | |
| "In general, the investment objectives of the … real estate investment trusts previously organized by Mr. Knight …were similar to our investment objectives of achieving long-term growth in cash distributions, together with possible capital appreciation, through the acquisition, ownership and | ¶ 103 | Amendments to registration statements: 7/2/07 at 72 12/27/07 at 72 3/27/08 at 72<br><br>Prospectuses and supplements: 7/19/07 at 72 | Amendments to registration statements: 4/23/08 at 80 10/23/08 at 80 1/23/09 at 80 4/17/09 at 80 7/17/09 at 80 9/4/09 at 91 12/4/09 at 91 2/26/10 at 91 4/21/10 at 91 7/21/10 at 91 10/21/10 at 91 | Amendments to registration statements: 1/7/11 at 76 5/9/11 at 76 8/19/11 at 76 11/18/11 at 76<br><br>Prospectuses and supplements: 1/19/11 at 76 | This statement, and the several paragraphs describing the prior REITs, do not disclose that the earlier REITs have never been able to pay distributions from operating income and are instead relying on borrowing and the return of capital.<br><br>*See* Complaint ¶¶ 105-107, 147-148, 151, 167 |

| Statement | Location in Complaint | Location in AR 8 offering documents | Location in AR 9 offering documents | Location in AR 10 offering documents | Why the statement is false or misleading |
|---|---|---|---|---|---|
| ultimate disposition of properties." | | | Prospectuses and supplements: 4/25/08 at 80 9/21/09 at 91 | | |
| "This information should not be considered to be indicative of our capitalizations or operations.  Also, past performance of prior programs is not necessarily indicative of our future results." | ¶ 103 | Amendments to registration statements: 7/2/07 at 72 12/27/07 at 72 3/27/08 at 72<br><br>Prospectuses and supplements: 7/19/07 at 72 | Amendments to registration statements: 4/23/08 at 80 10/23/08 at 80 1/23/09 at 80 4/17/09 at 80 7/17/09 at 80 9/4/09 at 91 12/4/09 at 91 2/26/10 at 91 4/21/10 at 91 7/21/10 at 91 10/21/10 at 91<br><br>Prospectuses and supplements: 4/25/08 at 80 9/21/09 at 91 | Amendments to registration statements: 1/7/11 at 76 5/9/11 at 76 8/19/11 at 76 11/18/11 at 76<br><br>Prospectuses and supplements: 1/19/11 at 76 | The disclaimer that past performance is not necessarily indicative of future results is not meaningful or prominent compared to the statements about the prior REITs.<br><br>*See* Complaint ¶¶ 97, 105-107, 147-148, 151, 167, 187 |

**APPENDIX G:**
**Distribution Rates of Non-Traded REITs from 2007 – Q2 2011**

|  | 2007 | 2008 | 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Apple REIT Six | 8.00 | 8.20 | 8.20 | 7.80 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT Seven | 8.00 | 8.00 | 7.40 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT Eight | 8.00 | 8.00 | 7.40 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Apple REIT Nine |  | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| Apple REIT Ten |  |  |  |  |  |  |  | 7.50 | 7.50 |
| **Closed REITs** |  |  |  |  |  |  |  |  |  |
| Apartment Trust of America | 7.00 | 7.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 3.00 |
| Behringer Harvard Opportunity REIT I | 3.00 | 3.00 | 3.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Behringer Harvard REIT I | 6.40 | 6.40 | 4.06 | 3.25 | 1.75 | 1.00 | 1.00 | 1.00 | 1.00 |
| CNL Lifestyle Properties | 6.00 | 6.15 | 6.58 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 |
| Cole Credit Property Trust II | 6.80 | 7.00 | 6.70 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 |
| Corporate Property Associates 15 | 6.70 | 7.00 | 7.20 | 7.29 | 7.30 | 7.31 | 7.32 | 7.33 | 7.34 |
| Corporate Property Associates 16 | 6.50 | 6.60 | 6.60 | 6.62 | 6.62 | 6.62 | 6.62 | 6.62 | 6.62 |
| Dividend Capital Total Realty Trust | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 7.10 |
| Healthcare Trust of America | 7.00 | 7.30 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Hines REIT | 6.25 | 6.40 | 6.20 | 6.00 | 6.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| Inland American Real Estate Trust | 6.20 | 6.20 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| Inland Western Retail Real Estate Trust | 6.40 | 6.40 | 1.80 | 1.60 | 1.75 | 2.25 | 2.25 | 2.37 | 2.50 |
| KBS REIT | 7.00 | 7.00 | 6.10 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 |
| KBS REIT II |  | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 |
| Lightstone Value Plus REIT | 7.00 | 7.00 | 7.00 | 7.00 | 8.00 | 7.00 | 7.00 | 7.00 | 7.00 |

| | 2007 | 2008 | 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Wells REIT II | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 5.00 | 5.00 |
| **Open REITs** | | | | | | | | | |
| American Realty Capital Healthcare Trust | | | | | | | | | 6.60 |
| American Realty Capital New York Recovery REIT | | | | | | | 6.05 | 6.05 | 6.05 |
| American Realty Capital Trust, Inc. | | 6.50 | 6.70 | 6.70 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Behringer Harvard Multifamily REIT I | | 6.50 | 6.90 | 7.00 | 7.00 | 6.70 | 6.00 | 6.00 | 6.00 |
| Behringer Harvard Opportunity REIT II | | 3.00 | 4.20 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| Bluerock Enhanced Multifamily Trust | | | | | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Carey Watermark Investors | | | | | | | | | 4.00 |
| CB Richard Ellis Realty Trust | 5.75 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| Cole Credit Property Trust III | | | 6.69 | 6.75 | 7.00 | 7.00 | 7.00 | 6.50 | 6.50 |
| Corporate Property Associates 17 - Global | 5.50 | 5.75 | 6.30 | 6.40 | 6.40 | 6.40 | 6.40 | 6.40 | 6.50 |
| Global Income Trust | | | | | | | | | 6.50 |
| Griffin Capital Net Lease REIT | | | | 6.75 | 6.75 | 6.75 | 6.75 | 6.75 | 6.75 |
| Grubb & Ellis Healthcare REIT II | | | | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 |
| Hartman Short Term Income Properties XX | | | | | | | | 7.50 | 7.00 |
| Hines Global REIT | | | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| Industrial Income Trust | | | | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 | 6.25 |
| Inland Diversified Real Estate Trust | | | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| KBS Legacy Partners Apartment REIT | | | | | | | | 6.50 | 6.50 |
| Lightstone Value Plus REIT II | | | | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 | 6.50 |
| Moody National REIT I | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| Northstar REIT | | | | | | | 8.00 | 8.00 | 8.00 |

| | 2007 | 2008 | 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Paladin Realty Income Properties | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| Phillips Edison - ARC Shopping Center REIT | | | | | | | 6.50 | 6.50 | 6.50 |
| Steadfast Income REIT | | | | | | 7.00 | 7.00 | 7.00 | 7.00 |
| Strategic Storage Trust | | 7.20 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| TNP Strategic Retail Trust | | | | 6.75 | 6.75 | 7.00 | 7.00 | 7.00 | 7.00 |
| United Development Funding IV | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| Wells Core Office Income REIT | | | | | | | 5.00 | 6.00 | 6.00 |