**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLE REITs LITIGATION | No. 11-CV-02919-KAM-JO |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED
CLASS ACTION COMPLAINT**

Daniel C. Girard
Amanda M. Steiner
Dena C. Sharp
Janice S. Yi
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94611
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
ZAMANSKY & ASSOCIATES LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Plaintiffs' Counsel*

David P. Meyer
Matthew R. Wilson
MEYER WILSON CO., LPA
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

*Additional Counsel for Plaintiffs*

# TABLE OF CONTENTS

Defendants ................................................................................................................ 1

PRELIMINARY STATEMENT ................................................................................ 3

FACTUAL BACKGROUND ...................................................................................... 4

I.    The Apple REITs .......................................................................................... 4

II.   David Lerner Associates ............................................................................. 7

III.  Defendants Sold the Apple REITs as Conservative Investments That Offered Steady Distributions and the Return of Principal in About Seven Years ....................................... 9

IV.  The Apple REITs Are Not Operated in a Manner Consistent With Their Stated Investment Objectives ........................................................ 10

V.   Defendants' Sales Practices Compounded the Misleading Impression in the Offering Documents and Are the Subject of a FINRA Complaint ................... 15

VI.  Investors Have Been Unable to Redeem Their Shares ........................... 17

VII. Plaintiffs Purchased Apple REIT Shares Through DLA ........................ 18

ARGUMENT ............................................................................................................ 19

I.    Plaintiffs Have Stated Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act Against Apple REITs Nine and Ten and DLA ........................... 20

     A.   Defendants' Statements About the Apple REITs' Investment Objectives Are Actionable and Material .......................................... 23

     B.   Defendants' Misstatements and Omissions About the Apple REITs' Distributions Are Actionable .................................................. 29

     C.   Defendants' Misstatements and Omissions About the Value of the Apple REIT Shares Are Actionable ........................................ 34

     D.   Defendants' Misstatements and Omissions About the Performance of Prior Apple REITs Are Actionable and Material ...................... 36

     E.   Plaintiffs Do Not Allege Mere Corporate Mismanagement ................. 39

     F.   Defendants' Loss Causation Arguments Are Premature and Unmeritorious ..... 41

         1.  Plaintiffs Are Not Required to Plead Loss Causation ................. 41

i

2.  Defendants' Narrow Formulation of Loss Causation is Unsupported by the Law and Contrary to Plaintiffs' Allegations .......................................... 42

G.  Plaintiffs Section 12(a)(2) Claims Against Apple REIT Nine Are Timely ........ 46

II.  Plaintiffs Have Stated Claims for Violations of Section 15 of the Securities Act.......... 49

A.  Plaintiffs Allege that the Apple REIT Individual and Affiliate Defendants Are Control Persons of Apple REITs Nine and Ten ............................................... 50

B.  Plaintiffs Allege Control Person Claims Against David Lerner........................... 52

C.  Plaintiffs' Claims Against Apple REIT Ten Director Adams Should Not Be Dismissed .................................................................................................. 53

III.  Plaintiffs Have Stated Claims for Violations of the Connecticut and Florida Securities Acts .................................................................................................. 54

A.  Plaintiff Berger Alleges Actionable Violations of the Connecticut Uniform Securities Act.......................................................................................... 54

1.  Plaintiff Berger Alleges Sufficient Facts to Support Her Section 36b-29(a) Claims.................................................................................... 54

2.  Plaintiff Berger's Claims Under Section 36b-5 are Actionable................. 55

3.  Plaintiff Berger Sufficiently Alleges Secondary Liability Claims Under Section 36b-29(c) ........................................................................ 57

4. Plaintiff Berger States A Claim Under Section 36b-4 ................................ 57

B.  Plaintiff Murray Alleges Actionable Violations of the Florida Securities Law .......................................................................................................... 58

IV.  Plaintiffs Have Stated Claims for Violations of State Common Laws ............................. 61

A.  A Choice-of-Law Analysis Is Premature................................................................. 61

B.  Defendants' Motions to Dismiss Plaintiffs' Breach of Fiduciary Duty Claim Should Be Denied ................................................................................... 62

C.  Defendants' Motions to Dismiss Plaintiffs' Unjust Enrichment Claim Should Be Denied ................................................................................... 66

D.  Defendants' Motions to Dismiss Plaintiffs' Negligence Claim Should Be Denied................................................................................................... 70

E.    Plaintiffs Have Standing to Pursue the State Common Law and Securities Claims .................................................................................................................. 75

V.    Leave to Amend .......................................................................................................... 76

CONCLUSION .......................................................................................................................... 77

# TABLE OF AUTHORITIES

**Cases**

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*
96 N.Y. 2d 280, 288 n.1 (N.Y. 2001) .............................................................................. 72

*Abels v. JPMorgan Chase Bank, N.A.*
678 F. Supp. 2d 1273 (S.D. Fla. 2009) ........................................................................... 67

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ............................................................................. 76

*Al-Babtain v. Banoub*
2008 WL 4938348 (M.D. Fla. Nov. 18, 2008) ............................................................... 68

*Algonquin Gas Transmission Co. v. Zoning Bd. of Appeals of City of Meriden*
291 A.2d 204, (Conn. 1971) ........................................................................................... 56

*Amorosa v. AOL Time Warner, Inc.*
409 F. App'x 412 (2d Cir. 2011) .................................................................................... 42

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*
785 F. Supp. 2d 799 (N.D. Cal. 2011) ........................................................................... 33

*Anwar v. Fairfield Greenwich Ltd.*
728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................................................... Passim

*Anwar v. Fairfield Greenwich Ltd.*
826 F. Supp. 2d 578 (S.D.N.Y. 2011) ...................................................................... 59, 70

*Arcand v. Brothers Int'l Corp.*
673 F. Supp. 2d 282 (D.N.J. 2009) ................................................................................ 62

*Armentano v. Paraco Gas Corp.*
90 A.D. 3d 683 (N.Y. App. Div. 2011) .......................................................................... 69

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................................................................ 20

*Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt. Inc.*
915 N.Y.S. 2d 7 (N.Y. App. Div. 2010) ........................................................................ 72

*Atlantis Information Technology, GmbH v. CA, Inc.*
485 F. Supp. 2d 224 (E.D.N.Y. 2007) ........................................................................... 68

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*
    493 F.3d 87 (2d Cir. 2007).................................................................... 42

*Auto–Owners Ins. Co. v. Ace Elec. Services, Inc.*
    648 F. Supp. 2d 1371 (M.D. Fla. 2009) ............................................... 72

*Banning v. Right Choice Real Estate, LLC*
    2011 WL 1033223 (Conn. Super. Ct. Feb. 22, 2011) ......................... 63

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007)...................................................................... 19, 20

*Blackmoss Invs. Ins. v. ACA Capital Holdings, Inc.*
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ....................................... 42

*Boll v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    2004 WL 5589731 (S.D. Fla. June 28, 2004) ..................................... 71

*Boll v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    2004 WL 5599306 (S.D. Fla. July 29, 2004)....................................... 71

*Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*
    331 U.S. 519 (1947)............................................................................ 56

*Brown v. E.F. Hutton Group, Inc.*
    991 F.2d 1020 (2d Cir. 1993).............................................................. 74

*Business Integration Services, Inc. v. AT&T Corp.*
    251 F.R.D. 121 (S.D.N.Y. 2008) ........................................................ 73

*Business Integration Services, Inc. v. AT&T Corp.*
    2008 WL 5159781 (S.D.N.Y. Dec. 9, 2008)……………………….…………………………73

*Camden Asset. Mgmt. v. Sunbeam Corp.*
    2001 WL 34556527 (S.D. Fla. July 3, 2001)...................................... 60

*Carran v. Morgan*
    510 F. Supp. 2d 1053 (S.D. Fla. 2007) .............................................. 60

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*
    114 F. Supp. 2d 316 (D.N.J. 2000) .................................................... 33

*Chambers v. Time Warner, Inc.*
    282 F.3d 147 (2d Cir. 2002)................................................................ 67

*Chanoff v. U.S. Surgical Corp.*
    857 F. Supp. 1011 (D. Conn. 1994).................................................... 58

*Charas v. Sand Tech. Sys. Int'l, Inc.*
    1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ...................................................................... 41

*Commerce Partnership 8098 Ltd. v. Equity Contracting Co., Inc.*
    695 So. 2d 383 (Fla. Dist. Ct. App. 1997) ...................................................................... 66

*Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*
    2011 WL 1233106 (S.D. Fla. Mar. 30, 2011) ................................................................... 65

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) .................................................................... 30

*de Kwiatkowski v. Bear, Stearns & Co., Inc.*
    306 F.3d 1293 (2d Cir. 2002) .......................................................................................... 63

*Deutsche Credit Corp. v. Peninger*
    603 So. 2d 57 (Fla. Dist. Ct. App. 1992) ........................................................................ 73

*Dime Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    2010 WL 760441 (Conn. Super. Ct. Jan. 15, 2010) ....................................................... 55

*Dolphin & Bradbury, Inc. v. SEC*
    512 F.3d 634 (D.C. Cir. 2008) ........................................................................................ 30

*Dodona I, LLC v. Goldman, Sachs & Co.*
    2012 WL 935815 (S.D.N.Y. Mar. 21, 2012) ................................................................... 46

*E.F. Hutton & Co., Inc. v. Rousseff*
    537 So. 2d 978 (Fla. 1989) .............................................................................................. 59

*Elipas v. Jedynak*
    2011 WL 1706059 (N.D. Ill. May 5, 2011) ..................................................................... 37

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*
    343 F.3d 189 (2d Cir. 2003) ............................................................................................ 42

*Fait v. Regions Fin. Corp.*
    655 F.3d 105 (2d Cir. 2011) ............................................................................................ 28

*Feit v. Leasco Data Processing Equip. Corp.*
    332 F. Supp. 544 (E.D.N.Y. 1971) ................................................................................. 33

*Field v. Trump*
    850 F.2d 938 (2d Cir. 1988) ..................................................................................... 40, 41

*Field v. Trump*
    113 F. App'x 427 (2d Cir. 2004) ................................................................ 41

*First Union Discount Brokerage Services, Inc. v. Milos*
    744 F. Supp. 1145 (S.D. Fla. 1990) ......................................................... 64

*First Union Discount Brokerage Services, Inc. v. Milos*
    997 F.2d 835 (11th Cir. 1993) .................................................................. 59

*Foman v. Davis*
    371 U.S. 178 (1962) ................................................................................... 76

*Friedman v. Wahrsager*
    2012 WL 273069 (E.D.N.Y. Jan. 30, 2012) ............................................ 63

*Gagne v. Vaccaro*
    766 A.2d 416 (Conn. 2001) ...................................................................... 66

*Gibbs v. Hernandez*
    810 So. 2d 1034 (Fla. Ct. App. 2002) ..................................................... 70

*Gochnauer v. A.G. Edwards & Sons, Inc.*
    810 F.2d 1042 (11th Cir. 1987) ...................................................... 58, 60, 64

*Goldberg v. Meridor*
    567 F.2d 209 (2d Cir. 1977) ..................................................................... 40

*Gough v. St. Peters Episcopal*
    2011 WL 2611747 (Conn. Super. Ct. June 2, 2011) ............................... 63

*Gracey v. Eaker*
    837 So. 2d 348, 353 (Fla. 2002) ............................................................... 63

*Green v. McLaughlin*
    2012 WL 1592621 (2d Cir. May 8, 2012) ............................................... 20

*Gerstle v. Gamble-Skogmo, Inc.*
    478 F.2d 1281 (2d Cir. 1973) ................................................................... 47

*Harris v. Mills*
    572 F.3d 66 (2d Cir. 2009) ....................................................................... 20

*Herman & McLean v. Huddleston*
    459 U.S. 375 (1983) ............................................................................ 21, 22

*Hevesi v. Citigroup, Inc.*
    366 F.3d 70 (2d Cir. 2004)......................................................................... 75

*Hutchison v. Deutsche Bank Sec. Inc.*
    647 F.3d 479 (2d Cir. 2011)....................................................................... 42

*IM Partners v. Debit Direct Limited*
    394 F.Supp.2d 503 (D. Conn. 2005)........................................................... 58

*In re Alliance North American Government Income Trust, Inc. Securities Litigation*
    1996 WL 551732 (S.D.N.Y. Sept. 27, 1996)............................................ 28

*In re Allied Capital Corp. Sec. Litig.*
    2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)........................................... 35

*In re Barclays Bank PLC Sec. Litig.*
    2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ............................................ 34, 35

*In re Britannia Bulk Holdings Inc. Sec. Litig.*
    665 F. Supp. 2d 404 (S.D.N.Y. 2009)........................................................ 42

*In re Charles Schwab Corp. Sec. Litig.*
    257 F.R.D. 534 (N.D. Cal. 2009)..................................................... 25, 43, 44

*In re CINAR Corp. Sec. Litig.,*
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................. 49, 52, 53

*In re CitiGroup Inc. Bond Litig.*
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)........................................................ 50

*In re Deutsche Telekom AG Securities Litigation*
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)............................................. 52

*In re Donna Karan Int'l Securities Litigation*
    1998 WL 637547 (E.D.N.Y. Aug. 14, 1998).............................................. 40

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*
    2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)........................................... 75

*In re Duke Energy Corp. Sec. Litig.*
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................ 41

*In re Dynex Capital, Inc. Sec. Litig.*
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............................................... 75

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*
    705 F. Supp. 2d 86 (D. Mass. 2010) ........................................................................ Passim

*In re Flag Telecom Holdings Ltd. Sec. Litig.*
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) ........................................................................ 33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
    574 F.3d 29 (2d Cir. 2009) ........................................................................ 42

*In re Ford Motor Co. E-350 Van Products Liab. Litig. (No. II)*
    2011 WL 601279 (D.N.J. Feb. 16, 2011) ........................................................................ 69

*In re Giant Interactive Group, Inc. Sec. Litig.*
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ........................................................................ 42

*In re Global Crossing Ltd. Sec. Litig.*
    2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) ........................................................................ 49

*In re Initial Public Offering Sec. Litig.*
    383 F. Supp. 2d 566 (S.D.N.Y. 2005) ........................................................................ 28

*In re Lehman Bros. Securities & ERISA Litig.*
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........................................................................ 27

*In re Lehman Bros. Securities Mortgage-Backed Securites Litigation*
    650 F.3d 167 (2nd Cir. 2011)………………………………………………………………..52

*In re Mercedes-Benz Tele Aid Contract Litig.*
    257 F.R.D. 46 (D.N.J. 2009) ........................................................................ 62, 66

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
    289 F. Supp. 2d 429 (S.D.N.Y. 2003) ........................................................................ 42

*In re Metropolitan Sec. Litig.*
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) ........................................................................ 30

*In re Morgan Stanley Info. Fund Sec. Litig.*
    592 F.3d 347 (2d Cir. 2010) ........................................................................ 19, 21, 48

*In re Morgan Stanley Info. Fund*
    592 F.3d at 359 ........................................................................ 21

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*
    810 F. Supp. 2d 650 (S.D.N.Y. 2011) ........................................................................ 48

*In re Mutual Funds Inv. Litig.*
    590 F. Supp. 2d 741 (D. Md. 2008) ........................................................................ 43

ix

*In re NovaGold Resources Inc. Sec. Litig.*
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)............................................................ 26, 48

*In re Oppenheimer Rochester Funds Group Sec. Litig.*
    2012 WL 171035 (D. Colo. Jan. 20, 2012)............................................Passim

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*
    975 F. Supp. 584 (D.N.J. 1996) ...................................................................... 68, 70

*In re Prudential Sec. Inc. P'ships Litig.*
    930 F. Supp. 68 (S.D.N.Y. 1996).......................................................................... 30

*In re Refco, Inc. Sec. Litig.*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007).................................................................. 50

*In re Rezulin Products Liab. Litig.*
    392 F. Supp. 2d 597 (S.D.N.Y. 2005).................................................................. 70

*In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation*
    774 F. Supp. 2d 584 (S.D.N.Y. 2011).................................................................. 43

*In re UBS Auction Rate Sec. Litig.*
    2010 WL 2541166 (S.D.N.Y. June 10, 2010) .................................................... 32

*In re Van Wagoner Funds, Inc.*
    382 F. Supp. 2d 1173 (N.D. Cal. 2004) .............................................................. 35

*In re Vivendi Universal, S.A. Securities Litig.*
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)............................................................ 26, 38

*In re WorldCom, Inc Sec. Litig.*
    219 F.R.D. 267 (S.D.N.Y. 2003) ........................................................................ 21

*Jennings v. Reed*
    885 A.2d 482 (N.J. Sup. Ct. App. Div. 2005).................................................... 73

*JHW Greentree Capital, L.P. v. Whittier Trust Co.*
    2006 WL 1080395 (S.D.N.Y. Apr. 24, 2006)..................................................... 58

*Joffee v. Lehman Bros. Inc.*
    209 F. App'x 80 (2d Cir. 2006) .......................................................................... 32

*Johnson v. Nationwide Gen. Ins. Co.*
    971 F. Supp. 725 (N.D.N.Y. 1997) ................................................................ 72, 74

*Jones v. Childers*
    1992 WL 300845 (M.D. Fla. June 26, 1992) ........................................................... 59, 60

*Jones v. Nat'l Distillers and Chem. Corp.*
    484 F. Supp. 679 (S.D.N.Y. 1979) ........................................................................... 40

*Kashner Davidson Securities Corp., v. Desrosiers*
    689 So. 2d 1106 (Fla. Ct. App 1997) ....................................................................... 59

*Kassner v. 2nd Ave. Delicatessen, Inc.*
    496 F.3d 229 (2d Cir. 2007) ..................................................................................... 19

*Katcher v. 3V Capital Partners LP*
    2011 WL 1105724 (Conn. Super. Ct. Feb 1, 2011) ................................................. 64

*King County, Wash. v. IKB Deutsche Industriebank AG*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010) ...................................................................... 46

*King v. Estate of Senn*
    2008 WL 5331891 (N.J. Super. Ct. App. Div. Dec. 23, 2008) ................................ 74

*L-7 Designs, Inc. v. Old Navy, LLC*
    647 F.3d 419 (2d Cir. 2011) ..................................................................................... 20

*Lane v. Page*
    581 F. Supp. 2d 1094 (D.N.M. 2008) ...................................................................... 40

*Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*
    724 F. Supp. 2d 1228 (S.D. Fla. 2010) .................................................................... 63

*LC Capital Partners LP v. Frontier Ins. Group, Inc.*
    318 F.3d 148 (2d Cir. 2003) ............................................................................... 48, 59

*LeBlanc v. New England Raceway, LLC*
    976 A.2d 750 (Conn. App. Ct. 2009) ....................................................................... 74

*Lentell v. Merrill Lynch & Co.*
    396 F.3d 161 (2d Cir. 2005) ......................................................................... 42, 44, 46

*Lerner v. Fleet Bank, N.A.*
    459 F.3d 273 (2d. Cir. 2006) ............................................................................. 64, 66

*Levine v. AtriCure, Inc.*
    508 F. Supp. 2d 268 (S.D.N.Y. 2007) ...................................................................... 42

*Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*
   767 F. Supp. 1220 (S.D.N.Y. 1991),.................................................................... 64

*Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*
   967 F.2d 742 (2d Cir. 1992)................................................................................. 64

*Maharishi School Vedic Sciences, Inc. v. Connecticut Constitution Associates Ltd. Partnership*
   799 A.2d 1027 (Conn. 2002) ............................................................................... 73

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*
   697 F. Supp. 1224 (D.D.C. 1988) ........................................................................ 71

*Mesher v. Combs*
   685 So. 2d 1391 (Fla. App. 1997)........................................................................ 61

*Miller v. Inverness Corp.*
   2000 WL 1687345 (Conn. Super. Ct. Oct. 9, 2000) ............................................. 5

*Minskoff v. American Express Travel Related Services Co., Inc.*
   98 F.3d 703 (S.D.N.Y. 1996)................................................................................ 73

*Moore and Co. v. T-A-L-L Inc.*
   792 P.2d 794 (Colo. 1994).................................................................................. 69

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*
   331 F.3d 406 (3d Cir. 2003)................................................................................ 65

*Morton v. Young*
   311 So. 2d 755(Fla. Ct. App. 1975).................................................................... 60

*Motor Credit Corp. v. Woolverton*
   99 So. 2d 286 (Fla. 1957).................................................................................... 73

*Myers v. MedQuist, Inc.*
   2006 WL 3751210 (D.N.J. 2006) ........................................................................ 67

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)............................................................ 32, 33

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*
   2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ..................................................... 46

*New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.*
   2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ..................................................... 50

*P. Stolz Family Partnership L.P. v. Daum*
355 F.3d 92 (2d Cir. 2004)............................................................................ 26

*Parsons & Whittemore Enterprises Corp. v. Schwartz*
387 F. Supp. 2d 368 (S.D.N.Y. 2005)........................................................... 69

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*
446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................................... 63

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*
2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)............................................ 49, 52

*Press v. Chemical Investment Services Corp.*
166 F. 3d 529 (2d. Cir. 1999)........................................................................ 24

*Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co., Inc.*
277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................... 48

*Rafton v. Rydex Series Funds*
2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ..................................................... 43

*Rent-A-PC, Inc. v. Rental Management, Inc.*
96 Conn. App. 600 (Conn. Ct. App. 2006) ................................................... 67

*Roby v. Corp. of Lloyd's*
996 F.2d 1353 (2d Cir. 1993)........................................................................ 22

*Roessler v. Novak*
858 So. 2d 1158 (Fla. Dist. Ct. App. 2003) .................................................. 74

*Rombach v. Chang*
355 F.3d 164 (2d Cir. 2004).................................................................. Passim

*Rousseff v. E.F. Hutton Co., Inc.*
867 F.2d 1281 (11th Cir. 1989) .................................................................... 59

*Ruotolo v. City of New York*
514 F.3d 184 (2d Cir. 2008).......................................................................... 19

Russell v. Dean Witter Reynolds, Inc.
510 A.2d 972 (Conn. 1996) ........................................................................... 73

*S.E.C. v. Carriba Air, Inc.*
681 F.2d 1318 (11th Cir. 1982) .................................................................... 37

*S.E.C. v. Curshen*
   372 F. App'x 872 (10th Cir. 2010) ................................................................ 24

*Saltiel v. GSI Consultants, Inc.*
   788 A.2d 268 (N.J. 2002) ........................................................................... 72

*Santa Fe Industries, Inc. v. Green*
   430 U.S. 462 (1997) ................................................................................ 39

*Schneider v. Brown*
   2003 WL 22290993 (Conn. Super. Ct. Sept. 19, 2003) ................................... 55

*Scott v. Dime Savings Bank of N.Y., FSB*
   886 F. Supp. 1073 (S.D.N.Y.1995) ............................................................. 71

*Sergeants Benevolent Association Annuity Fund v. Renck*
   796 N.Y.S. 2d 77 (N.Y. App. Div. 2005) ..................................................... 68

*Shaw v. Digital Equip. Corp.*
   82 F.3d 1194 (1st Cir. 1996) ..................................................................... 41

*Shenandoah Assocs. Ltd. P'ship v. Tirana*
   182 F. Supp. 2d 14 (D.D.C. 2001) ............................................................. 70

*Shields v. Citytrust Bancorp*
   25 F.3d 1124 (2d Cir. 1994) ...................................................................... 28

*Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*
   650 F. Supp. 2d 1213 (S.D. Fla. 2009) ........................................................ 67

*Skinner v. Switzer*
   131 S. Ct. 1289 (2011) ............................................................................. 19

*Slayton v. American Express Co.*
   604 F.3d 758 (2d Cir. 2010) ................................................................. 27, 38

*Speedmark Transp., Inc. v. Mui*
   778 F. Supp. 2d 439 (S.D.N.Y. 2011) ......................................................... 62

*Sperry v. Crompton*
   8 N.Y. 3d. 204 (N.Y. App. Div 2006) .......................................................... 70

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*
   2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) .............................................. 53

*St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n,*
    2005 WL 1199045 (D.N.J. May 18, 2005) ...................................................... 63

*STMicroelectronics v. Credit Suisse Group,*
    775 F. Supp. 2d 525 (S.D.N.Y 2011) .......................................................... 52

*Sunset Fin. Res., Inc. v. Redevelopment Group V, LLC*
    2006 WL 3675384 (D.N.J. Dec. 12, 2006) ................................................. 63

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*
    2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010) .............................................. 69

*Thermo Contracting Corp. v. Bank of New Jersey*
    354 A.2d 291 (N.J. 1976) ........................................................................... 73

*Thomas v. Biller Associates Tri State*
    2006 WL 2000138 (Conn. Super. Ct. June 28, 2006) .................................. 64

*Torres v. Dep't of Correction*
    912 A.2d 1132 (Conn. Super. Ct. 2006) ..................................................... 70

*Town of New Canaan v. Brooks Laboratories, Inc.*
    2007 WL 4214227 (Conn. Super. Ct. Nov. 7, 2007) .................................... 72

*Town of New Hartford v. Conn. Res. Recovery Auth.*
    970 A.2d 592, 612 (Conn. 2009) ............................................................... 68

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ....................................................... 35

*U.S. S.E.C. v. Meltzer*
    440 F. Supp. 2d 179 (E.D.N.Y. 2006) ....................................................... 24

*United Paperworkers Int'l Union v. Int'l Paper Co.*
    985 F.2d 1190 (2d Cir. 1993) .................................................................... 39

*Waters v. Int'l Precious Metals Corp.*
    172 F.R.D. 479 (S.D. Fla. 1996) .......................................................... 58, 59

*Wiatt v. Winston & Strawn, LLP*
    2011 WL 2559567 (D.N.J. June 27, 2011) ................................................. 64

*Williams Ford, Inc. v. Hartford Courant Co.*
    657 A.2d 212 (Conn. Super. Ct. 2008) ...................................................... 72

*Wilson v. Merrill Lynch & Co., Inc.*
    671 F.3d 120 (2d Cir. 2011) ............................................................ 32

*Zeigler v. Sony Corp.*
    849 A.2d 19 (Conn. Super. Ct. 2004) ............................................. 69

**Statutes**

15 U.S.C. § 77j ................................................................................... 22

77 U.S.C. § 77k ................................................................................... 21

15 U.S.C. § 77m .................................................................................. 46

15 U.S.C. § 77o ................................................................................... 49

15 U.S.C. § 77z ................................................................................... 25

Conn. Gen. Stat. § 36 ................................................................... Passim

Fla. Stat. § 517.211 ............................................................................. 61

Restatement (Third) of Agency § 2.02 (2006) .................................... 73

Restatement (Third) of Agency § 2.03 (2006) .................................... 74

Restatement (Third) of Agency § 4.01 (2006) .................................... 73

Restatement (Second) of Agency § 82 (1957) .................................... 73

**Rules**

Fed. R. Civ. Proc. 8 ……………………………………………………..19

Fed. R. Civ. Proc. 9 ……………………………………………………..19

Fed. R. Civ. Proc. 10 …………………………………………………...39, 58

Fed. R. Civ Proc. 12 …………………………………………………….20, 42

**Defendants**

| Name | Role |
|------|------|
| **DLA Defendants** | |
| David Lerner Associates, Inc. | Best efforts underwriter and exclusive seller of the Apple REIT shares |
| Lerner, David | President, founder and controlling owner of DLA |
| **Apple REITs** | |
| Apple REIT Six, Inc. | Issuer of Apple REIT Six shares |
| Apple REIT Seven, Inc. | Issuer of Apple REIT Seven shares |
| Apple REIT Eight, Inc. | Issuer of Apple REIT Eight shares |
| Apple REIT Nine, Inc. | Issuer of Apple REIT Nine shares |
| Apple REIT Ten, Inc. | Issuer of Apple REIT Ten shares |
| **Apple REIT Affiliates** | |
| Apple Suites Realty | Provides brokerage services to the Apple REITs<br>Wholly owned by Glade Knight |
| Apple Fund Management | Supplies officers and employees for the Apple REITs, Apple Suites Realty, and the Apple Advisors |
| Apple Eight Advisors | Evaluates and recommends property, serves as property investment advisor, and provides day-to-day management for Apple REIT Eight<br>Wholly owned by Glade Knight |
| Apple Nine Advisors | Evaluates and recommends property, serves as property investment advisor, and provides day-to-day management for Apple REIT Nine<br>Wholly owned by Glade Knight |
| Apple Ten Advisors | Evaluates and recommends property, serves as property investment advisor, and provides day-to-day management for Apple REIT Ten<br>Wholly owned by Glade Knight |
| **Apple REIT Directors and Officers** | |
| Adams, David J. | Director of Apple REIT Ten |

| Name | Role |
|---|---|
| Bunting, Glenn W. | Director of Apple REITs Seven and Eight<br><br>Member of Apple REIT Eight's audit, compensation, and executive committees |
| Colton, Kent W. | Director of Apple REITs Seven, Eight and Ten<br><br>Member of Apple REIT Eight's audit and compensation committees<br><br>Chairperson of Apple REIT Ten's audit committee and member of the compensation and executive committees |
| Hall, Garnett, Jr. | Director of Apple REIT Ten<br><br>Member of the audit committee |
| Keating, Anthony Francis "Chip" | Director of Apple REIT Ten<br><br>Chairperson of compensation committee and member of audit committee |
| Kern, Lisa B. | Director of Apple REITS Six, Seven and Nine<br><br>Chairperson of Apple REIT Nine's audit committee |
| Knight, Glade M. | Chairman and CEO of the Apple REITs<br><br>Direct owner of Apple Advisors and Apple Suites Realty<br><br>Indirectly controls Apple Fund Management |
| Matson, Bruce H. | Director of Apple REITs Six, Seven and Nine<br><br>Chairperson of Apple REIT Nine's compensation committee and member of executive committee |
| Peery, Bryan | Executive VP and CFO of the Apple REITs |
| Rosenfeld, Ronald A. | Former director of Apple REIT Ten<br><br>Former member of Apple REIT Ten's executive committee |
| Waters, Michael S. | Director of Apple REITs Six, Eight and Nine<br><br>Member of Apple REITs Eight and Nine's audit committees |
| Wily, Robert M. | Director of Apple REITs Six, Eight and Nine<br><br>Member of Apple REITs Eight and Nine's audit committees |

## PRELIMINARY STATEMENT

This class action arises out of the offer and sale of over $5 billion of shares in real estate investment trusts (REITs).  Starting in 1993, Glade Knight and David Lerner teamed up to sponsor a series of REITs known as the Apple REITs.  Knight is the chairman and CEO of each of the REITs and David Lerner's investment company is the underwriter and exclusive seller of the REITs' shares.  They have each collected hundreds of millions of dollars in fees.

The plaintiffs are individuals who invested in the Apple REITs at issue in this case— Apple REITs Six, Seven, Eight, Nine and Ten.  Each plaintiff invested with the understanding that the money he or she invested would be used to pursue the REITs' stated investment objectives of "maximiz[ing] shareholder value by achieving long-term growth in cash distributions to our shareholders" and "maximiz[ing] current and long-term net income and the value of our assets."  Plaintiffs were told the Apple REITs were safe, conservative investments that would protect their savings from the stock market.  Plaintiffs were told the Apple REITs consistently paid 7% to 8% distributions and about the REITs' unwavering $11 share price.  And plaintiffs were told they could expect a favorable return in five to seven years through a sale of the properties, listing on an exchange, or other transaction.

As a result of the investigation by their counsel, which included consulting with experts in real estate finance, the hotel industry, and the REIT market, plaintiffs have determined that defendants were in fact operating the Apple REITs in a manner inconsistent with the REITs' stated investment objectives.  The Apple REITs set distribution rates to be competitive with other non-traded REITs and paid distributions without regard to profitability, even as they acquired properties at prices they knew could not conceivably justify the level of distributions they were paying.  The Apple REITs' distribution policy was dictated by defendants' interest in

carrying on continuous sales of the REITs and the need for new capital to fund distributions to maintain the appearance that the REITs were operating profitably.

Plaintiffs allege, on behalf of a class of investors, that defendants have violated sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and Connecticut and Florida securities laws, breached their fiduciary duties to plaintiffs, acted negligently, and unjustly enriched themselves. Plaintiffs' detailed and thorough allegations easily satisfy the Rule 8 pleading standard. Plaintiffs therefore request that the Court deny defendants' motions to dismiss.

## FACTUAL BACKGROUND

### I.      The Apple REITs

A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors.  REITs pool the capital of numerous investors to purchase a portfolio of properties the typical investor might not be able to buy individually.  To qualify as a REIT, a company must have most of its assets and income tied to a real estate investment and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends.  To be sustainable, a REIT's dividends should be funded by cash flows from the income-producing properties.  ¶¶ 71, 108, 120-24, 134, 139, 152, 158-160, 165-66.[1]

Glade Knight is the sponsor of all of the Apple REITs.  Knight built a business around real estate tax shelters in the 1970s, but when Congress ended those tax-shelter benefits in the mid-1980s he entered the REIT industry.  ¶ 33.  He is the chairman and CEO of each of the Apple REITs, and also directly or indirectly controls the Apple REIT affiliates that provide day-

---

[1] All citations to "¶ __" are to the plaintiffs' Consolidated Class Action Complaint.

to-day property management, acquisition, advisory, operational and managerial services to the REITs.  ¶¶ 28-38.

Knight structured the Apple REITs to focus primarily on owning and operating extended stay and limited service hotels.  ¶¶ 28-32, 75.  The REITs were sold one at a time.  As each REIT closed to new investors, Knight opened the next one.  Apple REITs Six, Seven, Eight and Nine are closed to new investors but Apple REIT Ten is still open to new investors.  ¶¶ 73-74.  This chart shows the opening and closing dates for each of the Apple REIT offerings at issue in this case (with closing dates in bold), and the total capital raised:

| | **Raised** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|---|---|---|---|---|
| **Apple REIT Six** | $1 billion | April | | **March** | | | | | |
| **Apple REIT Seven** | $1 billion | | | March | **July** | | | | |
| **Apple REIT  Eight** | $1 billion | | | | July | **April** | | | |
| **Apple REIT Nine** | $2 billion | | | | | April | | **Dec** | |
| **Apple REIT Ten**[2] | $.5 billion | | | | | | | | Jan |

The Apple REITs are reporting, non-traded public companies, meaning that the offer and sale of the Apple REIT shares are registered with the SEC but the shares are not traded on any exchange. The shares are therefore illiquid and, unlike publicly-traded REIT shares, are not followed by securities analysts.  ¶¶ 3, 73. The Apple REIT shares are sold pursuant to a registration statement that incorporates by reference subsequent prospectuses and prospectus supplements.  ¶ 82; *see also* Appendix A-E (listing the documents that are incorporated into the registration statement for each Apple REIT).  Together, the registration statement and incorporated documents are referred to as the "offering documents."

---

[2] *See* Sharp Decl., Ex. F at S-3.

The Apple REITs all invest in the same type of hotel properties.  ¶¶ 28-32.  They all have the same stated investment objective of "maximiz[ing] shareholder value by achieving long-term growth in cash distributions to our shareholders," and "maximiz[ing] current and long-term net income and the value of our assets":

> Our primary business objective is to maximize shareholder value by achieving long-term growth in cash distributions to our shareholders. We intend to pursue this objective by acquiring hotels, residential apartment communities and other income-producing real estate in metropolitan areas throughout the United States for long-term ownership. We generally intend to acquire fee ownership of our properties. We seek to maximize current and long-term net income and the value of our assets. Our policy is to acquire assets where we believe opportunities exist for acceptable investment returns. We expect to pursue our objectives primarily through the direct ownership of hotels, residential apartment communities and other income-producing real estate assets in metropolitan areas throughout the United States.

¶ 76.

The shares of each Apple REIT, which are sometimes referred to as "Units," have been continuously priced at $11 (after the first 5% was sold for $10.50).  ¶¶ 8, 77, 113.  Until recently, the REITs maintained monthly distributions of 7% to 8%.  ¶¶ 105, 147.  Investors were encouraged to reinvest their dividends in the REIT through a dividend reinvestment plan, known as the "DRIP."  Many investors did so, and many investors purchased shares in multiple REITs. ¶¶ 80, 87.

The REITs also offered investors limited redemption rights.  Starting three years from the date of their initial investment, investors were in theory free to redeem their shares for the full $11 paid to acquire them.  If they redeemed earlier, investors would receive only 92% of their principal investment.  But even after the three-year waiting period, redemptions were limited to 3% to 5% of the weighted average number of shares outstanding during the 12-month period immediately prior to the date of redemption.  Thus, if a substantial number of Apple REITs

investors were to seek redemption at or about the same time, only a small fraction would be eligible.  ¶ 81.

Knight has earned more than $100 million through ongoing management and transactional fees paid by the Apple REITs to the various entities he controls.  ¶ 96.  He is the sole owner of Apple Suites Realty Group, which provides brokerage services to all of the Apple REITs and receives 2% of the total purchase price of all acquisitions.  ¶¶ 34, 96.  He is also the sole owner of the Apple advisory companies (Apple Eight Advisors, Apple Nine Advisors and Apple Ten Advisors), which evaluate and recommend property, serve as property investment advisors, and supervise day-to-day operations.  ¶¶ 35-37.  The advisory fees range from .1% to .25% of investors' capital annually.  ¶ 96.  Knight also indirectly controls Apple Fund Management, which provides staffing to the other Apple entities.  ¶ 38.

## II.    David Lerner Associates

DLA is the exclusive seller and best efforts underwriter of the Apple REITs.  ¶¶ 5, 21, 72, 83, 188, 194, 202, 233, 252.  DLA is headquartered in New York and has additional offices in New Jersey, Connecticut and Florida, where most of its Apple REIT clients live.  ¶¶ 20, 64.  DLA claims to specialize in fixed income, government bonds, municipal bonds, and conservative investments for individual investors and retirees.  ¶ 20.  DLA and David Lerner have lengthy disciplinary and complaint histories.  *See* ¶¶ 22-25.  On April 4, 2012, FINRA fined DLA for charging excessive markups on municipal bond and collateralized mortgage obligation transactions over a two year period, which caused DLA's clients to pay unfairly high prices and receive lower yields than they otherwise would have received.  DLA's head trader was fined $200,000 and suspended from the securities industry for six months.  *See* Sharp Decl., Ex. B.

And earlier this week, a FINRA arbitrator awarded claimants who invested in Apple REIT Nine the full compensatory damages they requested from DLA.  *See* Sharp Decl., Ex. C.

DLA sells the Apple REITs through the internet, radio, cold calls, mailings, and open invitation seminars at senior centers, retirement communities, and membership clubs.  David Lerner identifies himself as "Poppy" in commercials that pitch seminars about the Apple REITs. The seminars offer door prizes like umbrellas and flat-screen TVs.  DLA financial advisors also often make personal visits to customers' homes.  DLA's customers are individual retail investors, typically retirees, and nearly all of DLA's sales of the Apple REITs were "solicited," meaning that a DLA representative persuaded a DLA customer to buy the shares.  ¶ 85.

DLA provides its clients with monthly account statements.  Until recently, the account statements showed an $11 market price and market value for the shares in each of the REITs. The statements said, "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets." ¶ 78. Since May 2011, following a FINRA disciplinary complaint, the statements have described the shares as "not priced."  *Id.*

DLA collects a commission of 7.5% of each Apple REIT share it sells, plus a 2.5% marketing expense allowance, for a total of 10% of each share.  DLA also collects account management fees of $4 per new account and $10 per year for each active customer account. DLA received $500 million in commissions and expenses from its sale of Apple REIT Six, Seven, Eight and Nine shares and, as of December 31, 2011, had received more than $47.3

million from its sale of Apple REIT Ten shares.  The sale of Apple REIT shares has accounted

for 60% to 70% of DLA's business annually since 1996.  ¶ 95.

### III.      Defendants Sold the Apple REITs as Conservative Investments That Offered Steady Distributions and the Return of Principal in About Seven Years

Defendants sold the Apple REITs as safe, conservative investments that would protect

investors' savings from the volatility of the stock market.  ¶¶ 7, 86.  The Apple REIT offerings

were structured as "blind pool" offerings, in which investors like plaintiffs committed their

money before knowing what properties the REITs would purchase with the net offering

proceeds.  Investors therefore depended on the accuracy of defendants' disclosures about the

REITs' investment objectives and policies to assess the risks associated with investing.  ¶ 6.

In selling the Apple REIT shares, defendants emphasized the success of the prior

REITs—all of which had paid consistent dividend distributions of 7% to 8% and maintained an

unwavering $11 per share value.  ¶¶ 24, 92, 98.  The offering documents for each of the Apple

REITs have lengthy descriptions of the "past performance of programs sponsored by Glade M.

Knight."  While they include the typical disclaimer that "past performance of prior programs is

not necessarily indicative of our future results," this pro forma, innocuous warning is outweighed

by the paragraphs that follow.

The prospectuses emphasize the similarity of the past REITs to the current REIT:  "In

general, the investment objectives of the eight real estate investment trusts previously organized

by Mr. Knight … were similar to our investment objectives of achieving long-term growth in

cash distributions, together with possible capital appreciation, through the acquisition, ownership

and ultimate disposition of properties."   Several paragraphs describing the prior REITs follow.

The descriptions of Apple REITs Six through Nine are virtually identical, with variations only in

dates and the number of hotels acquired and, for Apple REIT Nine, a note of its purchase of land in Ft. Worth, Texas. ¶ 98.

The offering documents also say that investors could expect a reasonable prospect of recovering their principal within approximately seven years from the initial closing, when the REITs would either list the shares on a national securities exchange, dispose of all of the properties in a manner that will permit cash distributions to shareholders, or merge, consolidate or otherwise combine with another REIT or similar investment vehicle. ¶ 8; *see also* Blanchard Decl., Exs. A at 9, B at 9, C at 9, D at 11, E at 9.

## IV. The Apple REITs Are Not Operated in a Manner Consistent With Their Stated Investment Objectives

Contrary to the Apple REITs' stated investment objectives, defendants pursued a policy of maintaining a steady 7% to 8% rate of distributions, without regard to the ability of the REIT to fund the distributions from operating income. ¶¶ 11, 79, 102, 106. The Apple REITs' distribution policy was dictated by defendants' interest in carrying on continuous sales of the REITs and the need for new capital to fund distributions to maintain the appearance that the REITs were operating profitably. ¶¶ 11, 105. The Apple REITs set distribution rates to be competitive with other non-traded REITs and paid distributions without regard to profitability, even as they acquired properties at prices they knew could not conceivably justify the level of distributions they were paying. ¶¶ 105, 120-24, 126-40, 142-49, 152-60, 162, 165-66, 168-69.

For every dollar invested in the Apple REITs, the first $.10 is paid to DLA as a commission and marketing expense, leaving $.90 available for investment in income-producing properties. ¶ 121. Additional amounts are paid to Glade Knight and his entities as property acquisition fees (2% of the purchase price) and advisory fees (.1% to .25% of investor capital annually). ¶¶ 96, 121. An additional $.05 is set aside for cash reserves. To fund distributions of

7% to 8%, each dollar must return approximately 9.1% annually.  ¶ 121.  (This calculation, like the other calculations plaintiffs provide in this brief and their complaint, is an approximation derived from publicly-available information.)  The required return on investor capital for a particular property is calculated by dividing the hotel's net operating income (NOI) by the total amount of invested capital (including commissions and fees).  ¶ 122.

Plaintiffs' consultants analyzed information scattered across tens of thousands of pages of SEC filings to estimate the return of capital offered by hotels purchased by Apple REITs Eight and Nine.  As a group and individually, the hotels purchased by Apple REIT Eight did not offer a return on investor capital of 9.1% or more.  ¶¶ 121-24, 135-36.  For example, Apple REIT Eight purchased the Burbank Residence Inn for $50,500,000 in March 2008.  With DLA's commission ($6,733,333) and the 2% acquisition fee to Mr. Knight ($1,010,000), the total capital invested was $57,233,333.  The net operating income was $3,015,179.  The return on investor capital was 5.27%.  ¶ 123.

In addition, the capitalization rates were lower than market capitalization rates. Appraisers and real estate investors use capitalization rates, often referred to as "cap rates," as benchmarks for determining a hotel property's value.  The cap rate is the projected return for one year if the property was bought with all cash.  ¶ 126.  A cap rate is calculated by dividing the net operating income (NOI) of the hotel by the price paid for the hotel.  For example, the cap rate for a hotel with an annual NOI of $1 million that sold for $10 million is 10% ($1,000,000 divided by $10,000,000).  Generally speaking, the higher the cap rate the faster an investor recovers the capital invested to acquire the property.  In a typical transaction, the seller of the hotel is trying to get the highest price for the property or sell at the lowest cap rate possible.  The buyer is trying to

purchase the property at the lowest price possible, which translates into a higher cap rate.  From an investor's or buyer's perspective, the higher the cap rate the better.  ¶ 127.

Market capitalization rates are derived from the most recent transactions occurring in a property sector or locale, so they represent the average rate that hotel purchasers are obtaining in the market.  Benchmarks are reported in publications commonly used by hotel investors, such as PwC's Korpacz Real Estate Investor Survey and PFK Consulting's Hospitality Investment Survey.  ¶ 128.  The approximate capitalization rates for Apple REIT Eight's acquisitions based upon twelve months trailing earnings were consistently lower than (and many were well below) the average market rate, the rate at which Apple REIT Eight's competitors were purchasing property.  ¶ 130.

Plaintiffs' complaint provides additional analysis of Apple REIT Eight's acquisitions, as well some analysis of Apple REIT Nine and Ten acquisitions (both of which had less information available because many of the acquisitions were reported as portfolios rather than individual transactions).  *See* ¶¶ 131-36, 138-40, 152-60, 164-66.  The hotel properties acquired by Apple REIT Nine offered returns on investor capital between 4% and 7%.  ¶¶ 158-60.  The hotels acquired by Apple REIT Ten offered returns on capital ranging from 5% to 7%.  ¶¶ 165-66.

To maintain consistent 7% to 8% distributions, all of the Apple REITs have resorted to returning investor capital or borrowing to continue to pay the distributions.  ¶¶ 101-02, 142-43, 145-46, 162.  Colloquially speaking, the REITs distributions were paid by "robbing Peter to pay Paul," paying investors their own money in form of "distributions."  This chart shows that a significant percentage of distributions each year were paid from sources other than operating income:

| | Distributions Paid | Distributions Paid from Cash from Operations | % of Distributions Paid from Cash from Operations |
|---|---|---|---|
| **Apple REIT Six** | | | |
| 2007 | $78,834,000 | $74,980,000 | 95% |
| 2008 | $81,746,000 | $74,471,000 | 91% |
| 2009 | $82,215,000 | $55,162,000 | 67% |
| 2010 | $72,301,000 | $57,420,000 | 79% |
| **Totals:** | **$315,096,000** | **$262,033,000** | |
| **Apple REIT Seven** | | | |
| 2007 | $60,234,000 | $43,126,000 | 72% |
| 2008 | $81,440,000 | $41,644,000 | 51% |
| 2009 | $75,380,000 | $39,086,000 | 52% |
| 2010 | $71,340,000 | $56,873,000 | 80% |
| **Totals:** | **$288,394,000** | **$ 180,729,000** | |
| **Apple REIT Eight** | | | |
| 2007 | $14,464,000 | $5,751,000 | 40% |
| 2008 | $76,378,000 | $27,344,000 | 36% |
| 2009 | $74,924,000 | $8,733,000 | 12% |
| 2010 | $72,465,000 | $40,483,000 | 56% |
| **Totals:** | **$ 238,231,000** | **$82,311,000** | |
| **Apple REIT Nine** | | | |
| 2008 | $13,012,000 | $4,371,000 | 34% |
| 2009 | $57,330,000 | $15,810,000 | 28% |
| 2010 | $118,126,000 | $22,028,000 | 19% |
| **Totals:** | **$188,468,000** | **$42,209,000** | |

Apple REIT Nine, for example, returned a total of $156 million in capital to investors to pay 8% distributions through 2010.  ¶ 152.

Despite this consistent history of paying distributions with returns of investor capital and borrowed money, the offering documents portray the payment of dividends from sources other

than operating income as a contingency that "may" occur in "certain circumstances" and "from time to time." ¶¶ 106-07.  For example, the offering documents stated:

- The REITs "**may** need to utilize debt, offering proceeds and cash for operations" to pay consistent distributions.

- "While we will seek generally to make distributions from our operating revenues, we **might** make distributions (although there is no obligation to do so) **in certain circumstances** in part from financing proceeds or other sources, such as proceeds from our offering of Units."

- "In addition, we **may from time to time** distribute funds that include a return of capital and we **may from time to time** need to borrow to make distributions."

- "While the Company continues to seek generally to make distributions from its operating revenues, distributions **may** be made (although there is no obligation to do so) **in certain circumstances** in part from financing proceeds or other sources, such as proceeds from the offering of Units."

- "Our distributions **may** include a return of capital." [3]

¶¶ 107; Sharp Decl., Ex. A at 3-7.

Returning capital to investors and taking on debt that must be serviced out of future income and new investor proceeds limited the REITs' ability to acquire income-producing assets, and thus to generate future income for distribution to investors.  It also reduced the value of the shares.  ¶ 101.  But the Apple REITs' boards of directors set the share price at a consistent $11 based on the prices of other non-traded REITs' shares.  ¶ 109.  The share prices of all other existing non-traded REITs during their offering periods were $10 (except for one at $20 and another at $25 per share).  ¶ 109.  The Apple REITs did not change the value of their shares from $11 despite market fluctuations, including significant declines in the hotel industry, net income declines, increased leverage through borrowing, and return of capital to investors through distributions.  ¶ 111.

---

[3] All emphasis is added.

In a June 2, 2011 New York Times article about DLA and the Apple REITs entitled "Statements Skip Over REIT's Woes," Knight was quoted as saying, "Who knows what the value is? I would not be comfortable in saying it was $4, $5, or $6.  If I said I could sell it for $12, I would be sued."  ¶ 174.

## V.     Defendants' Sales Practices Compounded the Misleading Impression in the Offering Documents and Are the Subject of a FINRA Complaint

Defendants engaged in acts and practices that compounded the misleading impression created by the offering documents.  DLA's marketing and sales presentations emphasized that investors could repose trust and confidence in David Lerner and his employees.  ¶¶ 13-14.  DLA's motto is that "You don't gamble with your rent and grocery money."   David Lerner has said that the "stock market should not be a matter of financial life and death," and investing in the stock market—which could cause an entire lifetime of work to "go down"—is an "act of insanity."  Instead, people should target a "sensible middle ground" that is shielded from the fluctuations of the stock market.  ¶ 84.  DLA states on its website, "We believe we have an obligation to guide our investors in directions we feel will help them achieve their financial objectives. We believe investors should not be chasing financial rainbows."  ¶ 86.

From 2008 through early 2011, while defendants were selling Apple REIT Nine and Ten shares, the DLA website said that investing in the Apple REITs "provides reliable and significant dividends typically higher than other stocks" and because "REITs must pay out almost all of their taxable income to shareholders, investors can look to REITs for reliable and significant dividends (typically four times higher than those of other stocks, on average)."  ¶¶ 90-91.  DLA's website includes a page titled "REIT History at David Lerner Associates."  The website provides information about each of the previous REITs, touting the successful sale of the first REITs, Apple Hospitality Two and Apple Hospitality Five, both at a profit to investors.  (These early

15

REITs are not part of this case.)  The recitation of "REIT History" includes year-by-year "annual yields" for these earliest REITs.  The website currently provides very little information about Apple REITs Six through Nine, stating only the number of hotels the REIT owns, the total amount invested, and that the REIT is no longer open to investors. Until recently, however, DLA's website provided only a single figure, "average annualized distribution" since inception for Apple REITs Six through Nine.  ¶ 89.  The average annualized distribution showed an attractive rate of distribution ranging from 7% to 8%.  *Id.*

In May 2011, DLA was sued by its primary securities regulator, the Financial Industry Regulatory Authority (FINRA).  FINRA alleged that in marketing the Apple REIT Ten shares, DLA provided misleading performance figures for all of the Apple REITs on its website and implied that future investments could be expected to achieve similar results.  FINRA also alleged that the uniform $11 price of the Apple REIT shares was inaccurate and that DLA improperly recorded the Apple REITs at $11 per share on account statements.  FINRA alleged that DLA failed to investigate the Apple REITs adequately and had no basis for recommending and selling them as suitable investments for its customers.  ¶¶ 9, 170.

DLA responded to the FINRA lawsuit in June 2011 by changing its account statements to say that the value of the shares was "not priced."  ¶¶ 13, 78, 173.  DLA also sent a letter to its clients that said, among other things,

- *"None of the allegations have any impact on your investments purchased at DLA, including Apple REITs, municipal bonds, mutual funds, or any other investments."*

- "Apple REIT programs (and prior programs) sold by DLA have a proven track record going back to 1993, and *given today's market, all the Apple programs are performing as expected."*

- "The current, fully-subscribed Apple REIT programs (Apple Six, Apple Seven, Apple Eight and Apple Nine) have, historically, been consistently profitable and have paid distributions even during recessionary periods."

- "Apple REIT programs and DLA fully comply with regulatory requirements for displaying the estimated value on monthly statements."

- "And most importantly, ***NO ONE HAS EVER LOST MONEY IN ANY OF THE APPLE REIT HOTEL PROGRAMS!***"[4]

¶ 93.  FINRA notified DLA that "several of the bullet points included in the letter raise serious regulatory concerns" and directed DLA to "cease the use of the letter immediately as it fails to comply with applicable standards."  ¶ 94.

FINRA filed an amended complaint in December 2011, adding David Lerner as a defendant and detailing the "untrue, false, exaggerated, unwarranted and misleading" statements DLA has used in its seminars for existing and prospective REIT investors.  *See* Sharp Decl., Ex. D.  Among other things, FINRA alleges that David Lerner misleadingly told investors that Apple REIT Six and Apple REIT Eight are making money "hand over fist" and that Apple REIT Eight is "making all kinds of money," and described the Apple REITs as a "cash cow."  Lerner also described the Apple REITs as essentially risk-free:

> There is limited liquidity—no one, ever, in the history of these two programs, has ever not gotten back their money or has ever lost money— ever, in the history of these programs.  All right, I hope everyone understands this.  This is a fact.

Lerner has also said, "We are the Rolls Royce of this business," and says, "It doesn't get any better.  These are the facts. … So if you have any of these Apple programs, this is it.  You're the Rolls Royce of the business.  You have the best that there is in the entire industry."  ¶ 182; Sharp Decl., Ex. D at 23-24.

## VI.     Investors Have Been Unable to Redeem Their Shares

Since the FINRA complaint brought defendants' practices to the public's attention, many investors have tried unsuccessfully to redeem their shares.  Up until December 31, 2010, the

---

[4] All emphasis in original.

Apple REITs granted 100% of investors' redemption requests to avoid creating a secondary market that would have undermined the $11 per share price of the Apple REITs. ¶¶ 112, 171-72. In the last year, however, the percentage of redemption requests the Apple REITs honored has dropped dramatically as requests have increased:

|  | 2007 | 2008 | 2009 | 2010 | Q2 2011 | Q2 2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|---|---|---|---|
| Apple REIT Six | 100% | 100% | 100% | 100% | 100% | 100% | 17% | 7% |
| Apple REIT Seven | 100% | 100% | 100% | 100% | 63% | 56% | 13% | 6% |
| Apple REIT Eight |  | 100% | 100% | 100% | 61% | 48% | 9% | 4% |
| Apple REIT Nine |  |  | 100% | 100% | 100% | 100% | 41% | 18% |

In October 2011 Apple REITs Six, Seven, and Eight announced plans to further limit the number of redemption requests that will be granted, dropping the 3% to 5% limit down to 2%. ¶ 172.

## VII. Plaintiffs Purchased Apple REIT Shares Through DLA

The FINRA complaint and subsequent reporting on the Apple REITs by *The New York Times*, the *Wall Street Journal*, and other publications prompted plaintiffs to seek out counsel. Plaintiffs reside in New York, New Jersey, Connecticut and Florida. They collectively purchased shares in each of the REITs from DLA. This chart shows their investments:

|  | Barbara Shefsky (NY) | Marvin Bendavid (NY) | Debra and Stanley Kronberg (NJ) | Laura Berger (CT) | William Murray (FL) |
|---|---|---|---|---|---|
| Apple REIT 6 |  |  | $ 76,000 |  |  |
| Apple REIT 7 |  |  | $ 236,286 |  |  |
| Apple REIT 8 | $ 526,687 |  | $ 136,721 | $ 893,736 | $ 300,000 |
| Apple REIT 9 | $ 302,061 | $ 250,000 | $ 285,199 | $ 940,395 | $ 87,690 |
| Apple REIT 10 |  | $ 250,000 | $ 10,487 |  |  |
| **Total Invested** | **$ 828,748** | **$ 500,000** | **$ 744,694** | **$ 1,834,131** | **$ 387,690** |

¶¶ 15-18.

The Kronbergs initially filed a case asserting state law claims in the District of New Jersey.  After additional investors filed cases in this District asserting federal securities violations, the Kronbergs, Ms. Shefsky, Mr. Bendavid and Ms. Berger moved as a group to serve as lead plaintiffs under the PSLRA.  The Court granted plaintiffs' motion.  Around the same time, the New Jersey District Court granted defendants' motion to transfer the New Jersey case to this District.  Plaintiffs filed their consolidated class action complaint on February 17, 2012, asserting both federal and state law claims.

## ARGUMENT

When considering a motion to dismiss, courts must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff."  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  Since plaintiffs' claims are not "premised on allegations of fraud," "notice pleading supported by facially plausible factual allegations is all that is required—nothing more, nothing less."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  "Rule 8(a)(2) of the Federal Rules of Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument."  *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation omitted).[5]

A complaint will withstand a motion to dismiss if it alleges "enough facts to state a claim to relief that is plausible on its face."  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

---

[5] Defendants essentially concede that Rule 8 governs plaintiff's claims, and only footnote their half-hearted arguments that Rule 9(b) *may* apply to *some* of plaintiffs' claims.  DLA Mem. at 10, n.13; Apple REITs Mem. at 20 n.12;  Apple REIT D, O & A Mem. at 12 n.6. None of plaintiffs' claims sound in fraud.  The Securities Act claims are strict liability and negligence claims.  The state securities law claims are Securities Act analogs.  And the breach of fiduciary duty, unjust enrichment and negligence claims are not fraud-based.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Green v. McLaughlin*, No. 11-5451-pr, 2012 WL 1592621, at *1 (2d Cir. May 8, 2012) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). "Thus, plausibility 'depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render [the] plaintiff's inferences unreasonable.'" *Id.* (quoting *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011)).

A court cannot at the pleading stage dismiss a complaint simply because it does not believe a plaintiff's allegations. *Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations.") (citation omitted). Even if a complaint "strikes a savvy judge that actual proof of [its] facts is improbable" and "that a recovery is very remote and unlikely," all *Twombly* requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. *Id.* Plaintiffs must only "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570.

## I.   Plaintiffs Have Stated Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act Against Apple REITs Nine and Ten and DLA

Plaintiffs allege that Apple REITs Nine and Ten and DLA violated sections 11 and 12(a)(2) of the Securities Act. A section 11 claim "places a relatively minimal burden on a plaintiff" and "is designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered

offering."  *Herman & McLean v. Huddleston*, 459 U.S. 375, 381 (1983).  Like the section 11

claim, "Section 12(a)(2) imposes liability without requiring 'proof of either fraud or reliance.'"

*In re WorldCom, Inc Sec. Litig.*, 219 F.R.D. 267, 290 (S.D.N.Y. 2003) ("Reliance by the buyer

need not be shown, for § 12(2) is a broad anti-fraud measure and imposes liability whether or not

the purchaser actually relied on the misstatement.") (citation omitted).

Section 11 imposes liability on issuers like Apple REITs Nine and Ten and underwriters

like DLA for material misstatements and omissions in the registration statement and documents

incorporated into the registration statement.  "To state a claim under section 11, the plaintiff

must allege that: (1) she purchased a registered security, either directly from the issuer or in the

aftermarket following the offering; (2) the defendant participated in the offering in a manner

sufficient to give rise to liability under section 11; and (3) the registration statement 'contained

an untrue statement of a material fact or omitted to state a material fact required to be stated

therein or necessary to make the statements therein not misleading.'"  *In re Morgan Stanley Info.

Fund*, 592 F.3d at 359 (quoting 77 U.S.C. § 77k(a)).

Section 12(a)(2) imposes liability on issuers and sellers of securities for material

misstatements and omissions in prospectuses.  "[T]he elements of a *prima facie* claim under

section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by

means of a prospectus or oral communication'; and (3) the prospectus or oral communication

'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in

order to make the statements, in the light of the circumstances under which they were made, not

misleading.'"  *Id.*at 359 (quoting 15 U.S.C. § 77k(a)(2)) (alterations in original).

"Claims under sections 11 and 12(a)(2) are therefore Securities Act siblings with roughly

parallel elements, notable both for the limitations on their scope as well as the *interrorem* nature

21

of the liability they create." *Id.* "[I]n contrast to their 'catchall' cousin in the Exchange Act—section 10(b), 15 U.S.C. § 77j(b)—sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily." *Id.* at 359-60 (citation omitted). "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *Id.* at 359 (quoting *Huddleston,* 459 U.S. at 382) (internal citations omitted).

To determine whether defendants' statements and omissions are actionable under federal securities laws, a court must analyze "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.*; *see also Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1364 (2d Cir. 1993) ("The framers of the securities laws were concerned principally with reversing the common law rule favoring 'caveat emptor.' To this end, the securities laws are aimed at prospectively protecting American investors from injury by demanding 'full and fair disclosure' from issuers.") (citations omitted).

Defendants' material misstatements and omissions in the offering documents about the Apple REITs' investment objectives, sources of distributions, share value, and performance of prior programs are actionable because, when considered in context, they misled investors and failed to fully disclose the risks associated with investments. Appendix F to plaintiffs' complaint (an amended version of which is attached as Exhibit A to the Sharp Declaration) identifies each

of the statements that plaintiffs challenge as false or misleading, lists the paragraphs in the

complaint that discuss them, and briefly states why the statements are false or misleading.[6]

> ### A.      Defendants' Statements About the Apple REITs' Investment Objectives Are Actionable and Material

Apple REITs Nine and Ten have the same investment objective:

> Our primary business objective is to maximize shareholder value by achieving long-term growth in cash distributions to our shareholders. We intend to pursue this objective by acquiring hotels, residential apartment communities and other income-producing real estate in metropolitan areas throughout the United States for long-term ownership. We generally intend to acquire fee ownership of our properties. We seek to maximize current and long-term net income and the value of our assets. Our policy is to acquire assets where we believe opportunities exist for acceptable investment returns. We expect to pursue our objectives primarily through the direct ownership of hotels, residential apartment communities and other income-producing real estate assets in metropolitan areas throughout the United States.

¶¶ 6, 76, 120; Sharp Decl., Ex. A at 1-2.  Plaintiffs contend that this investment objective is false

and misleading because defendants at no time intended to, or did operate the REITs in a manner

consistent with these investment objectives.  Plaintiffs allege that defendants' focus was not

maximizing shareholder value, but was instead on continuing to sell shares to increase their own

profits.  ¶¶ 10-12.  To accomplish this, defendants maintained a steady 7% to 8% rate of

distribution and consistently valued the shares at $11 to ensure that the Apple REITs remained

competitive with other non-traded REITs and create the appearance that the Apple REITs were

operating profitably.  ¶¶ 78-79, 92, 105, 109, 111, 147-48.  They did so without regard to

whether the REITs could fund the distributions from operating income or the actual value of the

shares.  ¶¶ 11-12, 100-02, 108, 116-18, 120-24, 126-40, 142-46, 152-60, 162-66, 168.

---

[6] In their briefs, defendants also address DLA's oral statements, statements about the economic downturn, and statements about newly-constructed hotels.  Plaintiffs' Securities Act claims are not based on any of these statements.

To determine whether a statement about an investment objective is actionable, "the question is whether the statements were so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker that no reasonable investor could find them important to the overall mix of available information."  *In re Oppenheimer Rochester Funds Group Sec. Litig.*, No. 09-MD-02063-JLK-KMT, 2012 WL 171035, at *8 (D. Colo. Jan. 20, 2012) (quoting *S.E.C. v. Curshen*, 372 F. App'x 872, 879 (10th Cir. 2010)).  The Apple REITs' investment objective is not vague or merely an opinion.  It sets forth the REITs' specific objectives of maximizing shareholder value and achieving long-term growth in cash distributions to shareholders.  It explains that the REITs will accomplish those purposes by acquiring fee ownership of hotels and other income-producing real estate that present opportunities for acceptable investment returns.  And it says that the plan is to "maximize current and long-term net income and the value of our assets."

This investment objective "describe[s] an essential feature of the [REITs] that reasonable investors would consider important, material information."  *Oppenheimer*, 2012 WL 171035, at *9; *see also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 92 (D. Mass. 2010) (the investment objectives were "key guidelines that established the Trust's investment strategy and laid down the basic ground rules it would follow" and "in all likelihood, of utmost importance to potential investors").  The Apple REITs' investment objectives were particularly important to investors because the REITs were "blind pool" offerings in which plaintiffs committed their money before knowing what properties the REITs would purchase with the net offering proceeds.  ¶ 6.  Moreover, materiality is usually an issue for a jury to decide.  *See, e.g., U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 190 (E.D.N.Y. 2006) (quoting *Press v. Chemical Investment Services Corp.,* 166 F. 3d 529, 538 (2d. Cir. 1999).

Other courts have found similar investment objectives to be actionable.  *See Evergreen*, 705 F. Supp. 2d at 92 (investment objectives of seeking "the highest total return by maximizing income and minimizing price fluctuation" and providing "high levels of current income while reducing price volatility" and "income consistent with the preservation of capital and low principal fluctuation" were actionable as they were "'not so general and indefinite' as to be devoid of any meaning"); *Oppenheimer*, 2012 WL 171035, at *8 (statements regarding the funds' objective to pursue high yields while carefully monitoring liquidity and risk were actionable);  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546 (N.D. Cal. 2009) (finding investment objective to "limit principal risk to preserve capital" sufficient to withstand a motion to dismiss).

Defendants also argue that the statements about the Apple REITs' investment objectives are not actionable because they are forward-looking statements.  Apple REITs Mem. at 9; DLA Mem. at 14.  Forward-looking statements—broadly defined as expressions of optimism or projections of the future—are protected under certain circumstances outlined by the PSLRA "safe harbor" provision and the "bespeaks caution" doctrine.  The PSLRA safe harbor provision is based in part on the judicially created "bespeaks caution" doctrine, and the two are often discussed together or interchangeably.  *See, e.g.*, *Rombach*, 355 F.3d at 173.  The PSLRA safe harbor provision protects a forward-looking statement that is (1) identified as a forward-looking statement and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) not made with actual knowledge that the statement was false or misleading.  15 U.S.C. § 77z-2(c). The judicially-created bespeaks caution doctrine is similar to the PSLRA safe harbor.  It "removes liability for statements accompanied by cautionary language, providing that 'alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that

25

any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *In re NovaGold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 291 (S.D.N.Y. 2009) (quoting *Rombach*, 355 F.3d at 173).

Under either standard, a defendant may not escape liability for "statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events." *In re Vivendi Universal, S.A. Securities Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011); *see also P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). Courts must analyze "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Rombach*, 355 F.3d at 173 (quotation omitted).

The investment objectives are not forward-looking statements. They are statements of present fact and their misleading nature was verifiable at the time they were made. Apple REITs Nine and Ten were essentially carbon copies of the earlier REITs, with the same distribution policy, share price, and ownership and management. The REITs all acquired the same type of hotel properties. By 2009, when defendants began selling Apple REIT Nine shares, defendants had five years of prior operating history that showed their investment strategy and distribution policy for the REITs did not "maximize shareholder value." *See* ¶¶ 28-34, 38-39, 74, 76-81, 98.

The investment objectives were not accompanied by meaningful cautionary language. Defendants cite to scattered statements in the Apple REIT Nine and Ten prospectuses as "warnings" that the REIT might not meet its objective.  DLA Mem. at 14 n.18.  But courts do not allow generic warnings to cure otherwise misleading statements.  "[V]ague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky nature of the Fund's investments with sufficient clarity as to 'bespeak caution' …." *Evergreen*, 705 F. Supp. 2d at 93.  The statement that Apple REIT Ten may not achieve its investment objective because it is "a thinly-capitalized company" does not warn investors that defendants' operation of the REIT the same way they operated the earlier REITs would not maximize shareholder value or achieve long-term growth in cash distributions to shareholders. *See Slayton v. American Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010) ("The defendants' caution, referencing the deterioration in the high-yield sector generally, is vague, and the pleaded facts do not support the defendants' assertion that this is the exact risk that materialized.").

The purported warnings were also insufficient to outweigh the impact of the statements about the Apple REITs' investment objectives.  Statements about "maximizing shareholder value," "maximizing current and long-term net income," "grow[ing] the value of your investment over time," and acquiring assets with "acceptable investment returns" appear more than 50 times in the Apple REIT Nine prospectuses and registration statements and have so far appeared at least 20 times in the Apple REIT Ten prospectuses and registration statements.   6, 10, 76, 120; Sharp Decl., Ex. A at 1-3.  The scattered and buried references to thin capitalization and distributions including a return of capital were not prominent enough to counter the false and misleading investment objectives.  *See, e.g., In re Lehman Bros. Securities & ERISA Litig.*, 799 F. Supp. 2d 258, 314 (S.D.N.Y. 2011) ("[A] misleading statement displayed prominently and in

27

numerous places may not be cured by inconspicuous and scattered warnings."); *In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 576 (S.D.N.Y. 2005) ("cautionary language must be too prominent and specific to be disregarded") (citation omitted).

This case is not like *In re Alliance North American Government Income Trust, Inc. Securities Litigation*, in which the court determined that other statements in the prospectus, combined with "subsequent letters and reports to investors" specifically disclosed the information the plaintiffs alleged was misrepresented.  No. 95-CV-0330 (LMM), 1996 WL 551732, at *4-5 (S.D.N.Y. Sept. 27, 1996).  Knight's subsequent letters to shareholders re-emphasized the investment objectives.  *See* ¶ 167 ("Our team at Apple REIT Ten is committed to maximizing the value of your investment through a conservative approach to the ownership of income producing real estate.").

Defendants also argue that the Apple REITs' investment objectives were "not objective statements of fact, but rather were subjective statements about their intentions."  Apple REITs Mem. at 8.  As discussed above, the investment objectives were statements of facts.  But even subjective statements are actionable if they are not honestly held.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("matters of belief and opinion are not beyond the purview" of sections 11 and 12); *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1131 (2d Cir. 1994) ("A statement of reasons, opinion or belief … can be actionable under the securities laws if the speaker knows the statement to be false.").  Plaintiffs have alleged that defendants did not believe the statements about the REITs' investment objectives at the time they made them because the prior REITs did not maximize shareholder value and defendants' true intention was to maintain the appearance that the REITs were profitable to continue selling shares and collecting fees.  *See* ¶¶ 10-11, 100-02, 106, 120-24, 134, 139, 142-43, 145-46, 152, 156-162.

28

B.    **Defendants' Misstatements and Omissions About the Apple REITs' Distributions Are Actionable**

Plaintiffs also allege that statements in the Apple REIT Nine and Ten offering documents about the policy of payment of distributions to shareholders were misleading.  The Apple REITs stated that "[d]istributions will be at the discretion of our board and will depend on factors including:  the gross revenues we receive from our properties, our interest expenses incurred in borrowing, capital expenditures, and our need for cash reserves."  ¶¶ 51, 109; Sharp Decl., Ex. A at 3-4.  In fact, plaintiffs allege, the boards set the distribution rates at 7% to 8% to match or exceed those of other non-traded REITs, and to provide the illusion that the Apple REITs were operating profitably.  ¶¶ 8, 11, 89, 105-06; Appendix G.  The boards approved the rates even though the prior REITs, operated in the same manner by the same management, were unable to pay distributions from operating expenses, and despite an increasingly challenging economy for the type of hotels the REITs acquired.  ¶¶ 97-102, 115-18, 120, 142-48, 152.

Plaintiffs attached a chart as Appendix G to their complaint that shows the distribution rates for all existing non-traded REITs, gathered from Blue Vault Partners Nontraded REIT Industry Review Reports.  (The chart at paragraph 105 of the complaint is a representative sample of the complete chart at Appendix G.)  The chart divides the REITs into "closed" REITs that are no longer open to new investors and "open" REITs that are still accepting new investors. This data shows that the Apple REITs' distribution rates always equaled or exceeded the distribution rates of all other existing non-traded REITs.  Defendants are unable to point to any economic justification for their distribution policy.

The offering materials for Apple REITs Nine and Ten did not disclose that all of the prior REITs, as well as Apple REITs Nine and Ten, paid distributions with borrowed funds or return of investor capital.  Instead, they said that the REITs "may from time to time distribute funds that

29

include a return of capital" and "may from time to time need to borrow to make distributions,"
and "[o]ur distributions may include a return of capital."  ¶¶ 106-07; Sharp Decl., Ex. A at 3-6.
These equivocal statements were inadequate to warn investors.  There is a "critical distinction
between disclosing the risk a future event *might* occur and disclosing actual knowledge the event
*will* occur."  *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (emphasis in
original).  The disclosure of a potential risk is insufficient when, in fact, the risk is much greater
or is a known certainty.  *See In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1292 (E.D.
Wash. 2007) ("[T]o suggest that an event is a possibility when it is, in fact, a certainty is
necessarily misleading."); *In re Prudential Sec. Inc. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.
1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his
hiking companion to walk slowly because there might be a ditch ahead when he knows with near
certainty that the Grand Canyon lies one foot away.").

   Defendants argue that plaintiffs have not alleged facts that show a certainty that
distributions would always be sourced by funds other than operating income.  DLA Mem. at 14-
15.  Plaintiffs do not have to allege a certainty because "warnings of specific risks …do not
shelter defendants from liability if they fail to disclose hard facts critical to appreciating the
**magnitude** of the risks described."  *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
No. 99-CV-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (emphasis added).  But
plaintiffs also allege facts that support the inference that it was certain, or at least virtually
certain, that distributions would be paid from sources other than operating income.  Since 2007,
none of the Apple REITs have paid distributions exclusively from operating income.  *See* ¶¶ 102,
142-43, 146, 162-63, 168.  This chart shows that distributions were consistently paid in
substantial part from sources other than income:









Although plaintiffs only have access to quarterly data about the sources of distributions, the reasonable inference is that each monthly distribution was paid in part or primarily from sources other than operating income. Defendants argue that plaintiffs' allegations are insufficient because they identified one quarter in which Apple REIT Six's cash generated from operations exceeded the distribution payments. DLA Mem. at 15. But that does not mean that Apple REIT Six paid any of the distributions that quarter exclusively from operating income.

Defendants cite a couple of section 10(b) cases involving auction rate securities (ARS) in support of their argument that it was not misleading to use "may" or "might" when it was highly likely or even certain that the distributions would be paid from sources other than operating income. In the ARS cases, the plaintiffs alleged that the defendants engaged in a scheme to

manipulate the ARS market by placing "support bids" to prevent auction failures, which masked the liquidity risks and created the false impression that the lack of auction failures reflected investor demand.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 124 (2d Cir. 2011).

Not only were the allegations in the ARS cases subject to the stricter Rule 9(b) pleading standard, but the courts found that the defendants adequately disclosed the likelihood that they would place support bids.  In *Wilson*, for example, Merrill Lynch disclosed that it "may routinely" place support bids in the auctions which, the Second Circuit found, was "consistent with the frequency of intervention that Wilson alleges."  *Id.* at 133 ("If Merrill's intention was, as Wilson alleges, to place support bids in every single auction unless it decided to let certain auctions fail or withdraw from the market altogether, we think that Merrill fairly disclosed that intention by stating that it 'may routinely' place such bids."); *see also In re UBS Auction Rate Sec. Litig.*, No. 08-cv-2967(LMM), 2010 WL 2541166, at *18 (S.D.N.Y. June 10, 2010) ("Here, the prospectuses for each of the ARS purchased by Plaintiffs disclosed that Defendants could, although they were not obligated to do so, engage in the very conduct of which Plaintiffs primarily complain—the placing of support bids—and the information advantages that Defendants would have if they did engage in such conduct.").

The additional cases defendants cite stand for the unremarkable, and inapplicable, proposition that plaintiffs cannot show that defendants' statements are misleading when the offering documents explicitly disclose the information the plaintiffs claim was omitted.  *See Joffee v. Lehman Bros. Inc.*, No. 06-0903, 209 F. App'x 80, 81 (2d Cir. 2006) (in a section 10(b) case, plaintiffs failed to allege that the defendants concealed market risks that caused their losses because "all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings"); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F.

Supp. 2d 254, 271 (S.D.N.Y. 2010) ("the Offering Documents 'warn investors of exactly the risk the plaintiffs claim [were] not disclosed'") (alteration in original) (citation omitted); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 325 (D.N.J. 2000) ("Thus, the exact production problems that form the foundation of Plaintiffs' Second Amended Complaint were the subject of explicit cautionary language in the Prospectus.").

Defendants also point to disclosures in SEC filings by Apple REITs Six, Seven and Eight as cautionary language that purportedly warned investors that distributions would be made from sources other than operating income.  DLA Mem. at 16.  Defendants have cited no cases in which courts have found disclosures in SEC filings by other issuers to constitute adequate cautionary language.  In fact, courts often conclude that disclosures that appear in exhibits and amendments to prospectuses from the **same** issuer are inadequate.  *See, e.g.*, *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors."); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 565 (E.D.N.Y. 1971) (even if the information the plaintiffs alleged was misleading was disclosed in a way that was "probably technically accurate," it was "hardly calculated to apprise" the investor of the actual risks).

Ultimately, a jury must decide whether defendants' equivocal statements were misleading and if the scattered disclosures defendants identify adequately informed investors about the sources of the distributions.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 785 F. Supp. 2d 799, 813 (N.D. Cal. 2011) ("A reasonable juror could certainly find that representing that

DBSI 'may' participate in the auctions does not disclose that DBSI 'will' participate, much less that DBSI 'will always' participate.").

### C.    Defendants' Misstatements and Omissions About the Value of the Apple REIT Shares Are Actionable

Plaintiffs allege defendants' statement that the share prices "have been established arbitrarily" was false and misleading because in fact defendants chose and maintained an $11 share price to compete with other non-traded REITs, nearly all of which sold for $10.  ¶ 109; Sharp Decl., Ex. A at 7.  The chart in plaintiffs' complaint shows the share prices for all existing non-traded REITs (except for two that were, at $20 and $25, far above the rest of the REITs). ¶ 109.[7]  Defendants then perpetuated the illusion that the shares were worth $11 by selling shares through the DRIP at $11 and redeeming shares for $11 through the REITs' redemption programs.  ¶¶ 12, 80, 87, 111-13, 172.  DLA also sent its clients account statements that showed the market price and market value for the shares as $11, purportedly derived by considering "the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets."  ¶ 78.  After FINRA sued DLA in May 2011, DLA changed the account statements to say "not priced."  ¶¶ 13, 78, 173.

Defendants argue that the value of the shares cannot "be ascertained with empirical certainty," and that as a matter of law statements of value of non-traded securities are "subjective opinions" that are only actionable if the "speaker did not have the opinion."  DLA Mem. at 17-18 (quoting *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989(PAC), 2011 WL 31548, at *8 (S.D.N.Y. Jan. 5, 2011)).  But defendants cannot deny that it is possible to value the shares based on a methodology that takes into account relevant, objective data.  FINRA requires that brokers

---

[7] Defendants say plaintiffs "hand-picked" certain REITs, but plaintiffs included the share prices for all existing non-traded REITs, gathered from Blue Vault Partners Nontraded REIT Industry Review Reports.

selling non-traded REITs provide customers with an estimated value and "a brief description of

the estimated value, its source, and the method by which it was developed."  NASD Rule

2340(b)(1)(B).  (A copy of NASD Rule 2340 is attached as Exhibit G to the Sharp Declaration.)

Moreover, Apple REIT Ten issued a new prospectus on May 2, 2012 that includes a section

titled "Net Book Value Per Share" and states that the shares have a net book value of $9.10.

According to the prospectus, net book value is "calculated as total book value of assets minus

total liabilities."  Sharp Decl., Ex. E at 8.

Plaintiffs have also alleged that defendants did not "have the opinion" that the shares are

worth $11.  Plaintiffs allege that defendants chose to set the price at $11 for marketing purposes.

¶¶ 109-12.  The $11 is therefore not defendants' subjective opinion.  If defendants had used

some methodology to value the Apple REITs' shares, the resulting figure might be the type of

subjective opinion the courts found to be non-actionable in the cases defendants cite.  *See Fait*,

655 F.3d at 110 (plaintiffs challenged the defendant's goodwill calculations); *Barclays*, 2011 WL

31548, at *3, 8 (plaintiffs alleged that Barclays failed to use a particular market index in valuing

its subprime assets); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d

387, 393 (S.D.N.Y. 2010) (plaintiffs alleged that property appraisals were not conducted in

accordance with industry standards and were inflated); *In re Van Wagoner Funds, Inc.*, 382 F.

Supp. 2d 1173, 1182 (N.D. Cal. 2004) (plaintiffs alleged that Van Wagoner was not valuing

certain securities at "fair value," but also acknowledged that the offering documents said the

securities were valued "at cost" and that they were aware of public information that revealed Van

Wagoner was not valuing the securities at fair value); *In re Allied Capital Corp. Sec. Litig.*, No.

02 Civ. 3812 (GEL), 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (plaintiffs alleged that

the defendants used a valuation policy that violated Generally Accepted Accounting Practices).

Plaintiffs also contend that the statement, "If we listed our Units on a national securities exchange, the Unit price might drop below our shareholder's original investment" was false and misleading. ¶ 114; Sharp Decl., Ex. A at 8. As discussed above, statements that an event "might" happen when defendants knew it "would" happen are actionable. *See* Section I(B). In their complaint, plaintiffs provided an analysis of publicly-available information about the REITs' properties that shows they are not capable of earning the income necessary to sustain 7% to 8% distributions. *See* ¶¶ 150, 152-60, 164-66, 168.[8] Plaintiffs also set forth the sources of the distributions and show that a significant portion was paid from the return of investor capital, which reduced the amount of capital available to acquire new properties. ¶¶ 102, 152, 162, 168. It is reasonable to infer from these allegations that the REITs were not operating profitably and that the share value is less than $11.

### D. Defendants' Misstatements and Omissions About the Performance of Prior Apple REITs Are Actionable and Material

Plaintiffs allege that the information in the offering documents about the prior Apple REITs was misleading. The offering documents emphasized the similarity of the prior REITs to the current REIT, while presenting seemingly favorable results for those programs without disclosing that the prior programs had achieved those results by paying investors back their own money: "In general, the investment objectives of the … real estate investment trusts previously organized by Mr. Knight … were similar to our investment objectives of achieving long-term growth in cash distributions, together with possible capital appreciation, through the acquisition, ownership and ultimate disposition of properties." ¶ 98; Sharp Decl., Ex. A at 8-9. The prior REITs are then described in several paragraphs. ¶ 98; *see also* Blanchard Decl., Exs. D at 80-81;

---

[8] Defendants incorrectly characterize this analysis as a "valuation" of the shares. DLA Mem. at 13. It is not. Plaintiffs and their consultants analyzed available data to determine information about the price and earning potential of the properties and the income necessary to sustain the distributions.

36

E at 77-78.  But the offering documents do not inform investors that the prior REITs have not

generated sufficient income to pay their consistent 7% to 8% distributions solely from operating

income, and that the REITs have relied on a combination of borrowing and returning investor

capital to make up the difference.

Information about similar predecessor programs or entities is material to investors.  *See*

*S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1323-24 (11th Cir. 1982) (information about a

predecessor company's bankruptcy was material where the businesses were similar and

employed virtually all of the same principals); *Elipas v. Jedynak*, No. 07 C 3026, 2011 WL

1706059, at *5 (N.D. Ill. May 5, 2011) (the fact that predecessor entities "engaged in the same

business" lost money was material).  This is particularly true where, as here, the REITs are so

similar.  They all have the same investment objective, are operated and managed by many of the

same people, and have the same basic terms.  ¶¶ 28-34, 38-39, 76-81, 97-98.

The SEC has provided guidance to REITs about disclosing information about the

performance of similar prior programs.  Guide 5 of the Securities Act Industry Guidelines ("SEC

Guide 5") includes disclosure requirements for real estate investment trusts.[9]  SEC Guide 5

instructs that the disclosures should include "a narrative summary of the 'track record' or prior

performance" of similar programs, as well as tables relating to the prior program's use of

proceeds, operations and acquisitions and sales.  Sharp Decl., Ex. I at section 8.  "The narrative

summary should include a discussion of those major adverse business developments or

conditions experienced by any prior program … that would be material to investors in this

program."  *Id.*  In an interpretive release, the SEC said that "[t]he prior performance tabular

_____

[9] Although SEC Guide 5 is called "Preparation of Registration Statements Relating to Interests in
Real Estate Limited Partnerships," the SEC said that its requirements "should be considered, as
appropriate, in the preparation of registration statements for real estate investment trusts and for
all other limited partnership offerings."  SEC Release No. 33-6900, 56 FR 28979-01, at *28983.

information should reflect whether prior programs have been able to achieve their stated

objectives.  Adverse developments contained in the tables should be addressed in detail in the

narrative section."  56 FR 28979-01, at *28985.

The Apple REITs' offering documents do not comply with these requirements.  The

narrative does not discuss the prior REITs' adverse business developments or conditions.

Defendants argue that the statements about the prior programs are forward-looking, and rely on

disclaimers that "past performance of prior programs is not necessarily indicative of our future

results" and "We have no operating history and we can give no assurance of success."  Apple

REITs Mem. at 15; DLA Mem. at 19.  Defendants want to have it both ways: they flaunt the

purported success of the prior programs and then immediately disclaim all of their statements.

The securities laws do not sanction this type of gamesmanship.  *See Rombach*, 355 F.3d at 173

("The bespeaks caution doctrine does not serve if it is abused or gamed."); *see also Halperin*,

295 F.3d at 360 (prospectuses may not "gloss over the relevant risk, focus investors' attention

elsewhere, and thereby lead them down some primrose path").

In addition, the boilerplate warnings are insufficient to outweigh the misleading effect of

the positive descriptions of the prior REIT programs.  *See Slayton*, 604 F.3d at 772 ("To avail

themselves of safe harbor protection under the meaningful cautionary language prong,

defendants must demonstrate that their cautionary language was not boilerpate and conveyed

substantive information."); *Vivendi*, 381 F. Supp. 2d at 183 (finding that the generic warning that

"actual results may differ" was insufficient cautionary language to bring allegedly false financial

results from prior quarters within the safe harbor provision).  Defendants rely on *Rombach*, but

in that case the registration statement included very specific cautionary language in addition to

some of the more boilerplate warnings.  355 F.3d at 175-76 (cautionary language included

statements about the company's $3.6 million and $1.7 million net losses, its lowered cash reserves, and its $180 million debt).

Finally, defendants argue that that the information plaintiffs allege was omitted—that the distributions were paid in part with the return of investor capital—was disclosed in the 10-K and 10-Q filings of the earlier REITs. Apple REITs Mem. at 15. Investors are not required to study the voluminous SEC filings of the prior Apple REITs to assess the truth of statements in the prospectus for the Apple REIT they are investing in. *See, e.g.*, *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198-99 (2d Cir. 1993) (information disclosed to investors "need not be considered part of the total mix reasonably available to them if 'the true' is 'buried'").

### E.   Plaintiffs Do Not Allege Mere Corporate Mismanagement

Defendants contend that most of plaintiffs' allegations "boil down to nothing more than claims of corporate mismanagement." Apple REIT Mem. at 4, 16-17; DLA Mem. at 13, 20. Defendants rely on *Santa Fe Industries, Inc. v. Green*, in which the Supreme Court rejected the proposition that "a breach of fiduciary duty … without any deception, misrepresentation, or nondisclosure" violates Rule 10b-5. 430 U.S. 462, 476-77 (1997) ("'Manipulation' is 'virtually a term of art when used in connection with securities markets.' … No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of s 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.") (citations omitted).

As discussed in the previous sections, plaintiffs allege specific misstatements and omission in the offering documents that violate the Securities Act. *Santa Fe* did **not** hold that defendants do not violate federal securities laws just because they may have also breached

fiduciary duties; if the defendants' breaches of fiduciary duty involved misstatements or omissions, plaintiffs may advance claims under both federal securities laws and state law.  *See Jones v. Nat'l Distillers and Chem. Corp.*, 484 F. Supp. 679, 685 (S.D.N.Y. 1979) (citing *Goldberg v. Meridor*, 567 F.2d 209, 221 (2d Cir. 1977)); *see also Lane v. Page*, 581 F. Supp. 2d 1094, 1106 (D.N.M. 2008) (holding that *Santa Fe* does not "preclude an action . . . based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary duty claim") (citations omitted).

In *In re Donna Karan Int'l Securities Litigation*, the court noted that the Second Circuit "has instructed that '[a]llegations that a defendant failed to disclose material facts only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws.'"  No. 97-CV-2011 CBA, 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998) (alteration in original) (quoting *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988)).  Applying this standard, the court held that allegations that the defendants failed to disclose the company was having a substantial problem containing costs and had inadequate cost controls were not actionable, nor were allegations that challenged "the conduct, judgment, and abilities of [the company's] management."  *Id.* at *10.  But the court also recognized that "the mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose specific material fact resulting from mismanagement."  *Id.*  The court held that allegations that "arguably identify known objective facts that existed at the time of the IPO that render certain statements in the Prospectus false and misleading" were actionable.  *Id.*

The other cases defendants cite are equally inapplicable, since the plaintiffs did not allege

misstatements or omissions in the offering documents.  *See Shaw v. Digital Equip. Corp.*, 82

F.3d 1194, 1206, 1206 n.14 (1st Cir. 1996) (allegations that the defendants implemented a

commission program and set sales quotas "without careful evaluation" were not actionable

because they were claims of corporate mismanagement and not misstatements or omissions in

offering materials); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y.

2003) ("In the absence of … an affirmative misrepresentation, allegations of 'garden-variety

mismanagement, such as managers failing to ... adequately inform themselves' do not state a

claim under federal securities laws.") (second alteration in original) (quoting *Field*, 850 F.2d at

948, *aff'd*, 113 F. App'x 427 (2d Cir. 2004)); *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90 Civ.

5638 (JFK), 1992 WL 296406, at *5 (S.D.N.Y. Oct. 7, 1992) ("Common law breach of fiduciary

duty 'cannot be transformed into manipulative or deceptive devices so as to state a cause of

action under section[] 10(b) … simply by alleging that the defendants failed to disclose the

alleged breaches.'") (alterations in original) (citation omitted).

### F.     Defendants' Loss Causation Arguments Are Premature and Unmeritorious

#### 1.     Plaintiffs Are Not Required to Plead Loss Causation

Defendants contend that plaintiffs' Securities Act claims fail because plaintiffs do not

allege that their losses were caused by defendants' misstatements and omissions.  Apple REITs

Mem. at 18-20; DLA Mem. at 26-29.  But plaintiffs are not required to affirmatively plead loss

causation in a Securities Act case, since loss causation is not an element of a section 11 or

12(a)(2) claim.  *Fait*, 655 F.3d at 109 ("[C]laims under sections 11 and 12 do not require

allegations of scienter, reliance, or loss causation."); *Hutchison v. Deutsche Bank Sec. Inc.*, 647

F.3d 479, 484 (2d Cir. 2011) ("plaintiffs alleging violations of Sections 11 and 12(a)(2) not need plead 'scienter, reliance, or loss causation'") (citations omitted).[10]

The affirmative defense of lack of causation (or "negative causation") is "generally not properly raised on a Rule 12(b)(6) motion." *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009); *see also Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) (observing that the negative causation defense is usually raised on summary judgment or at trial due to its fact-intensive nature). Even if the Court were to entertain defendants' argument at this stage, defendants bear the "heavy burden of proving negative causation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009). Defendants' conclusory assertions do not meet their heavy burden of proof on this issue and, as set forth below, plaintiffs allege abundant facts to support their entitlement to relief.

2.      **Defendants' Narrow Formulation of Loss Causation is Unsupported by the Law and Contrary to Plaintiffs' Allegations**

Defendants' loss causation argument suggests that issuers and sellers of REITs, mutual funds, and securities other than stock are immune from liability under the Securities Act. One court recently characterized a very similar argument as "both hypertechnically narrow and sweepingly broad" and concluded that "[u]nless and until Congress defines [non-stock] offering statements out of the category of registration statements to which the 1933 Act applies, I will

---

[10] Most of defendants' cases are section 10(b) cases in which, unlike section 11 and 12 cases, the plaintiff bears the burden of pleading loss causation. *See, e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 415-16 (2d Cir. 2011); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106-07 (2d Cir. 2007); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197-98 (2d Cir. 2003). And in the few Securities Act cases defendants do cite, plaintiffs were unable to allege even *prima facie* section 11 and 12 claims. *See Blackmoss Invs. Ins. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at * 11 (S.D.N.Y. Jan. 14, 2010); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419-20 (S.D.N.Y. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 435-37 (S.D.N.Y. 2003).

take the statute's language at face value and consider Defendants' loss causation arguments within its confines." *Oppenheimer,* 2012 WL 171035, at *23-24.

Other courts confronted with the same arguments have arrived at similar conclusions. *See Rafton v. Rydex Series Funds*, No. 10-CV-01171, 2011 WL 31114, at *11 (N.D. Cal. Jan. 5, 2011) (rejecting mutual fund defendants' loss causation argument as leading to "the absurd result that such funds could even *intentionally* misrepresent material facts with impunity") (emphasis in original); *Schwab*, 257 F.R.D. at 547 ("Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations…."); *Evergreen*, 705 F. Supp. 2d at 94-95 (rejecting mutual fund defendants' loss causation argument on motion to dismiss); *In re Mutual Funds Inv. Litig.*, 590 F. Supp. 2d 741, 748 (D. Md. 2008) (rejecting loss causation argument in section 10(b) case).

That defendants rely heavily on *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011) is not surprising, as it is the "only decision to date that stands for the sweeping proposition that open-end mutual funds are categorically excluded from Congress's reach under the 1933 Act because their value is not specifically determined by trading on an open market." *Oppenheimer,* 2012 WL 171035, at *24 (collecting cases and observing that other courts have "firmly rejected the proposition").  The Court should lend little credence to *State Street* because it endorses "a restrictive view of liability under the 1933 Act requiring that plaintiffs plead proximate, rather than merely transaction, causation in order to state a claim for relief" that "glosses over the statutory elements" of a section 11 and 12(a)(2) case.  *Id.*

DLA and the Apple REIT defendants contend that declines in the value of the REIT shares are "*always* the result of things 'other than' prospectus representations" because the REIT

shares are not traded on any exchange or secondary market.  *Oppenheimer,* 2012 WL 171035, at

*23 (emphasis in original).   According to defendants, the revelation of the truth about the Apple

REITs' investment objectives and policies, dividends and risk profiles could not have caused

plaintiffs' losses because they could not have operated as "corrective disclosures" that caused the

decline in value of the REIT shares or impacted the value of the assets underlying the REITs (the

hotels).  Apple REITs Mem. at 19; DLA Mem. at 27-28.   This analysis "restrict[s] the concept

of loss causation too narrowly," however.  *Schwab,* 257 F.R.D. at 546.  Although loss causation

(which is similar to proximate cause) is often based on the "typical inflation-disclosure-deflation

scenario" in which a security's value declines after negative or corrective disclosures, loss

causation is "not limited to that scenario."  *Id.* at 547 (citation omitted).

Plaintiffs' claims—like the claims upheld in *Oppenheimer* and *Schwab*—are based on

allegations that defendants' "misstatements and omissions concealed the price-volatility risk (or

some other risk) that materialized and played some part in diminishing the market value" of the

securities.  *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 176-7 (2d Cir. 2005); *see also*

*Oppenheimer,* 2012 WL 171035, at *24 (upholding claims "premised on allegations that

misstatements and omissions in [offering documents] concealed the price-volatility and risk");

*Schwab,* 257 F.R.D. at 547 (finding that the "plaintiffs certainly alleged … that defendants

misrepresented or failed to disclose [] risks, the materialization of which caused (or exacerbated)

the losses" and that the plaintiffs' undervaluation of risks "might be deemed to have caused some

portion of their losses").

Plaintiffs' allegations plead cognizable losses in accord with this standard.  Defendants

sold the Apple REITs as safe, conservative investments that would protect investors' savings

from the unpredictability of the stock market, and emphasized the lack of price volatility and risk

based on the success of the prior REITs—all of which had provided consistent distributions of 7% to 8% and maintained an unwavering $11 per share value.  ¶¶ 7, 24, 79, 86, 92, 98.  What defendants did not reveal was that the Apple REITs set distribution rates to be competitive with other non-traded REITs and paid distributions without regard to profitability, even as they acquired properties at cap rates they knew were below market averages and could not justify the level of distributions they were paying.  ¶¶ 11, 79, 105-06, 120-24, 126-40, 142-49, 152-60, 162, 165-66, 168-69; Appendix G.  And contrary to the REITs' stated investment objectives, defendants pursued a policy of maintaining a steady 7% to 8% rate of distributions, without regard to the ability of the REIT to fund the distributions from operating income.  ¶¶ 11, 79, 102, 106.  To maintain those distributions, the Apple REITs have resorted to returning investor capital or borrowing to continue to pay the distributions.  ¶¶ 101-02, 142-43, 145-46, 162, 168.

Plaintiffs also allege that the value of investors' shares has declined as these misstatements and omissions have come to light.  Returning capital to investors and taking on debt that must be serviced out of future income and new investor proceeds has reduced the value of the shares.  ¶ 101.  Investors' account statements used to show an $11 market price, but they now describe the shares as "not priced," and a recent Apple REIT Ten prospectus shows "net book value" for shares ("calculated as total book value of assets minus total liabilities") at an optimistic $9.10.  13, 78, 173; Sharp Decl., Ex. E at 8.

Even though Apple REIT investors were promised that three years from the date of their initial investment they would be free to redeem their shares for the full purchase price, many investors have recently been unable to redeem their shares at all.  ¶ 81.  The REITs granted 100% of investors' redemption requests through the end of 2010, but this percentage has since decreased dramatically.  In the fourth quarter of 2011 the REITs granted only 4% to 18% of

redemption requests due to the marked increase in redemption requests since FINRA filed its complaint.  ¶¶ 171-72.

Investors purchase even those securities that "do not trade on national exchanges" "expecting to resell them, making market value the critical valuation marker for Plaintiff." *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2010 WL 1473288, at *5 (S.D.N.Y. Mar. 29, 2010).  Because the value of the Apple REIT shares has declined and plaintiffs can neither accurately value nor predictably redeem those shares, defendants' contentions that plaintiffs have failed to plead cognizable losses should be rejected.

Defendants argue in the alternative that plaintiffs' losses are attributable to the downturn in the economy, rather than defendants' misstatements or omissions.  Apple REITs Mem. at 19; DLA Mem. at 24, 26-29.  While plaintiffs' losses may coincide with the general market slump, the existence of a market-wide phenomenon does not "necessarily *eliminate[]* a plausible causal connection" between plaintiffs' losses and defendants' misstatements or omissions.  *King County, Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) (citing *Lentell*, 396 F.3d at 172) (emphasis in original).  At the pleading stage, the complaint "need not rule out all competing theories for the [loss]; that is an issue to be determined by the trier of fact on a fully developed record."  *Dodona I, LLC v. Goldman, Sachs & Co.*, No. 10 Civ. 7497 (VM), 2012 WL 935815, at *19 (S.D.N.Y. Mar. 21, 2012) (citation omitted).

## G.    Plaintiffs Section 12(a)(2) Claims Against Apple REIT Nine Are Timely

Plaintiffs' claims for violations of section 12(a)(2) were filed within one year of "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and "no later than three years after the sale."  15 U.S.C. § 77m.  Plaintiffs allege that they did not discover and could not have reasonably discovered the facts constituting defendants' violations until FINRA filed its original complaint against DLA on

May 27, 2011.  ¶¶ 195-96.  Nancy Kowalski filed a complaint asserting section 12(a)(2) claims

against Apple REIT Nine on June 17, 2012, and plaintiffs filed their consolidated complaint on

February 17, 2012.  Dkt. No. 1, 82.  Both of these complaints were filed within one year of the

FINRA complaint.

The Apple REITs argue that the claims of plaintiffs who purchase Apple REIT Nine

shares prior to June 17, 2010 are time barred because the facts underlying plaintiffs' claims

should have been known to a diligent investor before that date.  Apple REITs Mem. at 30-32.  As

an initial matter, plaintiffs Barbara Shefsky and the Kronbergs purchased Apple REIT Nine

shares after June 17, 2010, so their claims are not time barred even if the Court accepts

defendants' argument.  ¶¶ 15, 17.

The information defendants point to would not have put a reasonably diligent investor on

notice of his claims.  The references to book value the Apple REITs cite are single line items in a

chart that is in the middle of a series of charts.  *See* Edwards Decl., Ex. K at 17; Ex. L at 18.[11]

These buried references are insufficient to trigger the statute of limitations, even if investors

knew what the net book value meant in relation to the $11 price that defendants referenced

everywhere else.  *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973) ("[I]t

is not sufficient that overtones might have been picked up by the more sensitive antennae of

investment analysts.").  Two of the supposedly "public reports" that plaintiffs cited in their

complaint are in fact pricey subscription-only reports available primarily to professionals in the

hotel industry.  *See* Sharp Decl., Exs. J & K.  And the one report that was publicly available was

a "generic news report" about the industry that did not trigger inquiry notice.  *See Public*

*Employees' Ret. System of Mississippi v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 116

---

[11] The Apple REITs also cite page 1 of Exhibit K, which does not contain any reference to share value.  Apple REITs Mem. at 32.

(S.D.N.Y. 2011); *see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F.

Supp. 2d 650, 665 (S.D.N.Y. 2011) (media news items and SEC reports not specifically about

the defendant were not "sufficient to establish as a matter of law that [plaintiff's] claim is

untimely").

The statements about the sources of distributions payments in the Apple REIT Nine

prospectus and SEC filings were "accompanied by reliable words of comfort from management."

*NovaGold Resources*, 629 F. Supp. 2d at 285 (quoting *LC Capital Partners LP v. Frontier Ins.*

*Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003)).  For example, the statement on page 29 of the

Apple REIT Nine prospectus is couched in the type of "may" language that plaintiffs discuss

above:  "Our distributions to our shareholders may not be sourced from offering cash flow but

from offering proceeds or indebtedness and this will decrease our distributions in the future."

Edwards Decl., Ex. D at 29; *see also id.* at 7 ("We may be unable to generate sufficient cash for

operations.").[12]  The prospectus then explains that this may occur "early in operations" because

"[t]here may be a 'lag' or delay between the raising of offering proceeds and their investment in

real estate properties."  *Id.* at 29.  This disclosure would not alert a reasonably diligent investor to

Apple REIT Nine's misstatements and omissions about its distribution policy.

The Apple REIT Nine 10-Q for the third quarter of 2008 that defendants cite also

attributed the return of capital to early operations, and said that the REIT's ability to pay future

distributions at the 7% to 8% rate depended on its ability to "increase its cash generated from

income":

> Due to the inherent delay between raising capital and investing that same
> capital in income producing real estate, the Company has had significant

---

[12] The Apple REITs also cite the Apple REIT Ten prospectus and 10-K, but since they concede
that all claims for purchases of Apple REIT Ten shares are timely (because sales commenced in
January 2011), those documents are irrelevant.

amounts of cash earning interest at short term money market rates.  As a
result, the difference between distributions paid and cash generated from
operations has been funded from proceeds from the offering of Units, and
this portion of distributions is expected to be treated as a return of capital
for federal income tax purposes.  The Company intends to continue paying
dividends on a monthly basis, at an annualized dividend rate of $0.88 per
common share.  Since a portion of distributions has to date been funded
with proceeds from the offering of Units, the Company's ability to maintain
its current intended rate of distribution will be based on its ability to fully
invest its offering proceeds and thereby increase its cash generated from
operations.  Since there can be no assurance of the Company's ability to
acquire properties that provide income at this level, there can be no
assurance as to the classification or duration of distributions at the current
rate.

Edwards Decl., Ex. F at 19.  Apple REIT Nine continued paying distributions of 7% to 8%,

which would cause any reasonable investor to believe that the REIT had succeeded in increasing

its cash from operations, not that Apple REIT Nine's statements were false or misleading.

## II.    Plaintiffs Have Stated Claims for Violations of Section 15 of the Securities Act

Section 15 imposes secondary liability on individuals who control other persons or

entities that are primarily liable under Sections 11 and 12.  *See* 15 U.S.C. § 77o.  To establish

control person liability at the pleading stage, "a plaintiff must plead:  (1) a primary violation, and

(2) control over the primary violator."  *Plumbers' & Pipefitters' Local No. 562 Supplemental*

*Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 (ERK)(WDW), 2012 WL

601448, at *20 (E.D.N.Y. Feb. 23, 2012) (citations omitted).  "Control" under section 15 means

"the power to direct or cause the direction of the management and policies of [the primary

violators], whether through the ownership of voting securities, by contract, or otherwise."  *In re*

*CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002).

Dismissal of section 15 claims "is improper as long as it is at least plausible that plaintiff

could develop some set of facts that would pass muster."  *In re Global Crossing Ltd. Sec. Litig.*,

No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (emphasis in

49

original).  And "it is well settled that the issue of whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."  *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (internal quotations and citation omitted).

### A.   Plaintiffs Allege that the Apple REIT Individual and Affiliate Defendants Are Control Persons of Apple REITs Nine and Ten

The Individual Apple REIT defendants do not dispute that they control Apple REITs Nine and Ten.  And contrary to the Apple REIT defendants' assertion, plaintiffs do not claim that any Apple REIT defendant is a control person of DLA.  Apple REIT D, O & A Mem. at 10-11. Thus, the only issue in dispute as to the Apple REIT defendants' secondary liability is whether plaintiffs have sufficiently alleged that the Apple REIT affiliates—Apple Nine Advisors, Apple Ten Advisors, Apple Suites Realty, and Apple Fund Management—control Apple REITs Nine and Ten.  Apple REIT D, O & A Mem. at 9-10.

Where a control person is "charged with the day-to-day operations" of the primary violator and "keeping [the primary violator] on the straight and narrow," it is "reasonable to presume that [the control person] had the power to control or influence the particular transactions giving rise to the securities violations."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007) (citation omitted); *see also New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc.,* No. 08 Civ. 5310 (DAB), 2012 WL 1076143, at *7 (S.D.N.Y. Mar. 29, 2012) (direct involvement in "day-to-day operations, including financial reporting and accounting" are sufficient to uphold control person claims) (citation omitted); *Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d 372, 427 (S.D.N.Y. 2010) (allegations that defendants appointed directors "to oversee day-to-day operations" made it "at least plausible that [the control persons] exerted

actual control").  Control persons "need not, of course, have actually exercised that authority to be held liable as control persons." *Refco,* 503 F. Supp. 2d at 639 (citation omitted).

Plaintiffs allege that the Apple REIT affiliates oversaw the REITs' day-to-day operations and, since the REITs did not have their own employees or infrastructure, were charged with keeping the REITs on the "straight and narrow."  *See* ¶¶ 31-32, 34, 36-38.  Specifically, plaintiffs allege that Apple REIT Nine is dependent on Apple Nine Advisors, Apple Suites Realty and Apple Fund Management to manage its day-to-day operations and provide brokerage services.  ¶ 31.  Apple REIT Ten is likewise dependent on Apple Ten Advisors, Apple Suites Realty and Apple Fund Management to manage its day-to-day operations and provide brokerage services.[13] ¶ 32.  Apple Nine Advisors and Apple Ten Advisors also serve as property investment advisors, and evaluate and recommend properties to their respective REITs.  ¶ 96.   Apple Fund Management supplies officers and employees to Apple REITs Nine and Ten, as well as Apple Nine Advisors, Apple Ten Advisors, and Apple Suites Realty Group.  ¶ 38.  And Apple Nine Advisors and Apple Ten Advisors receive advisory fees from 0.1% to 0.25% of investors' capital annually, and Apple Suites Realty receives 2% of the total purchase price of all acquisitions for its brokerage services.  ¶ 96.  The Apple REIT affiliates thus directed or managed (and benefited from) Apple REITs Nine and Ten, and "had the power, influence and authority to cause or prevent the wrongful conduct" alleged in the complaint.  ¶¶ 222, 226.  Based on the Apple REIT affiliates' intimate involvement with the REITs' day-to-day operations and business affairs, it is

---

[13] Defendants point out a typographical error in the complaint at the second line of paragraph 226, where "Apple REIT Nine" should say "Apple REIT Ten."  A second typographical error appears in paragraph 227, which includes the names of certain Apple REIT Nine directors instead of their Apple REIT Ten counterparts.  Defendants do not seek dismissal of Count Four on these grounds.  To the extent that the Court finds correction of these typographical errors necessary, plaintiffs request leave to amend for that purpose.

at least plausible that plaintiffs could develop some set of facts that would ultimately establish liability.

Glade Knight wholly owns Apple Nine Advisors, Apple Ten Advisors and Apple Suites Realty Group and indirectly controls Apple Fund Management.  He also serves as chairman and CEO and owns substantial stock interests in Apple REITs Nine and Ten.  ¶¶ 33-34, 36-38, 179.  Mr. Knight's involvement in each of these entities further supports plaintiffs' claims, since shared officers and stock ownership, as well as direct involvement, are also sufficient to establish control.  *See, e.g., STMicroelectronics v. Credit Suisse Group,* 775 F. Supp. 2d 525, 536 (S.D.N.Y 2011).

The control allegations in the cases defendants cite were weaker and sparser than plaintiffs' allegations.  In *In re Deutsche Telekom AG Securities Litigation*, the court dismissed control person claims because the plaintiffs' "only factual allegation" was that the alleged control person owned a substantial percentage of the primary violator.  No. 00 CIV 9475 SHS, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002).  And in *In re Lehman Brothers Mortgage-Backed Securities Litigation*, the Second Circuit found that the plaintiffs' control allegations "at most suggest that the [control persons] provided advice and 'strategic direction…'" and that "providing advice … does not suggest control."  650 F.3d 167, 187 (2d Cir. 2011).  Because plaintiffs allege more than a mere ownership or advice, the section 15 claims should be upheld.

**B.     Plaintiffs Allege Control Person Claims Against David Lerner**

David Lerner incorrectly invokes the "culpable participation" standard in his attempt to escape control person liability, even though courts in this District routinely recognize that a plaintiff need not allege culpable participation to state a claim under section 15.  *See. e.g., Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *20-21 ("culpable participation" requirement applies to section 20 claims but not section 15 claims); *CINAR*, 186 F. Supp. 2d at

309 (rejecting argument that culpable participation is required and upholding section 15 claim).

Courts have reasoned that since section 11 and 12(a)(2) claims do not include an intent element,

"it would make little sense to compel plaintiffs to allege a culpable state of mind in order to state

a claim under Section 15." *See, e.g.*, *CINAR*, 186 F. Supp. 2d at 310 (citations omitted).

Plaintiffs have satisfied the culpable participation standard in any event, since they have

alleged Mr. Lerner's "conscious misbehavior or recklessness." *Steed Fin. LDC v. Nomura Sec.

Int'l, Inc.,* No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001).

Defendant Lerner is the "public face" of DLA, has appeared in many promotional videos and on

the radio, and has personally disseminated "untrue, false, exaggerated, unwarranted, and

misleading statements" about the Apple REITs.   ¶¶ 26, 182.  Mr. Lerner also personally failed to

conduct due diligence about the risks and value of Apple REIT offerings prior to the sale of the

offerings and, along with DLA, violated NASD and FINRA rules.  ¶¶ 183, 185, 186, 235, 253,

254.  The complaint therefore adequately alleges that Mr. Lerner's conscious misbehavior or

recklessness rises to the level of culpable participation.

### C.    Plaintiffs' Claims Against Apple REIT Ten Director Adams Should Not Be Dismissed

The premise underlying Director Adams' request for dismissal—that "[n]othing in the

supplements he signed is alleged as the basis for any of Plaintiffs' claims"—is simply untrue.

Apple REIT D, O & A Mem. at 27.  The complaint alleges that Mr. Adams signed Apple REIT

Ten Post-Effective Amendment Nos. 2 and 3.  ¶ 49.  Both of those Post-Effective Amendments

include the contents of the original Apple REIT Ten registration statement, which is part of the

offering documents that form the basis for plaintiffs' claims.  As such, the allegations regarding

Director Adams should not be dismissed.

III.    **Plaintiffs Have Stated Claims for Violations of the Connecticut and Florida Securities Acts**

Plaintiffs' state securities law claims are based on the same misstatements and omissions as plaintiffs' section 11 and 12(a)(2) claims.  Because the complaint adequately alleges actionable misstatements under the federal laws and satisfies the elements of each relevant state securities law claim, defendants' arguments against plaintiffs' state securities claims fail.

A.    **Plaintiff Berger Alleges Actionable Violations of the Connecticut Uniform Securities Act**

1.    **Plaintiff Berger Alleges Sufficient Facts to Support Her Section 36b-29(a) Claims**

Because plaintiff Berger alleges all of the requisite facts to state a claim under sections 11 and 12(a)(2), she also states a claim for primary liability under section 36b-29(a), the Connecticut counterpart to the federal securities claims.  Plaintiff Berger alleges that the DLA and Apple REITs Eight, Nine and Ten sold or materially assisted in the sale of securities by means of misstatements or omissions of material facts, that defendants knew of such facts, and that plaintiff Berger did not.  *See, e.g.,* ¶¶ 7, 11-14, 26-27, 84-85, 89-92, 182, 195-96, 200-01, 205, 211-13, 215, 234, 237, 242-43, 268-75; Sharp Decl., Ex. A.

DLA argues that the alleged misstatements and omissions were disclosed, and that plaintiff Berger therefore cannot satisfy the requirement that she did not "know[] of the untruth or omission."  DLA Mem. at 34; CONN. GEN. STAT. ANN. § 36b-29(a)(2).  But plaintiff Berger specifically alleges that she "did not know of the untruth or omission."  ¶¶ 195, 205, 215, 258, 272.  And she could not have reasonably known of the misstatements or omissions until at least May 27, 2011, when FINRA filed its original complaint against DLA.  ¶¶ 8, 9, 171, 195-97, 205, 215; *see also* Section I(G).

## 2.      Plaintiff Berger's Claims Under Section 36b-5 are Actionable

Plaintiff Berger alleges sufficient facts to support her claims against DLA and Apple REITs Eight, Nine and Ten for primary violations under Section 36b-5(a) of the Connecticut Uniform Securities Act.  ¶¶ 30-32, 92, 95, 109, 111, 261-65.

Defendants do not dispute that plaintiff Berger has adequately alleged defendants' "dishonest or unethical practices" in advising her and Connecticut subclass members about the value of the Apple REIT shares.  CONN. GEN. STAT. § 36b-5(f).  Instead, defendants contend that section 36b-5 does not apply because they are not "investment advisors."  Apple REITs Mem. at 28-29; DLA Mem. at 34; Apple REIT D, O & A Mem. at 26.  Defendants cite only the language of the statute itself in support of this contention, but the statute expressly states that it applies to any "person who directly or indirectly receives compensation or other remuneration for advising another person…." CONN. GEN. STAT. §36b-5(a).  Each defendant, including DLA and Apple REITs Eight, Nine and Ten, is a "person" under the relevant statutory framework.  CONN. GEN. STAT. § 36b-3(15) ("'Person' means…a corporation…"); *see also Dime Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. X05CV094017091S, 2010 WL 760441 (Conn. Super. Ct. Jan. 15, 2010) (upholding section 36b-5 claims case against a corporate defendant).  If the Connecticut General Assembly had intended the statute to apply only to investment advisers, it could have used a term more specific than "person."  *See Schneider v. Brown,* No. CV980340692S, 2003 WL 22290993, at *6 (Conn. Super. Ct. Sept. 19, 2003) ("there is a presumption of purpose behind every sentence, clause, or phrase in a legislative enactment….") (citation omitted).

DLA cites no authority for its contention that it falls under the statutory exception for a broker dealer that "receives no special compensation" for services rendered.  DLA Mem. at 34.

And the complaint alleges that DLA is a broker dealer that collected a 2.5% per share expense

allowance, plus a 7.5% per share sales commission, as a result of its solicitation of plaintiff

Berger's investment in the Apple REITs.  ¶¶ 5, 17, 20, 84-86, 95.  Plaintiff Berger also alleges

that DLA advised her about her investment and made misstatements about the value of Apple

REIT shares and other aspects of the Apple REITs investments, including the investment

objectives and distribution policy.  ¶¶ 5, 10, 17, 86, 141, 233, 240, 253, 254, 262.

Contrary to the Apple REITs' assertions, plaintiff Berger specifically alleges that the

Apple REITs repeatedly made misstatements in the offering documents about the value of the

Apple REIT shares and whether the distributions would only come from non-operating income

sources, among other things.  *See, e.g.*, ¶¶ 8, 106-09, 112, 114; *see also* Sharp Decl. Ex. A.

Plaintiff Berger also alleges that the Apple REITs received money for shares as a result of

advising her about the value of the Apple REITs investments.  *See, e.g.*, ¶¶ 29-32.

The Apple REIT defendants also argue that they are not liable because they do not solicit

"advisory business" on behalf of investment advisors. They point to no operative statutory

language or authority for this argument, but presumably rely solely on the heading of section

36b-5 ("Prohibited activities of investment advisers and persons who solicit advisory business on

behalf of investment advisers").  Apple REITs Mem. at 28.  But both the United States Supreme

Court and the Connecticut Supreme Court have clarified that statutory headings "cannot undo or

limit that which the text makes plain," and are instead "of use only when they shed light on some

ambiguous word or phrase. They are but tools available for the resolution of a doubt."

*Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29 (1947); *Algonquin

Gas Transmission Co. v. Zoning Bd. of Appeals of City of Meriden*, 291 A.2d 204, 206-07 (Conn.

1971) (although statutory headings may serve as "an aid to statutory construction," they cannot "govern in the face of the unambiguous language of the statute").

### 3.   **Plaintiff Berger Sufficiently Alleges Secondary Liability Claims Under Section 36b-29(c)**

Plaintiff Berger also states claims against David Lerner and the individual Apple REIT defendants for secondary liability, which attaches under section 36b-29(c) to any person "who directly or indirectly controls" or is a "partner, officer or director" of a primary violator. CONN. GEN. STAT. § 36b-29(c).

David Lerner's status as president and controlling owner of DLA is alone sufficient under the express statutory language to subject him to secondary liability. ¶¶ 26, 266. The individual Apple REIT defendants are officers and directors of primary violators Apple REITs Six, Seven, Eight, Nine and Ten, and are therefore also control persons under the express language of section 36b-29(c). ¶¶ 33, 39-49, 51, 222, 226, 267. Glade Knight, as chairman and CEO of each of the Apple REITs and a principal in the agency relationship with DLA, advised and misrepresented facts to plaintiff Berger about the suitability and performance of her Apple REIT investments. ¶¶ 33, 83. Defendant Knight also made direct misstatements to Berger and other shareholders about the financial strength of the Apple REITs, and received compensation indirectly from the REITs (and by extension the shareholders) for those services. ¶¶ 96, 119, 121, 123-125, 151, 152, 167.

### 4.   **Plaintiff Berger States A Claim Under Section 36b-4**

Plaintiff Berger also states a claim under section 36b-4, which—like sections 36b-5 and 36b-29—prohibits false and misleading statements, and dishonest and unethical practices in connection with the offer or sale of securities. CONN. GEN. STAT. § 36b-4. DLA argues that section 36b-4 does not provide for a private right of action, relying only on *Chanoff v. U.S.*

*Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994).  DLA Mem. at 34.  The *Chanoff* court declined to recognize a private right of action to follow "recent, albeit scant, precedent" nearly 20 years ago, but it also observed a split in the district on the question.  *Id.* at 1022, 1023 (collecting cases).  More recent decisions have permitted private recovery under section 36b-4. *See, e.g.*, *IM Partners v. Debit Direct Limited*, 394 F.Supp.2d 503, 518 (D. Conn. 2005) (denying motion to dismiss the plaintiffs' section 36b-4 claims); *Miller v. Inverness Corp.*, CV980071530S, 2000 WL 1687345, at *9 (Conn. Super. Ct. Oct. 9, 2000) (entering judgment against defendants whose conduct was found to be "deceitful, dishonest and unethical" under 36b-4).

Even if the Court is not inclined to follow the more recent Connecticut authority and allow the section 36b-4 claim to proceed, "section 36b-29 provides a private right of action that appears to be coextensive with the provisions of section 36b-4."  *JHW Greentree Capital, L.P. v. Whittier Trust Co.,* No. 05 Civ. 2985(HB), 2006 WL 1080395, at *6 n.6 (S.D.N.Y. Apr. 24, 2006).

**B.      Plaintiff Murray Alleges Actionable Violations of the Florida Securities Law**

Defendants assert that justifiable reliance is an element of plaintiff Murray's Florida state securities law claim, but ignore the split on the issue and the line of authority that "holds that reliance is not an element of a cause of action under section 517.301…."  *Waters v. Int'l Precious Metals Corp.,* 172 F.R.D. 479, 496 (S.D. Fla. 1996).   One line of cases has viewed section 517.301 as the Florida version of Rule 10b-5 and, since reliance is an element of a Rule 10b-5 claim, deemed reliance an element under the Florida statute.  *See, e.g., Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046-47 (11th Cir. 1987).   But in 1989, the Florida Supreme Court concluded that section 517.301 is "vastly different" from Rule 10b-5 and is

instead more analogous to section 12(a)(2).  *E.F. Hutton & Co., Inc. v. Rousseff*, 537 So. 2d 978,

981 (Fla. 1989); *see also Rousseff v. E.F. Hutton Co., Inc.*, 867 F.2d 1281 1282 (11th Cir. 1989)

(adopting the Florida Supreme Court's conclusion).  The *Waters* court was "cognizant of the

conflicting positions this Circuit has taken on the issue" when it concluded that a claimant under

section 517.301 need not prove reliance.  172 F.R.D. at 495.[14]

Plaintiff Murray has in any event adequately alleged reliance, which only requires the

court to assess whether the plaintiff "intentionally disregarded the facts known to him or

recklessly failed, in light of information available to him, to make a reasonable investigation, to

inquire about or to discover the true facts regarding such alleged misrepresentations or

omissions."  *Jones v. Childers,* No. 88-85-CIV-T-22C, 1992 WL 300845, at *16 (M.D. Fla. June

26, 1992) (finding reliance when the plaintiffs had no securities expertise and hired an

investment advisor), *aff'd in part, rev'd in part on other grounds*, 18 F.3d 899 (11th Cir. 1994).

Plaintiff Murray alleges that he and other Florida subclass members justifiably relied on

defendants' misstatements and omissions of material fact.  ¶¶ 278-79.  DLA's marketing

practices emphasized that investors could trust DLA and encouraged plaintiff Murray and other

investors to rely on their misstatements.  ¶¶ 13-14.  And because the Apple REITs were a "blind

pool" offering, plaintiffs necessarily depended on the accuracy of defendants' disclosures about

their investment objectives and policies to assess the risks associated with investment, as well as

the value of the REIT shares.  ¶¶ 3, 6.   These misstatements induced plaintiff Murray to invest in

---

[14] While some post-*E.F. Hutton* decisions—including defendants' cases—do hold that justifiable
reliance is an element of a section 517.301 claim, these decisions do not distinguish, analyze or
even mention *E.F. Hutton*.  *See First Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d
835, 844-846 (11th Cir. 1993); *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578
(S.D.N.Y. 2011).  The one case defendants cite that references *E.F. Hutton* does so without
analysis.  *Kashner Davidson Securities Corp., v. Desrosiers,* 689 So. 2d 1106, 1107 (Fla. Ct.
App 1997).

the Apple REITs.  ¶¶ 6-8.  Plaintiff Murray did not have knowledge of the misstatements and

omissions until May 27, 2011 when FINRA filed its original complaint against DLA, nor could

he have reasonably discovered these highly technical facts on his own.   ¶¶ 8, 9, 170, 171, 195-

97, 205, 215.

      These allegations show that plaintiff Murray justifiably relied on defendants'

misstatements and omissions, because no reasonable amount of investigation would have

uncovered the defendants' misstatements, and he did not intentionally ignore any facts.

*Childers,* 1992 WL 300845, at *16 (holding that a plaintiff only has to undertake a "reasonable

investigation").   Regardless, whether his reliance is "justifable" is a fact intensive inquiry and

should not be resolved on the pleadings.  *Carran v. Morgan,* 510 F. Supp. 2d 1053, 1059 (S.D.

Fla. 2007).

      The cases DLA cites are distinguishable because each of them involved proof (after

discovery) that the plaintiffs were either sophisticated investors who did not use their readily

available investment advisors, or would have invested in the securities even if they had known

about the defendants' misstatements.  *See Gochnauer*, 810 F.2d at 1047 (upholding bench verdict

finding lack of justifiable reliance upon seller's qualifications because the plaintiff testified at

trial that he still would have purchased the securities even if he knew seller was unlicensed);

*Camden Asset. Mgmt. v. Sunbeam Corp.,* No. 99–CV–8275, 2001 WL 34556527, at *13-15, 17

(S.D. Fla. July 3, 2001) (declining to find or presume reliance of "sophisticated plaintiffs (the

savviest of the savvy)" where some plaintiffs testified that they  bought securities without relying

on the misstated financials); *Morton v. Young,* 311 So. 2d 755, 755-57 (Fla. Ct. App. 1975)

(stating that a sophisticated business man did not justifiably rely upon a broker's statement

concerning whether securities would be registered, because he had ready access to investment advisors that he failed to use).

The individual and affiliate Apple REIT defendants contend that plaintiffs do not allege their active participation in or aid of the sale of Apple REIT securities to Florida residents. Apple REIT D, O & A Mem. at 6.  To clarify, Count 13 does not allege claims against the Apple REIT affiliates.  And although plaintiffs inadvertently omitted the individual Apple REIT defendants' names from Count 13's heading, the Count itself includes the individual defendants. ¶¶ 278- 80; Apple REIT D, O & A Mem. at 25 n.12.

Section 517.211(2) of the Florida securities law imposes liability on "every director, officer, partner or agent of or for the … seller, if the director, officer, partner or agent has personally participated or aided in making the sale or purchase."  FLA. STAT. § 517.211(2). Individual defendants are liable when they "made the statements" that constitute material misstatements, for example.  *Mesher v. Combs*, 685 So. 2d 1391, 1392 (Fla. App. 1997).

Plaintiff Murray specifically alleges the each of the individual Apple REIT defendants participated and aided in the offer and sale of the Apple REIT investments.  *See, e.g.*, ¶¶ 51, 54, 222, 226, 280.  Each individual Apple REIT defendant is an officer or director of Apple REITs Nine or Ten, and each one signed or consented to be named in actionable offering documents for their respective Apple REITs.  33, 39-50.   These allegations are sufficient to uphold plaintiff Murray's claims against the individual Apple REIT defendants.

## IV.    Plaintiffs Have Stated Claims for Violations of State Common Laws

### A.    A Choice-of-Law Analysis Is Premature

A choice-of-law analysis is premature at this stage because the analysis requires a fact-specific determination and the necessary facts are unavailable prior to discovery.  *See, e.g.*,

*Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011) ("[A] choice-of-law

determination is premature on this motion to dismiss, since the record lacks facts necessary to

conduct the context-specific … analysis required by New York's choice-of-law principles.")

(citation omitted); *Arcand v. Brothers Int'l Corp.*, 673 F. Supp. 2d 282, 295-96 (D.N.J. 2009)

("This Court need not, and will not, resolve this choice of law issue at this early stage of the

litigation.  The second prong of New Jersey's most significant relationship test requires the Court

to engage in a fact sensitive analysis, which simply may not be undertaken on the record

presently before the Court.").  The Court may, upon an appropriate factual record after

discovery, decide to apply the law of each plaintiff's home state to his or her claims, or the Court

may determine that it is appropriate to apply the law of one state to all plaintiffs' claims.  *See,*

*e.g.*, *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) (applying

New Jersey law to plaintiffs' unjust enrichment claims because there are no material differences

in the laws of the fifty states and because, even if there were conflicts, the "most significant

relationship" test supports applying New Jersey law to the claim).

        For purposes of this motion, plaintiffs will address the state common law claims under

the laws of each plaintiff's home state:  New York, New Jersey, Connecticut and Florida.  This

approach will address all of defendants' arguments, since the Apple REITs and the Apple REIT

directors, officers and affiliates cited cases from all four states, while DLA focused primarily on

New York law.  As discussed below, defendants' motions to dismiss the common law claims

should be denied.

### B.    Defendants' Motions to Dismiss Plaintiffs' Breach of Fiduciary Duty Claim Should Be Denied

        To plead a breach of fiduciary duty claim, plaintiffs must allege that the defendants had a

fiduciary duty to the plaintiffs, the defendants breached their duty, and the breach injured

plaintiffs.  *See Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC,* 446 F. Supp. 2d 163, 195-96 (S.D.N.Y. 2006); *St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. Civ. A. 04-4540 (FLW), 2005 WL 1199045, at *9 (D.N.J. May 18, 2005); *Banning v. Right Choice Real Estate, LLC*, No. CV106003818S, 2011 WL 1033223, at *4 (Conn. Super. Ct. Feb. 22, 2011)); *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). Plaintiffs have alleged each of these elements in compliance with Rule 8.  *See* ¶¶ 13-14, 183-94, 217, 232-44.

DLA argues that it owed no fiduciary duty to plaintiffs.  DLA Mem. at 32-33.  Whether or not defendants owed fiduciary duties is "necessarily a factual inquiry" that should not be resolved on a motion to dismiss.  *Friedman v. Wahrsager*, No. 11 CV 815 (DRH) (ARL),, 2012 WL 273069, at *5 (E.D.N.Y. Jan. 30, 2012); *see also Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010) (finding that plaintiffs sufficiently pled a claim for breach of fiduciary duty and observing that the claim requires "fact-intensive inquiries that are inappropriate" at the motion to dismiss stage); *Sunset Fin. Res., Inc. v. Redevelopment Group V, LLC*, Nos.  05-2914 & 05-2915, 2006 WL 3675384, at *7 (D.N.J. Dec. 12, 2006) ("New Jersey law makes clear … that determining whether a fiduciary relationship exists between two parties is a fact sensitive inquiry.") (citation omitted); *Gough v. St. Peters Episcopal*, No. CV106012967S, 2011 WL 2611747, at *4 (Conn. Super. Ct. June 2, 2011) ("existence of a fiduciary duty is largely a factual determination and the extent of the duty and the resulting obligations may vary according to the nature of the relationship") (citation omitted).

DLA acknowledges that it has, at the very least, a duty to "provid[e] honest and complete information when recommending a security."  DLA Mem. at 30-31; *see also de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("[A] broker … is obliged to give

honest and complete information when recommending a purchase or sale.").  In Florida, "[i]t is

well-established that a securities broker owes a fiduciary duty to their investors," including

investors with non-discretionary accounts.  *First Union Discount Brokerage Services, Inc. v.*

*Milos*, 744 F. Supp. 1145, 1156 (S.D. Fla. 1990) (citations omitted); *see also Gochnauer*, 810

F.2d at1049  ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a

securities investor.") (citations omitted).  In New York, "[a] fiduciary relation exists between two

persons when one of them is under a duty to act for or give advice for the benefit of another upon

matters within the scope of the relation."  *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*,

767 F. Supp. 1220, 1231 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992)

(citation omitted).  And DLA owed fiduciary duties to plaintiffs because of its "superior

knowledge" and the "trust and confidence" plaintiffs necessarily had to place in it.  *See, e.g.*,

*Thomas v. Biller Associates Tri State*, No. CV054010695, 2006 WL 2000138, at *2-3 (Conn.

Super. Ct. June 28, 2006) (upholding the plaintiff's fiduciary duty claim where the defendant

"occupied a position of trust and confidence"); *Wiatt v. Winston & Strawn, LLP*, No. Civ. A. 10-

6608 JLL, 2011 WL 2559567, at *9 (D.N.J. June 27, 2011) (denying the defendant's motion to

dismiss where the plaintiffs alleged that they had placed their trust and confidence in the

defendant).

     To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege

the primary violation, and that the aider and abettor knew about the breach and assisted in or

encouraged the wrongdoing.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d. Cir. 2006)

(under New York law, "[s]ubstantial assistance occurs when a defendant affirmatively assists,

helps conceal or fails to act when required to do so, thereby enabling the breach to occur")

(citation omitted); *Katcher v. 3V Capital Partners LP*, No. X05CV085008383S, 2011 WL

1105724, at *13 (Conn. Super. Ct. Feb 1, 2011) (finding that to be liable for aiding and abetting

a breach of fiduciary duty a "defendant must be generally aware of his role as part of an overall

illegal or tortious activity" and "must knowingly and substantially assist the principal violation");

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir.

2003) (under New Jersey law, the "elements of aiding and abetting are: (1) the commission of a

wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor

knowingly and substantially participated in the wrongdoing.") (citations omitted); *Court

Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, No. 05-60080-CIV, 2011 WL

1233106, at *9 (S.D. Fla. Mar. 30, 2011) (aider and abettor liability requires "knowledge of the

breach by the alleged aider and abettor; and … the aider and abettor's substantial assistance or

encouragement of the wrongdoing").

The Apple REITs and their directors, officers and affiliates argue that the complaint does

not allege that they had actual knowledge of and participated in DLA's breach of fiduciary duty.

Apple REITS Mem. at 20; Apple REIT D, O & A Mem. at 19-20.[15]  But plaintiffs allege that the

Apple REITs knew about the statements DLA made that plaintiffs allege were false and

misleading, yet took no action to correct them.  ¶ 190.  Knight and Lerner first teamed up to sell

REITs to the public in 1993, and they have partnered ever since to maintain the continuous sale

of Apple REIT shares.  ¶¶ 5, 21, 72, 184, 187, 189.  Knight owns or controls all of the Apple

REIT affiliates, and is chairman of all of the Apple REITs' boards.  ¶¶ 33-38.  It is therefore

reasonable to infer that Knight, his fellow directors and officers, the affiliates he owns, and the

Apple REITs he runs knew about DLA's misrepresentations.  Their "mere inaction" is a

---

[15] Plaintiffs do not intend to assert claims against the Apple REITs or their directors, officers and
affiliates for breach of fiduciary duty, but do allege that they aided and abetted DLA's breaches
of fiduciary duty.

sufficient form of "assistance" to support a claim for aiding and abetting breach of fiduciary duty. *Lerner*, 459 F.3d at 294-95.

DLA and the Apple REITs also coordinated their presentation to the public by integrating their websites. The Apple REITs' websites direct potential investors to DLA's website, and DLA's website links to the Apple REITs' sites. ¶¶ 88-89, 191-93. The REITs—and their management, which includes the directors and officers—therefore must have known about the allegedly false and misleading statements on DLA's website, but took no action to correct them. ¶¶ 89-91 (identifying allegedly false and misleading statements that are or were on DLA's website).

### C.   Defendants' Motions to Dismiss Plaintiffs' Unjust Enrichment Claim Should Be Denied

To state a claim for unjust enrichment, plaintiffs must allege that plaintiffs conferred a benefit on defendants and that defendants' retention of the benefit was unjust. *See Mercedes-Benz*, 257 F.R.D. at 72; *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010); *Commerce Partnership 8098 Ltd. v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997) (en banc); *Gagne v. Vaccaro*, 766 A.2d 416, 427-28 (Conn. 2001) ("Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff."). Plaintiffs allege that defendants unjustly retained benefits, in the form of fees, commissions and salaries, at plaintiffs' expense. *See* ¶¶ 245-50.

Defendants argue that there is a contract between the parties and therefore plaintiffs cannot assert a claim for unjust enrichment. Apple REITs Mem. at 21-22; DLA Mem. at 33; Apple REIT D, O & A at 20-21. Plaintiffs have not asserted a breach of contract claim,

however, and have not alleged that there is a valid contract that governs their relationship with any of the defendants.  The Apple REITs have submitted a subscription agreement that they contend governs their relationship with plaintiffs, and DLA has submitted a customer agreement that it contends governs its relationship with plaintiffs.[16]  But there has been no finding that either agreement is valid and enforceable.

Courts routinely allow claims for unjust enrichment to proceed even if there is a contract. *See Anwar*, 728 F. Supp. 2d at 421 (unjust enrichment claim allowed to proceed even if a contract exists because Rule 8(d) allows pleading in the alternative); *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009) ("it would be premature to dismiss the unjust enrichment count simply because an express contract exists"); *Myers v. MedQuist, Inc.*, No. 05-4608 (JBS), 2006 WL 3751210, at *8 (D.N.J. 2006) ("a breach of contract and unjust enrichment claim may be alleged simultaneously") (citations omitted); *Rent-A-PC, Inc. v. Rental Management, Inc.*, 96 Conn. App. 600, 605-06 (Conn. Ct. App. 2006) ("Although the lack of remedy under the contract is a precondition for recovery based on unjust enrichment, the existence of a contract, in itself, does not preclude equitable relief which is not inconsistent with the contract.") (internal quotations and citations omitted).

At the motion to dismiss stage, the Court should not dismiss an unjust enrichment claim merely because a defendant contends that there is a contract that governs, particularly when the contract does not govern the conduct that is the basis for the claim.  *See, e.g., Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009)

---

[16] Because plaintiffs did not rely on the customer agreement in their complaint, the Court should disregard it.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[W]e reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.") (emphasis in original).

("Until an express contract is proven, a motion to dismiss a claim for … unjust enrichment on these grounds is premature.") (citation omitted); *Al-Babtain v. Banoub*, No. 806-CV-1973-T-30TGW, 2008 WL 4938348, at \*3-4 (M.D. Fla. Nov. 18, 2008) (upholding the plaintiff's unjust enrichment claim as to consulting and development services not covered by contract);*Atlantis Information Technology, GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 234-35 (E.D.N.Y. 2007) (a contract must be "valid and enforceable" to preclude a claim for unjust enrichment); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 621-22 (D.N.J. 1996) ("the mere existence of a written contract between the parties does not bar an unjust enrichment claim"); *Town of New Hartford v. Conn. Res. Recovery Auth.*, 970 A.2d 592, 612 (Conn. 2009) ("[W]hen an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice.") (citation omitted); *Sergeants Benevolent Association Annuity Fund v. Renck*, 796 N.Y.S. 2d 77, 81 (N.Y. App. Div. 2005) (reversing the dismissal of an unjust enrichment claim that was "predicated on conduct not covered by the contract").

The subscription agreement contains representations about the investor's net worth, taxpayer information, receipt of the prospectus, and an arbitration provision. *See* Edwards Decl., Ex. A at Appendix A. The customer agreement addresses the mechanics of purchasing shares, the buyer's capacity to enter into a contract, survivorship, and security interests. *See* Blanchard Decl., Ex. J. These agreements do not address the conduct that plaintiffs allege in their complaint.

Defendants also argue that plaintiffs have not pleaded that the defendants received a benefit. Apple REITs Mem. at 21; DLA Mem. at 33; Apple REIT D, O & A Mem. at 21. Plaintiffs allege that defendants received benefits in the form of fees, commissions and salary. ¶ 246. Courts have found this kind of benefit to be a sufficient basis for an unjust enrichment

claim.  *See, e.g.*, *Anwar*, 728 F. Supp. 2d at 421 (finding that fees collected for managing

investments may constitute benefits for unjust enrichment purposes); *Armentano v. Paraco Gas

Corp.,* 90 A.D. 3d 683, 685-86 (N.Y. App. Div. 2011) (denying motion to dismiss unjust

enrichment claim on the grounds that plaintiffs alleged that the defendants were "unjustly

enriched by receipt of the treasury shares, at the expense of the corporation and its

shareholders"); *Parsons & Whittemore Enterprises Corp. v. Schwartz*, 387 F. Supp. 2d 368, 377

(S.D.N.Y. 2005) (granting summary judgment for plaintiffs on unjust enrichment claim based on

defendant's receipt of "salary, bonuses and other compensation" while performing duties in a

"disloyal manner"); *Moore and Co. v. T-A-L-L Inc.*, 792 P.2d 794, 800-01 (Colo. 1994) (en banc)

(commission paid to real estate broker sufficient benefit to support unjust enrichment claim).

  The Apple REIT directors, officers and affiliates also argue that they did not deal directly

with or receive a benefit directly from the plaintiffs.  Apple REIT D, O & A Mem. at 21.  But

courts do not require the benefit to come directly from the plaintiffs.  *See T.D. Bank, N.A. v. JP

Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG) (ARL), 2010 WL 4038826, at *5 (E.D.N.Y.

Oct. 14, 2010) ("it does not matter whether the benefit is directly or indirectly conveyed")

(citation omitted); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at

*8-9 (S.D. Fla. Sept. 19, 2011) (plaintiffs "need not have direct dealings or be in contractual

privity with Defendants in order to bestow a direct benefit on them for purposes of an unjust-

enrichment claim").[17]  In the Connecticut case defendants cite, the court concluded that requiring

a "direct relationship" would "engraft a requirement not imposed by higher courts."  *Zeigler v.

Sony Corp.*, 849 A.2d 19, 25 (Conn. Super. Ct. 2004).   In another of defendants' cases, the

plaintiffs had no more than an "expectation interest in the money" and the court was applying

---

[17] New Jersey does require a direct benefit.  *See In re Ford Motor Co. E-350 Van Products Liab.
Litig. (No. II)*, No. Civ. A. 03-4558 GEB, 2011 WL 601279, at *8 (D.N.J. Feb. 16, 2011).

Virginia law.  *Shenandoah Assocs. Ltd. P'ship v. Tirana,* 182 F. Supp. 2d 14, 24 (D.D.C. 2001).

The other decisions defendants cite simply say that the relationship between the parties cannot be

too "attenuated."  *In re Rezulin Products Liab. Litig.*, 392 F. Supp. 2d 597, 620 (S.D.N.Y. 2005);

*Sperry v. Crompton*, 8 N.Y. 3d. 204, 215-16 (N.Y. App. Div. 2006).  As shareholders of the

Apple REITs, plaintiffs' relationship with the REITs' officers, directors and affiliates that serve

the corporations are not too attenuated to support an unjust enrichment claim.

### D.   Defendants' Motions to Dismiss Plaintiffs' Negligence Claim Should Be Denied

To state a claim for negligence a plaintiff must allege that the defendant breached a duty

owed to the plaintiff and that the plaintiff suffered damages as a proximate result of the breach.

*See Anwar*, 728 F. Supp. 2d at 432; *Prudential Ins.*, 975 F. Supp. at 621 ("To state a claim for

negligence, plaintiffs must allege the four well-established elements of duty, breach, causation

and damages."); *Gibbs v. Hernandez*, 810 So. 2d 1034, 1036 (Fla. Ct. App. 2002); *Torres v.

Dep't of Correction*, 912 A.2d 1132, 1143 (Conn. Super. Ct. 2006).  Plaintiffs allege that DLA

owed a duty to plaintiffs to, among other things, perform a reasonable review and due diligence

investigation of the Apple REITs, ensure that the Apple REITs were suitable investments, ensure

that all material facts about and risks of investing in the Apple REITs were disclosed, and

provide full and fair disclosure of the risks associated with investing in the Apple REITs.  ¶¶ 14,

183-86, 252-3.  Plaintiffs also allege that DLA breached their duties and that plaintiffs suffered

damages as a result.  ¶¶ 183-86, 233-38, 254.

Although DLA argues that it owed no duties to investors, brokers do owe a duty of

reasonable care to investors, which includes the duty to perform due diligence on a security

before recommending it and to inform investors of all material information and risks related to

the security.  *See Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578 (S.D.N.Y. 2011)

("broker-dealers have a duty to recommend [investments] only after studying [them] sufficiently to become informed as to [their] nature, price, and financial prognosis"); *de Kwiatkowski*, 306 F.3d at 1302 (collecting cases and stating that there is "[n]o doubt" that "a duty of reasonable care applies to the broker's performance of its obligations to customers," including the duty to give "complete and honest information when recommending a purchase or sale").  These are exactly the types of duties that plaintiffs allege DLA owed them and breached.

Courts may also consider FINRA rules as evidence of the duties a broker owes to investors.  *See Boll v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 04-800c31-CIV, 2004 WL 5589731, at *9 (S.D. Fla. June 28, 2004) (recognizing that courts view FINRA "rule violations a[s] breaches of the standards of care of liability"), *adopted by* 2004 WL 5599306 (S.D. Fla. July 29, 2004); *Scott v. Dime Savings Bank of N.Y., FSB*, 886 F. Supp. 1073, 1080–81 (S.D.N.Y.1995) (recognizing that violation of rules of NASD (the predecessor of FINRA) may be a factor in considering negligence claim); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F. Supp. 1224, 1227 (D.D.C. 1988) (violation of NASD rule would "be a factor for consideration by the jury as to whether he acted as a 'reasonable' person" for purposes of considering a negligence claim).  FINRA Rule 2310 requires that a broker have a reasonable basis for believing that an investment is suitable for investors.  *See* Sharp Decl., Ex. H.  The cases DLA cites for the proposition that FINRA Rules do not create a private right of action are irrelevant, since plaintiffs cite Rule 2310 not as a separate cause of action, but only as further explanation of the duties DLA owed to plaintiffs.

Defendants argue that the economic loss rule bars plaintiffs' negligence claim.  Apple REITs Mem. at 26-27; DLA Mem. at 32; Apple REIT D, O & A Mem. at 24.  The economic loss rule provides that a party who suffers only economic harm may only recover damages based on a

contract theory and not on a tort theory such as negligence. But in New York, the economic loss rule has no application outside product defect claims. *See 532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y. 2d 280, 288 n.1 (N.Y. 2001); *see also Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt. Inc.*, 915 N.Y.S. 2d 7, 17 (N.Y. App. Div. 2010), *aff'd*, 18 N.Y. 3d 341(N.Y. 2011).[18] In Connecticut, plaintiffs are "not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim," *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. Super. Ct. 2008), and the rule is typically applied only when the claim is brought by a sophisticated party. *See Town of New Canaan v. Brooks Laboratories, Inc.*, No. FSTCV054006797S, 2007 WL 4214227, at *4 (Conn. Super. Ct. Nov. 7, 2007). And in Florida and New Jersey, the economic loss rule does not bar a negligence claim if the defendant owed a duty not included in the terms of the contract, which is the case here given the narrow scope of the customer agreement. *See Auto–Owners Ins. Co. v. Ace Elec. Services, Inc.,* 648 F. Supp. 2d 1371, 1380-81 (M.D. Fla. 2009); *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002).

Plaintiffs allege that the Apple REITs are jointly and severally liable for the DLA defendants' negligent acts. ¶ 255. The Apple REITs argue that they cannot be held liable for any statements DLA made that are not in the offering documents because they are outside the scope of the agency agreement. Apple REITs Mem. at 22-24.[19] The Apple REITs concede that a principal is liable for its agent's actions that are within the scope of the agent's actual or apparent authority. *Id.* at 23. Actual authority includes both express and implied powers that are

---

[18] This narrow application of the economic loss rule also defeats David Lerner's argument that he cannot be personally liable for negligence because plaintiffs seek to recover only economic losses and they are not in contractual privity with him. DLA Mem. at 32.

[19] "In general, a third party is not required to inquire into the scope of the agent's authority." *Johnson v. Nationwide Gen. Ins. Co*., 971 F. Supp. 725, 734 (N.D.N.Y. 1997).

necessary or incidental to achieving the principal's objectives. Restatement (Third) of Agency § 2.02 (2006); *Maharishi School Vedic Sciences, Inc. v. Connecticut Constitution Associates Ltd. Partnership*, 799 A.2d 1027, 1032 (Conn. 2002); *Jennings v. Reed*, 885 A.2d 482, 490 (N.J. Sup. Ct. App. Div. 2005); *Motor Credit Corp. v. Woolverton*, 99 So. 2d 286, 291 (Fla. 1957) (recognizing implied actual authority); *Minskoff v. American Express Travel Related Services Co., Inc.*, 98 F.3d 703, 708 (S.D.N.Y. 1996). The Apple REITs' objectives were the sale of billions of dollars of shares and, as the sole seller of the shares, DLA had the implied authority to make representations to potential investors about the risks and benefits of the REITs.

The Apple REIT defendants are also vicariously liable because they ratified the DLA defendants' acts. Ratification occurs when the principal manifests asset to the actions of the agent. Restatement (Third) of Agency § 4.01 (2006); *see also Business Integration Services, Inc. v. AT&T Corp.*, 251 F.R.D. 121, 125 (S.D.N.Y. 2008) (citing Restatement (Third) of Agency § 4.01), *adopted by* 2008 WL 5159781 (S.D.N.Y. Dec. 9, 2008); *Deutsche Credit Corp. v. Peninger*, 603 So. 2d 57, 58 (Fla. Dist. Ct. App. 1992) ("Ratification … occurs where a person expressly or impliedly adopts an act..."); *Thermo Contracting Corp. v. Bank of New Jersey*, 354 A.2d 291, 296 (N.J. 1976) (citing Restatement (Second) of Agency § 82 (1957), the predecessor to § 4.01); *Russell v. Dean Witter Reynolds, Inc.*, 510 A.2d 972, 979 (Conn. 1996) (same). "Ratification occurs when one, having full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another." *Business Integration*, 251 F.R.D. at 125 (citation omitted). "Silence may constituted a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence." *Id.* (citation omitted). Ratification is tantamount to actual authority. Restatement § 4.01 cmt.b.

The Apple REITs argue that plaintiffs could not have reasonably relied on statements DLA made that are outside the offering documents because the prospectuses said that, "No dealer, salesman or other person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the offering made by this prospectus, and, if given or made, any other information or representations must not be relied on."  Apple REITs Mem. at 23-24.  But the Second Circuit has found that information outside the prospectuses may be material and justify reliance despite this type of statement.  *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 n.4 (2d Cir. 1993).

"Whether apparent authority exists is usually a question of fact for the jury."  *Johnson v. Nationwide Gen. Ins. Co.*, 971 F. Supp. 725, 730 n.6 (N.D.N.Y. 1997); *see also Roessler v. Novak*, 858 So. 2d 1158, 1162-63 (Fla. Dist. Ct. App. 2003); *King v. Estate of Senn*, No. A-3013-07T3, 2008 WL 5331891, at *6 (N.J. Super. Ct. App. Div. Dec. 23, 2008) ("The reasonableness of [plaintiff's] belief in [defendant's] apparent authority under the circumstances was a fact question for the jury to decide."); *LeBlanc v. New England Raceway, LLC*, 976 A.2d 750, 759-60 (Conn. App. Ct. 2009) ("Whether apparent authority exists is a question of fact, requiring the trier of fact to evaluate the parties' conduct in light of the attenuating circumstances.").

To establish apparent authority, plaintiffs must show they "reasonably believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006).  Plaintiffs have alleged that, among other things, DLA is the exclusive seller of the Apple REITs, DLA and the Apple REITs have integrated their presentation to the public, the Apple REITs' websites link directly to DLA's website as the source for investment information, and DLA and the Apple REITs (and Lerner and Knight) have a long, interdependent history of selling and profiting from the Apple

REITs.  ¶¶ 21, 72, 83, 191-94.  These allegations are sufficient to infer that plaintiffs reasonably believed DLA had authority to act on behalf of the Apple REITs.

### E.   Plaintiffs Have Standing to Pursue the State Common Law and Securities Claims

Defendants argue that certain common law claims and state securities law claims should be dismissed because the named individual lead plaintiffs did not invest in all of the Apple REITs and therefore lack standing with respect to certain REITs.  Apple REITs Mem. at 27-28.  Specifically, defendants contend that because neither plaintiff Berger or Murray acquired Apple REIT Six, Seven or Ten shares, their claims brought on behalf of the Connecticut and Florida subclasses should be dismissed as to those REITs.  *Id*.  Additionally, defendants assert that the common law claims brought by plaintiffs Bendavid and Shefsky on behalf of the New York subclass should be dismissed as to Apple REITs Six and Seven because neither owns any shares in either REIT.  Apple REITs Mem. at 27.

While courts have split on this standing issue, courts have permitted class representatives to bring claims for securities they did not invest in where "plaintiffs have alleged a single course of wrongful conduct with regard to each security."  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98CIV4318(HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security."); *see also In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV. 1897 (HB), 2011 WL 781215, at *3 (S.D.N.Y. Mar. 7, 2011) ("[I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim.") (quoting *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004)).  Such is the case here.  Plaintiffs' complaint has identified a single course of wrongful conduct common to the offer and sale of all the Apple REIT shares.  Plaintiffs have

also identified specific material misrepresentations and omissions common to the offering

materials for Apple REITs Eight, Nine and Ten.  *See* Sharp Decl., Ex. A.

Courts have also permitted plaintiffs to serve as "class representatives for claims based

on securities they did not purchase, [so long as] one of the named plaintiffs … purchased those

securities." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155,

175 (S.D.N.Y. 2009).  Plaintiffs as group own shares in each of the Apple REITs, and the

Kronbergs own shares in all of the REITs.  ¶¶ 15-19.

## V.      Leave to Amend

Should the Court dismiss any of plaintiffs' claims, plaintiffs request leave to amend their

complaint.  The Supreme Court has instructed that "[i]n the absence of any apparent or declared

reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought

should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

None of these factors weigh against granting plaintiffs leave to amend.

Defendants argue that plaintiffs should not be given leave to amend because they

amended once, prior to defendants responding, while the case was pending in New Jersey and

again, still prior to any response by defendants, after the New Jersey case was transferred to this

District and consolidated with the two cases that asserted federal securities claims.  But both

prior amendments were before defendants responded and this is the first motion to dismiss.  As

the Supreme Court noted, "[i]f the underlying facts or circumstances relied upon by a plaintiff

may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the

merits."  *Id.*

## CONCLUSION

Plaintiffs respectfully request that the Court deny defendants' motions to dismiss.


Dated: May 25, 2012                         GIRARD GIBBS LLP

                                            By:     /s/ *Daniel C. Girard*

                                            Daniel C. Girard
                                            Amanda M. Steiner
                                            Dena C. Sharp
                                            Janice S. Yi
                                            601 California Street, 14th Floor
                                            San Francisco, CA 94611
                                            Telephone: (415) 981-4800
                                            Facsimile: (415) 981-4846

                                            ZAMANSKY & ASSOCIATES LLC
                                            Jacob H. Zamansky
                                            Edward H. Glenn, Jr.
                                            Kevin D. Galbraith
                                            50 Broadway, 32nd Floor
                                            New York, NY 10004
                                            Telephone: (212) 742-1414
                                            Facsimile: (212) 742-1177

                                            *Lead Plaintiffs' Counsel*


                                            MEYER WILSON CO., LPA
                                            David P. Meyer
                                            Matthew R. Wilson
                                            1320 Dublin Road, Suite 100
                                            Columbus, Ohio 43215
                                            Telephone: (614) 224-6000
                                            Facsimile: (614) 224-6066

                                            *Additional Counsel for Plaintiffs*