# BINGHAM

Kenneth I. Schacter
Direct Phone:  212.705.7487
Direct Fax:      212.702.3622
kenneth.schacter@bingham.com

August 27, 2012

**VIA ECF**

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East - Room N406
Brooklyn, New York 11201

Re:  *In re Apple REITs Litigation*,
     **Civil Action No. 1:11-cv-02919 (KAM)(JO)**

Dear Judge Matsumoto:

We are counsel for defendants David Lerner Associates, Inc. and David Lerner (the "DLA Defendants").  We write on behalf of all Defendants to advise the Court of a recent decision by the Second Circuit, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, --- F.3d ----, 11-cv-1305, 2012 WL 3518537 (2d Cir. Aug. 14, 2012) (copy attached), which further compels the conclusion that, as Defendants demonstrated in their pending motions to dismiss Plaintiffs' Consolidated Class Action Complaint in this action, Plaintiffs have failed to allege any actionable misstatement or omission by Defendants.

In *Anschutz*, the Second Circuit reaffirmed its holding in *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011), a case that was discussed at length in the briefing on the motion to dismiss.[1]  Both *Wilson* and *Anschutz* involved alleged securities laws violations relating to, *inter alia*, Merrill Lynch's disclosures that it "*may routinely*" place support bids for auction rate securities when, according to the plaintiffs in those actions, Merrill Lynch *invariably* placed such bids.  *See Wilson*, 671 F.3d at 124, 126; *Anschutz*, 2012 WL 3518537 at *6.

The Second Circuit in *Wilson* affirmed the district court's holding that the subject

---

[1] *See* Memorandum of Law in Support of the DLA Defendants' Motion to Dismiss, dated April 18, 2012 (Dkt. 115-1), at 15-16; Plaintiffs' Memorandum of Law In Opposition To Defendants' Motions to Dismiss the Consolidated Class Action Complaint, dated May 25, 2012 (Dkt. 116) ("Opp. Mem."), at 32; Reply in Support of the DLA Defendants' Motion to Dismiss, dated July 13, 2012 (Dkt. 118) ("DLA Reply Mem."), at 6-7.

Boston
Frankfurt
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

T +1.212.705.7000
F +1.212.752.5378
bingham.com

A/75025461.1

Honorable Kiyo A. Matsumoto
August 27, 2012
Page 2

disclosures precluded any finding of securities laws violations.  In so holding, the court rejected the plaintiff's argument that the disclosure that Merrill Lynch *may* place support bids was incomplete and misleading because it understated the likelihood that Merrill Lynch *would* place such bids:

> Merrill's statement that it "may routinely" place support bids is not inconsistent with the possibility that it would place such bids in every Merrill ARS auction that took place over a particular period. While Wilson reads the word "may" as speaking to the likelihood that Merrill would place support bids, an investor could more easily understand the word as disclosing merely that Merrill was permitted, but not required, to place bids for its own account to prevent an auction from failing.

*Wilson*, 671 F.3d at 132-33.

Faced with substantively identical facts and allegations in *Anschutz*, the Second Circuit held that *Wilson* was controlling and compelled dismissal of plaintiff's securities claims.  Notably, the *Anschutz* court rejected the plaintiff's attempt to distinguish *Wilson* on the grounds that, unlike the plaintiff in *Wilson*, it had alleged that Merrill Lynch was aware at the time it made the relevant disclosures that it "would participate … in 100 percent of the auctions."  *Anschutz*, 2012 WL 3518537 at *6.  This allegation, the court held, did not make Merrill Lynch's "may" disclosure misleading any more than did the plaintiff's similar allegation in *Wilson*:

> Anschutz argues that its allegations are different from the insufficient allegations in *Wilson* because the [complaint] here explicitly alleges that, "[b]y the time the offering statements were issued, Merrill Lynch knew that it would participate (and had participated) in 100 percent of the auctions."  But the *Wilson* complaint likewise alleged that Merrill Lynch "invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period to prevent auction failures."

*Id.* (citations omitted).  Accordingly, the court affirmed dismissal of the securities claims to the extent based on such allegations.  *Id.* at *7.

Plaintiffs here advance the very same theory that the Second Circuit rejected in *Wilson* and *Anschutz*: that the Apple REITs' repeated disclosures that they "may" or "might" pay distributions from sources other than operating income were materially misleading because, according to Plaintiffs, it was a "certainty" that distributions would be paid from such sources.  *See* Consolidated Class Action

Honorable Kiyo A. Matsumoto
August 27, 2012
Page 3

Complaint (Dkt. 82) at ¶ 106.  Plaintiffs' argument that they were misled by the
"may" or "might" disclosures because, Plaintiffs say, it was "highly likely or even
certain" that distributions for the Apple REITs would be paid from sources other
than operating income (Opp. Mem. (Dkt. 116) at 31)) cannot survive in light of
the Second Circuit's explicit rejection of the very same theories in *Wilson* and
*Anschutz*.  The Second Circuit could hardly have been clearer on this point.  *See
Anschutz*, 2012 WL 3518537 at *6-7 ("*Wilson* explicitly rejected the argument –
repeated by Anschutz here – that it was insufficient to disclose that Merrill Lynch
'may routinely place one or more bids in an auction'" when it was a certainty it
would do so).

Thus, under both *Wilson* and *Anschutz*, the disclosures that the Apple REITs
"may" or "might" pay distributions from sources other than operating income
defeat Plaintiffs' argument that the statements about distributions in the offering
materials were false or misleading.

Respectfully,

Kenneth I. Schacter

cc:  Counsel of Record (via ECF)

encl.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

**H**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
The ANSCHUTZ CORPORATION,
Plaintiff–Appellant,
v.
MERRILL LYNCH & CO., INC., Merrill Lynch,
Pierce, Fenner & Smith Incorporated, Moody's In-
vestors Service, Inc., and The McGraw–Hill Com-
panies, Inc., Defendants–Appellees.

Docket No. 11–1305–cv.
Argued: April 26, 2012.
Decided: Aug. 14, 2012.
Amended: Aug. 16, 2012.

**Background:** Shareholder brought action against
broker-dealer for offerings of auction rate securities
(ARS), and against agencies that assigned credit
ratings to the ARS, asserting claims under federal
and state law for market manipulation, control per-
son liability, fraud, and negligent misrepresenta-
tion. After action was transferred from California to
New York by Judicial Panel on Multidistrict Litiga-
tion, defendants moved to dismiss. The United
States District Court for the Southern District of
New York, Loretta A. Preska, J., 2011 WL 536437,
granted motions. Shareholder appealed.

**Holdings:** The Court of Appeals, JosÉ A. Cabranes
, Circuit Judge, held that:
(1) disclosures regarding broker-dealer's support
bidding practices were sufficient to preclude share-
holder's market-manipulation securities fraud claim
alleging that support bidding caused shareholder to
earn less interest and created false appearance of
ARS liquidity;
(2) shareholder failed to allege any wrongdoing by
broker-dealer in California, as required to state
claim against broker-dealer for manipulation of
ARS market in violation of California Corporations
Code;

(3) New York law applied to shareholder's claims
alleging negligent misrepresentation by agencies;
and
(4) shareholder failed to allege privity with agen-
cies as required to state negligent misrepresentation
claim.

Affirmed.

West Headnotes

**[1] Securities Regulation 349B ⬦278**

349B Securities Regulation
  349BII State Regulation
    349BII(A) In General
      349Bk278 k. Fraudulent or Other Prohib-
ited Practices. Most Cited Cases
  California Corporations Code prohibits securit-
ies market manipulation and creates a civil remedy
for buyers or sellers of stock the price of which has
been affected by prohibited market manipulation.
West's Ann.Cal.Corp.Code §§ 25400, 25500.

**[2] Federal Civil Procedure 170A ⬦636**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and
Particularity
      170Ak636 k. Fraud, Mistake and Con-
dition of Mind. Most Cited Cases
  To satisfy the particularity requirement for
pleading fraud, the plaintiff must: (1) specify the
statements that the plaintiff contends were fraudu-
lent; (2) identify the speaker; (3) state where and
when the statements were made; and (4) explain
why the statements were fraudulent. Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Securities Regulation 349B ⬦60.51(2)**

349B Securities Regulation
  349BI Federal Regulation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most
Cited Cases

**Securities Regulation 349B ⚖➔60.53**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.53 k. Misrepresentation.
Most Cited Cases

Securities fraud complaints must: (1) specify each misleading statement; (2) set forth the facts on which a belief that a statement is misleading was formed; and (3) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. Private Securities Litigation Reform Act of 1995, § 101(b)(1), (2), 15 U.S.C.A. § 78u–4(b)(1), (2).

**[4] Securities Regulation 349B ⚖➔60.25**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
349Bk60.25 k. Fraud on the Market; Price Manipulation. Most Cited Cases

Website disclosure by broker-dealer for auction rate securities (ARS) offering contained sufficient information on broker-dealer's support bidding practices to preclude shareholder's market-manipulation securities fraud claim alleging that support bidding caused shareholder to earn less interest and created false appearance of ARS liquidity; website disclosed broker-dealer "may routinely place one or more bids...to prevent an auction failure," and although broker-dealer allegedly knew all auctions would fail absent support bids, some auc-

tions allegedly succeeded without support bids. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**[5] Securities Regulation 349B ⚖➔60.25**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
349Bk60.25 k. Fraud on the Market; Price Manipulation. Most Cited Cases

Securities and Exchange Commission (SEC) order that preceded shareholder's purchase of auction rate securities (ARS) gave sufficient notice to shareholder that its purchase might be affected by broker-dealer's intervention in ARS market to prevent auction failure or to affect interest rates, so that shareholder was not misled by broker-dealer's support bidding, thus precluding shareholder's market-manipulation securities fraud claim alleging broker-dealer's support bidding caused shareholder to earn less interest and created false appearance of ARS liquidity. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5 .

**[6] Securities Regulation 349B ⚖➔306**

349B Securities Regulation
349BII State Regulation
349BII(B) Civil Effects of Violations
349Bk303 Actions
349Bk306 k. Pleading. Most Cited Cases

Shareholder that purchased auction rate securities (ARS) failed to allege any wrongdoing by broker-dealer in California, as required to state claim against broker-dealer for manipulation of ARS market in violation of California Corporations Code. West's Ann.Cal.Corp.Code §§ 25400, 25500.

**[7] Courts 106 ⚖➔8**

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106I(A) In General
            106k3 Jurisdiction of Cause of Action
                106k8 k. Actions Under Laws of Other State. Most Cited Cases

Under California law, state statute is not operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably to be inferred from the language of the statute or from its purpose, subject matter, or history.

**[8] Securities Regulation 349B ☞291.1**

349B Securities Regulation
    349BII State Regulation
        349BII(B) Civil Effects of Violations
            349Bk291 Rights, Liabilities, and Remedies
                349Bk291.1 k. In General. Most Cited Cases

California Corporations Code provides a civil remedy for parties whose sale or purchase of stock is affected by unlawful conduct in California. West's Ann.Cal.Corp.Code §§ 25400, 25500.

**[9] Federal Courts 170B ☞622**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)2 Objections and Exceptions
                170Bk622 k. Organization and Jurisdiction of Lower Court; Venue. Most Cited Cases

Court of Appeals would not consider shareholder's allegations regarding broker-dealer's contacts with California, on appeal of dismissal of claims against broker-dealer alleging manipulation of market for auction rate securities (ARS) in violation of California Corporations Code, where shareholder's allegations were not raised in its complaint. West's Ann.Cal.Corp.Code §§ 25400, 25500.

**[10] Securities Regulation 349B ☞306**

349B Securities Regulation
    349BII State Regulation
        349BII(B) Civil Effects of Violations
            349Bk303 Actions
                349Bk306 k. Pleading. Most Cited Cases

Shareholder that purchased auction rate securities (ARS) failed to allege any material misrepresentation by broker-dealer, as required to state securities fraud claim against broker-dealer under California Corporations Code. West's Ann.Cal.Corp.Code §§ 25401, 25501.

**[11] Federal Courts 170B ☞157**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)5 Multi–District Litigation; Transfer for Pre–Trial Proceedings
                170Bk157 k. Effect of Transfer and Subsequent Proceedings. Most Cited Cases

California, as law of transferor forum in multidistrict litigation, supplied choice-of-law rules for shareholder's claims in transferee district court in New York alleging negligent misrepresentation by agencies that assigned credit ratings to the auction rate securities (ARS) purchased by shareholder.

**[12] Action 13 ☞17**

13 Action
    13II Nature and Form
        13k17 k. What Law Governs. Most Cited Cases

Under California law, court applies three-step "governmental interest analysis" to resolve choice-of-law questions: (1) court determines whether substantive laws of the competing jurisdictions are different; (2) if there is a difference, court examines each jurisdiction's interest in application of its own law under the circumstances of the particular case to determine whether true conflict exists; and (3) if true conflict exists, court evaluates and compares the nature and strength of the interest of each jurisdiction in application of its own law to determine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

which state's interest would be more impaired if its policy were subordinated to policy of other state.

**[13] Fraud 184** ⟜**1.5**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k1.5 k. What Law Governs. Most Cited Cases

New York and California law clearly diverged with respect to elements of negligent misrepresentation claim, and thus, under California choice-of-law rules, court was required to analyze interest of each state in application of its own law to shareholder's claims alleging negligent misrepresentation by agencies that assigned credit ratings to the auction rate securities (ARS) purchased by shareholder, in action transferred from California to New York federal district court by Judicial Panel on Multidistrict Litigation; New York negligent misrepresentation law required existence of special or privity-like relationship between defendant and plaintiff, but California permitted negligent misrepresentation claims to be brought against any person who negligently supplied false information for guidance of others in their business transactions and intended to supply the information for the benefit of one or more third parties.

**[14] Fraud 184** ⟜**1.5**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k1.5 k. What Law Governs. Most Cited Cases

Under California choice-of-law rules, even if true conflict existed between interests of California and New York, New York law applied to shareholder's claims alleging negligent misrepresentation by agencies that assigned credit ratings to the auction rate securities (ARS) purchased by shareholder, in action transferred from California to New York federal district court by Judicial Panel on Multidistrict Litigation; if New York's policy of

strictly limiting negligent misrepresentation claims to privity-like relationships was subordinated to California law based only on shareholder's purchase of ARS through broker's California office, result would clearly impair New York's interest in defining scope of negligence liability for professional conduct by agencies that were New York and Delaware corporations with their principal places of business in New York.

**[15] Fraud 184** ⟜**13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

**[16] Fraud 184** ⟜**13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

**Fraud 184** ⟜**29**

184 Fraud

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

184I Deception Constituting Fraud, and Liability Therefor
    184k29 k. Persons Entitled to Sue. Most Cited Cases

New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.

**[17] Fraud 184 &#x21D0;13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

**Fraud 184 &#x21D0;29**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k29 k. Persons Entitled to Sue. Most Cited Cases

Under New York law, shareholder that purchased auction rate securities (ARS) failed to allege actual privity or other special relationship so close as to approach privity with agencies that assigned credit ratings to ARS, as required to state negligent misrepresentation claim against agencies.

Appeal from a judgment of the United States District Court for the Southern District of New York ( Loretta A. Preska, *Judge* ), dismissing the plaintiff's claims, brought pursuant to federal and state law, for market manipulation, control person liability, fraud, and negligent misrepresentation. We affirm the District Court's decision to dismiss the federal securities law claims against Merrill Lynch & Co., Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Merrill Defendants"), holding that the market manipulation claims in this case fail for

the same reasons we identified in *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120 (2d Cir.2011). We affirm the District Court's decision to dismiss the California Corporations Code claims against the Merrill Defendants, holding that the plaintiff fails to allege any injury or unlawful conduct in California. Finally, we affirm the District Court's decision to dismiss the negligent misrepresentation claims against Moody's Investors Service, Inc., and The McGraw–Hill Companies, Inc., holding that New York law controls, and that the plaintiff fails to allege an actionable misrepresentation under New York law. Affirmed.Kevin J. Miller (Mark C. Hansen, David L. Schwarz, and Andrew C. Shen, on the brief), Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Plaintiff–Appellant The Anschutz Corporation.

Barry J. Mandel (Jonathan H. Friedman, on the brief), Foley & Lardner LLP, New York, NY, for Defendants–Appellees Merrill Lynch & Co., Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

Floyd Abrams (Tammy L. Roy, S. Penny Windle, and Adam Zurofsky, on the brief), Cahill Gordon & Reindel LLP, New York, NY, for Defendant–Appellee The McGraw–Hill Companies, Inc.;[FN1] James J. Coster, Joshua M. Rubins, and James I. Doty, Satterlee Stephens Burke & Burke LLP, New York, NY, for Defendant–Appellee Moody's Investors Service, Inc.

Before WINTER, WALKER, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

  **\*1** This appeal raises (1) federal and state claims of market manipulation based upon the practice of placing "support bids" in the Auction Rate Securities ("ARS") market; and (2) claims of negligent misrepresentation based upon the credit ratings assigned to the ARS at issue. We affirm the District Court's decision to dismiss the federal securities

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

law claims against Merrill Lynch & Co ., Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Merrill Defendants"), holding that the market manipulation claims in this case fail for the same reasons we identified in *Wilson v. Merril Lynch & Co.,* 671 F.3d 120 (2d Cir.2011). We affirm the District Court's decision to dismiss the California Corporations Code claims against the Merrill Defendants, holding that the plaintiff fails to allege any injury or unlawful conduct in California. Finally, we affirm the District Court's decision to dismiss the negligent misrepresentation claims against Moody's Investors Service, Inc., and The McGraw-Hill Companies, Inc., holding that New York law controls, and that the plaintiff fails to allege an actionable misrepresentation under New York law.

## BACKGROUND
### A. Factual Background

This is the latest in a series of cases to arise from the collapse of the ARS market. *See, e.g., Wilson,* 671 F.3d at 123; *Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333(2d Cir.2011).

The following facts, which we assume to be true for purposes of this appeal, are drawn from the allegations in the First Amended Complaint ("FAC"), together with those "documents incorporated in it by reference" and "matters of which judicial notice may be taken," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002) (internal quotation marks omitted). Since the facts alleged in the FAC are set forth in detail in the District Court's opinion, *In re Merrill Lynch Auction Rate Secs. Litig.,* No. 09 Civ. 9888(LAP), 2011 WL 536437 (S.D.N.Y. Feb.9, 2011), we summarize them here only to the extent pertinent to the issues on appeal.

### 1. Auction Rate Securities

Auction Rate Securities are variable-rate equity or debt instruments that pay interest or dividends at rates set by periodic "Dutch" auctions, in which potential buyers submit bids at various interest rates. In *Wilson,* we described the ARS market as fol-

lows:

ARS are debt or equity interests issued by various public and private entities and traded through periodic auctions. At [all] times relevant to [the plaintiff's] claim, ARS were used by issuers as an alternative financing vehicle and were promoted to investors as a safe, liquid alternative to money market funds. The ARS market, which began in the 1980s, was initially dominated by institutional investors. Eventually, however, unsophisticated investors entered the market. By February 2008, the ARS market exceeded $330 billion in value.

The periodic auctions held with respect to ARS would determine both the ownership of the securities as well as their "clearing rate," *i.e.,* the rate of interest that was paid on the securities until the next auction. At each auction, participants submitted orders to buy, sell, or hold ARS at particular interest rates or in particular quantities. When the number of shares subject to buy orders at a given rate met or exceeded the number of shares offered for sale at that rate, the auction would succeed, and the clearing rate would be set at the lowest interest rate at which all sell orders could be fulfilled. When the number of shares offered for sale exceeded the number of shares bid for purchase, the auction would fail, and the interest rate on the ARS would reset to a predetermined rate known as the "maximum rate." If the maximum rate were sufficiently high, it would ensure that the ARS remained liquid by attracting new buyers or prompting the issuer to refinance. If, on the other hand, the maximum rate were too low, then new buyers would not be attracted, and the auction failure, absent further intervention, would leave investors with illiquid securities.

**\*2** 671 F.3d at 123–24. The ARS at issue in this case had a "put option" feature that allowed the issuer, Ambac Assurance Corp. ("Ambac"), at its discretion, to convert the ARS into equity securities also issued by Ambac.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

### 2. Merrill's Conduct

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")[FN2] underwrote numerous ARS offerings, including two offerings of ARS issued by Ambac—the "Dutch Harbor" and "Anchorage Finance" offerings. Plaintiff The Anschutz Corporation ("Anschutz") made the following purchases through its broker, Credit Suisse: (1) on July 21, 2006, Anschutz purchased $7.95 million of Dutch Harbor Finance Sub–Trust # II ARS; and (2) on January 25, 2007, Anschutz purchased $5 million of Dutch Harbor Finance Sub–Trust # III ARS and $6 million of Anchorage Finance Sub–Trust # 2 ARS. As the sole broker-dealer for those offerings, Merrill Lynch selected and hired the auction agent; received and transmitted all buy, hold, and sell orders; participated in drafting ARS offering statements; and entered into re-marketing agreements with "downstream" brokers who would buy ARS and then re-sell them to their own customers. Merrill Lynch allegedly earned $90 million in profits from its ARS underwriting and broker-dealer services in the years 2006 and 2007.

Merrill Lynch also participated as a buyer and seller in the ARS auctions for its own account in order to prevent auction failures. By placing so-called "support bids" in 100 percent of the Dutch Harbor and Anchorage Finance auctions, Merrill Lynch ensured that the auction would "clear" without regard to the volume of buy, sell, or hold orders received from others. The extent of this practice was not fully disclosed to investors. Merrill Lynch allegedly knew that, in the absence of its support bids, the demand for ARS was insufficient to feed the auctions.

Merrill Lynch's practice of placing support bids had two primary effects. First, the support bids, which established the clearing rate in "a significant percentage" of the Dutch Harbor and Anchorage Finance auctions, caused the clearing rates to be lower "than they otherwise would have been." As a result, Anschutz earned less interest on its ARS that it otherwise would have earned. Second, the undis-

closed support bids "injected false information into the marketplace" about the liquidity of the ARS. Anschutz alleges that it relied on the appearance of ARS liquidity manufactured by Merrill Lynch, and on its previous success in buying and selling similar ARS, in deciding to make its purchases.

In May 2006, the Securities and Exchange Commission ("SEC") reached a settlement with 15 investment banks, including Merrill Lynch, that had participated in the ARS market. The SEC issued a cease-and-desist order (the "SEC Order" or the "Order") on May 31, 2006, ordering the banks to cease various forms of intervention in the ARS market in the absence of adequate disclosures. The SEC concluded that the banks had violated § 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), which prohibits material misstatements and omissions in any offer or sale of securities, by "interven [ing] in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures."[FN3]

**\*3** Although the SEC Order enumerated several violative practices, including bidding to prevent auction failures or to affect clearing rates, the Order did not specify which banks engaged in which practices. The banks were divided into two tiers for civil penalty purposes. Merrill Lynch, along with each of the other banks in "Tier One," was ordered to pay a penalty of $1.5 million in light of its "relatively large share of the auction rate securities market" and the fact that it "engaged in more types of violative practices than the firms in Tier Two." In addition, the SEC Order required each bank, among other things, to (1) provide, at or before the completion of each transaction, a written description of the bank's ARS practices to all first-time purchasers and broker-dealer purchasers, and (2) post a description of the bank's ARS practices on its website.

In August 2006, Merrill Lynch posted a document disclosing its ARS practices on its website (the "Website Disclosure"). *See Wilson,* 671 F.3d at 125–26 (discussing the same disclosure). The Web-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

site Disclosure, which is quoted in the FAC and incorporated therein by reference, included the following statements:

• "Auction procedures generally permit auction dealers like Merrill Lynch to buy and sell, in their sole discretion, auction rate securities for their own account between auctions at any time."

• "Merrill Lynch is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely does so in its sole discretion."

• "Merrill Lynch may routinely place one or more bids in an auction for its own account to acquire auction rate securities for its inventory, to prevent an auction failure ... or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the securities."

• "Bids by Merrill Lynch or by those it may encourage to place bids are likely to affect the clearing rate, including preventing the clearing rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Merrill Lynch not bid or not encouraged others to bid."

• "Because of these practices, the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk. Merrill Lynch is not obligated to continue to place such bids ... in any particular auction to prevent an auction from failing or clearing at a rate Merrill Lynch believes does not reflect the market for the securities. Investors should not assume that Merrill Lynch will do so or that auction failures will not occur."

• "If Merrill Lynch submits an order for its own account, it would likely have an advantage over other bidders because Merrill Lynch would have knowledge of some or all of the other orders placed through Merrill Lynch in that auction.... Merrill Lynch's interests in conducting an auction

may differ from those of holders and prospective holders who participate in auctions."

**\*4** • "Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid. Therefore, auction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid."

Anschutz alleges that these disclosures were false and misleading, and that they "amount to little more" than the disclosures found to be inadequate in the SEC Order.[FN4]

In August 2007, Merrill Lynch discontinued its practice of placing support bids, and the auctions for the Dutch Harbor and Anchorage Finance ARS failed. The market for these ARS "completely evaporated" and has not recovered. Anschutz has been unable to sell its ARS, so that it now holds $18.95 million of "illiquid and severely impaired securities."

### 3. The Rating Agencies' Conduct

Anschutz directs a separate, but related, set of allegations against defendants Moody's Investors Service, Inc. ("Moody's") and The McGraw–Hill Companies, Inc., doing business as Standard & Poors ("S & P") (jointly, the "Rating Agencies" or the "Rating Agency Defendants"), the credit rating agencies that assigned ratings to the ARS at issue. Moody's assigned an "Aa2" credit rating to the Dutch Harbor and Anchorage Finance offerings, a rating reserved for securities "judged to be of high quality and ... subject to very low credit risk." S & P assigned an "AA" rating to the same ARS, thereby indicating that the "obligor's capacity to meet its financial commitment on the obligation is very strong."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

Anschutz alleges that these ratings were false and misleading for four reasons. First, Anschutz argues that the Rating Agencies should not have assigned any rating to these ARS, because the put option feature made it impossible to predict the probability of default. Second, Anschutz asserts that the Rating Agencies should have downgraded the ratings on these ARS by mid–2006 or early 2007, when they knew or should have known that the ratings were undeserved. Third, Anschutz argues that, due to the "put option" feature, these ARS were effectively "contingent capital arrangements" designed to ensure the availability of cash in times of crisis. As a result, Anschutz claims, the ARS ratings should have been based not on the credit quality of Ambac at the time the ARS were issued, but on the (lower) credit quality of Ambac when the put feature would likely be exercised. Finally, Anschutz asserts that the ratings were false representations about the "ready liquidity" of the ARS.

Anschutz alleges that it relied on the original ratings in making its purchasing decisions and that, if it had known the ratings were false and misleading, it never would have purchased the ARS at issue. When the ARS market evaporated, the Rating Agencies downgraded their ratings for the Dutch Harbor and Anchorage Finance ARS, and ultimately withdrew those ratings altogether.

**B. Procedural History**

**\*5** Anschutz filed suit in the United States District Court for the Northern District of California on August 17, 2009, alleging claims under federal and state law for market manipulation, fraud, control person liability, and negligent misrepresentation. On December 2, 2009, the Judicial Panel on Multidistrict Litigation ("MDL") transferred the portion of Anschutz's claims concerning the Merrill Securities to the United States District Court for the Southern District of New York, where it was consolidated with a pending MDL proceeding.[FN5] *In re Merril Lynch & Co., Auction Rate Sec. (ARS) Marketing Litig.,* No. 09–md–2030 (LAP) (S.D.N.Y. Dec. 2, 2009), Doc. No. 33.

[1] On March 19, 2010, Anschutz filed the First Amended Complaint ("FAC"). As against the Merrill Defendants, the FAC alleged securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),[FN6] and Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"),[FN7] promulgated thereunder; control person liability in violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);[FN8] violations of the California Corporate Securities Law of 1968, Cal. Corp.Code §§ 25500,[FN9] 25501,[FN10] and 25504;[FN11] and common law fraud. As against the Rating Agency Defendants, the FAC alleged claims for common law negligent misrepresentation. On April 13, 2010, the Merrill and Rating Agency Defendants filed separate motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

In a 36–page Opinion and Order dated February 9, 2011, the District Court granted the defendants' motions to dismiss the FAC in its entirety. With respect to the claims against the Merrill Defendants, the District Court concluded that the disclosures on the Merrill Lynch website, in conjunction with the SEC Order of May 31, 2006, were sufficient to apprise Anschutz of Merrill Lynch's ARS support bidding practices. *See In re Merrill Lynch Auction Rate Sec. Litig.,* 2011 WL 536437, at \*6 ("Putting these statements, among others, together, no reasonable person would assume that [Merrill Lynch's] bidding was not keeping the auctions afloat."). Although the July 21, 2006 ARS purchase preceded the Website Disclosure, the District Court concluded that, "[g]iven the sophistication of Plaintiff, the SEC Order of May 31, 2006, was enough in these circumstances to disclose [Merrill Lynch's] ARS market intervention at the time of this earlier purchase." *Id.* at \*8. With respect to the claims against the Rating Agency Defendants, the District Court held that Anschutz failed to allege any actionable misstatement under either New York or California law because credit ratings were merely "statements of opinion." *Id.* at \*12–13.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

Judgment in favor of the defendants was entered on March 2, 2011. This appeal followed.

**DISCUSSION**

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), "accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "A claim has facial plausibility where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

*6 [2][3] A complaint alleging securities fraud must also satisfy the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b). Rule 9(b) requires that averments of fraud be "state[d] with particularity." Fed.R.Civ.P. 9(b). To satisfy this requirement the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (internal quotation marks omitted). The PSLRA expanded on the Rule 9(b) standard, requiring that "securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. § 78u–4(b)(1), (2)).

**A. Market Manipulation Claims**

**1. Federal Securities Law Claims**

[4] As noted above, the FAC alleges that Merrill Lynch committed securities fraud in violation of § 10(b) and Rule 10b–5, and that its parent corporation is subject to control person liability under § 20(a). We have recently considered and rejected a substantially similar claim, also brought against the Merrill Defendants, alleging market manipulation in violation of the federal securities laws. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120 (2d Cir.2011).[FN12] In *Wilson,* we held that the same Website Disclosure that is at issue here contained sufficient information about Merrill Lynch's support bidding practices to preclude a market manipulation claim. *Id.* at 131–32. Thus, the primary question before us with respect to the federal securities fraud claims is whether Anschutz alleges facts that would dictate a result contrary to *Wilson* in this case. We conclude that no such facts are alleged, and that *Wilson* controls the outcome here.

Anschutz argues that three categories of allegations distinguish the FAC from the complaint deemed insufficient in *Wilson.*[FN13] We find each of the three purported distinctions unpersuasive.

First, Anschutz argues that its allegations are different from the insufficient allegations in *Wilson* because the FAC here explicitly alleges that, "[b]y the time the offering statements were issued, Merrill Lynch knew that it would participate (and had participated) in 100 percent of the auctions." FAC ¶ 53; *see also id.* ¶¶ 31, 44, 56, 59. But the *Wilson* complaint likewise alleged that Merrill Lynch "invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period to prevent auction failures." First Am. Consol. Class Action Compl., *Wilson v. Merrill Lynch & Co.,* No. 08–cv–3037 (LAP) (S.D.N.Y. May 22, 2009), Doc. No. 45 ("Wilson Compl."), at ¶ 49; *see also id.* at ¶ 5 ("Merrill maintained a policy of placing or causing the placement of support bids in every auction for which it served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer, to create

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

the appearance of stability and liquidity in the auction market, prevent auction failures, and set the rates of interest or dividends paid on those securities."). Although the *Wilson* complaint also contained inconsistent allegations regarding the frequency of Merrill Lynch's support bids, *see* FAC ¶¶ 44, 46, 58, we made clear that our holding did not rest on those inconsistencies:

> **\*7** Even if we were to construe the complaint as attempting to plead that Merrill, at least for a time, placed support bids in every single auction for Merrill ARS, we do not see how that allegation can be actionable given Merrill's disclosure that it "may routinely" place such bids.

*Wilson,* 671 F.3d at 133. Thus, *Wilson* explicitly rejected the argument—repeated by Anschutz here, Anschutz Supp. Br. 2 n. 2—that it was insufficient to disclose that Merrill Lynch "may routinely place one or more bids in an auction ... to prevent an auction failure." Joint App'x at 148. FN14

Second, Anschutz argues that its allegations are distinct from those in *Wilson* because the FAC contains "unequivocal" allegations that Merrill Lynch "knew there was no liquid market for [ARS]" and that "the auctions would not clear in the absence of Merrill Lynch's continuing placement of support bids." Anschutz Supp. Br. 3 (citing FAC ¶ 52). But on this score, it appears that the FAC is at least as inconsistent as the *Wilson* complaint. In *Wilson,* the Court held that the complaint failed to allege that Merrill Lynch "knew with certainty" that the ARS market would fail if Merrill Lynch did not intervene:

> [A]lthough the complaint's allegation that 87% of ARS auctions failed following the withdrawal of support by Merrill and other ARS dealers certainly suggests that support bidding was significant to the overall viability of the ARS market, the corollary that 13% of the auctions nonetheless succeeded is inconsistent with Merrill's alleged knowledge with "certainty" that support bids were necessary for the success of every auction.

*Wilson,* 671 F.3d at 133–34. In this case, the FAC likewise contains allegations inconsistent with the conclusion that Merrill Lynch knew that *all* auctions would fail absent intervention. For example, Anschutz alleges that "a *huge percentage* of auctions would have failed" without Merrill Lynch's support bids, FAC ¶¶ 33, 63, that auction failure was a "*virtual* certainty" without such intervention, *id.* ¶ 55, that "there was insufficient legitimate third-party demand in a *significant number* of the auctions ... to avoid auction failures," *id.* ¶ 71(e), and that Merrill Lynch's support bids "cleared the auction and established the clearing rate for a *significant percentage* of all Dutch Harbor and Anchorage Finance auctions," *id.* ¶ 59 (emphases supplied). Thus far, we see nothing to distinguish the FAC in this case from the pleadings we found inadequate in Wilson.

Third, Anschutz argues that this case falls outside the *Wilson* holding because the FAC alleges that Merrill's support bidding "signaled" to investors that the ARS were liquid, when in fact they were not. To that end, Anschutz points to allegations about the "appearance of liquidity" created by Merrill Lynch's support bidding. *See* FAC ¶ 1 ("the appearance of ready and regular liquidity for these securities ... was created by an extensive pattern of deceptive and manipulative activities by Merrill Lynch"); *id.* ¶ 8 (Merrill Lynch's support bidding "created the appearance of liquidity" for ARS); *id.* ¶ 10 (Merrill Lynch's support bidding created "the appearance of an efficient and liquid market for auction rate securities"). But these generalized allegations are no different than the allegations in the *Wilson* complaint about Merrill Lynch's representations of ARS liquidity. *See* Wilson Compl. ¶ 49 ("the impact of [Merrill's] extensive and sustained interventions created the outward appearance that [Merrill] ARS were readily liquid investments"); *id.* ¶ 50 ("[b]y intervening to prevent auction failures and set interest rates, Merrill masked the liquidity risks inherent in [Merrill] ARS"); *id.* ¶ 51 ("Merrill's actions created a 'façade of liquidity' ").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

**\*8** [5] Finally, we note the existence of one wrinkle in this case not present in *Wilson*—namely, that Anschutz made one of its ARS purchases on July 21, 2006, one month prior to the Website Disclosure. Nevertheless, we conclude that Anschutz's claims based on the July 2006 purchase fail for two reasons. First, the SEC Order, which was issued on May 31, 2006, concluded that various banks, including Merrill Lynch, had committed a number of securities violations by intervening in the ARS market in order to prevent auction failure or to affect clearing rates. Although the SEC Order did not specify which banks had committed which violations, the Order surely put Anschutz—a qualified institutional buyer or "QIB"—on notice that ARS auctions involving any of the banks penalized by the SEC might be affected by such practices. Second, auctions involving the relevant ARS continued for a full year after Merrill Lynch posted the Website Disclosure in August 2006. At each of these auctions, Anschutz had the option to buy, sell, or hold the ARS at issue. By that time, Anschutz was fully informed of Merrill Lynch's ARS practices, and still decided to hold.

In short, the FAC fails to state a claim for violation of the federal securities laws, not because it lacks magic words prescribed by *Wilson,* but because, like the complaint we rejected in that case, the FAC's generalized and conclusory allegations are not "well-pleaded." *See Wilson,* 671 F.3d at 139 FN15
.

### 2. California Corporations Code Claims

In addition to its federal securities law claims, Anschutz also alleges that the Merrill Defendants violated §§ 25500, 25501, and 25504 of the California Corporations Code. The District Court dismissed these state law claims on the ground that Anschutz failed to allege that it was injured in California or that Merrill Lynch committed any relevant conduct in California. We agree.

### a. Section 25500

[6][7] California courts have long recognized a presumption against the extraterritorial application of state law. *Sullivan v. Oracle Corp.,* 51 Cal.4th 1191, 127 Cal.Rptr.3d 185, 254 P.3d 237, 248 (Cal.2011). Like the Supreme Court of California, we therefore presume that the California legislature "did not intend a statute to be 'operative, with respect to occurrences outside the state, ... unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.' " *Id.* (quoting *Diamond Multimedia Sys., Inc. v. Superior Court,* 19 Cal.4th 1036, 80 Cal.Rptr.2d 828, 968 P.2d 539, 553 (Cal.1999)). In keeping with that presumption, the California Court of Appeals has held, in a case involving the California Unfair Competition Law, that California statutory remedies are not available "for injuries suffered by non-California residents, caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside of California." *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 25 (Cal.Ct.App.1999).

**\*9** [8] The same is true with respect to § 25500 of the California Corporations Code, which "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." *Diamond Multimedia Sys.,* 80 Cal.Rptr.2d 828, 968 P.2d at 541. As the Supreme Court of California has squarely held, "[s]ection 25500 simply provides a remedy for third parties whose sale or purchase of stock is affected by unlawful conduct in California." *Id.* at 546; *see id.* at 556 ("[S]ection 25400 regulates only manipulative conduct in California.").

[9] In this case, Anschutz is a Kansas corporation with its principal place of business in Denver, Colorado. Its only relevant contacts with California were through its broker, Credit Suisse, which purchased the ARS at issue. Credit Suisse is not a party to this action. Anschutz does not allege any injury, any communication with Merrill, or any conduct by Merrill in California. FN16

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

In an effort to cure the deficiencies of the FAC, Anschutz cites a decision from the United States District Court for the Northern District of California involving parallel claims against Deutsche Bank Securities Inc. ("Deutsche Bank"). *Anschutz Corp. v. Merrill Lynch & Co.,* 785 F.Supp.2d 799 (N.D.Cal.2011). In that case, the district court concluded that the purchase of shares by Credit Suisse in California provided a sufficient nexus for Anschutz to pursue claims under the California Corporations Code. *Id.* at 818 n. 18 ("The ARS at issue were purchased in California by plaintiff's agent. That conduct is sufficient to allow plaintiff to bring claims under California's Corporation Code."). That assertion, which appears to confuse the requirements of personal jurisdiction with the availability of a state statutory remedy, is contrary to the California Supreme Court's holding that § 25500 is available where the "sale or purchase of stock is affected by *unlawful conduct* in California." *Diamond Multimedia Sys.,* 80 Cal.Rptr.2d 828, 968 P.2d at 546 (emphasis supplied).[FN17]

The alleged unlawful conduct at the crux of this case—Merrill Lynch's placement of support bids to manipulate the market—is not alleged to have occurred, and did not occur, in California. In the absence of any alleged unlawful conduct in California, Anschutz cannot assert claims against the Merrill Defendants under § 25500 of the California Corporations Code.

**b. Section 25501**

[10] Anschutz also alleges that Merrill Lynch violated § 25501 of the California Corporations Code, which provides a remedy for violations of § 25401. Section 25401, in turn, "prohibits misrepresentations in connection with the purchase or sale of securities." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,* 158 Cal.App.4th 226, 70 Cal.Rptr.3d 199, 218 (Ct.App.2007). For all the reasons previously stated, *see* Discussion at Part A.1 *ante,* Anschutz has failed to allege any material misrepresentations made by Merrill Lynch in relation to these ARS. Accordingly, Anschutz has no

claim under § 25501. *See Ins. Underwriters Clearing House v. Natomas Co.,* 184 Cal.App.3d 1520, 228 Cal.Rptr. 449, 453 (Ct.App.1986) ("The test of materiality under the California Corporations Code is the same [as under federal law].").

**c. Section 25504**

*10 Finally, Anschutz fails to state a control person liability claim under § 25504 of the California Corporations Code because its underlying California securities law claims fail. *See Moss v. Kroner,* 197 Cal.App.4th 860, 129 Cal.Rptr.3d 220, 229 (Ct.App.2011) (holding that secondary liability under § 25504 may exist "as long as primary liability is stated or established").

**B. Rating Agency Claims**

Against the Rating Agencies, Anschutz alleges common law negligent misrepresentation based on the ratings assigned to the Dutch Harbor and Anchorage Finance ARS. The District Court held that Anschutz failed to state a claim for negligent misrepresentation under either New York or California law. *See In re Merrill Lynch,* 2011 WL 536437, at *12–13. Because we hold that New York law applies, and that Anschutz fails to state a negligent misrepresentation claim under New York law, we do not address Anschutz's California law claim.

**1. Choice of Law**

[11][12] In multi-district litigation, we apply the choice-of-law rules from the transferor forum—in this case, California—to determine which state law controls. *See Desiano v. Warner–Lambert & Co.,* 467 F.3d 85, 91 (2d Cir.2006). California law prescribes a three-step "governmental interest" analysis to resolve choice-of-law questions. *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4th 95, 45 Cal.Rptr.3d 730, 137 P.3d 914, 922 (Cal.2006). At step one, the court determines whether the substantive laws of the competing jurisdictions are different. *Id.* If there is a difference, the court "examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* Finally, if a "true conflict" exists, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

court evaluates and compares "the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (internal quotation marks omitted).

[13] In this case, there is no dispute that New York and California law clearly diverge with respect to the elements of a negligent misrepresentation claim. As discussed below, New York negligent misrepresentation law requires the existence of a "special" or "privity-like" relationship that "impos[es] a duty on the defendant to impart correct information to the plaintiff." *See J .A.O. Acquisition Corp. v. Stavitsky,* 8 N.Y.3d 144, 148, 831 N.Y.S.2d 364, 863 N.E.2d 585 (2007). California courts have expressly rejected that requirement, holding that negligent misrepresentation claims may be brought against any person "who negligently supplies false information for the guidance of others in their business transactions" and "intends to supply the information for the benefit of one or more third parties." *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 757–58 (Cal.1992) (internal quotation marks omitted). Because of the clear difference between New York and California law, we proceed to step two of the choice-of-law analysis by "examin[ing] each jurisdiction's interest in the application of its own law." *Kearney,* 45 Cal.Rptr.3d 730, 137 P.3d at 922.

***11** [14] The New York contacts and interests in this case are considerable. Moody's is a Delaware corporation with its principal place of business in New York. FAC ¶ 16. McGraw–Hill is a New York corporation with its principal place of business in New York. *Id.* ¶ 17, 45 Cal.Rptr.3d 730, 137 P.3d 914. The ratings assigned to the relevant ARS were issued in New York, as the accompanying ratings announcements confirm. *See* Joint App'x 283–84 (Rubins Decl., Ex. A) (announcing Moody's rating for Anchorage Finance ARS); *id.* 288, 291, 296, 45 Cal.Rptr.3d 730, 137 P.3d 914

(Loewenson Decl., Exs. A–C) (announcing S & P rating for Anchorage Finance ARS); *id.* 300, 305, 45 Cal.Rptr.3d 730, 137 P.3d 914 (Loewenson Decl., Exs. D–E) (announcing S & P rating for Dutch Harbor ARS). Given the strength of these contacts, the Ratings Agencies argue that New York has a long-standing interest in applying its own standards for negligence liability to the New York financial community. Rating Agencies Br. 14.

By contrast, the only alleged connection with California is that the ARS were purchased through the San Francisco office of Credit Suisse.[FN8] FAC ¶ 2. Nevertheless, Anschutz argues that California has a "fundamental interest" in protecting investors, even out-of-state investors, who purchased securities in California. Reply 13. To that end, Anschutz cites *Diamond Multimedia* for the proposition that California "has a clear and substantial interest in preventing fraudulent practices in this state." 80 Cal.Rptr.2d 828, 968 P.2d at 556. That proposition is certainly true—but it affords no help to Anschutz in this case. The FAC fails to allege any conduct *by the Rating Agencies* in California, much less any "fraudulent practices in [that] state." *Id.* The FAC also fails to allege any injury to a California resident, any injury by a California resident, or any activity connected to the ratings that occurred in California. On these facts, the asserted California interest in protecting investors is highly attenuated, if not utterly dissipated.

Assuming *arguendo* that a "true conflict" exists between the interests asserted by both states, New York law still prevails. If New York's policy of strictly limiting negligent misrepresentation claims to "privity-like" relationships is subordinated to California law, the result would clearly impair New York's interest in defining the scope of negligence liability for professional conduct based in New York. Contrary to Anschutz's assertions, these are not "generic" interests in the uniform application of New York law, but particular interests in regulating the New York-based conduct of New York-based defendants. Without a comparable nexus between

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

this case and California, the impairment to California's interests if New York law were applied is much less clear. Indeed, a holding that California's interests prevail in this case would effectively make California law into national law for any negligent misrepresentation claim based on the purchase of securities through a broker's California office. Such a holding would make no sense, especially when the countervailing interest is that of a state that has been the center of our country's financial markets for more than a century.

**\*12** Accordingly, having "evaluate[d] and compare[d] the nature and strength of the interest of each jurisdiction in the application of its own law," *Kearney,* 137 P.3d at 108, we conclude that New York law controls.[FN19]

### 2. New York Law

[15][16] To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000); *see Eiseman v. State of New York,* 70 N.Y.2d 175, 187–88, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987). Under the "duty" element, "New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.' " *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 271 (2d Cir.1993) (quoting *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 424, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989)); *see also J.A.O. Acquisition Corp.,* 8 N.Y.3d at 148, 831 N.Y.S.2d 364, 863 N.E.2d 585 ("A claim for negligent misrepresentation requires the plaintiff to

demonstrate ... the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff.").

[17] Anschutz has alleged no relationship or contact with the Rating Agencies that could remotely satisfy the New York standard. The primary authority Anschutz musters in support of its negligent misrepresentation claims is not to the contrary.[FN20] *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1093–94 (S.D.N.Y.1996). In *LaSalle,* a case decided under the pleading standards abrogated by the Supreme Court in *Iqbal* and *Twombly,*[FN21] the complaint contained allegations of direct communication between six of the twenty-six plaintiffs and the rating agency, which "evidence[d] an intent to assure plaintiffs of the validity of the rating and influence plaintiffs to purchase the Bonds." *Id.* at 1094. Here, there are no allegations of any direct contact between Anschutz and the Rating Agencies. We therefore conclude that Anschutz has failed to state a claim for negligent misrepresentation under New York law.

For the foregoing reasons, we conclude that New York law controls, and that Anschutz fails to state a claim for negligent misrepresentation under New York law. We therefore affirm the decision of the District Court to dismiss the negligent misrepresentation claims against the Rating Agencies.

### CONCLUSION
To summarize:

(1) We affirm the District Court's decision to dismiss the federal securities law claims against the Merrill Defendants, holding that the market manipulation claims in this case fail for the same reasons we identified in *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120 (2d Cir.2011);

**\*13** (2) We affirm the District Court's decision to dismiss the California Corporations Code claims against the Merrill Defendants, holding that Anschutz fails to allege any injury or unlawful conduct

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

in California; and

(3) We affirm the District Court's decision to dismiss the negligent misrepresentation claims against the Rating Agency Defendants, holding that New York law controls, and that Anschutz fails to allege an actionable misrepresentation under New York law.

> FN1. We note that Cahill Gordon & Reindel LLP did not appear in the District Court. Accordingly, there was no arguable conflict of interest involving that firm, where the husband of the District Judge is a partner.

> FN2. We refer to Merrill Lynch, together with its parent corporation, Merrill Lynch & Co., Inc., as the "Merrill Defendants."

> FN3. The SEC Order did not, however, prohibit broker-dealers from placing support bids when properly disclosed.

> FN4. The SEC Order rejected as insufficient disclosure documents that (1) "did not disclose anything about bidding by broker-dealers"; (2) disclosed that "[a] broker-dealer may submit orders in Auctions for its own accounts"; or (3) disclosed that "[a] Broker–Dealer may submit orders in Auctions for its own accounts. Any Broker–Dealer submitting an order for its own account in any Auction might have an advantage over other bidders in that it would have knowledge of other orders placed through it for that Auction (but it would not have knowledge of orders submitted by other Broker–Dealers, if any)."

> FN5. The portion of Anschutz's claims concerning its purchases of ARS underwritten by Deutsche Bank Securities Inc. remained in the Northern District of California, where the parties recently entered a

joint stipulation to dismiss the action with prejudice. *Anschutz Corp. v. Merrill Lynch & Co.,* No. 09–03780(SI) (N.D.Cal. July 5, 2012), Doc. No. 442.

> FN6. 15 U.S.C. § 78j(b) provides, in relevant part, that it shall be unlawful:

>> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

> FN7. Rule 10b–5 provides that it is unlawful:

>> (a) To employ any device, scheme, or artifice to defraud,

>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

>> in connection with the purchase or sale of any security.

> 17 C.F.R. § 240.10b–5.

> FN8. 15 U.S.C. § 78t(a) provides as follows:

>> Every person who, directly or indirectly,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

FN9. Section 25500 of the California Corporations Code prohibits the "willful[ ] participat[ion] in any act or transaction in violation of Section 25400." Cal. Corp.Code § 25500 (West 2006).

Section 25400 provides, in relevant part, that "it is unlawful for any person, directly or indirectly, in this state"

(b) To effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others....

(d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he

knew or had reasonable ground to believe was so false or misleading.

*Id.* § 25400. In other words, § 25400 "prohibits market manipulation," while § 25500 "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by [§ ] 25400." *Diamond Multimedia Sys., Inc. v. Superior Court,* 19 Cal.4th 1036, 80 Cal.Rptr.2d 828, 968 P.2d 539, 541 (Cal.1999) (internal footnote omitted).

FN10. Section 25501 provides that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him." Cal. Corp.Code § 25501 (West 2006).

Section 25401 provides that:

It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

*Id.* § 25401. In other words, § 25401 "is essentially identical to clause (b) of rule 10b–5 promulgated under section 10(b) of the Securities Exchange Act of 1934 and governs negligent misrepresentation in securities sales." *Lynch v. Cook,* 148 Cal.App.3d 1072, 196 Cal.Rptr. 544, 554 (Ct.App.1983).

FN11. Section 25504 provides, *inter alia,* for joint and several liability for "[e]very person who directly or indirectly controls a person liable under Section 25501 or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

25503." Cal. Corp.Code § 25504 (West 2006).

FN12. Specifically, the complaint in *Wilson* alleged market manipulation under section 10(b) and Rule 10b–5, and control person liability under section 20(a). Our opinion in *Wilson* was filed after the District Court issued its decision in this case, and after the parties submitted their briefs on appeal, but prior to oral argument. Following oral arguments, the parties filed supplemental briefs on the import of the *Wilson* decision to this appeal.

FN13. The three categories purportedly correspond to the characteristics of a "hypothetical complaint" we described in *Wilson:*

> Because Wilson's complaint lacks well-pleaded allegations that as of the time of Wilson's purchase, Merrill presently intended to place bids in every single auction, knew that each auction would fail if it did not place these bids, and signaled to its ARS investors that these securities were genuinely liquid, we have no occasion to address whether a hypothetical complaint containing such allegations would state a claim for market manipulation.

> 671 F.3d at 139.

FN14. *See Wilson,* 671 F.3d at 133 ("If Merrill's intention was, as Wilson alleges, to place support bids in every single auction unless it decided to let certain auctions fail or withdraw from the market altogether, we think that Merrill fairly disclosed that intention by stating that it 'may routinely' place such bids.").

FN15. For the same reasons, we affirm the District Court's dismissal of Anschutz's

common law fraud claim, which suffers from the same deficiencies as its claims under § 10(b).

FN16. Anschutz asserts for the first time on appeal (1) that Merrill Lynch disseminated the Offering Memoranda to California; (2) that Merrill Lynch attempted to resell ARS in California; and (3) that the account for which Anschutz purchased its ARS was maintained in California. Because none of these allegations appears in the FAC, we do not consider them here.

FN17. Anschutz also cites a California securities treatise for the proposition that the "civil liability provisions of Corp.Code Sections 25500[and] 25501 ... apply to any purchase or offer to buy 'in this state' as well as an offer or sale." Harold Marsh & Robert Volk, *Practice Under the California Securities Laws* § 3.08[5] (2011) (footnote omitted). To the extent that proposition conflicts with *Diamond Multimedia,* we adhere to the latter.

FN18. Once again, the Anschutz briefs attempt to embellish the record on appeal by asserting that the ARS ratings "were intended to be (and were in fact) disseminated to potential investors in California," and that Anschutz purchased the ARS "for its working capital account, which was also maintained in California." Reply 14. No such allegations appear in the FAC.

FN19. We recognize, once again, that the Northern District of California reached a different result in the parallel proceeding. *Anschutz Corp.,* 785 F.Supp.2d at 822. Because the District Court in that case did not appear to consider the strength of New York's interest in protecting New York-based defendants for their New York-based conduct, we are not persuaded.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))
**(Cite as: 2012 WL 3518537 (C.A.2 (N.Y.)))**

FN20. The other two cases Anschutz cites in its opening brief are clearly inapposite. In *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.,* 651 F.Supp.2d 155 (S.D.N.Y.2009), the district court did not reach the duty element, because it held that the negligent misrepresentation claim was preempted by New York's Martin Act. *Id* . at 181–82. In *Duke v. Touche Ross & Co.,* 765 F.Supp. 69 (S.D.N.Y.2001) which did not involve credit rating agencies, the complaint contained allegations that the defendant accounting firm had directly solicited the investments of several plaintiffs. *Id.* at 77.

FN21. *LaSalle Nat'l Bank,* 951 F.Supp. at 1080–81; *cf. Aschroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

C.A.2 (N.Y.),2012.
Anschutz Corp. v. Merrill Lynch & Co., Inc.
--- F.3d ----, 2012 WL 3518537 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.