# GIRARD GIBBS
LLP

ATTORNEYS AT LAW

August 29, 2012

**VIA ECF and U.S. MAIL**

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *In re Apple REITs Litigation,*
Civil Action No. 1:11-cv-02919-KAM-JO

Dear Judge Matsumoto:

We are co-lead counsel for the plaintiffs. We write to respond to the defendants' August 27 letter regarding *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, Docket No. 11-1305-cv, 2012 WL 3518537 (2d Cir. Aug. 14, 2012). Contrary to defendants' assertions, the case does not support defendants' motions to dismiss.

In *Anschutz*, the Second Circuit affirmed the district court's dismissal of the plaintiff's section 10(b) market manipulation claim against Merrill Lynch based on Merrill Lynch's placement of "support bids" in the auction rate securities (ARS) market. As in *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011), a case the defendants relied upon in their motion that addressed the same disclosures, the *Anschutz* plaintiff's section 10(b) claim was subject to the stricter Rule 9(b) pleading standard. Plaintiffs' non-fraud-based Securities Act, state securities and common law claims need only comply with Rule 8's "short and plain statement" pleading standard. *See Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011).[1]

The language of the disclosures in *Anschutz* is very different from the Apple REITs' disclosures. In *Wilson* and *Anschutz*, Merrill Lynch disclosed that it "**may routinely** place one or more bids in an auction to prevent an auction failure." *Anschutz*, 2012 WL 3518537, at *7 (emphasis added). The word "routinely" conveyed that Merrill Lynch's payment of support bids was "of a commonplace or repetitious character." *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/routinely (last visited August 28, 2012). The Second Circuit found that the "may routinely" language was sufficient to alert investors that Merrill Lynch would place support bids in every auction unless it intended to let the auction fail. *Anschutz*, 2012 WL 3518537, at *6-7; *see also Wilson*, 671 F.3d at 133.

---

[1] Also, unlike plaintiffs and other Apple REIT investors, the plaintiff in *Anschutz* is a "qualified institutional buyer or 'QIB,'" 2012 WL 3518537, at *8; QIBs "have a more sophisticated understanding of risks of the investments they make and are better able to protect themselves" than the average investor. *In re Merrill Lynch Auction Rate Securities Litig.*, No. 09 MD 2030 (LAP), 2011 WL 536437, at *7 (S.D.N.Y. Feb. 9, 2011) (citing 17 C.F.R. § 230.1440A(a),(d), which defines "qualified institutional buyers").

To:   The Honorable Kiyo A. Matsumoto
Re:   *In re Apple REITs Litigation*
August 29, 2012
Page 2

  The Apple REIT offering documents do not include the word "routinely" like the Merrill Lynch disclosures. They say instead that the REITs "may from time to time distribute funds that include a return of capital" and "may from time to time need to borrow to make distributions," and that "[o]ur distributions may include a return of capital." ¶¶ 106-07; Sharp Decl., Ex. A at 3-6. At the same time, defendants also said that "[d]istributions will be at the discretion of our board and will depend on factors including: the gross revenues we receive from our properties, our interest expenses incurred in borrowing, capital expenditures, and our need for cash reserves." ¶¶ 51, 104, 109; Sharp Decl., Ex. A at 3-4.

  Thus, defendants claimed on one hand that they might "from time to time" return capital, while promising on the other that the REITs' boards would set distributions by reference to the profitability of the properties, capital expenditures, and the need for reserves. Based on these disclosures, plaintiffs were justified in believing that defendants would set their distribution rates by reference to the actual profitability and cash needs of the REITs, and that returns of capital would be the exception rather than the rule. But plaintiffs allege that the REIT boards ignored profitability and cash needs in setting distributions, and instead set the rates at 7% to 8% to match or exceed the rates of other non-traded REITs and to provide the illusion that the Apple REITs were operating profitably, so that investors would continue to purchase shares. ¶¶ 8, 11, 89, 105-06, 147-49; Appendix G.

  Plaintiffs allege that the REITs always, or virtually always, included a return of capital or borrowed funds in their distributions to investors, even though returning capital and borrowing to pay distributions made no economic sense in light of the investment objectives of the REITs. *See* ¶¶ 100-02, 142-43, 146, 162-63, 168. If the REITs had disclosed their true distribution policy, plaintiffs would have known that the stellar track record of distributions the REITs emphasized in their offering documents and promotional presentations depended on defendants' practice of borrowing money or returning capital without regard to the profitability and cash needs of the properties. By representing that the rates would be based on factors tied to the performance of the REITs and that the REITs would only return capital "from time to time," however, defendants misled plaintiffs and other investors. The phrase "from time to time" suggests an infrequent or occasional occurrence, and does not describe the scheme pled in the complaint. *See Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/time (last visited August 28, 2012) ("from time to time: once in a while: occasionally").

  Plaintiffs' contention is that defendants said distributions "may" include returns of capital "from time to time," as if such returns were only a possibility, when in fact returns of capital were essential to defendants' strategy of lulling their retail investors into believing the REITs were appropriate repositories of retirement money in a time of economic uncertainty. Defendants' coy phraseology is the antithesis of the "full and fair" disclosure mandated by the federal securities laws. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357, 360 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions … [would] mislead a reasonable investor"); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *see also Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (holding that there is a

To:   The Honorable Kiyo A. Matsumoto
Re:   *In re Apple REITs Litigation*
August 29, 2012
Page 3

"critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur").

Plaintiffs' allegations that the REIT boards set the distribution rates to match or exceed the rates of other non-traded REITs and that the distributions included a return of capital and often borrowed funds are credibly supported by factual allegations in the complaint. See ¶¶ 100-02, 105, 142-43, 146-49, 162-63, 168; Appendix G.  These allegations confirm that the "may" statements in the Apple REIT offering materials are misleading and allow the Court to draw the reasonable inference that defendants are liable for violations of the federal and state securities laws and state common law.  See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Respectfully submitted,

**GIRARD GIBBS LLP**

Daniel C. Girard

cc:   All counsel of record (via ecf)