UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- X

IN RE APPLE REITs LITIGATION          **MEMORANDUM & ORDER**

                                          11-CV-2919 (KAM)


--------------------------------- X

**MATSUMOTO, United States District Judge:**

          Putative class plaintiffs Stanley and Debra Kronberg,
Marvin Bendavid, Laura Berger, Barbara Shefsky, and William
Murray ("individual plaintiffs") commenced this Consolidated
Class Action pursuant to the Private Securities Litigation
Reform Act, 15 U.S.C. § 77a *et seq.* ("PSLRA") and Federal Rule
of Civil Procedure 23 on behalf of themselves and others
similarly situated (all plaintiffs, collectively, "Proposed
Class Plaintiffs") against defendants alleging claims under
section 11, 15 U.S.C. § 77k ("section 11"), section 12(a)(2), 15
U.S.C. § 77l(a)(2) ("section 12(a)(2)"), and section 15, 15
U.S.C. § 77o ("section 15"), of the Securities Act of 1933
("Securities Act"); common law breach of fiduciary duty, unjust
enrichment, and negligence; the Connecticut Uniform Securities
Act; and the Florida Securities Investor Protection Act.  (*See
generally* ECF No. 82, Amended Consolidated Class Action
Complaint ("Compl.").)

Presently before the court are three motions to dismiss by (1) defendants Apple REIT Six, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc., Apple REIT Nine, Inc., and Apple REIT Ten, Inc. (collectively, the "Apple REITs"); (2) defendants Glenn W. Bunting, Kent W. Colton, Michael S. Waters, Robert M. Wiley, Bruce H. Matson, Garnett Hill, Jr., Anthony Francis "Chip" Keating, Ronald A. Rosenfeld, David J. Adams, and Lisa B. Kern, Glade M. Knight, Bryan Peery (collectively, the "Apple Individuals"), Apple Fund Management, LLC, Apple Suites Realty Group Inc., Apple Eight Advisors, Inc., Apple Nine Advisors, Inc., and Apple Ten Advisors, Inc. (collectively, the "Apple Affiliates"), (collectively, "Apple Individuals & Affiliates"); and (3) defendants David Lerner and David Lerner Associates, Inc. ("DLA") (collectively, "DLA Defendants") (all defendants, collectively, "Defendants").  (*See* ECF No. 104, Mot. to Dismiss for Failure to State a Claim by Apple REITs; ECF No. 105, Mot. to Dismiss for Failure to State a Claim by Apple Affiliates; ECF No. 115, Mot. to Dismiss for Failure to State a Claim by DLA Defendants.)  For the reasons set forth below, Defendants' motions to dismiss the Complaint are granted.

**BACKGROUND**

**I.   Procedural History**

On June 17, 2011, Nancy Kowalski filed a complaint in this district.  (*See* ECF No. 1, Compl.); *Kowalski v. Apple REIT*

2

*Ten, Inc., et al*, 11-CV-2919 (E.D.N.Y.).  On June 20, 2011,
Stanley and Debra Kronberg filed a class action complaint (and
an amended class action complaint on October 20, 2011) against
the DLA Defendants in the United States District Court for the
District of New Jersey.  *Kronberg v. David Lerner Associates,*
*Inc., et al.*, 11-CV-3558 (D.N.J.).  On June 28, 2011, Marvin
Leff filed a complaint in this district against the same
defendants named in Kowalski's complaint.  (*See* ECF No. 9,
Notice of Related Case entered June 28, 2011); *Leff v. Apple*
*REIT Ten, Inc., et al.*, 11-CV-3094 (E.D.N.Y.).  On November 9,
2011, the District of New Jersey granted the DLA Defendants'
motion to transfer the *Kronberg* action to this district for
consolidated proceedings with the other two actions.  Upon
stipulation of the parties on December 13, 2011, the court
ordered that these three cases be consolidated into one action
in this district.  (*See* ECF No. 78, Stipulation and Order.)
Subsequently, on February 17, 2012, plaintiffs filed the instant
Complaint.

## II.   **The Parties**

### A.   **Plaintiffs**

Plaintiffs are six individuals who, based on DLA
Defendants' solicitations, invested in real estate investment

trusts ("REITs"),[1] specifically, REIT Six, REIT Seven, REIT Eight, REIT Nine, and/or REIT Ten, which have been operated or sold by Defendants.  (Compl. ¶¶ 4-5, 15-19.)

Plaintiffs bring this putative class-action lawsuit on behalf of themselves and a Proposed Class of all others who have purchased shares in Apple REITs Six, Seven, Eight, Nine, and Ten, which were offered and sold by Defendants.  (*Id.* ¶ 58.). (*Id.* ¶ 14.)  Additionally, the Kronberg individual plaintiffs allege claims on behalf of themselves and a proposed New Jersey subclass consisting of all other New Jersey residents who have purchased any of the Apple REITs' shares that were offered and sold by the DLA Defendants; the Bendavid and Shefsky individual Plaintiffs allege claims on behalf of themselves and a proposed New York subclass consisting of all other New York residents who have purchased any of the Apple REITs' shares that were offered and sold by the DLA Defendants; individual plaintiff Berger alleges claims on behalf of herself and a proposed Connecticut

---

[1] As Plaintiffs explain, a REIT

is an entity that owns and operates income-producing real estate and distributes the income to investors.  REITs pool the capital of numerous investors to purchase a portfolio of properties the typical investor might not be able to buy individually.  To qualify as a REIT, a company must have most of its assets and income tied to a real estate investment and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends.

(Compl. ¶ 71.)

Subclass consisting of all other Connecticut residents who have purchased any of the Apple REITs' shares that were offered and sold by the DLA Defendants; individual plaintiff Murray brings this lawsuit on behalf of himself and a Proposed Florida Subclass consisting of all other Florida residents who have acquired any of the Apple REITs' shares that were offered and sold by DLA Defendants. (*Id.* ¶¶ 59-62.)

**B.  Defendants**

The Apple REITs are non-traded public companies subject to Securities and Exchange Commission ("SEC") reporting, that offer and sell non-traded security interests, primarily in hotel revenues.[2]  (*Id.* ¶ 73; *see also id.* ¶¶ 28-32.)  All of the Apple REITs' shares have been SEC-registered, and the shares are nearly illiquid because they are not traded on any public securities exchange. (*Id.* ¶ 73.)  As of February 17, 2012, REITs Six through Nine are operating but have closed to new investors, and REIT Ten is still open to new investors.[3] (*Id.* ¶ 73; *see id.* ¶¶ 28-32, 74.)

The Apple Affiliates are four corporations and one limited liability company "that provide property management

---

[2] "The Apple REITs all invest primarily in Marriot and Hilton extended stay and limited service hotels.  (One exception was Apple REIT Nine's acquisition in 2009 of . . . land . . . .)" (Compl. ¶ 75.)

[3] When REIT Six closed to new investors, REIT Seven opened; when REIT Seven closed to new investors, REIT eight opened; and so on, up to REIT Ten.  (*See* Compl. ¶ 73.)

acquisition, advisory, operational and managerial services to the Apple REITs."[4]  (*Id.* ¶ 5.)

Glade M. Knight is the founder, Chairman, and Chief Executive Officer of all of the Apple REITs, is the sole owner of Apple Suites Realty Group, Apple Eight Advisors, Apple Nine Advisors, and Apple Ten Advisors, and is the indirect owner of Apple Fund Management.  (*Id.* ¶¶ 5, 28-33, 72, 96.)  Knight has signed the SEC registration statements for REITs Eight through Ten, and has signed various SEC forms with respect to Apple REIT Nine.  (*Id.* ¶ 33.)

Bryan Peery, the Executive Vice President and Chief Financial Officer of all of the Apple REITs, has signed the SEC registration statements for REITs Eight through Ten and has signed various SEC forms with respect to REIT Nine.  (*Id.* ¶ 39.)

At the time the Complaint was filed, each of the Apple REIT Individuals had been a director of at least one of the Apple REITs.  (*Id.* ¶¶ 40-50.)  Each REIT Individual has been named in the SEC registration statement or post-effective amendments of REITs Eight, Nine, or Ten.  (*Id.* ¶¶ 40-50.)

---

[4] Specifically, the Apple Suites Realty Group provides brokerage services for all of the Apple REITs; Apple Eight Advisors, Apple Nine Advisors, and Apple Ten Advisors appraise and propose property for the REITs to purchase, advise on REIT investments, and manage day-to-day operations of their respectively named Apple REITs; and Apple Fund Management (a subsidiary of REIT Six) supplies staffing services for all of the other Apple REIT Affiliates, "which have no employees."  (Compl. ¶¶ 34-38, 96.)

David Lerner ("Lerner") is the founder, president, and controlling owner of the private brokerage firm DLA, a registrant with the SEC and a member of the Financial Industry Regulatory Authority ("FINRA"). (*Id.* ¶¶ 20, 26.) DLA has "served as [the] best efforts underwriter and exclusive selling agent" of the Apple REITs.[5] (*Id.* ¶ 72; *see also id.* ¶¶ 5, 21, 83.)

### C.  Plaintiffs' Complaint

#### 1.  Factual Allegations

Plaintiffs allege the following pertinent facts, which the courts accepts as true for purposes of Defendants' motions.

"The offerings in which Plaintiffs invested were structured as 'blind pool' offerings, in which Plaintiffs committed their money before knowing what properties the REITs would purchase with the net offering proceeds." (*Id.* ¶ 6.) After the DLA Defendants sold the first 5% of each of the REITs' shares for $10.50, they sold the rest of the shares at a fixed price of $11 per share. (*Id.* ¶¶ 8, 77.) Until sometime in February 2012, all of the REITs consistently paid the Plaintiffs monthly distributions equal to, on an annualized basis, approximately 7%-8% of their principal investments. (*Id.* ¶¶ 8, 79.) Plaintiffs believed that until approximately May 2011, the

---

[5] For all of the REITs' offerings, the DLA Defendants entered into an "Agency Agreement" with the Apple REITs, which "engaged DLA [Defendants] to solicit purchasers for shares in the Apple REITs." (Compl. ¶ 187.)

REITs "were performing sufficiently well to justify payment of dividends of 7% to 8%," and that Plaintiffs had a good chance of recovering their principal at the end of the investments' terms. (*Id.* ¶ 8.) Through the DLA Defendants' "Dividend Reinvestment Plan" ("DRIP"), many of the REITs' investors reinvested their distributions to acquire additional shares of open Apple REITs at the fixed price of $11 per share. (*Id.* ¶ 80; *see id.* ¶ 87.) The DLA Defendants are alleged to have encouraged its investors "to invest in multiple REITs." (*Id.* ¶ 87.)

Investors of the REITs have had the limited right to redeem their shares, and, if done within three years of their initial investment, investors would receive 92% of their principal investment. (*Id.* ¶ 81.) After three years, investors could redeem their shares for the full $11 purchase price. (*Id.* ¶ 81.) Redemptions after three years "were limited to 3% to 5% of the weighted average number of shares outstanding during the 12-month period immediately prior to the date of redemption." (*Id.* ¶ 81.) Hence, "if a substantial number" of investors "were to seek redemption at or about the same time, only a small fraction [of investors] would be eligible." (*Id.* ¶ 81.)

Because REITs are not publicly traded, Plaintiffs (1) anticipated "hold[ing] their shares for a five to seven year term, with the understanding that" the DLA Defendants would eventually "seek to list the shares on a national securities

exchange"; (2) relied "on the sale of properties or listing for the return of their principal"; and (3) relied "on the disclosures made by [the DLA Defendants] for information about the value of the REITs' shares."[6]  (*Id.* ¶ 3.)

In May 2011, FINRA filed a complaint against the DLA Defendants.[7]  (Compl. ¶ 9.)  After that lawsuit became public,

---

[6] Before the conclusion of the REITs' terms, investors seeking to sell their shares are alleged to have resold them either to the DLA Defendants or "in an inefficient secondary market, usually at severe discounts." (Compl. ¶ 3.)  Thus, Plaintiffs were disinclined to sell their shares before the conclusion of the REITs' terms.  (*See id.*)

[7] On October 23, 2012, Plaintiffs filed a letter informing the court that, on October 22, 2012, DLA Defendants and FINRA agreed to a settlement of FINRA's complaint.  (ECF No. 126, Pls. Ltr. at 1.)  In that letter, Plaintiffs urge the court to take judicial notice of the settlement, which was attached as an exhibit to the letter.  (*Id.*; ECF No. 126-1, Settlement.)  On October 26, 2012, DLA Defendants filed a letter in opposition to Plaintiffs' request, arguing that the settlement is irrelevant to this case because it does not constitute an adjudication of FINRA's complaint, and DLA Defendants specifically consented to the entry of findings as part of the settlement "without admitting or denying the allegations" of the complaint.  (ECF. No. 127, DLA Opp. Ltr. at 1; Settlement.)  On October 31, 2012, Apple REIT Defendants filed a letter joining in DLA Defendants' letter, and also noting that no Apple REIT Defendant was a party to the FINRA action.  (ECF No. 128, Apple REITs Opp. Ltr.)  On November 1, 2012, Plaintiffs filed a response to DLA Defendants' letter, citing cases in which district courts have held that "[t]here is no absolute rule barring a private plaintiff from relying on government *pleadings and proceedings* in order to meet the Rule 9(b) and PSLRA thresholds." (ECF No. 129, Pls. Response Ltr. at 1 (quoting *SEC v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010) (emphasis added)).)

Notwithstanding Plaintiffs' assertions, because DLA Defendants' *settlement* with FINRA "was the result of private bargaining, and there was no hearing or rulings or any form of decision on the merits," it is immaterial to the instant motion.  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).  Defendants have not specifically moved to strike references to the FINRA pleadings from the Complaint.  Rather, the DLA Defendants oppose the court taking judicial notice of the FINRA settlement as additional pleading of Plaintiffs' allegations.  *Cf. In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) ("[C]ourts in this Circuit have found repeatedly . . . that references to . . . administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial." (internal quotation marks omitted)); *see also id.* (collecting cases).  Indeed, one of the cases cited by Plaintiffs notes that "a consent judgment *that does not involve any admissions* and that results in . . .

"[r]edemption requests for all of the Apple REITs increased significantly, and the Apple REITs [have, as of February 17, 2012, ceased] granting 100% of the requests." (Id. ¶ 171.) "Despite the significant increase in the number of requests" for redemption, in or about October 2011 or February 2012, "REITs Six, Seven, and Eight announced plans to further limit the number of redemption requests that [would] be granted, dropping the . . . 3% to 5% limit down to 2% of the weighted average of outstanding units during the 12-month period immediately prior to the date of redemption." (Id. ¶ 172; see also id. ¶ 81.)

Following the filing of FINRA's complaint against DLA Defendants, Plaintiffs claim to have determined first that the Defendants "misrepresented the investment objectives of the Apple REITs, the dividend payment policy of the Apple REITs, and the value of their Apple REIT investments." (*Id.* ¶ 10.) All of the Apple REITs' stated investment objectives included "maximiz[ing] shareholder value by achieving long-term growth in cash distributions to [their] shareholders," "acquiring income-producing real estate," and "maximiz[ing] current and long-term net income and the value of [their] assets." (*Id.* ¶¶ 6, 10, 76.) Nevertheless, Plaintiffs claim, the REITs

---

penalties is just as frequently viewed . . . as a cost of doing business imposed by having to maintain a working relationship with a regulatory agency, *rather than as any indication of where the real truth lies.*" *SEC v. Citigroup Global Mkts. Inc.*, 827 F. Supp. 2d 328, 333 (S.D.N.Y. 2011) (emphasis added). Therefore, the court declines to take judicial notice of DLA Defendants' settlement with FINRA.

> pursued a policy of maintaining a steady 7%
> to 8% rate of distributions, without regard
> to the ability of the REIT to fund the
> distributions from operating income.  The
> Apple REIT's distribution policy was
> dictated by Defendants' interest in carrying
> on continuous sales of the REITs and the
> need for new capital to fund distributions
> to maintain the appearance that the REITs
> were operating profitably.  The Apple REITs
> set distribution rates to be competitive
> with other non-traded REITs and paid
> distributions without regard to
> profitability, even as they acquired
> properties at prices they knew could not
> conceivably justify the level of
> distributions they were paying.  Defendants
> nevertheless continued to solicit new
> investments from Plaintiffs and other
> investors using offering materials that
> contained false and misleading statements
> about the Apple REITs' investment objectives
> and coy references to the possibility they
> might return capital in the form of
> distributions for some limited period of
> time.

(*Id.* ¶ 11; *see id.* ¶ 79.)[8]  Plaintiffs claim that the stated

investment objectives were not followed because "the Apple REITs

---

[8] (*See also* Compl. ¶ 100):

"[E]ven as the market peaked in 2007, Apple REITs Six
and Seven were not generating sufficient income to
consistently pay 7% to 8% dividends to investors from
operating cash.
          . . . . Returning capital to investors
and taking on debt that must be serviced out of
future income and new investor proceeds limited the
REITs' ability to acquire income-producing assets,
and thus to generate future income for distribution
to investors, and reduced the value of the shares.");
*id.* ¶¶ 104-05 (second alteration in Offering
Documents) ("The offering documents [for each REIT
offering, which include the registration statements,
the prospectuses, and the prospectus supplements,]
say that '[d]istributions will be at the discretion
of our board [of directors]' and 'will depend on

operated in a manner inconsistent with" those objectives, as opposed to "the result of mismanagement or changes in investment objectives that occurred after Defendants had solicited Plaintiffs' investments." (*Id.* ¶ 10.)

Plaintiffs second claim that the REITs' disclosures "did not fairly appraise [*sic*] Plaintiffs of the following alleged investment objectives and policies implemented in operating earlier Apple REITs," as well as REITs Six through Ten:

> [A]cquiring properties at prices that ensured Apple REIT investors would lose a substantial portion of their principal unless the properties appreciated greatly in value; depleting the capital raised from investors to pay distributions at rates that far exceeded the operating income generated by the properties; and depleting capital to repurchase at inflated values the shares tendered by earlier investors who wished to liquidate their interests, in order to prevent the development of a secondary market in which Apple REIT shares traded for less than their stated value.

(*Id.* ¶ 12.)

Plaintiffs third allege that the following acts and practices of the Defendants "compounded the misleading

---

factors including: gross revenue we receive from our properties, our operating expenses, our interest expenses incurred in borrowing, capital expenditures, and our need for cash reserves.' In fact, [however,] the boards set distribution rates at a level that would promote further sales of Apple REIT shares and be competitive with other non-traded REITs."

impressions created by the written disclosures Defendants

circulated to" the Plaintiffs:

> DLA's marketing and sales presentations
> emphasized that investors could repose trust
> and confidence in David Lerner and his sales
> operatives; that David Lerner had developed
> a desirable "middle ground" investment
> strategy that permitted investors to achieve
> reasonable rates of return without assuming
> undue risks; that no investor had ever lost
> a penny investing in Apple REITs; that the
> Apple REITs paid attractive rates of return
> in comparison to other alternatives
> available to retail investors; that
> investments in the Apple REITs were
> desirable because they were shielded from
> fluctuations in the stock market; that Apple
> REIT investments would prove profitable
> because the REITs were acquiring highly
> desirable properties at attractive prices
> without incurring debt; and that the Apple
> REITs were appropriate investments for
> conservative, income oriented investors.[9]

(*Id.* ¶ 13.)  Plaintiffs claim that these alleged

misrepresentations were material because Plaintiffs relied upon

them.  (*See id.* ¶ 3.)  In addition, Plaintiffs claim that

although the REITs' shares were worth much less than $11, the

DLA Defendants' monthly customer account statements valued all

of the Apple REITs at the market price and market value of $11

until May 2011.  (*Id.* ¶¶ 13, 78.)  Subsequent to the May 2011

FINRA complaint, the DLA Defendants replaced the $11 valuation

on the statements with "not priced," "deleted the explanation of

---

[9] (*See also* Compl. ¶ 7 ("Plaintiffs were told the Apple REITs were
safe, conservative investments that would protect their savings from the
volatility of the stock market," "that previous Apple REITs had a track
record of paying dividends at a rate of return in the range of 7% to 8%").)

how the share value was calculated from the statements, and gave no explanation for the change to 'not priced.'" (*Id.* ¶¶ 13, 78, 173.)

Lastly, the Apple REIT Defendants are alleged to be jointly responsible for the DLA Defendants' alleged wrongdoings based on their contractual relationships. (*See id.* ¶¶ 187-94.)

### 2. Substantive Claims

Plaintiffs' thirteen-count complaint asserts the following claims:

Count One, asserted on behalf of Proposed Class Plaintiffs who acquired Apple REIT Ten shares and were damaged by misrepresentations or omissions of material facts in REIT Ten's registration statement, alleges that the DLA Defendants, REIT Ten, and those who served on the board of directors of REIT Ten violated section 11. (*Id.* ¶¶ 198-207.)

Count Two, asserted on behalf of Proposed Class Plaintiffs who acquired REIT Nine and/or Ten shares and were damaged by misrepresentations or omissions of material facts in REIT Nine and/or Ten's prospectuses or oral representations, alleges that the DLA Defendants and REIT Nine and Ten violated section 12(a)(2). (*Id.* ¶¶ 208-19.)

Count Three, asserted on behalf of Proposed Class Plaintiffs who acquired REIT Nine shares and were damaged by misrepresentations or omissions of material facts in REIT Nine's

prospectuses and/or oral representations, alleges that Apple Nine Advisors, Apple Suites Realty Group, Apple Fund Management, and Apple REIT Officers Waters, Wily, Kern, and Matson violated section 15.  (*Id.* ¶¶ 220-23.)

Count Four, asserted on behalf of Proposed Class Plaintiffs who acquired REIT Ten shares and were damaged by misrepresentations or omissions of material facts in REIT Ten's registration statements, prospectuses, or oral representations, alleges that Apple Ten Advisors, Apple Suites Realty Group, Apple Fund Management, Apple REIT Officers Colton, Hall, Keating, Rosenfeld, and Adams violated section 15.  (*Id.* ¶¶ 224-27.)

Count Five, asserted on behalf of Proposed Class Plaintiffs who acquired REIT Nine and/or Ten shares and were damaged by misrepresentations or omissions of material facts in REIT Nine and/or Ten's prospectuses or oral representations and/or REIT Ten's registration statement, alleges that Lerner violated section 15.  (*Id.* ¶¶ 228-31.)

Count Six alleges that DLA Defendants breached their common law fiduciary duty and/or aided and abetted that breach. (*Id.* ¶¶ 232-38.)

Count Seven alleges that the Apple Individuals breached their fiduciary duty under the REIT's bylaws and the North American Securities Administrators Association's Policy

Regarding Real Estate Investment Trusts, that Apple Affiliates aided and abetted that breach, and that Apple Individuals and Apple Affiliates aided and abetted the DLA Defendants' breach of fiduciary duty. (*Id.* ¶¶ 239-44.)

Count Eight alleges common law unjust enrichment on behalf of all Plaintiffs against Defendants. *(Id.* ¶¶ 245-50.)

Count Nine alleges common law negligence and breach of various federal and state laws "and applicable industry rules, regulations, and regulatory notices issued by FINRA or its predecessor, the National Association of Securities Dealers ("NASD"), including FINRA Rules 2010, 2020, 2710, and NASD Rules 2210 and 2310 against the Defendants. (*Id.* ¶¶ 251-55.)

Count Ten, asserted by individual plaintiff Berger on behalf of Connecticut Subclass Members, alleges that the DLA Defendants, Lerner, and REITs Eight, Nine, and Ten violated the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen. Stat. § 36b-4(a)(2) (misrepresentation or omission of a material fact made in connection with an offer, a sale, or a purchase of a security). (*Id.* ¶¶ 256-60.)

Count Eleven, asserted by individual plaintiff Berger on behalf of Connecticut Subclass Members, alleges that the Apple Individuals, DLA Defendants, and REITs Eight, Nine, and Ten violated the CUSA, Conn. Gen. Stat. § 36b-5(a)(2), by misrepresenting or omitting a material fact in connection with

16

advising another as to the value, purchase, or sale of a security, and § 36b-5(f), by engaging in dishonest or unethical practices in connection with investment security advice. (*Id.* ¶¶ 261-67.)

Count Twelve, asserted by individual plaintiff Berger on behalf of Connecticut Subclass Members, alleges that the Apple Individuals, DLA Defendants, and REITs Eight, Nine, and Ten violated the CUSA, Conn. Gen. Stat. § 36b-29(a)(2), by misrepresenting or omitting a material fact in connection with an offer or sale of a security. (*Id.* ¶¶ 268-75.)

Count Thirteen, asserted by individual plaintiff Murray on behalf of Florida Subclass Members, alleges that the Apple Individuals, DLA Defendants, and REITs Eight, Nine, and Ten violated the Florida Securities Investor Protection Act ("FSIPA"), Fla. Stat. § 517.301(1)(a), by obtaining money or property by means of a misrepresentation or omission of a material fact in connection with investment security advice or an offer, sale, or purchase of a security. (*Id.* ¶¶ 276-81.)

<u>**DISCUSSION**</u>

## I.    <u>Standard for Rule 12(b)(6) Motion to Dismiss</u>

Rule 12(b)(6) provides for the dismissal of a cause of action if plaintiff's complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to survive a motion to dismiss, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To determine whether a complaint states a plausible claim for relief, the Supreme Court has suggested a "'two-pronged approach.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, a court should begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plausibility standard, however, does not require a showing of a "probability" of misconduct, but it does demand more than a "sheer possibility that a defendant has acted unlawfully." *Id.*

18

A well-pleaded complaint may survive a motion to dismiss even where "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation and internal quotation marks omitted).  This is because the court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In conducting such an assessment on a Rule 12(b)(6) motion to dismiss, courts must "'accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). Further, courts may consider "the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit." *Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (internal quotations marks omitted).

When assessing the sufficiency of claims under sections 11 and 12(a)(2) of the Securities Act, "the structure of the analysis is guided by a preliminary inquiry into the

nature of the plaintiff's allegations.  Where the claims are
'premised on allegations of fraud,' the allegations must satisfy
the heightened particularity requirements of Rule 9(b) of the
Federal Rules of Civil Procedure."  *In re Morgan Stanley Info.*
*Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (internal
citation omitted).  However, where, as in this case, a
plaintiff's claims are not premised on allegations of fraud,
(*see generally* Compl.), Rule 8(a) governs the complaint and
"notice pleading supported by facially plausible factual
allegations is all that is required--nothing more, nothing less"
*Id.*

## II.  **Defendants' Motions to Dismiss**[10]

"[I]n securities actions, the Court may consider
'public disclosure documents required by law to be, and that
have been, filed with the SEC, and documents that the plaintiffs
either possessed or knew about and upon which they relied in
bringing the suit.'"  *Sedona Corp. v. Ladenburg Thalmann & Co.*,
No. 03 Civ. 3120, 2005 U.S. Dist. LEXIS 16382, at *17 (S.D.N.Y.

---

[10] Although the three groups of Defendants filed separate motions
to dismiss, in addition to the arguments made in each group's own motion,
Defendants incorporate by reference the arguments made in each other's moving
papers. (*See* ECF No. 118, DLA Defendants' Reply Mem. of Law in Supp. of Mot.
to Dismiss ("DLA Reply") at 15 n.20; ECF No. 108, Apple REITs' Mem. of Law in
Supp. of Mot. to Dismiss ("REITs Mem.") at 1 n.1; Apple Individuals and
Affiliates' Mem. of Law in Supp. of Mot. to Dismiss ("Individuals Mem.") at 1
n.1.) Further, because the claims against Defendants substantially overlap
and derive from the same body of operative facts, Plaintiffs oppose all three
motions in a single opposition brief. (*See generally* ECF No. 116,
Plaintiffs' Mem. of Law in Opp. to Defendants' Mots. to Dismiss ("Pls.
Opp.").) Therefore, the court refers to Defendants collectively throughout
this opinion, unless otherwise noted.

Aug. 8, 2005) (quoting *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000)).  The PSLRA further provides that "[o]n any motion to dismiss . . . , the court shall consider any statement cited in the complaint and any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).

In its consideration of Defendants' motions to dismiss and Plaintiffs' opposition thereto, the court has carefully reviewed the extensive exhibits submitted by the parties.  These exhibits include the Apple REITs' prospectuses and supplements; Form 10-Q, 10-K, and 8-K filings by the REITs to the SEC; "Subscription Agreements" by which investors certify to having received the prospectus; the "Acknowledgment of Risk" forms executed by the individual Plaintiffs; and charts by the parties that summarize the various disclosures at issue in this action. (*See generally* ECF No. 117, Decl. of Michael D. Blanchard in Supp. of DLA Defendants' Mot. to Dismiss ("Blanchard Decl.") Exs. A-K; ECF No. 116-2, Decl. of Dena C. Sharp in Supp. of Pls.' Opp. to Mots. to Dismiss ("Sharp Decl.") Exs. A-K.)

## A.    Plaintiffs' Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act

Defendants argue that each of Plaintiffs' claims pursuant to sections 11 and 12(a)(2) of the Securities Act fail as a matter of law.  (*See generally* ECF No. 115, DLA Defendants'

Mem. of Law in Supp. of Mot. to Dismiss ("DLA Mem.") at 13-23.)
Plaintiffs counter that the Complaint adequately pleads claims
against Defendants pursuant to sections 11 and 12(a)(2).  (*See
generally* Pls. Opp. at 20-49.)  Each of Plaintiffs' claims is
addressed below.

### 1.    Actionable Misrepresentations or Omissions

"Sections 11 [and] 12(a)(2) . . . of the Securities
Act impose liability on certain participants in a registered
securities offering when the publicly filed documents used
during the offering contain material misstatements or omissions.
Section 11 applies to registration statements, and section
12(a)(2) applies to prospectuses and oral communications."  *In
re Morgan Stanley*, 592 F.3d at 358 (citing 15 U.S.C. §§ 77k(a),
77l(a)(2).)

Section 11 "prohibits materially misleading statements
or omissions in registration statements filed with the SEC."
*Id.*

> To state a claim under section 11, the
> plaintiff must allege that: (1) she
> purchased a registered security, either
> directly from the issuer or in the
> aftermarket following the offering; (2) the
> defendant participated in the offering in a
> manner sufficient to give rise to liability
> under section 11; and (3) the registration
> statement "contained an untrue statement of
> a material fact or omitted to state a
> material fact required to be stated therein
> or necessary to make the statements therein
> not misleading."

*Id.* at 358-59 (quoting 15 U.S.C. § 77k(a)).  Section 11 "places a relatively minimal burden on a plaintiff," and is "designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who  play a direct role in a registered offering." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

"Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley*, 592 F.3d at 359.  "[T]he elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 15 U.S.C. § 77*l*(a)(2)).  Defendants do not dispute that they qualify as "statutory sellers" pursuant to section 12(a)(2).  (*See generally* DLA Mem.; Apple REIT Mem.; Apple Individuals Mem.)

23

In determining whether a securities offeror's statements are actionable under sections 11 and 12(a)(2), a court analyzes

> the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled.  The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (quoting *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

Finally, "unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."  *In re Morgan Stanley*, 592 F.3d at 359 (internal citation omitted).

           a.   The REITs' "Investment Objectives"

The Apple REITs' stated in their prospectuses that their investment objectives included "maximiz[ing] shareholder value by achieving long-term growth in cash distributions to [their] shareholders,'" "acquiring income-producing real estate," and "'maximiz[ing] current and long-term net income and the value of [shareholders'] assets."  (Compl. ¶¶ 6, 10, 76.)

24

Plaintiffs claim that the REITs' stated investment objectives constitute material misstatements or omissions because "defendants' true intention was to maintain the appearance that the REITs were profitable to continue selling shares and collecting fees." (*Id.* Counts One, Two; Pls. Opp. at 28.)  The court finds that plaintiffs fail to state a claim that the REITs' investment objectives constitute material misstatements or omissions.

The court first notes that to the extent Plaintiffs claim that Defendants intentionally hid their true intentions from investors and "at no time intended to, or did operate the REITs" according to the REITs' investment objectives, (*id.* at 23), this claim could only sound in fraud under section 10(b) of the 1934 Act, which Plaintiffs have not adequately pleaded pursuant to the heightened particularity requirement of Rule 9(b), *Apple v. Atlantic Yards Dev. Co. LLC.*, No. 11-CV-5550, 2012 U.S. Dist. LEXIS 84281, at *21 (E.D.N.Y. June 18, 2012) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  Indeed, Plaintiffs disclaim any intent to allege fraud under section 10(b) in this action. (Pls. Opp. at 19 n.5.)

Second, if Plaintiffs cannot and do not intend to allege intentional fraud, then claims that "[t]he REITs acquired properties that did not generate sufficient income to pay the

25

distributions [to shareholders] with cash," (Compl. at 97), must be viewed as "allegations constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, [which] cannot support claims under . . . §§ 11 and 12 of the Securities Act," *In re Donna Karan Int'l Secs. Litig.*, No. 97-CV-2011, 1998 U.S. Dist. LEXIS 22435, at *25 (E.D.N.Y. Aug. 14, 1998); *see also Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988) ("Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws.").

Third, it is well-established that "the investment objective announces the goal of the Fund, rather than a promise to investors.  The investment objective is not the type of statement that a reasonable investor would consider important in deciding whether or not to invest." *In re Alliance North Am. Gov't Income Trust, Inc. Sec. Litig.*, 1996 U.S. Dist. LEXIS 14209, at *12 (S.D.N.Y. Sept. 26, 1996); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (finding statements in marketing plans that defendant was "optimistic" and "expected" to do well was "puffery [that] cannot . . . constitute actionable statements under the securities laws.").  Further, pursuant to the "bespeaks caution" doctrine and the PSLRA's safe

26

harbor provision applicable to Plaintiffs' claims, a statement is not actionable where it is (1) identified as a forward-looking statement and accompanied by meaningful cautionary statements; (2) immaterial; or (3) not made with actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 77z-2(c). The Apple REITs expressly caution in their prospectuses that their objectives are forward-looking. (*See, e.g.*, Blanchard Decl. Ex. E at 15 (Apple REIT Ten prospectus: "We are a thinly-capitalized company and, as a result, you cannot be sure . . . if we will achieve the investment objectives described in this prospectus.").)

The cases cited by Plaintiffs in support of their claims regarding the Apple REITs' investment objectives are predominantly from courts outside of the Second Circuit, and are, at any rate, factually distinguishable from this case. For instance, in *Jones v. National Distillers & Chem. Corp.*, the district court denied defendant's motion for summary judgment because issues of material fact remained as to, *inter alia*, the defendant's failure to disclose the present fact that its board authorized higher payment for certain shares. 484 F. Supp. 679, 682-83 (S.D.N.Y. 1979). Likewise, *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, the plaintiffs' sufficiently pleaded misstatements of present fact, such as the defendant mutual fund's average portfolio duration and percentage of

assets invested in certain securities.  705 F. Supp. 2d 86, 92 (D. Mass. 2010); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 542 (N.D. Cal. 2009) (same).  In contrast, the Apple REITs' investment objectives contained no present and quantifiable statements of obviously aspirational fact; rather, the REITs' investment objectives consist of the type of open-ended "puffery [that] cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy." *San Leandro*, 75 F.3d at 811; (*see, e.g.*, Compl. at 97 (Amendments to registration statements for REITs Eight, Nine, Ten: "We seek to maximize current and long-term net income and the value of our assets").)

Having considered whether the Apple REITs' investment objectives "together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered," the court concludes that the objectives do not constitute actionable misrepresentations or omissions. *Rombach*, 355 F.3d at 173 (quotations marks omitted).

  b. *The REITs' Disclosure of Distribution Policies*

Plaintiffs claim that "statements in the Apple REIT Nine and Ten offering documents about the policy of payment

28

distributions to shareholders were misleading." (Compl. Counts One, Two; Pls. Opp. at 29.) The court finds that Plaintiffs' claim fails as a matter of law.

The Apple REITs disclosed in their offering documents and other filings that distributions may be paid from offering proceeds, as well as the historic record of past REITs' distribution sources, no fewer than 127 times. (*See generally* Blanchard Decl. Ex. G at 8-57 (excerpts of disclosures from the Apple REITs' SEC filings concerning the payment of distributions from sources other than operating income).) For instance, Prospectus Supplement 7 for Apple REIT Six, dated October 23, 2004, discloses in no uncertain terms that of the $867,000 in dividends (or distributions) paid to shareholders through June 30, 2004, "substantially the entire dividend was a return of capital." (Blanchard Decl. Ex. G at 8.) There are dozens of similarly unambiguous disclosures throughout the prospectuses and other public filings of each REIT at issue here. (*See, e.g.*, *id.* at 5 (Apple REIT Nine prospectus: "Our distributions to our shareholders may not be sourced from operating cash flow but instead from *offering proceeds* or indebtedness, which (to the extent it occurs) will decrease our distributions in the future." (emphasis added)); *id.* at 7 (Apple REIT Ten prospectus: "While we will seek generally to make distributions from our cash generated from operations, we might make distributions

29

(although there is no obligation to do so) in certain circumstances in part from financing proceeds . . . or . . . proceeds from our offering of Units.  *There is no limit on the amount of distributions that may be funded with offering proceeds or proceeds from debt, as opposed to cash generated from operations.*" (emphasis added)); *see generally id.* at 2-57.)

Defendants cannot be alleged to have misrepresented or omitted that which they plainly disclosed.  *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("[T]he Prospectus [is] the single most important document and perhaps the primary resource an investor should consult in seeking [] information"); *In re UBS Auction Rate Sec. Litig.*, Nos. 08-CV-3082, *et al.*, 2010 U.S. Dist. LEXIS 59024, at *56 (S.D.N.Y. June 10, 2010) (granting defendants' motions to dismiss where prospectuses "disclosed that Defendants could, although they were not obligated to do so, engage in the very conduct of which Plaintiffs primarily complain"); *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 194 (S.D.N.Y. 2006), *aff'd* 209 Fed. Appx. 80, 81-82 (2d Cir. 2006) (dismissing complaint where all facts plaintiffs alleged were concealed were, in fact, revealed in public filings).

Nonetheless, Plaintiffs argue that the REITs' disclosure that they "may from time to time distribute funds that include a return of capital," (Sharp Decl. Ex. A at 4-5),

was misleading because, in fact, it was "a certainty that distributions would always be sourced by funds other than operating income," (Pls. Opp. at 30).  Plaintiffs' argument has, however, been expressly rejected by the Second Circuit in *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011).  There, the Second Circuit noted that the defendant's "statement that it 'may routinely' place support bids is not inconsistent with the possibility that it would place such bids in every . . . auction that took place over a particular period."  *Id.* at 133.  The Circuit further noted that while plaintiff "read[] the word 'may' as speaking to the likelihood that [defendant] would place support bids, an investor could more easily understand the word as disclosing merely that [defendant] was permitted, but not required, to place bids for its own account to prevent an auction from failing."  *Id.* (citing *Webster's Third New International Dictionary* 1396 (2002) (defining "may" to mean, *inter alia*, "have permission to," "have liberty to," and "be in some degree likely to")).

Recently, the Second Circuit further underscored the speciousness of Plaintiffs' argument in *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98 (2d Cir. 2012), in which a party attempted to distinguish *Wilson* in the same way that Plaintiffs do.  The *Anschutz* plaintiff, similar to Plaintiffs here, argued that "[b]y the time the offering statements were

31

issued, [defendant] knew that it would participate . . . in 100 percent" of the events that defendant disclosed it "may" participate in.  *Id.* at 108-09.  The Circuit rejected plaintiff's argument, noting that the *Wilson* complaint, which was properly dismissed, alleged the same theory of misrepresentation.  *See id.* at 109.

Plaintiffs also attempt to distinguish *Wilson* by arguing that it, unlike this case, involved 1934 Act claims that were subject to Rule 9(b) pleading.  (Pls. Opp. at 32.) Plaintiffs' assertion, however, that the analysis of whether a statement is materially misleading differs under the 1933 Act and the 1934 Act is unsupported by Second Circuit law.  *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) ("The central inquiry in determining whether a prospectus is materially misleading under both Section 10(b) and Section 11 is therefore whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." (quotation marks omitted) (alteration in original)); *see also Rombach*, 355 F.3d at 178 n.11 (same).

The court notes that Plaintiffs' assertion that the Apple REITs' distributions were "always" sourced by the return of capital, (Pls. Opp. at 30), is based on Plaintiffs' misguided aggregation of the REITs' distribution history on an annual

32

basis, whereas the Complaint correctly notes that the REITs made distributions to shareholders on a monthly basis, (*see* Compl. ¶ 16; *see also* Blanchard Decl. Ex. E at 9 (Apple REIT Ten prospectus: "We intend to make monthly distributions commencing after the first full month following the closing of the minimum offering of 9,523,810 Units").)   Therefore, Plaintiffs' claim that the Apple REITs' distributions were "always" sourced by the return of capital is purely speculative.   *See Iqbal*, 556 U.S. at 679.

Defendants have demonstrated that the Apple REITs' distribution policies, as stated in their prospectuses, were not misleading given that the prospectuses "state[] exactly the fact[s] that [Plaintiffs] contend[] [have] been covered up,". *Pincus*, 936 F.2d at 762.

c.   *The REITs' Valuation of Shares*

Plaintiffs claim that the REITs' disclosure in its offering documents that the $11 share prices "have been established arbitrarily by us and may not reflect the true value of the Units," (Sharp Decl. Ex. A at 7), "was false and misleading because in fact defendants chose and maintained an $11 share price to compete with other non-traded REITs, nearly

33

all of which sold for $10,"[11]  (Compl. Counts One, Two; Pls. Opp.
at 34).  The court finds that the REITs' valuation of shares was
not misleading, and therefore not actionable.

In addition to stating explicitly that the $11 share
price was established arbitrarily, the REITs' offering documents
further disclosed that the price "may not reflect the true value
of the Units," that *investors may be paying more for a Unit
than the Unit is actually worth*" and should not "assume that the
per-Unit prices reflect the intrinsic or realizable value of the
Units or otherwise reflect our value, earnings or other
objective measures of worth," and that "*investors will not have
reliable information on the net fair value of the assets owned
by us*." (Blanchard Decl. Ex. E at 17, 26, 100 (Apple REIT Ten
prospectus) (emphasis in original).)  Further, although the
Complaint offers a panoply of methods by which the REITs'
objective values can be measured, (Compl. ¶¶ 110, 122, 126-31,
133, 140, 176, 180), Plaintiffs also acknowledge that the "Apple
REITs are not traded on any exchanges" and thus "not subject to
the scrutiny of the market" or a valuation based on trading
price, (*id*. ¶ 112).  Therefore, the REITs cannot by any means be
said to have misrepresented the basis for their share prices.
As Defendants note, the nine different metrics by which

---

[11] Plaintiffs' underlying allegation again sounds in fraud.
Additionally, Plaintiffs acknowledge that two other non-traded REITs sold
shares for $20 and $25, but omitted these prices from their analysis because
these prices were "far above the rest of the REITs." (Pls. Opp. at 34.)

Plaintiffs claim that the REITs' actual value can be ascertained each produce different results, underscoring the impossibility of calculating the REITs' value, or any other investment's value, with empirical certainty.  (DLA Mem. at 17.)

These realities and inherent difficulties in ascertaining the value of REIT shares necessarily means that investment valuations "can only fairly be characterized as subjective opinions." *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989, 2011 U.S. Dist. LEXIS 2667, at *28 (S.D.N.Y. Jan. 5, 2011) (internal quotation marks omitted); *see also id.* at *28-29 ("The assets here 'were not traded on the New York Stock Exchange or some other efficient market where the fair market value typically is the price at which a share or other asset is trading at any given moment. . . . Rather, the value of such assets is a matter of judgment and opinion.'" (quoting *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122-23 (S.D.N.Y. 2010)).

Furthermore, "[s]ubjective opinions are only actionable under the Securities Act if a complaint alleges that the speaker did not truly have the opinion at the time it was made public." *Id.* (internal quotation marks omitted). Plaintiffs additionally argue that Defendants "did not 'have the opinion'" that the shares were worth $11 because Defendants stated that the offering share prices were established

35

"arbitrarily" in their disclosures.  (Pls. Opp. at 35.)  Yet, Plaintiffs do not provide any specific explanation as to how Defendants did not actually have the opinion that the REITs' $11 share prices were arbitrary.  The Defendants expressly disclosed in the REITs' offering documents that if Apple REIT shares were traded on a public market, they might trade for less than $11 per share.  (*See, e.g.*, Blanchard Decl. Ex. E at 17, 26, 100.) Consequently, Plaintiffs' allegation that Defendants misrepresented or omitted the market value of the Apple REITs' shares is without merit.

Plaintiffs' remaining arguments regarding the valuation of Apple REIT shares are irrelevant to the sufficiency of Plaintiffs' section 11 and 12(a)(2) clams.[12]  Accordingly, the court finds that Plaintiffs' claim that the Apple REITs misled investors about the valuation of REIT shares fails as a matter of law.

---

[12] Plaintiff's invocation of FINRA Rule 2340 is irrelevant to this action.  (*See* Pls. Opp. at 34-35; Sharp Decl. Ex. G (Rule 2340).)  First, Rule 2340 concerns estimated investment values in account statements, not offering documents.  *See Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788, 1995 U.S. Dist. LEXIS 5909, at *46 (S.D.N.Y. May 2, 1995) (holding, pursuant to *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), that "Portfolio Evaluations" (account statements) "cannot be prospectuses"); (*see generally* Sharp Decl. Ex. G).  Second, because FINRA does not provide a private right of action, DLA Defendants' alleged violations of FINRA rules are irrelevant to Plaintiffs' Securities Act claims.  *See Weinraub v. Glen Rauch Sec., Inc.*, 399 F. Supp. 2d 454, 462 (S.D.N.Y. 2005) ("[Plaintiff] cannot state a valid cause of action based on violations of New York Stock Exchange and NASD," (FINRA's predecessor), "rules and guidelines, as these rules confer no private right of action").

                 d.   The Past Performance of Earlier REITs

          Plaintiffs claim that the Apple REITs' offering

documents contained actionable misstatements and omissions about

the performance of prior REITs.  (Compl. Counts One, Two; Pls.

Opp. at 36.)  Plaintiffs specifically challenge the veracity of

the Apple REITs' statement in its various prospectuses and other

offering documents that "[i]n general, the investment objectives

of the . . . [REITs] previously organized by Mr. Knight . . .

were similar to our investment objectives of achieving long-term

growth in cash distributions, together with possible capital

appreciation, through the acquisition, ownership and ultimate

disposition of properties."  (Pls. Opp. at 36 (citing Sharp

Decl. Ex. A at 8-9).)  Plaintiffs claim this statement was

misleading because it "does not inform investors that the prior

REITs have not generated sufficient income to pay their constant

7% to 8% distributions solely from operating income, and that

the REITs relied on a combination of borrowing and returning

investor capital to make up the difference."  (Id. at 36-37.)

          The REITs' prospectuses, however, explicitly disclose

the income from operations, distribution amounts, and

distribution sources, including "return of capital," of the

prior REITs.  (Blanchard Decl. Exs. D at 142 tbl.3; E at 123-

25); Nadoff v. Duane Reade, Inc., 107 Fed. App'x 250, 252 (2d

Cir. 2004) ("Accurate statements about past performance are self

                                 37

evidently not actionable under the securities laws,"). The REITs' statements about past performance are therefore not misleading and not actionable.[13]

For the above reasons, Plaintiffs' claims that Defendants made material misrepresentations or omissions pursuant to sections 11, 12(a)(2), and 15 fail as a matter of law. Therefore, Counts One and Two of the Complaint are dismissed.

### 2. Loss Causation

Plaintiffs' section 11 and 12(a)(2) claims also fail as a matter of law on the independent ground that Plaintiffs have failed to allege any loss or damages attributable to Defendants. This necessarily means that Plaintiffs cannot establish that Defendants' purported "misstatement[s] or omission[s] concealed something from the market that, when disclosed, negatively affected the value of the security." *Amorosa v. AOL Time Warner, Inc.*, 409 Fed. App'x 412, 415 (2d Cir. 2011). Plaintiffs correctly note that "claims under sections 11 and 12 do not require allegations of . . . loss

---

[13] Plaintiffs' claim that the Apple REIT offering documents "do not comply" with Guide 5 of the Securities Act Industry Guidelines ("Guide 5") is also irrelevant to Plaintiffs' claims. (*See* Pls. Opp. at 36-38.) "Guide 5 . . . 'is not a Commission rule nor is it published as bearing the Commission's official approval.'" *See* SEC, Staff Observations in the Review of Promotional and Sales Material Submitted Pursuant to Securities Act Industry Guide 5, at n.1 (Dec. 19, 2011) (quoting Securities Act Release No. 33-5692, Fed. Sec. L. Rep. (CCH) ¶ 80,405 (Mar. 17, 1976)); *see also New York City Emples. Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995) (noting that interpretive rules "do not have force of law").

causation." *Fait*, 655 F.3d at 109; *see also In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion,"); *but see id.* ("[C]ourts have, on occasion, found dismissal of Section 11 and 12 claims based on a negative causation defense proper in light of the allegations pleaded in the complaint,").  Nonetheless, the absence of loss causation is an affirmative defense to a section 11 claim, upon which a court may dismiss an action when it is "clear from the face of the pleadings that plaintiff suffered no damages." *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 514 (S.D.N.Y. 2009); *see also Amorosa*, 409 Fed. App'x at 417 ("The absence of loss causation is an affirmative defense to a section 11 claim, but it is here apparent from the face of the complaint.  It is thus a proper basis on which to dismiss the claim."); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint,"); *In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.*, 774 F. Supp. 2d 584, 595 (S.D.N.Y. 2011) (same); *In re Britannia Bulk Holdings*

*Inc. Secs. Litig.*, 665 F. Supp. 2d 404, 419-20 (S.D.N.Y. 2009) (same). Such is the case here.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). "The PSLRA codified this judge-made requirement: 'In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(4)). "[T]o establish loss causation, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Id.* at 173 (internal quotations marks omitted) (emphasis in original); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2003) (loss causation is satisfied where the plaintiffs "specifically assert[] a causal connection between the concealed information . . . and the ultimate failure of the venture.").

Plaintiffs go to great pains to contest the

40

Defendants' purportedly "narrow formulation of loss causation," (*see* Pls. Opp. at 42-46.); however, there can be no question that plaintiffs "must nevertheless satisfy the court that [they have] suffered a cognizable injury under the statute," *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781, 2010 U.S. Dist. LEXIS 32058, at *15 (S.D.N.Y. Mar. 31, 2010) (quotation marks omitted). Plaintiffs do not claim that any Apple REIT shareholder has ever received less than $11 per share, and in fact concede that the REITs redeem shares at $11 consistent with the redemption policy contained in the prospectuses. (*See* Compl. ¶ 111; *see also* Blanchard Decl. Ex. E at 13-14, 27 (detailing in Apple REIT Ten prospectus the terms and limitations of the REIT's Unit Redemption Program).) Further, nowhere in Plaintiffs' sprawling 108-page Complaint is there a single allegation that Plaintiffs have not consistently received monthly distributions on their shares. (*See generally* Compl.) Nor could Plaintiffs claim any loss in the value of their investment upon the REITs' sale on a national securities exchange or consolidation with another REIT because, at the time the Complaint was filed, none of REITs Six through Ten had yet completed the five to seven year term before the REITs' management could attempt to do so. (*See id.* ¶ 3.) Furthermore, the cases cited by Plaintiffs in which shareholders' investments lost value are factually distinguishable from this case. *See,*

41

*e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 U.S. Dist. LEXIS 47512, at *6 (S.D.N.Y. Mar. 29, 2010) ("Plaintiff alleges that the value of its Certificates plummeted by 79% shortly after purchase"); *cf. id.* at *15-16 (noting that presumption that "true value to the investor is the price at which [shares] may later be sold" is inapplicable where "investors d[o] not allege a loss from selling the securities at a reduced price").

Plaintiffs also imply that they were induced into purchasing their shares by the Defendants' alleged misrepresentations.  (*See* Compl. ¶ 186.)  This allegation "makes out transaction causation—not loss causation."  *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006) (averring in a Securities Act complaint that, "but for defendants' material omissions, plaintiffs would not have invested in the securities is sufficient to plead only transaction causation or reliance,").  However, "it is long settled that a securities-fraud plaintiff must prove both transaction and loss causation."  *Lentell*, 396 F.3d at 17 (quotation marks omitted).  Moreover, "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality."  *Id.* at 174 (quotation marks omitted); *see also Emergent Capital Inv. Mgmt.,*

*LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003)
("Plaintiff's allegation of a purchase-time value disparity,
standing alone, cannot satisfy the loss causation pleading
requirement.")

Here, Plaintiffs cannot possibly establish loss
causation because, as the Complaint details, "[t]he Apple REITs
are not traded on any exchange." (Compl. ¶ 112.) Consequently,
in the absence of the Apple REITs having already been sold on a
public trading market, Defendants cannot be alleged to have
"concealed something from the market that, when disclosed,
negatively affected the value of the security." *Lentell*, 396
F.3d at 173. Indeed, "where the [investment's value] does not
react to [] any misstatements in the [defendant's] prospectus,
no connection between the alleged material misstatement and a
diminution in the security's value has been or could be
alleged." *In re State Street*, 774 F. Supp. 2d at 596.

Finally, Plaintiffs themselves acknowledge that to the
extent that the Apple REITs have not performed as well as
Plaintiffs would have liked or anticipated, "the extended stay
and limited service hotel sector began to suffer due to the
real estate market crash and subsequent credit crunch" in 2007
and 2008. (Compl. ¶ 119; *see also id*. ¶ 163 (noting the
negative "impact of the economy on the hotel industry").) This
further illustrates Plaintiffs' inability to overcome a loss

causation affirmative defense by Defendants. *Cf. In re Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 CIV 9690, 2008 U.S. Dist. LEXIS 44344, at *22 (S.D.N.Y. June 4, 2008) ("[Plaintiff's] failure to allege that his losses were due to the purported fraud, rather than to the market-wide collapse of the Internet sector, also requires dismissal"). True, the fact that a plaintiff's losses coincide with a market-wide phenomenon does not "necessarily *eliminate[]* a plausible connection" between a plaintiff's losses and a defendants' misstatements or omissions. *King County v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) (emphasis in original). Here, however, Plaintiffs have failed to proffer an actionable theory of loss.

In sum, Plaintiffs' belabored Complaint appears only to confirm that the Apple REITs are currently functioning in exactly the manner that was anticipated and disclosed in the REITs' prospectuses and other offering documents. Once more, Counts One and Two against Defendants for violations of sections 11 and 12(a)(2) are dismissed.

**B.   Plaintiffs' Claims for Violations of Section 15 of the Securities Act**

Plaintiffs claim that the Apple Individuals & Affiliates and Lerner should be jointly and severally liable pursuant to section 15, which establishes so-called "control

44

person" liability under the Securities Act.   (Compl. Counts
Three, Four, Five; Pls. Opp. at 49-53.)   Specifically,
"[s]ection 15 . . . creates liability for individuals or
entities that 'control[] any person liable' under section 11 or
12.   Thus, the success of a claim under section 15 relies, in
part, on a plaintiff's ability to demonstrate primary liability
under sections 11 and 12."   *In re Morgan Stanley*, 592 F.3d at
358 (quoting 15 U.S.C. § 77o); *see also Anegada Master Fund,
Ltd. v. PXRE Group Ltd.*, 680 F. Supp. 2d 616, 624 (S.D.N.Y.
2010) ("In order to state a claim for liability under section 15
of the Securities Act, a plaintiff must allege (a) a primary
violation by a controlled person, and (b) control by the
defendant of the primary violator." (internal quotation marks
omitted).

    Because Plaintiffs have failed to plead a primary
violation of sections 11 and 12(a)(2) against Defendants, Counts
Three, Four, and Five of the Complaint, alleged pursuant to
section 15, must also be dismissed.   *See Rombach*, 355 F.3d at
178; *Anegada*, 680 F. Supp. 2d at 624.

**C.   Plaintiffs' Common Law Claims**

    Without invoking any state's laws, Plaintiffs allege
four common law claims against Defendants: (1) breach of
fiduciary duty and aiding and abetting breach of fiduciary duty
against the DLA Defendants, (Compl. Count Six), the Apple REITs,

45

the Apple Individuals, and the Apple Affiliates, (*id.* Count Seven); (2) unjust enrichment against all Defendants, (*id.* Count Eight); and (3) negligence against all Defendants, (*id.* Count Nine).

Plaintiffs first suggest that in order to adjudicate Plaintiffs' common law claims, the court would need to conduct a choice-of-law analysis in order to determine which state's common law applies to each individual Plaintiff's claim. (*See* Pls. Opp. at 61-62.)  Plaintiffs then argue that because such an analysis "requires a fact-specific determination and the necessary facts are unavailable prior to discovery," Plaintiffs' common law claims cannot be subject to dismissal. (*Id.* at 61.) Indeed, the Complaint alleges only general claims against Defendants, and does not invoke any particular state's law. (*See* Compl. ¶¶ 232-55.)  Plaintiffs, however, cannot rely on their own unspecific pleading to save their common law claims.[14] No matter the specific state law basis for their common law claims, Plaintiffs must sufficiently allege that they were in some way harmed by Defendants, which Plaintiffs cannot do.  Each

---

[14] The nonspecific nature of Plaintiffs' claims, in some instances by all Plaintiffs against all Defendants, (Compl. Counts Eight, Nine), may justify dismissal of Plaintiffs' claims in and of itself, *see Coakley v. Jaffe*, 49 F. Supp. 2d 615, 629 (S.D.N.Y. 1999) ("Even under the liberal standards of notice pleading, a complaint must contain specific allegations of fact indicating a deprivation of rights, not a mere litany of general conclusions that . . . have no meaning") (internal quotations marks omitted); *accord Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994).

of Plaintiffs' common law claims in Counts Six, Seven, Eight, and Nine must therefore be and are dismissed.

### 1.   Breach of Fiduciary Duty

Irrespective of the nature of the duty Defendants owed to Plaintiffs and are alleged to have breached, in order to state a claim for breach of fiduciary duty, "damages remains an element of the cause of action." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 50 (2d Cir. 2005); *see also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48 (2d Cir. 1987) ("[Plaintiffs] must prove . . . that [they] suffered damages as a result of the breach").

As the court previously discussed, Plaintiffs have failed to sufficiently plead any damages as a result of Defendants' purported misrepresentations or omissions with respect to the Apple REITs.  To the contrary, the Complaint alleges that Plaintiffs have in fact consistently earned money from the Apple REITs.  (*See* Compl. ¶ 183 (discussing the REITs' "consistent 7-8% distributions").)  Accordingly, Plaintiffs' claim for common law breach of fiduciary duty must be and is dismissed.

A claim for aiding and abetting a breach of fiduciary duty must, as a matter of law, fail where no underlying breach of fiduciary duty claim lies. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *Schandler v. New York Life*

*Ins. Co.*, No. 09 Civ. 10463, 2011 U.S. Dist. LEXIS 46322, at *49
(S.D.N.Y. Apr. 26, 2011).  Therefore, Plaintiffs' claim against
Defendants for aiding and abetting a breach of fiduciary duty is
also dismissed.

### 2. Unjust Enrichment

The court first notes that "unjust enrichment [will]
only exist where no prior agreement govern[s] the rights of the
parties: A quasi or constructive contract . . . is an obligation
which the law creates, *in the absence of any agreement*."
*Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*,
377 F.3d 209, 213 (2d Cir. 2004) (emphasis added) (internal
quotation marks omitted).  The Subscription Agreements and
Acknowledgment of Risk forms between Plaintiffs and Defendants
constitute the basis on which the rights of the parties are
governed, rather than a theory of unjust enrichment.

Nonetheless, it is also clear that Plaintiffs' unjust
enrichment claims must be dismissed for Plaintiffs' inability to
sufficiently allege any loss.  In order to prevail on a claim
for unjust enrichment, Plaintiffs must establish (1) that
Defendants were enriched; (2) that the enrichment was at
Plaintiffs' expense; and (3) that the circumstances are such
that in equity and good conscience Defendants should return the
money or other such enrichment to Plaintiffs.  *See, e.g.*, *Golden
Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001) (noting

48

elements under New York law); *see also McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 175 (E.D.N.Y. 2009) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)).

Because Plaintiffs have failed to plead any actionable damages or loss, Plaintiffs' common law unjust enrichment claim must be and is dismissed. *Cf. Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187, 190-91 (2d Cir. 2001) (reversing dismissal of unjust enrichment claim where there was "sufficient evidence of loss causation"), *abrogated on other grounds by Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 N.Y.3d 341 (2011).

### 3. Negligence

"A tort is comprised of (1) breach of a legally-imposed duty, and (2) *an injury* proximately caused by that breach." *Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 129 (2d Cir. 1991) (citing W. Keeton, *Prosser & Keeton on the Law of Torts* § 1, at 1-7 (5th ed. 1984) (emphasis added); *see also Tufariello v. Long Island R.R.*, 458 F.3d 80, 87 (2d Cir. 2006) ("To establish causation in a common law negligence action, a plaintiff generally must show that the defendant's conduct was a 'substantial factor in bringing about the *harm*'" (quoting Restatement 2d of Torts § 431(a) (emphasis added)); *Arlington Park Racetrack, Ltd. v. SRM Computers, Inc.*, 674 F. Supp. 986,

994 (E.D.N.Y. 1987) (harm or loss to plaintiff is necessary element of all torts).

Once again, Plaintiffs have failed to plead any cognizable theory of loss or harm.  Accordingly, Plaintiffs' common law negligence claim must be and is dismissed.

In light of the foregoing, the court declines to address Defendants' remaining arguments in support of dismissal of Plaintiffs' common law claims.

### D.   Plaintiffs' Claims for Violations of the Connecticut and Florida Exchange Acts

#### 1.   CUSA

Individual plaintiff Berger alleges claims against the DLA Defendants, Apple REITs Eight, Nine and Ten, the Apple Individuals, and Knight, pursuant to Connecticut's Blue Sky law, CUSA §§ 36b-4, 36b-5, and 36b-29(a).  (Compl. Counts Ten, Eleven, Twelve.)  Sections 36b-4 and 36b-5 mandate that "no person shall, in connection with the offer, sale or purchase of any security . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ."  Conn. Gen. Stat. § 36b-4(a); *see* Conn. Gen. Stat. §§ 36b-5(a).  Section 36b-29(c) is CUSA's section 15 "control person" analog.  *See* Conn. Gen. Stat. § 36b-29(c).

In order to establish a claim under Section 36b of CUSA, "there must be a primary violator." *Connecticut Nat'l Bank v. Giacomi*, 242 Conn. 17, 46 (1997). To establish the liability of a primary violator, Berger must prove: "(1) that the primary violator offered or sold a security by means of either an untrue statement of a material fact, or an omission to state a material fact necessary to make any statements made, in the circumstances of their making, not misleading; and (2) that the buyer did not know of the untruth or omission." *Id.* As Defendants note, Plaintiffs do not dispute that all of their [CUSA] claims must fail absent a material misrepresentation or omission, or unless Plaintiffs knew of the untruth or omission. (DLA Reply at 18; *see generally* Pls. Opp.)

As the court previously held, *supra*, Plaintiffs' claims that Defendants made untrue statements or omissions of material facts in the offer and sale of Apple REIT shares fail as a matter of law. Because Berger cannot sufficiently plead the first element of a Section 36b claim, Berger's CUSA claims in Counts Ten, Eleven, and Twelve, which are based on the same allegations of fact, must also be and dismissed for failure to

state a claim.[15]  Therefore, the court need not address the

parties' remaining arguments regarding this claim.

### 2.   FSIPA

Lastly, individual plaintiff Murray alleges claims

against the DLA Defendants, Apple REITs Eight, Nine and Ten, the

Apple Individuals, and Knight, pursuant to Florida's Blue Sky

law, FSIPA § 517.301 (Compl. Count Thirteen.)  Section 517.301

makes it unlawful for any person

> in connection with the offer, sale, or
> purchase of any investment or security . . .
> [t]o obtain money or property by means of
> any untrue statement of a material fact or
> any omission to state a material fact
> necessary in order to make the statements
> made, in light of the circumstances under
> which they were made, not misleading . . . .

*Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578, 584-85

(S.D.N.Y. 2011) (citing Fla. Stat. § 517.301(1)(a)).  To state a

claim under § 517.301, Murray must allege: "(1) a

misrepresentation or omission of material fact; (2) that this

misrepresentation or omission was justifiably relied on; and (3)

scienter."  *Id.* (citing *Durden v. Citicorp Trust Bank, FSB*, No.

---

[15]  Alternatively, Berger's § 36b-4 claims would also have to be
dismissed because § 36b-4 does not provide a private cause of action.  *See*
*Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011, 1023 (D. Conn.
1994) (declining to find a private cause of action under § 36b-4's
predecessor statute, § 36-472).  Although, as Plaintiffs note, more recent
courts have permitted plaintiffs to recover under § 36b-4, those courts have
not addressed whether § 36b-4 in fact provides a private cause of action.
*See IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 518 (D. Conn.
2005); *Miller v. Inverness Corp.*, No. CV980071530S, *et al.*, 2000 Conn. Super.
LEXIS 2771, at *27 (Conn. Super. Ct. Oct. 18, 2000).

3:07 civ. 974-J-34, 2009 U.S. Dist. LEXIS 127347, at *17 (M.D. Fla. Aug. 21, 2009)).

As the court previously held, *supra*, Plaintiffs' claims that Defendants made untrue statements or omissions of material facts in the offer and sale of Apple REIT shares fail as a matter of law. Because Murray cannot sufficiently plead the first element of a § 517.301 claim, Murray's FSIPA claim in Count Thirteen, which is based on the same allegations of fact, must also be and is dismissed for failure to state a claim. *See Jankovich v. Bowen*, 844 F. Supp. 743, 749 (S.D. Fla. 1994) (dismissing FSIPA claim for, among other reasons, failure to adequately allege material misrepresentations). Therefore, the court need not address the parties' remaining arguments regarding this claim.

## III. **Plaintiffs' Request for Leave to Amend**

"'[I]t is within the sound discretion of the district court to grant or deny leave to amend.'" *Wilson*, 671 F.3d at 139 (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "[W]here amendment would be futile, denial of leave to amend is proper." *Id.* at 140 (quotation marks omitted). Although Plaintiffs' Complaint, spanning 281 paragraphs and 108 pages, is the first iteration of a Consolidated Class Action Complaint, it is the fifth complaint to be filed by the various individual Plaintiffs, all of which

53

assert similar claims.  Plaintiffs have not "indicated to the . . . court how further amendment would permit [them] to cure the deficiencies in the complaint," nor have they "explained how they could cure the deficiencies that led to the dismissal of [their] complaint."  *Id.;* (Pls. Opp. at 76).  "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile."  *Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 883 (S.D.N.Y. 2011).  Plaintiffs' request for leave to amend the complaint is therefore denied.  *See Wilson* at 140 (affirming denial of leave to amend due to lack of "some indication as to what appellant[] might add to [his] complaint in order to make it viable" (alterations in original)); *see also Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) (dismissing twice-amended complaint with prejudice on first motion to dismiss); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (dismissing once-amended complaint on first motion to dismiss "because the flaws in pleading are incurable on the facts of this case").

## IV.  **Rule 11 Inquiry**

"The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and

each attorney representing any party with each requirement of Rule 11(b).'" *Rombach*, 355 F.3d at 178 (quoting 15 U.S.C. § 78u-4(c)(1)); *see also Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir. 1999) (noting that the PSLRA "functions . . . to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all"). Further, "if the court finds that any party or lawyer violated Rule 11(b), the PSLRA mandates the imposition of sanctions." *Rombach*, 355 F.3d at 178 (citing 15 U.S.C. § 78u-4(c)(2)).

Rule 11(b) pertains to parties' representations to the court, and states that:

> By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if

> specifically so identified, are reasonably
> based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

In this case, none of the parties have alleged that another party's submissions to the court have violated Rule 11(b). Additionally, although the court herein dismisses Plaintiffs' complaint in its entirety with prejudice, "[t]he operative question is whether [Plaintiffs'] argument[s] [are] frivolous, *i.e.*, the legal position[s] ha[ve] 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (quoting *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)). In light of FINRA's prior complaint against DLA Defendants, which Plaintiffs admit sparked this action, the court finds that Plaintiffs' Complaint was not frivolous, and therefore finds that sanctions are not warranted.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss the Amended Consolidated Class Action Complaint with prejudice are granted in their entirety. The Clerk of the Court is respectfully directed to enter judgment in favor of (1) defendants Apple REIT Six, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc., Apple REIT Nine, Inc., and Apple REIT Ten,

Inc.; (2) defendants Glenn W. Bunting, Kent W. Colton, Michael S. Waters, Robert M. Wiley, Bruce H. Matson, Garnett Hill, Jr., Anthony Francis "Chip" Keating, Ronald A. Rosenfeld, David J. Adams, and Lisa B. Kern, Glade M. Knight, Bryan Peery, Apple Fund Management, LLC, Apple Suites Realty Group Inc., Apple Eight Advisors, Inc., Apple Nine Advisors, Inc., and Apple Ten Advisors, Inc.; and (3) defendants David Lerner and David Lerner Associates, Inc., and to close this case.

**SO ORDERED.**

Dated:     Brooklyn, New York
           April 3, 2013

                              _____ _/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge